**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re: : Chapter 11
:
WANSDOWN PROPERTIES CORPORATION : Case No.: 19-13223 (SMB)
N.V., :
:
Debtor. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN
### OF WANSDOWN PROPERTIES CORPORATION N.V.

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN FOR WANSDOWN PROPERTIES CORPORATION N.V. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT.**

New York, New York
December 2, 2019

RUBIN LLC
Paul A. Rubin
Hanh V. Huynh
345 Seventh Avenue, 21st Floor
New York, New York 10001
Tel: 212.390.8054
Fax: 212.390.8064
prubin@rubinlawllc.com
hhuynh@rubinlawllc.com

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR THE PURPOSES OF SOLICITING ACCEPTANCES OF THE CHAPTER 11 PLAN OF WANSDOWN PROPERTIES CORPORATION N.V., DATED DECEMBER 2, 2019 (AS THE SAME MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE "PLAN"), AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.[1]  A COPY OF THE PLAN IS ANNEXED HERETO AS EXHIBIT A.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

**ALL HOLDERS OF CLAIMS ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  IN PARTICULAR, ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VI (CERTAIN OTHER FACTORS) OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THE PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.   IN THE EVENT OF ANY CONFLICTS BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN GOVERN.**

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING WITH RESPECT TO PROJECTED CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBE HEREIN.

AS TO CONTESTED MATTERS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT ALSO WILL NOT BE CONSTRUED TO BE

---

[1] Unless otherwise expressly set forth herein, capitalized terms used but not otherwise herein defined have the same meanings ascribed to such terms in the Plan.

CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR AND DEBTOR IN POSSESSION IN THE DEBTOR'S CHAPTER 11 CASE. THE DEBTOR URGES EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON SUCH HOLDER'S CLAIM OR INTEREST.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

# I.

## INTRODUCTION

On October 8, 2019 (the "<u>Commencement Date</u>"), Wansdown Properties Corporation N.V. (the "<u>Debtor</u>") commenced with the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") a voluntary case pursuant to chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). The Debtor's chapter 11 case (the "<u>Chapter 11 Case</u>") is being administered under the caption In re Wansdown Properties Corporation N.V., Case No. 19-13223 (SMB).

On [  ], 2019, the Bankruptcy Court preliminarily approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical holder of an Allowed Claim to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The purpose of this Disclosure Statement is to provide holders of Claims entitled to vote to accept or reject the Plan with adequate information about (i) the Debtor's business and certain historical events, (ii) the Chapter 11 Case, (iii) the Plan, (iv) the rights of holders of Claims and Interests under the Plan, and (v) other information necessary to enable each Holder of a Claim entitled to vote on the Plan to make an informed judgment as to whether to vote to accept or reject the Plan. Holders of Interests are not entitled to vote on the Plan (see discussion at Section V of the Disclosure statement).

Pursuant to section 1125 of the Bankruptcy Code, the Debtor submits this Disclosure Statement to all holders of Claims against the Debtor entitled to vote on the Plan to provide information in connection with the solicitation of votes to accept or reject the Plan. The Disclosure Statement is also available to all holders of Claims against and Interests in the Debtor for informational purposes, including detailing the impact the Plan will have on such holders' Claims and Interests. The Disclosure Statement is organized as follows:

- Section I includes certain general information.
- Section II provides an overview of the Debtor.
- Section III sets forth key events leading to the Chapter 11 Case.
- Section IV discusses the Chapter 11 Case.
- Section V contains a summary of the Plan.
- Section VI describes certain risk factors affecting the Debtor.
- Section VII discusses certain U.S. federal income tax consequences of the Plan.
- Section VIII addresses confirmation of the Plan.
- Section IX concludes this Disclosure Statement and recommends that eligible creditors vote to accept the Plan.

## A.     VOTING PROCEDURES

As set forth in more detail in Section V.C of this Disclosure Statement, certain holders of Claims are entitled to vote to accept or reject the Plan. For each holder of a Claim entitled to vote, the Debtor has enclosed, along with a copy of the Disclosure Statement, among other things, a ballot and voting instructions regarding how to properly complete the ballot and submit a vote with respect to the Plan. Holders of more than one Claim will receive an individual ballot for each Claim. The individual ballots must be used to vote each individual Claim. For detailed voting instructions, please refer to the specific voting instructions and the ballot enclosed with this Disclosure Statement.

All completed ballots must be actually received by the ballot collector at the following address no later than 5:00 p.m. (Eastern Time) on January 7, 2020 (the "Voting Deadline").

Via Regular Mail, Overnight Couriers, or Hand Delivery:

> Hanh Huynh
> Rubin LLC
> 345 Seventh Avenue, 21st Floor
> New York, NY 10001

If you are holder of a Claim that is entitled to vote on the Plan and you did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting with respect to the Plan, please contact Hanh V. Huynh at (212)-390-8272 or email (hhuynh@rubinlawllc.com).

> **THE BALLOT COLLECTOR WILL NOT COUNT ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE.**

## B.     DISCLOSURE STATEMENT EXHIBITS

The following are exhibits to this Disclosure Statement. Exhibits A, B and C are included in the solicitation materials distributed with the Disclosure Statement.

- **EXHIBIT A – Liquidation Analysis**

- **EXHIBIT B – Chapter 11 Plan**

- **EXHIBIT C – Real Estate Purchase Agreement**

## C.     THE DEBTOR'S PROFESSIONALS

The Debtor has retained the following professionals pursuant to separate orders of the Bankruptcy Court: (i) Rubin LLC, as bankruptcy counsel to the Debtor, and (ii) Blank Rome LLP, as special litigation, real estate, and tax counsel to the Debtor.

## D.   IMPORTANT DATES

Please take note of the following important dates and deadlines with respect to the Debtor's Plan and proposed sale of its property thereunder:

| | |
|---|---|
| Deadline to file and serve any objection or response to the Plan (the "<u>Plan Objection Deadline</u>") | January 7, 2020 at 5:00 p.m. (prevailing Eastern Time) |
| Deadline for completed ballots to be received by the Ballot Collector (the "<u>Voting Deadline</u>") | January 7, 2020 at 5:00 p.m. (prevailing Eastern Time) |
| Scheduled date and time for the commencement of the combined hearing to consider final approval of the Disclosure Statement and confirmation of the Plan and to approve sale of the property (the "<u>Confirmation Hearing</u>") | January 14, 2020 at 10:00 a.m. (prevailing Eastern Time) |

## E.   BRIEF OVERVIEW OF THE PLAN[2]

The Plan described in this Disclosure Statement provides the Allowed Claims of creditors to be satisfied from the sale of the Debtor's Property.  The Debtor has entered into a contract to sell the Property to 29 Beekman Corp. (the "<u>Purchaser</u>"), pursuant to a residential contract of sale (the "<u>Purchase Agreement</u>") for the purchase price of $10,300,000.

As set forth herein, the Debtor has marketed the Property for over 12 months in connection with a real estate broker. Based on the interest garnered from the numerous marketing efforts, the Debtor determined that the offer made by the Purchaser to be the highest and best offer that it could currently obtain as a result of its sale efforts and represents fair and adequate consideration for the purchase of the Property.

## F.   SUMMARY OF DISTRIBUTIONS AND VOTING ELIGIBILITY

The following summary table briefly outlines the classification and treatment of Claims against and Interests in the Debtor under the Plan, and the voting eligibility of the holders of such Claims and Interests.  As set forth in the Plan, the classification of Claims and Interests set forth herein will apply.  The following summary table is qualified in its entirety by reference to the full text of the Plan.

| Class | Designation | Treatment | Entitled to Vote |
|:---:|---|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |

---

[2] This summary is qualified in its entirety by reference to the Plan. Statements as to the rationale underlying the treatment of Claims and Equity Interests under the Plan are not intended to, and will not, waive, compromise or limit any rights, claims, defenses, or causes of action in the event that the Plan is not confirmed. You should read the Plan in its entirety before voting to accept or reject the Plan.

| 2 | Real Property Tax Claims | Unimpaired | No (deemed to accept) |
|---|---|---|---|
| 3 | Secured Claims | Unimpaired | No (deemed to accept) |
| 4 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| 5 | Subordinated Unsecured Claims | Impaired | Yes |
| 6 | Existing Equity Interests | Impaired | Yes |

Section V.C of this Disclosure Statement provides a more detailed description of the treatment of Claims and Interests under the Plan.

Pursuant to the provisions of the Bankruptcy Code, only those holders of Claims or Interests in Classes that are impaired under a plan of reorganization and that are not deemed to have rejected the plan are entitled to vote to accept or reject such proposed plan. Classes of Claims or Interests in which the holders of Claims are unimpaired under a proposed plan are deemed to have accepted such proposed plan and are not entitled to vote to accept or reject the Plan. Classes of Claims or Interests in which the holders of Claims receive no distribution under a proposed plan are deemed to have rejected such proposed plan and are not entitled to vote to accept or reject the Plan.

## G.     CONFIRMATION UNDER SECTION 1129(b)

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtor reserves the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both. In addition, with respect to the Classes that are deemed to have rejected the Plan, the Debtor intends to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

Section 1129(b) permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or interests. Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and reasonable" with respect to each rejecting class.

## H.     CONFIRMATION HEARING

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on **January 14, 2020 at 10:00 a.m.** (Eastern Time) before the Honorable Stuart M. Bernstein at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Customs House, One Bowling Green, New York 10004. Objections and responses to confirmation of the Plan, if any, must be served and filed as to be received on or before the Plan Objection Deadline on **January 7, 2020 at 5:00 p.m. (prevailing Eastern Time)**, in the manner described in the order preliminarily approving this Disclosure Statement (the "Disclosure Statement Order") and Section VIII.B of this Disclosure Statement. The Confirmation Hearing may be adjourned

from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## II.

## OVERVIEW OF THE DEBTOR

### A. THE DEBTOR'S BUSINESS

The Debtor primary asset is a seven-story townhouse located at 29 Beekman Place, New York, New York (the "Property"). The Debtor was incorporated in 1979 under the laws of Curacao, in accordance with Article 38 of the Commercial Code of the Netherlands Antilles and continues to exist under the laws of the Netherland Antilles. The Debtor was formed as a holding company to own and manage the Property for an affluent individual who deceased in January 2016.

## III.

## KEY EVENTS LEADING TO THE
## COMMENCEMENT OF THE CHAPTER 11 CASE

### A. LITIGATION WITH MS. AZARI & THE SCHEDULED SHERIFF'S SALE

In 2014, the Debtor decided to sell the Property and listed it for sale. Due to the then existing market conditions, the listing was terminated and the Property removed from the market. As late as 2016, the Debtor still had several employees, including Ms. Azari. At that time, Ms. Azari was earning $9,000 a month for her services. In an effort to maintain the high standard of living that her paycheck from the Debtor provided, Ms. Azari sought to secure a commitment from the Debtor to continue paying her even though her services were no longer needed.

On April 21, 2016, the Clerk of the New York Supreme Court for the County of New York (the "State Court") entered a judgment in favor of Ms. Azari and against the Debtor in the principal amount of $2.7 million, based on a confession of judgment. On February 13, 2017, the Debtor commenced a plenary action seeking to vacate the judgment by filing a complaint (the "Complaint") in the State Court. On April 3, 2017, Ms. Azari moved to dismiss the Complaint. Following oral argument, on October 17, 2017, the State Court issued a ruling denying the motion. Ms. Azari appealed. On October 23, 2018, the Supreme Court, Appellate Division, reversed the State Court decision and entered a judgment against the Debtor. In its decision, the appellate court found that the Debtor's managing director had the authority to execute the confession of judgment on behalf of the Debtor and, as such, the judgment was proper. On July 8, 2019, Ms. Azari sought to enforce the judgment through a writ of execution.

A sheriff's sale with respect to the Property was scheduled for October 9, 2019, at 11:00 a.m. The Debtor believes that the Judgment is far in excess of the amount due Ms. Azari and entry of the judgment constitutes a fraudulent transfer.

## B.    PREPETITION MARKETING EFFORTS AND OBJECTIVES OF THE SALE PROCESS

This case has been commenced by the Debtor to protect its sole asset – the Property – and to sell it in an organized sale process, and not a fire sale, so that the Debtor will maximize its value.

In early 2019, the Debtor retained Charlie Attias, a licensed real-estate broker, at the Corcoran Group, to market and sell the property. Mr. Attias was hired based upon his experience selling similar town houses and his international background.[3] Given that the Property is situated near the United Nations, the Property was marketed to wealthy internationals and foreign governments as potential embassy space. Several embassies viewed the Property, but none made an offer. Ultimately, one buyer made an offer for $17 million, but the sale never closed and the purchaser created a cloud on title.

In April 2019, Mr. Attias re-listed the Property for $17,995,000. In or around September 2019, Mr. Attias left Corcoran and began working at Compass. After joining Compass, Mr. Attias used Compass's resources to market the Property. As a result of this process, the Property garnered interest from a number of potential buyers, but Mr. Attias was unable to procure any binding offers. Ultimately, however, the Debtor received one binding offer, which was not obtained through Mr. Attias, Corcoran, or Compass. The offer came from the Purchaser, a New York Corporation, in the amount of $10,300,000. After reviewing the offer and an arms' length negotiation, and after considering the length of the marketing process, the Debtor determined that Purchaser's offer was not only the highest, but also the best offer for the Property, because of Purchaser's willingness to structure the Purchase Agreement to reduce the Debtor's execution risk.

Thereafter, the Debtor, in consultation with its advisors, negotiated, at arms' length, the Purchase Agreement with the Purchaser.

Under the Purchase Agreement, the Purchase, among other things, has agreed to:

    (a)     pay the purchase price of $10,300,000;

    (b)     close on the sale of the Property on or before January 31, 2020;

    (c)     deliver a cash deposit of $1,030,000, which has been provided by Purchaser; and

    (d)     purchase the Property "as is" being fully aware of its physical condition and state of repair.

Collectively, these agreements of Purchaser limit the risk of Purchaser's failure to perform as required by the Purchase Agreement. It was of the utmost importance to the Debtor to reduce the execution risk regarding the Purchase Agreement, and Purchaser was the only party willing to provide a cash deposit to support its offer at a time when the Debtor was contemplating the filing of a chapter 11 case.

---

[3] https://streeteasy.com/cattias

Under the Purchase Agreement, the parties have agreed that the consummation of the transactions contemplated thereunder is subject to the Debtor's receipt of requisite authority under the Bankruptcy Code pursuant to, among other things, the entry of an order confirming a chapter 11 plan, or if not possible, then an order approving a sale of the property under section 363 of the Bankruptcy Code.

At Purchaser's insistence, the Purchase Agreement contains the following liquidated damages provision:

> If, despite Seller's petition described herein, the Bankruptcy Court orders an auction or if any higher offer is made that the Bankruptcy Court accepts, or if the Bankruptcy Court proceeding is dismissed without approval of the sale under this Contract, then, Seller and Purchaser acknowledge, Purchaser will suffer damages that will be extremely difficult to calculate, and so Purchaser shall be entitled to receive, as liquidated damages and not as a penalty, which, Seller and Purchaser acknowledge, is a reasonable estimate of such damages from any disposition in any manner of the Premises other than to Purchaser or Purchaser's assignee (except on a default by Purchaser not cured following notice), equal to: US$500,000, plus 80% of all gross proceeds of such disposition(s) that are in excess of US$10,800,000 (for clarity). This Section 5(b) shall survive termination of this Contract.

As set forth above, the Debtor determined that value will be maximized by commencing this case and seeking court approval of the Purchase Agreement.

In order to implement the terms of the Purchase Agreement, the Debtor filed for bankruptcy to stay the sheriff's sale. The Debtor believes that the Purchase Agreement represents the best means to obtain the highest amount of proceeds for a sale of the Property and concomitantly the largest amount of proceeds for distribution to unsecured creditor.

## IV.

## THE CHAPTER 11 CASE

### A.  <u>PLEADINGS</u>

Shortly after the Chapter 11 Case was filed, the Debtor filed the following initial documents:

(a)     Schedules of Assets and Liabilities

(b)     Statement of Financial Affairs

(c)     Application to Employ Rubin LLC as Bankruptcy Counsel

(d)     Application to Employ Blank Rome LLP as special litigation, real estate and tax counsel

(e) Application for an order establishing the deadline for creditors to file proofs of claim against the Debtor

By filing these pleadings, the Debtor has retained the appropriate professionals to administer the Chapter 11 Case in order to proceed with its proposed sale process and confirm a plan providing for such sale.

## B. AZARI AVOIDANCE ACTION

The Debtor intends to file a complaint against Ms. Azari to avoid, as a fraudulent transfer, the transaction memorialized by the confession of judgment discussed above in that the Debtor received no value, let alone reasonably equivalent value, for the obligations assumed by the Debtor in the confession of judgment.

## V.

## THE PLAN

## A. INTRODUCTION

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed as Exhibit B hereto. This summary is qualified in its entirety by reference to the provisions of the Plan, which provisions shall control in the event of any discrepancy with the descriptions contained in the Disclosure Statement.

In general, a chapter 11 plan divides claims and equity interests into separate classes, specifies the property that each class is to receive under the Plan, and contains other provisions necessary to implement the Plan.

Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "equity holders," are classified because creditors and equity holders may hold claims and equity interests in more than one class.

Statements as to the rationale underlying the treatment of claims and equity interests under the Plan are not intended to, and will not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

> THE DEBTOR URGES YOU TO READ THE PLAN IN ITS ENTIRETY
> BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

One of the key concepts under the Bankruptcy Code is that only claims that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below.

In general, an "allowed" claim or an "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor. Section 502(a) of the

Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed. These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or under applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damages in excess of specified amounts, late-filed claims, and contingent claims for contribution and reimbursement. In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires, for purposes of treatment and voting, that a chapter 11 plan divides the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are not necessarily classified together, nor are equity interests of a substantially similar legal nature necessarily classified together. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the Plan) or "unimpaired" (unaffected by the Plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the Plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the Plan (i) does not alter the legal, equitable and contractual rights of the holders, or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights.

Pursuant to section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the Plan. Accordingly, their votes are not solicited. Under the Plan, the following classes are unimpaired and therefore, the holders of such Claims are "conclusively presumed" to have voted to accept the Plan: Class 1 (Other Priority Claims), Class 2 (Real Property Tax Claims), Class 3 (Secured Claims), and Class 4 (General Unsecured Claims).

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan. For example, a class is deemed to reject a plan under section 1126(g) of the Bankruptcy Code if the holders of claims or equity interests in such class do not receive or retain property

under the Plan on account of their claims or equity interests.  In this plan, no class is conclusively presumed to have rejected the Plan.

**B.**     **UNCLASSIFIED CLAIMS**

*1.      Administrative Claims.*

Administrative Claims are the actual and necessary costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code.

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Debtor or Reorganized Debtor, as applicable, agree to different treatment, the Debtor (or the Reorganized Debtor as the case may be) shall pay to each holder of an Allowed Administrative Expense Claim, Cash in an amount equal to such Claim (plus statutory interest on such claim, if applicable), on or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor shall be paid from Available Cash by the Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the Bar Date Order), requests for payment of Administrative Expense Claims, other than requests for payment of Fee Claims must be filed and served on the Debtor no later than the Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.

Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtor or its property, and Administrative Expense Claims shall be deemed compromised, settled, and released as of the Effective Date. The Debtor or Reorganized Debtor, as applicable, must file and serve objections to Administrative Expense Claims on or before the Administrative Expense Claims Objection Bar Date.

*2.      Fee Claims.*

All entities seeking an award by the Bankruptcy Court of Fee Claims shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date. No later than ten (10) days prior to the Effective Date, all entities holding claims for Fee Claims shall serve upon the Debtor a notice of the estimated amount of their unpaid Fee Claim and Debtor shall segregate, at Closing of the Sale Transaction, into a Estimated Professional Fee Escrow, the amounts which are necessary to pay the amount of such Fee Claim, in full subject to Allowance

by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the date upon which the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtor or Reorganized Debtor, as applicable. The Reorganized Debtor is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

>    3.    *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course.

## C.    CLASSIFICATION OF CLAIMS AND INTERESTS

All of the potential classes of claims against the Debtor and equity interests in the Debtor are set forth in the Plan.

>    1.    *Class 1 – Other Priority Claims.*

Class 1 is unimpaired, and the holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Priority Claim against the Debtor that has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash from the Plan Fund in an amount equal to such Claim, payable on the later of the Effective Date, the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or when such claim becomes payable in the ordinary course or as soon as reasonably practical thereafter.

>    2.    *Class 2 – Real Property Tax Claims.*

Class 2 is unimpaired, and holders of Allowed Class 2 Real Property Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Real Property Tax Claims are not entitled to vote to accept or reject the Plan.

Each Holder of an Allowed Class 2 Claim shall receive Cash in an amount sufficient to satisfy the sum of the Allowed Class 2 Claim, together with all applicable interest, costs and fees payable on the Effective Date.

3.      *Class 3 – Secured Claims.*

Class 3 is unimpaired, and holders of Allowed Claims in Class 3 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Secured Claims are not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Secured Claim against the Debtor has agreed to less favorable treatment of such Claim, each holder of an Allowed Secured Claim shall receive, at the option of the Reorganized Debtor, (i) payment in full and final satisfaction of such Allowed Class 3 Claim, Cash from the Plan Fund in the amount of such Allowed Claim payable on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Claim, or as soon as reasonably practical thereafter, (ii) delivery of the collateral securing such Allowed Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code.

4.      *Class  – General Unsecured Claims.*

Class 4 is unimpaired, and holders of Allowed Claims in Class 4 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of a General Unsecured Claim against the Debtor has agreed to less favorable treatment of such Claim, each holder of an Allowed General Unsecured Claim shall receive payment in full and final satisfaction of such Allowed Class 4 Claim, Cash from the Plan Fund in the amount of such Allowed Claim payable plus accrued post-petition interest at the Federal Judgment Rate on the Effective Date, on the later of the Effective Date and the date on which such General Unsecured Claim becomes an Allowed Claim, or as soon as reasonably practical.

5.      *Class 5 – Subordinated Unsecured Claims.*

Class 5 is Impaired by the Plan, and the holders of Allowed Subordinated Unsecured Claims are entitled to vote to accept or reject the Plan.

Except to the extent that a holder of a Subordinated Unsecured Claim against the Debtor has agreed to less favorable treatment of such Claim, each holder of an Allowed Subordinated Unsecured Claim shall receive a pro rata share of the Cash remaining after (a) payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Fee Claims, and (b) payment in full of the Allowed Claims in Classes 1, 2, 3 and 4.

6.      *Class 6 – Existing Equity Interests.*

Class 6 is Impaired by the Plan, and the holders of Allowed Existing Equity Interests are entitled to vote to accept or reject the Plan.

The holders of Allowed Existing Equity Interests shall receive the Sale proceeds, if any, remaining after (i) payment of the Allowed Claims in Classes 1, 2, 3, 4 and 5 and payment in full

of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Fee Claims in full in Cash on the Effective Date.

## D.    **MEANS FOR IMPLEMENTATION**

      *1.*     *The Sale.*

The Confirmation Order shall authorize the Sale of the Property under sections 363, 365, 1123(b)(4), 1129(b)(2)(A)(iii) and 1146(a) of the Bankruptcy Code. Upon the occurrence of the Effective Date, the Confirmation Order shall authorize the Reorganized Debtor to take any and all actions necessary to consummate the Sale of the Property without further order of the Bankruptcy Court.

      *2.*     *Exemption From Certain Taxes.*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer under this Plan as confirmed by the Court, (including an instrument of transfer executed in furtherance of the sale contemplated by the Plan), shall not be subject to tax under any law imposing a stamp tax, real estate transfer tax, mortgage recording tax or similar tax due on the sale of the Property in connection with or in furtherance of the Plan as confirmed by the Court and the funding requirements contained herein and shall not be subject to any state, local or federal law imposing such tax and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

      *3.*     *Preservation of Rights of Action.*

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court order, the Reorganized Debtor, on behalf of the Estate, reserves any and all Causes of Action. On and after the Effective Date, the Reorganized Debtor may pursue such Causes of Action in its sole discretion. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtor will not pursue any and all available Causes of Action against it. The Reorganized Debtor shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Confirmation of the Plan itself.

## E. __DISTRIBUTIONS__

### 1. *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the transfer register for each of the Classes of Claims or Interests as maintained by the Debtor shall be deemed closed, and there shall be no further changes in the record of holders of any of the Claims or Interests. The Debtor or the Reorganized Debtor, as applicable, shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

### 2. *Date of Distributions.*

Except as otherwise provided herein, the Reorganized Debtor shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date and thereafter, the Reorganized Debtor shall from time to time determine the subsequent Distribution Dates, if any. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

The Reorganized Debtor shall reserve an amount sufficient to pay holders of Disputed Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims. In the event the holders of Allowed Claims have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Reorganized Debtor shall make a final distribution to all holders of Allowed Claims.

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

### 3. *Delivery of Distributions.*

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Reorganized Debtor has determined the then current address of such holder, at which time such distribution shall be made to such holder without Interest; provided, however, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date the Initial Distribution is made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Reorganized Debtor automatically and without need for a further order by the Bankruptcy Court for distribution in accordance with the Plan, and the Claim of any such holder to such property or interest in property shall be released, settled, compromised, and forever barred. The Reorganized Debtor shall have no obligation to locate the current address for a returned distribution.

4. *Payment of Disputed Claims.*

As Disputed Claims are resolved pursuant to Section 8 hereof, the Reorganized Debtor shall make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date. Such distributions shall be made on the first Distribution Date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Reorganized Debtor in the Reorganized Debtor's sole discretion.

## F.   PROCEDURES FOR DISPUTED CLAIMS

1. *Allowance of Claims.*

After the Effective Date, the Reorganized Debtor shall have and shall retain all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under this Plan. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim.

2. *Objections to Claims.*

As of the Effective Date, objections to and requests for estimation of Claims against the Debtor may be interposed and prosecuted only by the Reorganized Debtor. Such objections and requests for estimation shall be served and filed (a) on or before the 60th day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Reorganized Debtor.

3. *Estimation of Claims.*

The Debtor or Reorganized Debtor, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim(s) pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor or Reorganized Debtor, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or Reorganized Debtor, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. The aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4. *No Distributions Pending Allowance.*

No payment or distribution provided under the Plan shall be made on account of a Claim unless and until such Claim is an Allowed Claim.

5. *Resolution of Claims.*

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its estate may hold against any Person, without the approval of the Bankruptcy Court, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith. The Reorganized Debtor may pursue such retained Claims, rights, Causes of Action, suits or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtor.

6. *Disallowed Claims.*

All Claims held by persons or entities against whom or which of the Debtor or Reorganized Debtor, as applicable, has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code shall be deemed "disallowed" Claims pursuant to section 502(d) of the Bankruptcy Code and holders of such Claims shall not be entitled to vote to accept or reject the Plan. Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the Avoidance Action against such party has been settled or resolved by Final Order and any sums due to the Debtor or Reorganized Debtor, as applicable, from such party have been paid.

## G.   **EFFECT OF CONFIRMATION**

1. *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtor's Estate shall vest in the Reorganized Debtor free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided pursuant to this Plan and the Confirmation Order.

2. *Release of Liens.*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Reorganized Debtor, unless sold to the Purchaser pursuant to the Sale Transaction.

3. *Subordination of Claims or Interests.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, under section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtor or Reorganized Debtor, as applicable, reserves the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

4. *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtor, and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

5. *Term of Injunctions or Stays.*

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

6. *Plan Injunction.*

Except (i) as otherwise provided under Final Order entered by the Bankruptcy Court or (ii) with respect to the Debtor's obligations under the Plan, the entry of the Confirmation Order shall forever stay, restrain and permanently enjoin with respect to any Claim held against the Debtor as of the date of entry of the Confirmation Order (i) the commencement or continuation of any action, the employment of process, or any act to collect, enforce, attach, recover or offset from the Debtor, from the Property, or from property of the Estate that has been or is to be distributed under the Plan, and (ii) the creation, perfection or enforcement of any lien or encumbrance against the Property and any property of the Estate that has been or is to be, distributed under the Plan. Except as otherwise provided in the Confirmation Order, the entry of the Confirmation Order shall constitute an injunction against the commencement or continuation of any action, the employment of process, or any act to collect, recover or offset from the Debtor, from the Property, or from property of the Estate, any claim, any obligation or debt that was held against the Debtor by any person or entity as of the Confirmation Date except pursuant to the terms of this Plan. The entry of the Confirmation Order shall permanently enjoin all Creditors, their successors and assigns, from enforcing or seeking to enforce any such Claims.

7. *Limitation of Liability.*

To the extent permitted under section 1125(e) of the Bankruptcy Code, neither the Exculpated Parties nor any of their respective officers, directors, or employees (acting in such

capacity) nor any professional person employed by any of them, shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, the Disclosure Statement, the Plan Supplement or the any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan, provided that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement, except in the case of fraud, gross negligence, willful misconduct, malpractice, breach of fiduciary duty, criminal conduct, unauthorized use of confidential information that causes damages, or ultra vires acts. Nothing in this Section 11.7 shall limit the liability of the Debtor's professionals pursuant to Rule 1.8 (h)(1) of the New York State Rules of Professional Conduct. Nothing in the Plan or the confirmation order shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Debtor or any of its respective members, shareholders, officers, directors, employees, attorneys, advisors, agents, representatives and assigns, nor shall anything in the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Debtor or any of its respective members, officers, directors, employees, attorneys, advisors, agents, representatives and assigns for any liability whatever, including without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in this Plan exculpate Debtor or any of its respective members, officers, directors, employees, attorneys, advisors, agents, representatives and assigns from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority.

8.      *Debtor Release.*

Except as otherwise provided in the Plan, upon the Effective Date, in consideration of the Cash and other property to be distributed to or on behalf of the holders of Claims and Interests under the Plan, the Plan shall be deemed to resolve all disputes and constitute a settlement and release, between and among the Debtor, on the one hand, and each Creditor and Interest Holder, on the other, from any claim or liability, whether legal, equitable, contractual, secured, unsecured, liquidated, unliquidated, disputed, undisputed, matured, unmatured, fixed or contingent, known or unknown, that the Debtor, its Creditors or Interest Holder ever had or now have through the Effective Date in connection with their Claim or Interest (including, without limitation, any claims the Debtor may assert on its own behalf or on behalf of Creditors or Interest Holders pursuant to sections 510 and 542 through 553 of the Bankruptcy Code, any claims Creditors or Interest Holders may have asserted derivatively on behalf of the Debtor absent bankruptcy, any claims based on the conduct of the Debtor's business affairs prior or subsequent to the commencement of the Case or any claims based on the negotiation, submission and confirmation of the Plan).

9. *Plan Supplement.*

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court by no later than the Plan Supplement Filing Deadline. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

## H.    MISCELLANEOUS PROVISIONS

1. *Amendments.*

(a)    *Plan Modifications*. Plan may be amended, modified or supplemented by the Debtor in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code; provided that such amendments, modifications, or supplements shall be satisfactory in all respects to the Debtor. In addition, after the Confirmation Date, the Debtor may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

(b)    *Other Amendments*. Before the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

2. *Revocation or Withdrawal of Plan.*

The Debtor reserves the right to revoke or withdraw the Plan, prior to the Confirmation Date. If the Debtor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtor, the Debtor's Estates, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor, the Debtor's Estates, or any other Entity.

## VI.

## CERTAIN RISK FACTORS AFFECTING THE DEBTOR

## A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

1. *Risk of Non-Confirmation of the Plan.*

Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will

reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.

> *2.*      *Non-Consensual Confirmation.*

In the event any impaired class of claims or interests entitled to vote on a plan of reorganization does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

## B.      <u>ADDITIONAL FACTORS TO BE CONSIDERED</u>

> *1.*      *The Debtor Has No Duty to Update.*

The statements contained in this Disclosure Statement are made by the Debtor as of the Commencement Date, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

> *2.*      *No Representation Outside This Disclosure Statement Are Authorized.*

No representations concerning or related to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

> *3.*      *No Legal or Tax Advice Is Provided to You by This Disclosure Statement.*

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interests should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

> *4.*      *No Admission Made.*

Nothing contained in the Plan will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or on holders of Claims or Interests.

*5.      Failure to Identify Litigation Claims or Projected Objections.*

No reliance should be placed on the fact that particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtor may seek to investigate, file, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

*6.      No Waiver of Right to Object or Right to Recover Transfers and Assets.*

The vote by a holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtor (or any entity, as the case may be) to object to that holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtor or its Estate are specifically or generally identified in this Disclosure Statement.

*7.      Information Was Provided by the Debtor and Was Relied Upon by the Debtor's Advisors.*

The Debtor's advisors have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement. Although the Debtor's advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

**VII.**

**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and to certain holders of Allowed Claims. This summary does not address the U.S. federal income tax consequences to holders of Claims whose Claims are entitled to payment in full in Cash, holders of Secured Claims or holders of Claims or Interests who are deemed to have rejected the Plan.

This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "Tax Code"), existing and proposed U.S. Treasury regulations (the "Treasury Regulations"), judicial decisions, and published rules and of the Internal Revenue Service (the "IRS") as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Debtor has not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan. This summary does not address state, local or foreign income or other tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as non-U.S. persons, broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred

accounts, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, any other Debtor entity, persons holding securities as part of a hedging, straddle, conversion or constructive sale transaction or other integrated investment, traders in securities that elect to use a mark-to-market method of accounting for their security holding, dealers in securities or foreign currencies, persons whose functional currency is not the U.S. dollar, certain expatriates or former long term residents of the United States, persons who received their Claim as compensation or who acquired their Claim in the secondary market, and persons subject to the alternative minimum tax or the "Medicare" tax on net investment income). Additionally, this discussion does not address the Foreign Account Tax Compliance Act.

The following discussion generally assumes that, the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form, that the Plan will be treated as a plan of liquidation of the Debtor for U.S. federal income tax purposes, and that all distributions to holders of Claims and Interests will be taxed accordingly.

**ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR _INFORMATIONAL_ PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.**

## A.    <u>CONSEQUENCES TO THE DEBTOR</u>

As indicated above, the Debtor intends to treat the Plan as a plan of liquidation for U.S. federal income tax purposes in that the Debtor will remain in existence following the Effective Date solely for the purpose of winding up their affairs including, but not limited to, resolving outstanding Claims, selling their assets and distributing the proceeds and any remaining property to or for the benefit of holders of Allowed Claims and Interests. The U.S. federal income tax impact of the Plan on the NOLs and other tax attributes of the Debtor is further discussed below.

*1.    Sale and Other Dispositions of Assets.*

The Plan authorizes the Debtor to take any and all actions necessary to consummate the sale of the Property. The Tax Code as cancellation of debt income ("<u>CODI</u>"), upon the elimination or reduction of debt for insufficient consideration. The Tax Code provides an exception to such income recognition treatment for any CODI arising in bankruptcy, but generally requires the debtor to reduce certain of its tax attributes – such as current year NOLs, NOL carryforwards, tax credits, capital losses and tax basis in assets – by the amount of any such CODI that arises by reason of the discharge of the debtor's indebtedness in the bankruptcy case. CODI is generally the amount by which the adjusted issue price of indebtedness discharged exceeds the sum of the amount of cash and the fair market value of any other property given in exchange therefore. Any reduction in tax attributes under the CODI rules does not occur until the end of the tax year after such attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the tax year in which the CODI

occurs. Accordingly, consistent with the intended treatment of the Plan as a plan of liquidation for U.S. federal income tax purposes, the Debtor expects that no CODI should be incurred by a Debtor as a result of the implementation of the Plan prior to the disposition by such Debtor of all or substantially all of its assets. In such case, the reduction of tax attributes resulting from such CODI (which, as indicated above, only occurs as of the end of the tax year in which the CODI occurs) generally should not have a material impact on the Debtor.

The Debtor's ability to utilize its NOL carryforwards and certain other tax attributes could be subject to limitation if the Debtor underwent or were to undergo an ownership change within the meaning of section 382 of the Tax Code by reason of the implementation of the Plan or otherwise. Nevertheless, there can be no assurance that all or a substantial amount of the CODI will not be incurred prior to the disposition of the Property, or that an ownership change will not occur upon consummation of the Plan due to, among other things, a lack of authoritative IRS guidance as to when CODI occurs in the context of a liquidating Chapter 11 plan. In such event, the Debtor could incur a material amount of U.S. federal income tax in respect of the sale of the Property depending, in part, on the amount realized upon the disposition of such assets and the then tax basis of the assets.

     *2.    Alternative Minimum Tax.*

In general, a U.S. federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing AMT taxable income, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

## B.   CONSEQUENCES TO HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS

     *1.    Recognition of Gain or Loss.*

The U.S. federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, upon the origin of the holder's Claim, when the holder receives payment in respect of such Claim, whether the holder reports income using the accrual or cash method of tax accounting, whether the holder acquired its Claim at a discount, whether the holder has taken a bad debt deduction or worthless security deduction with respect to such Claim, and/or whether (as intended and herein assumed) the Plan is treated as a plan of liquidation for U.S. federal income tax purposes. A holder of a Claim should consult its tax advisor regarding the timing and amount of any potential bad debt deduction.

Generally, a holder of an Allowed Claim will recognize gain or loss with respect to its Allowed Claim) in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any other property received by the holder and (ii) the adjusted tax basis of the Allowed Claim exchanged therefore (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). As discussed below, the

amount of Cash or other property received in respect of Claims for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a holder under its method of accounting. See Section B.2.— "Allocation of Consideration to Interest."

Consistent with the treatment of the Plan as a plan of liquidation, any loss realized by a holder of a Claim may not be recognizable until all of the distributions to such holder are received.

When gain or loss is recognized, such gain or loss may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the holder and has been held for more than one year. Each holder of an Allowed Claim should consult its tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such holder.

2. *Allocation of Consideration to Interest.*

All distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for U.S. federal income tax purposes), with any excess allocated to accrued but unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. In general, to the extent any amount received (whether stock, cash, or other property) by a holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as ordinary interest income (if not previously included in the holder's gross income under the holder's normal method of accounting). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.

Each holder of an Allowed Claim is urged to consult its own tax advisors regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

## C. WITHHOLDING ON DISTRIBUTIONS AND INFORMATION REPORTING

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, a holder of an Allowed Claim that is a not a U.S. person may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether

the type of income is subject to a lower treaty rate. As to certain Claims, it is possible that withholding may be required with respect to Distributions by the Debtor even if no withholding would have been required if payment was made prior to the Chapter 11 Case. A non-U.S. holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders. Non-U.S. holders are urged to consult their tax advisors regarding potential withholding on Distributions by the Debtor.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

## VIII.

## CONFIRMATION OF THE PLAN

### A.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan. The Bankruptcy Court has scheduled the Confirmation Hearing to commence on January 14, 2020 at 10:00 a.m. (Eastern Time). The Confirmation Hearing may be adjourned from time-to-time by the Debtor or the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

### B.    OBJECTIONS

Section 1128 of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### C.    REQUIREMENTS FOR CONFIRMATION OF THE PLAN

1.    *Requirements of Section 1129(a) of the Bankruptcy Code.*

a.    **General Requirements**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(i)      The Plan complies with the applicable provisions of the Bankruptcy Code.

(ii)     The Debtor has complied with the applicable provisions of the Bankruptcy Code.

(iii)    The Plan has been proposed in good faith and not by any means proscribed by law.

(iv)    Any payment made or promised by the Debtor or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been approved or is subject to the approval of the Bankruptcy Court as reasonable.

(v)     The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a plan with the Debtor, or a successor to the Debtor under the Plan, and the appointment to, or continuance in, such office of such individual is with the interests of creditors and equity holders and with public policy.

(vi)    With respect to each Class of Claims or Interests, each holder of an Impaired Claim or Impaired Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtor was liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test" below.

(vii)   Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of Claims or Interests has either accepted the Plan or is not impaired under the Plan.

(viii)  Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative and priority claims will be paid in full on the Effective Date.

(ix)    At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

(x)     Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor or any successor to the

Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.  See "Feasibility Analysis" below.

(xi)    All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

### b.    Best Interests Test

As noted above, the Bankruptcy Code requires that each holder of an Claim or Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.  This requirement is referred to as the "best interests test."

The best interests test requires the Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtor believes that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtor's belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the Liquidation Analysis set forth at Exhibit A.

The Liquidation Analysis is a comparison of (i) the estimated recoveries for creditors and equity holders of the Debtor that may result from the Plan and (ii) an estimate of the recoveries that may result from a hypothetical chapter 7 liquidation.  The Liquidation Analysis is based upon a number of significant assumptions which are described therein.  The Liquidation Analysis is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtor, subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that the Bankruptcy Court will accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### c.    Liquidation Analysis

The Debtor has concluded that the Plan provides to each Creditor and Interest Holder recovery with a present value at least equal to the present value of the distribution which such person would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.  The Plan provides for a sale of the Property through an organized arm's length transaction. If a sale of the Property were to occur in a chapter 7 liquidation, the Property would likely be sold through a

depressed auction sale at a lower price, while the administrative burden (including state and federal taxes) would increase the amount of liabilities that get deducted from the proceeds of the sale, and ultimately decreasing the amount available to creditors.

The Debtor further believes that the net effect of a conversion of this case to chapter 7 would be to (i) increase the administrative expenses of the estate and (ii) decrease the funds available for non-administrative creditors. In such event, the amount of funds available to unsecured creditors for distribution would be substantially less.

While the Debtor believes the assumptions underlying the Liquidation Analysis are reasonable, the validity of such assumptions may be affected by the occurrence of events, and the existence of conditions not now contemplated or by other factors, many of which will be beyond the control of the Bankruptcy Court, the Debtor and any trustee appointed for the Debtor. The actual liquidation value of the Debtor may vary from that considered herein and the variations may be material

### d. Feasibility Analysis

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless contemplated by the Plan. The Plan provides for the sale of substantially all of the Debtor's assets and the distribution of the proceeds of such sale. Thus, the Plan provides for the total liquidation of the Debtor's assets and therefore meets the feasibility tests of section 1129.

### 2. *Requirements of Section 1129(b) of the Bankruptcy Code.*

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of Claims or Interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

### a. No Unfair Discrimination

The "no unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan. A chapter 11 plan of reorganization does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its claims or equity interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtor believes that, under the Plan, all impaired classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of other classes of Claims and Interests having the same priority. Accordingly, the Debtor believes the Plan does not discriminate unfairly as to any impaired class of Claims or Interests.

### b. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. The test sets forth different standards for what is fair and equitable, depending on the type of claims or interests in such class. In order to demonstrate that a plan is "fair and equitable," the plan proponent must demonstrate the following:

(i)  *Secured Creditors*.  With respect to a class of impaired secured claims, a proposed plan must provide the following:  (a) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estates' interest in such property, or (b) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) or (c) of this paragraph, or (c) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim.  There are two impaired classes of Secured Claims.  Class 2 Real Property Tax Claims will either be paid in full or retain their liens in the same priority as before the Commencement Date.

(ii)  *Unsecured Creditors*.  With respect to a class of impaired unsecured claims, a proposed plan must provide the following:  either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

With respect to Unsecured Creditors, the absolute priority rule allows the confirmation of a Plan over the rejection of a class of Unsecured Claims if the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the Plan on account of such junior claim or interest any property.  As subordinated claims and equity interests in the Debtor are only receiving a distribution if all claims senior are paid in full, there is no class of claims or interests junior to the unsecured creditor class that is to receive payment under the Plan or retain any interest in any property under the Plan.

(iii)  *Holders of Equity Interests*.  A plan is fair and equitable as to a class of equity interests if that class of equity interests receives its liquidation preference, its fixed redemption price or its value.  The Plan is fair and equitable as to the Holders of Interests because they are receiving a distribution only after all other distributions are made pursuant to the Plan.  Thus, the Holders Interests are receiving the value of their equity interest in the Debtor.

### c. Application to the Plan

As to any Class that may reject the Plan, the Debtor believes the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirements, because, as to any such dissenting Class, there is no Class of equal priority receiving more favorable treatment,

and such Class will either be paid in full, or no Class that is junior to such a dissenting Class will receive or retain any property on account of the Claims or Interests in such Class.

### 3. Alternative to Confirmation and Consummation of the Plan.

The Debtor has evaluated several alternatives to the Plan. After studying these alternatives, the Debtor has concluded that the Plan is the best option for the Debtor and its estate and will maximize recoveries to parties-in-interest—assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan include a sale of the Property under section 363 of the Bankruptcy Code or a liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

### a. Section 363 Sale

If the Plan is not confirmed, the Debtor could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell the Property and other assets under section 363 of the Bankruptcy Code. **Indeed, the form of Asset Purchase Agreement will require any Purchaser to consummate a sale under section 363 in the event that the Plan is not confirmed**.

### b. Liquidation Under Chapter 7

In a chapter 7 case, a trustee is appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

Substantially all of the Debtor's assets are being sold through the proposed Sale Transaction under the Plan. The Debtor believes that the Plan provides a greater recovery to Holders of Allowed General Unsecured Claims than would a chapter 7 liquidation for several reasons. First, liquidation under chapter 7 of the Bankruptcy Code would both decrease the aggregate proceeds available to holders of Claims and Interests and increase the magnitude of claims to those proceeds. Specifically, the Plan contemplates that the Debtor sell the Property through a sale that is the result of substantial marketing and not a liquidation fire sale. A liquidation of the Property under chapter 7 would be less orderly and would yield only the liquidation value of the Property, not its fair market value.

The Debtor believes that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a chapter 7 trustee and its retained professionals would cause a substantial diminution in the value of the Debtor's assets. The assets available for distribution to creditors would be reduced by such additional expenses and by the Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts.

Based on the Debtor's analysis, it is probable that a liquidation of the Debtor's assets under a chapter 7 liquidation would result in smaller distributions being made to creditors than those provided for under the Plan because of (i) the likelihood that the assets of the Debtor would have to be sold or otherwise disposed of in a less orderly fashion over a short period of time, and (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the chapter 7 liquidation process. Accordingly, the Debtor believes that the Plan is in the best interests of creditors.

### c. Alternative Plans

The Debtor does not believe that there are any alternative plans for the reorganization or liquidation of the Debtor's Estate that would, or indeed could, yield a better result for its creditors that the current proposed plan. The Debtor believes that the Plan, as described herein, enables Holders of Claims and Interests to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

### 4. *Nonconsensual Confirmation.*

In the unlikely circumstance that any impaired Class of Claims entitled to vote will not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtor reserves the right to amend the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both. With respect to impaired Classes of Claims that are deemed to reject the Plan, the Debtor would request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

## IX.

## CONCLUSION

The Debtor believes that confirmation and implementation of the Plan is in the best interests of all creditors, and urges holders of impaired Claims to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than the Voting Deadline, January 7, 2020 at 5:00 p.m. (prevailing Eastern Time).

Dated: December 2, 2019
New York, New York

## EXHIBIT A

### Liquidation Analysis

This Liquidation Analysis compares the potential distributions to creditors under chapter 7 of the Bankruptcy Code and the proposed distributions under the Debtor's Chapter 11 Plan (the "Plan") proposed by Wansdown Properties Corportion N.V. (the "Debtor"). Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

Pursuant to the Plan, the Debtor will sell the Property to the Purchaser. Thus, the Debtor's remaining asset will be its available cash from the proceeds of the sale to the Purchaser.

| Potential Distribution In A Chapter 7 Liquidation | | |
|---|---:|---|
| **Assets** | | |
| Projected Available Cash (as of 1/31/20) | **$10,300,000.00** | |
| | | |
| **Estimated Distributions to Administrative and Priority Claims** | | |
| Chapter 7 Trustee Fees | $332,250 | |
| Chapter 7 Professional Fee Claims | $50,000 | |
| Chapter 11 Professional Fee Claims | $150,000 | |
| Administrative Claims | $0 | |
| Priority Tax Claims | $452,963 | |
| | | |
| Total Est. Admin. and Priority Claims | $985,213 | |
| | | |
| **Estimated Distribution to Other Claims** | | |
| Secured Claims | $8,811,543 | |
| Available Distribution to General Unsecured Claims (total Claims of $8,244,779, including Subordinated Unsecured Claims that holders of such claims would no longer consent to be subordinated) | $503,244 | *Pro rata distribution of 6% to general unsecured creditors* |

| Proposed Distributions Under Debtor's Chapter 11 Plan | | |
|---|---|---|
| **Assets** | | |
| Projected Available Cash (as of 1/31/20) | **$10,300,000.00** | |
| | | |
| **Estimated Distributions to Administrative and Priority Claims** | | |
| Statutory Fees | $103,000 | |
| Administrative Claims | $0 | |
| Fee Claims | $150,000 | |
| Priority Tax Claims | $66,026 | |
| | | |
| Total Est. Admin. and Priority Tax Claims | $319,026 | |
| | | |
| **Estimated Plan Distributions** | | |
| | | |
| Class 1 Other Priority Claims | $0 | |
| Class 2 Real Property Tax Claims | $386,937 | |
| Class 3 Secured Claims | $8,811,543* | *Includes claim of Azari for $3.4 million, which will be contested |
| Class 4 General Unsecured Claims (total $764,779) | $764,779 | ***Pro rata distribution of 100% for General Unsecured Claims** |
| Class 5 – Subordinated Unsecured Claims (total $7,480,000) | $17,715* | *Distribution to subordinated creditor claim of $7,480,000 will be increased to the extent Azari claim is disallowed |
| Class 6 – Existing Equity Interests | $0 | |

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :
In re:                                            :        Chapter 11
                                                  :
WANSDOWN PROPERTIES CORPORATION                   :        Case No.:  19-13223 (SMB)
N.V.,                                             :
                                                  :
                    Debtor.                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## <u>CHAPTER 11 PLAN</u>


New York, New York
December 2, 2019

RUBIN LLC
Paul A. Rubin
Hanh V. Huynh
345 Seventh Avenue, 21st Floor
New York, New York 10001
Tel: 212.390.8054
Fax: 212.390.8064
prubin@rubinlawllc.com
hhuynh@rubinlawllc.com

**Wansdown Properties Corporation N.V.**, the Debtor herein proposes the following chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Section 1.A.

## SECTION 1.    DEFINITIONS AND INTERPRETATION

### A.    Definitions

1.1    ***Administrative Expense Claim*** means any Claim for costs and expenses of Administration during the Chapter 11 Case pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code, including, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estate and operating the business of the Debtor (such as wages, salaries or commissions for services and payments for goods and other services and leased premises); (b) Fee Claims and (c) all fees and charges assessed against the Estates pursuant to section 1911 through 1930 of chapter 123 of title 28 of the United States Code, 28 U. S. C. §§ 1-1401.

1.2    ***Administrative Expense Claims Bar Date*** means the first Business Day that is 30 days following the Effective Date, except as otherwise specifically set forth in the Plan.

1.3    ***Administrative Expense Claims Objection Bar Date*** means the first Business Day that is 90 days following the Effective Date, except as otherwise specifically set forth in the Plan; provided that the Administrative Claims Objection Bar Date may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the Reorganized Debtor after notice and a hearing.

1.4    ***Allowed*** means, (i) with reference to any Claim (a) any Claim against the Debtor that has been listed by the Debtor in its Schedules, as such Schedules may be amended by the Debtor from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed, (b) any Claim listed on the Schedules or included in a timely filed proof of Claim, as to which no objection to allowance has been, or subsequently is, interposed in accordance with 7.9 hereof or prior to the expiration of such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such Final Order is in favor of the respective holder, or (c) any Claim expressly allowed by a Final Order.

1.5    ***Available Cash*** means all Cash of the Debtor realized from its business operations, the sale or other disposition (other than the Sale Transaction) of its assets, the interest earned on its invested funds, recoveries from Causes of Action or from any other source or otherwise.

1.6    ***Avoidance Action*** means any action commenced, or that may be commenced, before or after the Effective Date pursuant to section 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code.

1.7    ***Bankruptcy Code*** means title 11 of the United States Code, 11 U. S. C. §§ 101, et seq., as amended from time to time, as applicable to the Chapter 11 Case.

1.8     ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Case and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Case under section 151 of title 28 of the United States Code.

1.9     ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Case, and any Local Rules of the Bankruptcy Court.

1.10    ***Bar Date Order*** means that certain order to entered on November 6, 2019 by the Court establishing the last date for creditors that are governmental units to file claims against the Debtor's estate.

1.11    ***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.12    ***Cash*** means legal tender of the United States of America.

1.13    ***Causes of Action*** means any action, Claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. Cause of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Avoidance Action; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.14    ***Chapter 11 Case*** means the above-captioned case under chapter 11 of the Bankruptcy Code commenced by the Debtor on October 8, 2019.

1.15    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.16    ***Claims Objection Bar Date*** means the first Business Day that is 90 after the Effective Date; provided that the Claims Objection Bar Date may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the Reorganized Debtor.

1.17    ***Class*** means any group of Claims or Interests classified pursuant to Section 3.1 of the Plan.

1.18    ***Commencement Date*** means October 8, 2019.

1.19     **Confirmation** means the entry on the docket of the Chapter 11 Case of the Confirmation Order.

1.20     **Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.21     **Confirmation Hearing** means the hearing to be held by the Bankruptcy Court regarding Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.22     **Confirmation Order** means an order of the Bankruptcy Court in form and substance reasonably acceptable to the Debtor confirming the Plan and approving the Sale Transaction.

1.23     **Consummation** means the occurrence of the Effective Date of the Plan.

1.24     **Cure Obligation** means all (a) amounts (or such other amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults; and (b) other obligations required to cure any non-monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed by the Debtor pursuant to sections 365 or 1123 of the Bankruptcy Code.

1.25     **Debtor** means Wansdown Properties Corporation N.V.

1.26     **Disclosure Statement** means the Disclosure Statement for the Plan which is prepared and distributed in accordance with sections 1125, 1126(b) and/or 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and/or other applicable law.

1.27     **Disputed Claim** means with respect to a Claim or Interest, any such Claim or Interest (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503 or 1111 of the Bankruptcy Code, or (b) for which a Proof of Claim or Interest has been filed, to the extent the Debtor or any party in interest has interposed a timely objection or request for estimation before the Confirmation Date in accordance with the Plan, which objection or request for estimation has not been withdrawn or determined by a Final Order.

1.28     **Distribution Date** means a date or dates, including the Initial Distribution Date, as determined by the Reorganized Debtor in accordance with the terms of the Plan, on which the Reorganized Debtor makes a distribution to holders of Allowed Claims.

1.29     **Distribution Record Date** means the Effective Date of the Plan.

1.30     **Effective Date** means the date on which all conditions to the effectiveness of the Plan set forth in Section 11 hereof have been satisfied or waived in accordance with the terms of the Plan.

1.31     **Entity** has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.32     ***Estate*** means the estate of the Debtor created under section 541 of the Bankruptcy Code.

1.33     ***Estimated Professional Fee Escrow*** means the escrow account established under the Plan ten (10) days prior to the Effective Date holding sufficient Cash to pay the Fee Claims in full, subject to their Allowance by the Bankruptcy Court upon the later of (i) the Effective Date of (ii) the date upon which the order relating to any such Allowed Fee Claim is entered or (iii) upon such other terms and conditions as may be agreed to between the holder of such an Allowed Fee Claim and the Debtor or the Reorganized Debtor, as applicable.

1.34     ***Exculpated Parties*** means collectively: (a) the Debtor; and (b) the Purchaser; and (c) with respect to each of the foregoing entities in clauses (a) through (b), such entities' successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals, and such persons' respective heirs, executors, Estates, servants and nominees, in each case in their capacity as such.

1.35     ***Executory Contract*** means a contract or lease to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.36     ***Existing Equity Interests*** means all Interests in the Debtor, including membership interests or the rights to acquire any such Interests.

1.37     ***Fee Claim*** means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by professional persons retained by the Debtor pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Case.

1.38     ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

1.39     ***General Unsecured Claim*** means any unsecured Claim that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

1.40     *Governmental Unit* has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.41     *Impaired* means, with respect to a Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

1.42     *Initial Distribution* means the first distribution that the Reorganized Debtor makes to holders of Allowed Claims.

1.43     *Initial Distribution Date* means the date selected by the Debtor or the Reorganized Debtor, as applicable, on or as soon as reasonably practicable after the Effective Date.

1.44     *Interests* means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all instruments evidencing an ownership interest in the Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interests in the Debtor that existed immediately before the Effective Date.

1.45     *Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.46     *Other Priority Claim* means any Claim against the Debtor entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

1.47     *Person* means an individual, corporation, partnership, joint venture, association, Joint Stock Company, Limited Liability Company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit or other entity.

1.48     *Plan* means this chapter 11 plan, including the exhibits hereto and the Plan Supplement, as the same may be amended or modified from time to time in accordance with Section 14.4 herein.

1.49     *Plan Fund* means the amount of Cash available to the Debtor on the Effective Date from the sale of the Property, if any, which, when added to the Available Cash held by the Debtor on the Effective Date, will be utilized to fund the payment of Allowed Claims and Allowed Administrative Claims, Priority Tax Claims and Fee Claims (including the Estimated Professional Fee Escrow, if any) in their order of priority as provided for in this Plan and to fund Disputed Claim Reserves with respect to such claims.

1.50     *Plan Supplement* means the compilation of documents containing, among other things, the Schedule of Cure Costs, if any, the Purchase Agreement, and information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; provided that, through the Effective Date, the Debtor shall have the right to amend any schedules, exhibits, and the other documents contained in, and exhibits to, the Plan Supplement.

1.51     *Plan Supplement Filing Deadline* means the date that is five (5) business days prior to the commencement of the Confirmation Hearing.

1.52    ***Priority Tax Claim*** means any unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.53    ***Pro Rata*** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims and Disputed Claims within such Class.

1.54    ***Proof of Claim*** means a proof of Claim filed against the Debtor in its Chapter 11 Case.

1.55    ***Property*** means the real property and improvements thereon located at 29 Beekman Place, New York, New York and owned by the Debtor.

1.56    ***Purchase Agreement*** means a Residential Contract of Sale, in form attached to the Plan Supplement, which provides for the sale of the Property to the Purchaser and determined by the Debtor to reflect the highest or otherwise best offer for the Property.

1.57    ***Purchaser*** means 29 Beekman Corp.

1.58    ***Reorganized Debtor*** means the entity to be formed to receive the Sale Proceeds, make distributions to creditors under the Plan, and otherwise perform the post-Confirmation obligations of the Debtor.

1.59    ***Sale Proceeds*** means the proceeds from the Sale Transaction net of closing costs including but not limited to Debtor's brokerage fees, title costs and other ordinary and necessary costs of, or credits related to, the transfer of title to the Property.

1.60    ***Sale Transaction*** means the sale of the Property pursuant to the Plan.

1.61    ***Schedule of Cure Costs*** means the schedule of cure costs, if any, required to be paid by the Debtor in accordance with section 365 of the Bankruptcy Code in connection with the assumption and assignment of Executory Contracts and Unexpired Leases to be assumed by the Debtor under the Plan and to be filed with the Plan Supplement.

1.62    ***Schedules*** means the schedules of assets and liabilities and the statement of financial affairs filed by the Debtor under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time.

1.63    ***Secured Claim*** means a Claim to the extent (i) secured by property of the Estate, the amount of which is equal to or less than the value of such property (A) as set forth in the Plan, (B) as agreed to by the holder of such Claim and the Debtor or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

1.64    ***Subordinated Unsecured Claim*** means a Claim that would otherwise be a General Unsecured Claim that is legally (by virtue of the applicable laws and rules) or by agreement subordinated as to payment to such General Unsecured Claims.  Pursuant to section 510 of the Bankruptcy Code, the Debtor or Reorganized Debtor, as applicable, may seek entry of an order to

re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

1.65 **Unimpaired** means, with respect to a Claim, Interest or Class of Claims or Interests, that such Claim or Interest is not "impaired" within the meaning of section 1123(a)(4) and 1124 of the Bankruptcy Code.

B. **Interpretation; Application of Definitions and Rules of Construction**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained therein. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C. **Controlling Document**

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the Plan shall control (unless stated otherwise in the Plan). The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; provided that, if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

**SECTION 2.        ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS**

2.1 **Administrative Expense Claims**.

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Debtor or Reorganized Debtor, as applicable, agree to different treatment, the Debtor (or the Reorganized Debtor as the case may be) shall pay to each holder of an Allowed Administrative Expense Claim, Cash in an amount equal to such Claim (plus statutory interest on such claim, if applicable), on or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided that

Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor shall be paid from Available Cash by the Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the Bar Date Order), requests for payment of Administrative Expense Claims, other than requests for payment of Fee Claims must be filed and served on the Debtor no later than the Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.

Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtor or its property, and Administrative Expense Claims shall be deemed compromised, settled, and released as of the Effective Date. The Debtor or Reorganized Debtor, as applicable, must file and serve objections to Administrative Expense Claims on or before the Administrative Expense Claims Objection Bar Date.

### 2.2     *Fee Claims*.

All entities seeking an award by the Bankruptcy Court of Fee Claims shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date. No later than ten (10) days prior to the Effective Date, all entities holding claims for Fee Claims shall serve upon the Debtor a notice of the estimated amount of their unpaid Fee Claim and Debtor shall segregate, at Closing of the Sale Transaction, into a Estimated Professional Fee Escrow, the amounts which are necessary to pay the amount of such Fee Claim, in full subject to Allowance by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the date upon which the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtor or Reorganized Debtor, as applicable.  The Reorganized Debtor is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

### 2.3     *Priority Tax Claims*.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course.

**SECTION 3.          CLASSIFICATION OF CLAIMS AND INTERESTS**

3.1     *Classification in General*.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

3.2     *Summary of Classification*.

The following table designates the Classes of Claims against and Interests in the Debtor and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and, thus, are excluded from the classes of Claims and Interests set forth in this Section 3. All potential Classes for the Debtor are set forth herein. The Debtor may not have holders of Claims or Interests in a Class or Classes, and such Classes shall be treated as set forth in Section 3.4.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Real Property Tax Claims | Unimpaired | No (deemed to accept) |
| 3 | Secured Claims | Unimpaired | No (deemed to accept) |
| 4 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| 5 | Subordinated Unsecured Claims | Impaired | Yes |
| 6 | Existing Equity Interests | Impaired | Yes |

3.3     *Special Provision Governing Unimpaired Claims*.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtor or the Reorganized Debtor in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.4     *Elimination of Vacant Classes*.

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

3.5     *Voting Classes.; Presumed Acceptance by Non-Voting Classes*.

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtor shall request the Bankruptcy Court at the Confirmation Hearing to deem the Plan accepted by the holders of such Claims or Interests in such Class.

3.6     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*.

The Debtor shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtor reserves the right to modify the Plan, in accordance with Article XI hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## SECTION 4.        TREATMENT OF CLAIMS AND INTERESTS

4.1     *Other Priority Claims (Class 1)*.

(a)     *Classification*: Class 1 consists of Allowed Other Priority Claims against the Debtor.

(b)     *Treatment*: Except to the extent that a holder of an Allowed Other Priority Claim against the Debtor that has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash from the Plan Fund in an amount equal to such Claim, payable on the later of the Effective Date, the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or when such claim becomes payable in the ordinary course or as soon as reasonably practical thereafter.

(c)     *Voting*: Class 1 is Unimpaired, and the holders of Other Priority Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

4.2     *Real Property Tax Claims (Class 2)*.

(a)     *Classification*: Class 2 consists of claims for real property taxes against the Property. To the extent that Real Property Tax Claims are secured by different collateral or

different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

(b)     *Treatment*: Each Holder of an Allowed Class 2 Claim shall receive Cash in an amount sufficient to satisfy the sum of the Allowed Class 2 Claim, together with all applicable interest, costs and fees payable on the Effective Date.

(c)     *Voting*: Voting Class 2 is Unimpaired, and the holders of Real Property Tax Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Real Property Tax Claims are not entitled to vote to accept or reject the Plan.

4.3     ***Secured Claims (Class 3)***.

(a)     *Classification*: Class 3 consists of the Secured Claims. To the extent that Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 3.

(b)     *Treatment*: Except to the extent that a holder of an Allowed Secured Claim against the Debtor has agreed to less favorable treatment of such Claim, each holder of an Allowed Secured Claim shall receive, at the option of the Reorganized Debtor, (i) payment in full and final satisfaction of such Allowed Class 3 Claim, Cash from the Plan Fund in the amount of such Allowed Claim payable on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Claim, or as soon as reasonably practical thereafter, (ii) delivery of the collateral securing such Allowed Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code.

(c)     *Voting*: Class 3 is Unimpaired, and the holders of Secured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Secured Claims are not entitled to vote to accept or reject the Plan.

4.4     ***General Unsecured Claims (Class 4)***.

(a)     *Classification*: Class 4 consists of General Unsecured Claims against the Debtor.

(b)     *Treatment*: Except to the extent that a holder of a General Unsecured Claim against the Debtor has agreed to less favorable treatment of such Claim, each holder of an Allowed General Unsecured Claim shall receive payment in full and final satisfaction of such Allowed Class 4 Claim, Cash from the Plan Fund in the amount of such Allowed Claim payable plus accrued post-petition interest at the Federal Judgment Rate on the Effective Date, on the later of the Effective Date and the date on which such General Unsecured Claim becomes an Allowed Claim, or as soon as reasonably practical.

(c)     *Voting*: Class 4 Claims are Unimpaired, and the holders of General Unsecured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f)

of the Bankruptcy Code. Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

4.5    ***Subordinated Unsecured Claims (Class 5)***.

(a)    *Classification*: Class 5 consists of Subordinated Unsecured Claims against the Debtor.

(b)    *Treatment*:  Except to the extent that a holder of a Subordinated Unsecured Claim against the Debtor has agreed to less favorable treatment of such Claim, each holder of an Allowed Subordinated Unsecured Claim shall receive a pro rata share of the Cash remaining after (a) payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Fee Claims, and (b) payment in full of the Allowed Claims in Classes 1, 2, 3 and 4.

(c)    *Voting*: Class 5 is Impaired by the Plan, and the holders of the Allowed Subordinated Claims are entitled to vote to accept or reject the Plan.

4.6    ***Existing Equity Interests (Class 6)***.

(a)    *Classification*: Class 6 consists of Existing Equity Interests in the Debtor.

(b)    *Treatment*: The holders of Allowed Existing Equity Interests shall receive the Sale proceeds, if any, remaining after (i) payment of the Allowed Claims in Classes 1, 2, 3, 4 and 5 and payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Fee Claims in full in Cash on the Effective Date.

(c)    *Voting*: Class 6 is Impaired by the Plan, and the holders of the Allowed Existing Equity Interests are entitled to vote to accept or reject the Plan.

**SECTION 5.        MEANS FOR IMPLEMENTATION**

5.1    ***The Sale***.

(a)    The Confirmation Order shall authorize the Sale of the Property under sections 363, 365, 1123(b)(4), 1129(b)(2)(A)(iii) and 1146(a) of the Bankruptcy Code. Upon the occurrence of the Effective Date, the Confirmation Order shall authorize the Reorganized Debtor to take any and all actions necessary to consummate the Sale of the Property without further order of the Bankruptcy Court.  As a part of the Sale under the Plan, and in order to ensure consummation of the Plan, the Confirmation Order shall contain the following findings of fact and conclusions of law: (i) that the terms and conditions of the Sale and the Purchase Agreement are fair and reasonable, (ii) that the Debtor's sale, and the Purchaser's purchase, of the Property pursuant to the Plan, is non-collusive, fair and reasonable and was conducted openly and in good faith, (c) that the transfer of the Property to the Purchaser represents an arm's-length transaction and was negotiated in good faith between the parties, (d) that the Purchaser, as transferee of the Property, is a good faith purchaser under Bankruptcy Code § 363(m) and, as such, is entitled to the full protection of Bankruptcy Code § 363(m), (e) that the Purchased Assets are sold free and clear of all claims, interests, and encumbrances pursuant to Bankruptcy Code § 1141 (c), (f) that the Sale

was not controlled by an agreement among potential purchasers, and (g) that no cause of action exists against the Purchaser or with respect to the Sale of the Property to the Purchaser.

5.2 ***Withholding and Reporting Requirements***.

(a) *Withholding Rights*. In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b) *Forms*. Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Reorganized Debtor or such other Person designated by the Reorganized Debtor (which entity shall subsequently deliver to the Debtor any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the tax Code and so notifies the Reorganized Debtor. If such request is made by the Reorganized Debtor or such other Person designated by the Reorganized Debtor and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against the Debtor and its property.

5.3 ***Exemption From Certain Taxes***.

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer under this Plan as confirmed by the Court, (including an instrument of transfer executed in furtherance of the sale contemplated by the Plan), shall not be subject to tax under any law imposing a stamp tax, real estate transfer tax, mortgage recording tax or similar tax due on the sale of the Property in connection with or in furtherance of the Plan as confirmed by the Court and the funding requirements contained herein and shall not be subject to any state, local or federal law imposing such tax and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

5.4 ***Effectuating Documents; Further Transactions***.

On and after the Effective Date, the Reorganized Debtor is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate,

implement and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

5.5     *Preservation of Rights of Action*.

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court order, the Reorganized Debtor, on behalf of the Estate, reserves any and all Causes of Action. On and after the Effective Date, the Reorganized Debtor may pursue such Causes of Action in its sole discretion. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtor will not pursue any and all available Causes of Action against it.  The Reorganized Debtor shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Confirmation of the Plan itself.

5.6     *Closing of the Chapter 11 Case*.

After the Chapter 11 Case of the Debtor has been fully administered, the Reorganized Debtor shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**SECTION 6.          GOVERNANCE**

6.1     *Wind Down*.

After the Effective Date, pursuant to the Plan, the Reorganized Debtor shall wind-down, sell and otherwise liquidate assets of the Debtor. The wind-down, sale and liquidation of the Debtor's assets (as determined for federal income tax purposes) shall occur over a period not to exceed six (6) months after the closing of the Sale of the Property.

6.2     *Certificate of Organization and By-Laws*.

As of the Effective Date, by-laws of the Debtor shall be amended to the extent necessary to carry out the provisions of the Plan.

6.3     *Tax Returns*.

(a)     The Reorganized Debtor shall be responsible for filing tax returns and reporting transaction occurring subsequent to the Effective Date.

**SECTION 7.**     **DISTRIBUTIONS**

7.1     *Distribution Record Date*.

As of the close of business on the Distribution Record Date, the transfer register for each of the Classes of Claims or Interests as maintained by the Debtor shall be deemed closed, and there shall be no further changes in the record of holders of any of the Claims or Interests. The Debtor or the Reorganized Debtor, as applicable, shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

7.2     *Date of Distributions*.

Except as otherwise provided herein, the Reorganized Debtor shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date and thereafter, the Reorganized Debtor shall from time to time determine the subsequent Distribution Dates, if any. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

The Reorganized Debtor shall reserve an amount sufficient to pay holders of Disputed Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims. In the event the holders of Allowed Claims have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Reorganized Debtor shall make a final distribution to all holders of Allowed Claims.

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

7.3     *Delivery of Distributions*.

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Reorganized Debtor has determined the then current address of such holder, at which time such distribution shall be made to such holder without Interest; provided, however, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date the Initial Distribution is made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Reorganized Debtor automatically and without need for a further order by the Bankruptcy Court for distribution in accordance with the Plan, and the Claim of any such holder to such property or interest in property shall be released, settled, compromised, and forever barred. The Reorganized Debtor shall have no obligation to locate the current address for a returned distribution.

7.4 ***Manner of Payment Under Plan***.

At the option of the Reorganized Debtor, any Cash payment to be made hereunder may be made by a check or wire transfer.

7.5 ***Minimum Cash Distributions***.

The Reorganized Debtor shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash less than $100; provided, however, that if any distribution is not made pursuant to this Section 7.5, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim. The Reorganized Debtor shall not be required to make any final distributions of Cash less than $50 to any holder of an Allowed Claim. If either (a) all Allowed Claims (other than those whose distributions are deemed undeliverable hereunder) have been paid in full or (b) the amount of any final distributions to holders of Allowed Claims would be $50 or less and the aggregate amount of Cash available for distributions to holders of Allowed General Unsecured Claims is less than $2,500, then no further distribution shall be made by the Reorganized Debtor and any surplus Cash shall be donated and distributed to an I.R.C. § 501(c)(3) tax-exempt organization selected by the Reorganized Debtor.

7.6 ***Setoffs***.

The Debtor may, but shall not be required to, set off against any Claim, any Claims of any nature whatsoever that the Debtor may have against the holder of such Claim; provided that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such Claim the Debtor may have against the holder of such Claim.

7.7 ***Distributions After Effective Date***.

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

7.8 ***Payment of Disputed Claims***.

As Disputed Claims are resolved pursuant to Section 8 hereof, the Reorganized Debtor shall make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date. Such distributions shall be made on the first Distribution Date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Reorganized Debtor in the Reorganized Debtor's sole discretion.

## SECTION 8.    PROCEDURES FOR DISPUTED CLAIMS

8.1 ***Allowance of Claims***.

After the Effective Date, the Reorganized Debtor shall have and shall retain all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed

Allowed under this Plan. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim.

8.2    *Objections to Claims*.

As of the Effective Date, objections to and requests for estimation of Claims against the Debtor may be interposed and prosecuted only by the Reorganized Debtor. Such objections and requests for estimation shall be served and filed (a) on or before the 60th day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Reorganized Debtor.

8.3    *Estimation of Claims*.

The Debtor or Reorganized Debtor, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim(s) pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor or Reorganized Debtor, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or Reorganized Debtor, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. The aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

8.4    *No Distributions Pending Allowance*.

No payment or distribution provided under the Plan shall be made on account of a Claim unless and until such Claim is an Allowed Claim.

8.5    *Resolution of Claims*.

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its estate may hold against any Person, without the approval of the Bankruptcy Court, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith. The Reorganized Debtor may pursue such retained Claims,

rights, Causes of Action, suits or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtor.

8.6 *Disallowed Claims*.

All Claims held by persons or entities against whom or which of the Debtor or Reorganized Debtor, as applicable, has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code shall be deemed "disallowed" Claims pursuant to section 502(d) of the Bankruptcy Code and holders of such Claims shall not be entitled to vote to accept or reject the Plan. Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the Avoidance Action against such party has been settled or resolved by Final Order and any sums due to the Debtor or Reorganized Debtor, as applicable, from such party have been paid.

**SECTION 9. EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

9.1 *Assumption and Assignment of Executory Contracts and Unexpired Leases*.

(a) On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code except for those executory contracts or unexpired leases (1) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement, (2) that are the subject of a motion to assume or reject pending on the Effective Date (in which case the such assumption or rejection and the effective date thereof shall remain subject to a Bankruptcy Court order); (3) that are subject to a motion to reject with a requested effective date of rejection after the Effective Date; or (4) that are otherwise expressly assumed or rejected pursuant to the Plan. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such executory contracts or unexpired leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of such executory contracts and unexpired leases in the Plan are effective as of the Effective Date.

9.2 *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*.

Any Cure Obligation due under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash on the Effective Date, subject to the limitation described below, by the Debtor as an Administrative Claim or by the Purchaser, as applicable, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

In the event of a dispute regarding (1) the amount of the Cure Obligation, (2) the ability of the Debtor's Estate or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Obligations required by section 365(b)(1) of the Bankruptcy Code shall be satisfied following the entry of a Final Order or orders resolving the dispute and approving the assumption; provided that, depending on whether the Debtor or the Purchaser has the obligation to pay the Cure Obligation,

such party may settle any dispute regarding the amount of any Cure Obligation without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

At least fourteen (14) days before the Confirmation Hearing, the Debtor shall cause notice of proposed Cure Obligations to be sent to applicable counterparties to the Executory Contracts and Unexpired Leases. Any objection by such counterparty must be filed, served, and actually received by the Debtor not later than ten (10) days after service of notice of the Debtor's proposed assumption and associated Cure Obligation. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed cure amount will be deemed to have assented to such Cure Obligation.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the Effective Date of assumption and/or assignment. Any prepetition default amount set forth in the Schedules and/or any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

9.3    *Claims Based on Rejection of Executory Contracts and Unexpired Leases*.

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtor's Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be filed with Bankruptcy Court and served on the Debtor no later than fourteen (14) days after the earlier of the Effective Date or the effective date of rejection of such Executory Contract or Unexpired Lease. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court and served on the Debtor, no later than fourteen (14) days after service of the Debtor's proposed rejection of such Executory Contract or Unexpired Lease.

**Any holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely filed as set forth in the paragraph above shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Case on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtor, the Debtor's Estate, or the property for any of the foregoing without the need for any objection by the Debtor or Reorganized Debtor, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtor's prepetition Executory

Contracts or prepetition Unexpired Leases shall be classified as General Unsecured Claims, except as otherwise provided by order of the Bankruptcy Court.

9.4     *Modifications, Amendments, Supplements, Restatements, or Other Agreements*.

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

9.5     *Reservation of Rights*.

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtor's Estate have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor or Reorganized Debtor, as applicable, shall have 60 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

**SECTION 10.     CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

10.1    *Conditions Precedent to the Effective Date*.

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)     the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred and the Confirmation Order shall not be subject to any stay;

(b)     all actions, documents and agreements necessary to implement and consummate the Plan, including, without limitation, entry into the documents contained in the Plan Supplement required to be executed prior to the Confirmation Date, shall have been effected or executed;

(c)     all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan, if any, shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions; and

(d)     all documents and agreements necessary to implement the Plan shall have (i) been tendered for delivery and (ii) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

10.2    ***Waiver of Conditions Precedent***.

Each of the conditions precedent to the Effective Date in Section 10.1 other than the condition set forth in section 10.1(a) may be waived in writing by the Debtor.

10.3    ***Effect of Failure of Conditions to Effective Date***.

If the Confirmation Order is vacated due to a failure of a condition to the Effective Date to occur, (i) no distributions under the Plan shall be made and (ii) the Debtor and all holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date ever occurred.

## SECTION 11.        EFFECT OF CONFIRMATION

11.1    ***Vesting of Assets***.

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtor's Estate shall vest in the Reorganized Debtor free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided pursuant to this Plan and the Confirmation Order.

11.2    ***Release of Liens***.

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Reorganized Debtor, unless sold to the Purchaser pursuant to the Sale Transaction.

11.3    ***Subordination of Claims or Interests***.

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, under section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtor or Reorganized Debtor, as applicable, reserves the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 11.4    *Binding Effect*.

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtor, and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

### 11.5    *Term of Injunctions or Stays*.

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 11.6    *Plan Injunction*.

Except (i) as otherwise provided under Final Order entered by the Bankruptcy Court or (ii) with respect to the Debtor's obligations under the Plan, the entry of the Confirmation Order shall forever stay, restrain and permanently enjoin with respect to any Claim held against the Debtor as of the date of entry of the Confirmation Order (i) the commencement or continuation of any action, the employment of process, or any act to collect, enforce, attach, recover or offset from the Debtor, from the Property, or from property of the Estate that has been or is to be distributed under the Plan, and (ii) the creation, perfection or enforcement of any lien or encumbrance against the Property and any property of the Estate that has been or is to be, distributed under the Plan. Except as otherwise provided in the Confirmation Order, the entry of the Confirmation Order shall constitute an injunction against the commencement or continuation of any action, the employment of process, or any act to collect, recover or offset from the Debtor, from the Property, or from property of the Estate, any claim, any obligation or debt that was held against the Debtor by any person or entity as of the Confirmation Date except pursuant to the terms of this Plan. The entry of the Confirmation Order shall permanently enjoin all Creditors, their successors and assigns, from enforcing or seeking to enforce any such Claims.

### 11.7    *Limitation of Liability*.

To the extent permitted under section 1125(e) of the Bankruptcy Code, neither the Exculpated Parties nor any of their respective officers, directors, or employees (acting in such capacity) nor any professional person employed by any of them, shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, the Disclosure Statement, the Plan Supplement or the any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan, provided that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement, except in the case of fraud, gross negligence, willful misconduct, malpractice, breach of fiduciary duty, criminal conduct, unauthorized use of confidential information that causes damages, or ultra vires acts. Nothing in this Section 11.7 shall

limit the liability of the Debtor's professionals pursuant to Rule 1.8 (h)(1) of the New York State Rules of Professional Conduct. Nothing in the Plan or the confirmation order shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Debtor or any of its respective members, shareholders, officers, directors, employees, attorneys, advisors, agents, representatives and assigns, nor shall anything in the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Debtor or any of its respective members, officers, directors, employees, attorneys, advisors, agents, representatives and assigns for any liability whatever, including without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in this Plan exculpate Debtor or any of its respective members, officers, directors, employees, attorneys, advisors, agents, representatives and assigns from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority.

11.8    *Debtor Release*.

Except as otherwise provided in the Plan, upon the Effective Date, in consideration of the Cash and other property to be distributed to or on behalf of the holders of Claims and Interests under the Plan, the Plan shall be deemed to resolve all disputes and constitute a settlement and release, between and among the Debtor, on the one hand, and each Creditor and Interest Holder, on the other, from any claim or liability, whether legal, equitable, contractual, secured, unsecured, liquidated, unliquidated, disputed, undisputed, matured, unmatured, fixed or contingent, known or unknown, that the Debtor, its Creditors or Interest Holder ever had or now have through the Effective Date in connection with their Claim or Interest (including, without limitation, any claims the Debtor may assert on its own behalf or on behalf of Creditors or Interest Holders pursuant to sections 510 and 542 through 553 of the Bankruptcy Code, any claims Creditors or Interest Holders may have asserted derivatively on behalf of the Debtor absent bankruptcy, any claims based on the conduct of the Debtor's business affairs prior or subsequent to the commencement of the Case or any claims based on the negotiation, submission and confirmation of the Plan).

11.9    *Solicitation of the Plan*.

As of and subject to the occurrence of the Confirmation Date: (a) the Debtor shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation.

11.10    *Plan Supplement*.

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court by no later than the Plan Supplement Filing Deadline. Upon its filing with the Bankruptcy Court, the Plan

Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

## SECTION 12.    RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Case for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance, classification, priority, compromise, estimation or payment of Claims resulting there from;

(b)    to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date;

(c)    to insure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d)    to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim;

(e)    to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(f)    to adjudicate any dispute related to the Sale Transaction;

(g)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the Consummation, implementation or enforcement of the Plan, including the Confirmation Order, or any other order of the Bankruptcy Court;

(h)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)    to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(j)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Purchase Agreement, or the Confirmation Order or any agreement, instrument, or other document governing or relating to any of the foregoing;

(k)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following Consummation;

(l)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations of the Debtor's tax liability under section 505(b) of the Bankruptcy Code);

(n)     to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(o)     to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(p)     to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(q)     to enter a final decree closing the Chapter 11 Cases;

(r)     to enforce all orders previously entered by the Bankruptcy Court;

(s)     to recover all assets of the Debtor and property of the Debtor's Estate, wherever located; and

(t)     to hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

## SECTION 13.          MISCELLANEOUS PROVISIONS

13.1     *Payment of Statutory Fees*.

On the Effective Date and thereafter as may be required, the Reorganized Debtor shall pay all fees incurred pursuant to § 1930 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for the Debtor's case; provided, however, that after the Effective Date such fees shall only be payable with respect to the Debtor's Case until such time as a final decree is entered closing the Debtor's Case, a Final Order converting such case to a case under chapter 7 of the Bankruptcy Code is entered or a Final Order dismissing the Debtor's Case is entered.

13.2     *Substantial Consummation*.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

13.3     *Amendments*.

(a)      *Plan Modifications*. Plan may be amended, modified or supplemented by the Debtor in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code; provided that such amendments, modifications, or supplements shall be satisfactory in all respects to the Debtor. In addition, after the Confirmation Date, the Debtor may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

(b)      *Other Amendments*. Before the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

13.4     *Revocation or Withdrawal of the Plan*.

The Debtor reserves the right to revoke or withdraw the Plan, prior to the Confirmation Date. If the Debtor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtor, the Debtor's Estates, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor, the Debtor's Estates, or any other Entity.

13.5     *Severability of Plan Provisions upon Confirmation*.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtor; and (3) nonseverable and mutually dependent.

13.6     *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in

accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

13.7 *Time*.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

13.8 *Additional Documents*.

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtor and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

13.9 *Immediate Binding Effect*.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtor, the Purchaser, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns.

13.10 *Successor and Assigns*.

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

13.11 *Entire Agreement*.

On the Effective Date, the Plan, the Plan Supplement, the Purchase Agreement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

13.12 *Notices*.

All notices, requests and demands to or upon the Debtor to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows-

(i)  if to the Debtor or Reorganized Debtor:

Gholam Reza Golsorkhi
c/o Blank Rome LLP, Attn: Ira Herman
1271 Avenue of the Americas
New York, New York 10020

with a copy to:

RUBIN LLC
Paul A. Rubin
Hanh V. Huynh
345 Seventh Avenue, 21st Floor
New York, New York 10001
Tel: 212.390.8054
Fax: 212.390.8064
prubin@rubinlawllc.com
hhuynh@rubinlawllc.com

After the Effective Date, the Reorganized Debtor shall have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, that they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtor is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

Dated: December 2, 2019
         New York, New York

                                        Wansdown Properties Corporation N.V.


                                        By: *Gholam Reza Golsorkhi*
                                              Gholam Reza Golsorkhi

# EXHIBIT C

## Residential Contract of Sale

Contract of Sale made as of September 25, 2019 between WANSDOWN PROPERTIES CORPORATION N.V., a limited liability company established under the laws of the Netherlands Antilles, Address: 29 Beekman Place, New York, NY 10022 (hereinafter called **"Seller"**), and29 BEEKMAN CORP, a New York corporation, Address: 488 Madison Ave., 11th Fl, New York, NY 10022, (hereinafter called **"Purchaser"**).

RECITALS

WHEREAS, Seller intends to file a petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York on or before October 7, 2019 and its assets will be subject to the jurisdiction of such Court (the "**Bankruptcy Court**").

WHEREAS, Seller desires to liquidate all, or substantially all, of its assets to fund a plan of reorganization under chapter 11 or a plan of liquidation under chapter 7 of the Bankruptcy Code (the "**Plan**").

WHEREAS, Purchaser desires to purchaser the Premises (as herein defined) from the Seller, free and clear of liens, claims and interests of third parties and to have that sale effected pursuant to the Plan, or, if not possible then under section 363 of the Bankruptcy Code ("**363 Sale**"), the applicable Federal Rules of Bankruptcy Procedure and other rules of bankruptcy practice applicable in the Bankruptcy Court, or as otherwise provided in this contract.

WHEREAS, Seller has made good faith efforts to market the Premises for more than 12 months prior to the date of this contract and considers the offer it has received from Purchaser to be the highest and best offer that it could currently obtain as a result of such efforts;

WHEREAS, Seller has conducted a review of its books and records and projects that the net proceeds of the purchase price will be sufficient to pay all of the valid, liquidated debts of Seller, after adjudication of any disputed claims, in full;

WHEREAS, Purchaser acknowledges that the Seller will incorporate this contract into its Plan, or, if necessary, a 363 Sale, to be approved by the Bankruptcy Court as a sale that would generate sufficient net proceeds to satisfy all claims in form mutually and reasonably acceptable to Purchaser and Seller.

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual covenants set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller hereby agree as set forth below.

1. **Premises**. Seller shall sell and convey and Purchaser shall purchase the property, together with all buildings and improvements thereon (collectively the "**Premises**"), more fully described on a separate page marked "Schedule A", annexed hereto and made a part hereof and also known as: 29 Beekman Place Street Address: 29 Beekman Place, New York, New York 10022. Tax Map Designation: Block 1361, Lot 121 in the Borough of Manhattan. Together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, opened or proposed, adjoining the Premises to the center line thereof, including any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway. Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or thereafter, on demand, any documents that Purchaser may reasonably require for the conveyance of such title and the assignment and collection of such award or damages, together with all rights, including choses in action appurtenant or relating to the Premises.

2. **Personal Property**. This sale also includes all fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at Closing they will be paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, chandeliers, bathroom and kitchen cabinets and counters, mantels, mirrors, switch plates and door hardware, venetian blinds, window treatments, shades, screens, awnings, storm windows, storm doors, window boxes, mail box, TV aerials, weather vane, flagpole, pumps, shrubbery, fencing, outdoor statuary, tool shed, dishwasher, washing machine, clothes dryer, garbage disposal unit, range, oven, built-in microwave oven, refrigerator, freezer, air conditioning equipment and installations, wall to wall carpeting and built-ins, furniture and household furnishings, provided, however, that this sale shall <u>exclude</u> any and all rugs, art work, statues, dining tables, humidors, and personal items such as files, documents, photos and other similar items.

3. **Purchase Price**. The purchase price is ten million three hundred thousand dollars ($10,300,000.00), payable as follows:

(a) on the signing of this contract, by Purchaser's good check payable to or wire transfer to the Escrowee (as hereinafter defined), subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 4 of this contract (together with the payment in Section 3(b), the "**Downpayment**"): $200,000.00.

(b) on or before 12:00 noon on October 7, 2019, time being of the essence, by Purchaser's wire transfer to the Escrowee, subject to collection, to be held in escrow pursuant to paragraph 4 of this contract: $830,000.00.

(c) balance at Closing in accordance with paragraph 5: $9,270,000.00.

**4. Downpayment in Escrow**. (a) Seller's attorney (**"Escrowee"**) shall hold the Downpayment in escrow in a segregated bank account at Signature Bank, address: 565 Fifth Avenue, New York, NY 10017, until Closing or sooner termination of this contract and shall pay over or apply the Downpayment in accordance with the terms of this paragraph. Escrowee shall hold the Downpayment in an interest-bearing account for the benefit of the parties. If interest is held for the benefit of the parties, it shall be paid to the party entitled to the Downpayment and the party receiving the interest shall pay any income taxes thereon. If interest is not held for the benefit of the parties, the Downpayment shall be placed in an IOLA account or as otherwise permitted or required by law. The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Downpayment shall be paid by Escrowee to Seller. If for any reason Closing does not occur, Escrowee shall continue to hold such amount until otherwise directed by joint Notice from the parties to this contract or a final, nonappealable judgment, order or decree of a court. However, Escrowee shall have the right at any time to deposit the Downpayment and the interest thereon with the clerk of a court in the county in which the Premises are located and shall give Notice of such deposit to Seller and Purchaser. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

(d) Escrowee acknowledges receipt of the Downpayment, if by check subject to collection, and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this contract.

(e) Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

(f) The party whose attorney is Escrowee shall be liable for loss of the Downpayment.

5. **Acceptable Funds**. All money payable under this contract, unless otherwise specified, shall be paid by:

    a.    Cash, but not over $1,000.00;

    b.    Good certified check of Purchaser drawn on or official check issued by any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York, unendorsed and payable to the order of Seller, or as Seller may otherwise direct upon reasonable prior notice (by telephone or otherwise) to Purchaser;

    c.    As to money other than the purchase price payable to Seller at Closing, uncertified check of Purchaser up to the amount of $5,000.00;

    d.    Direct wire transfer of funds; and

    e.    As otherwise agreed to in writing by Seller or Seller's attorney.

6. **Permitted Exceptions**. The Premises are sold and shall be conveyed subject to:

    a.    Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the property or their use;

    b.    Consents for the erection of any structures on, under or above any streets on which the Premises abut;

    c.    Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

    d.    Real estate taxes that are a lien, but are not yet due and payable; and

    e.    The other matters, if any, including a survey exception, set forth in a Rider attached.

7. **Governmental Violations and Orders**. (a) Seller shall have no obligation whatsoever to comply with any noted, or any notices of, violations of law or municipal ordinances, orders or requirements noted or issued by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises and Purchaser agrees to accept the Premises subject to any and all of the foregoing; provided, however, Seller shall remove and discharge the two currently open violations on the Premises (elevator and façade/structure), Seller shall use reasonable efforts to do so prior to Closing and shall use funds from the Downpayment escrow, if necessary,

to pay the costs thereof, upon Purchaser's prior written approval of such disbursement amount, which approval shall not be unreasonably withheld, conditioned or delayed, provided that Purchaser acknowledges that such release may require Bankruptcy Court approval, and, if Seller shall not remove same prior to Closing, then an escrow shall be maintained by Seller's counsel from and after Closing to pay the remaining amount necessary to discharge such violations, as estimated by Seller's contractor then working on such discharge.

(b) All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing.

8. **Seller's Representations**. (a) Seller represents and warrants to Purchaser that:

(i)     The Premises abut or have a right of access to a public road;

(ii)     Seller is the sole owner of the Premises and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this contract;

(iii)     The "Whereas" recitals are correct in all material respects, except Seller makes not statement as to Purchaser's desires or knowledge;

(iv)     The Premises are not affected by any exemptions or abatements of taxes; and

(v)     Seller has been known by no other name for the past ten years.

(b) Seller covenants and warrants that all of the representations and warranties set forth in this contract shall be true and correct at Closing.

(c) Except as otherwise expressly set forth in this contract, none of Seller's covenants, representations, warranties or other obligations contained in this contract shall survive Closing.

9. **Condition of Property**. Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the Premises or the other property included in the sale, given or made by Seller or its representatives, and shall accept the same "as is" in their present condition and state of repair, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of Closing, without any reduction in the purchase price or claim of any kind

for any change in such condition by reason thereof subsequent to the date of this contract. Purchaser and its authorized representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.

10. **Insurable Title**. Seller shall give and Purchaser shall accept such title as Madison Title Agency LP, acting as agent for a title insurance underwriter, which Purchaser shall request to be First American Title Insurance Company (the "**Title Company**") shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this contract.

11. **Closing, Deed and Title**. (a) "**Closing**" means the settlement of the obligations of Seller and Purchaser to each other under this contract, including the payment of the purchase price to Seller, and the delivery to Purchaser of a bargain and sale deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser fee simple title to the Premises, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant by Seller as required by subd. 5 of Section 13 of the Lien Law.

12. **Closing Date and Place**. See Second Rider to Contract of Sale, Paragraph 51(e).

13. **Conditions to Closing**.

(a) This contract and Purchaser's obligation to purchase the Premises are also subject to, and conditioned upon, the fulfillment of the following conditions precedent:

(i)     The accuracy, as of the date of Closing, of the representations and warranties of Seller made in this contract.

(ii)    Intentionally omitted.

(iii)   Intentionally omitted.

(iv)    The delivery of the Premises and all building(s) and improvements comprising a part thereof in broom clean condition (subject to all included personal property), vacant and free of leases or tenancies, together with keys to the Premises.

(v)     Intentionally omitted.

(b) This contract, Purchaser's obligation to purchase the Premises and Seller's obligation to convey the Premises in accordance with this contract are also subject to, and conditioned upon, the fulfillment of the following conditions precedent:

(i)     Delivery by the parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Premises a smoke detecting alarm device or devices.

(ii)     The delivery by the parties of any other affidavits required as a condition of recording the deed.

(c) The Premises shall be in the condition such Premises are in on the date hereof, subject to reasonable wear and tear and Section 27 of the Rider annexed hereto.

14. **Deed Transfer and Recording Taxes**. At Closing, certified or official bank checks payable to the order of the appropriate State, City or County officer, or the Title Company, in the amount of any applicable transfer and/or recording tax payable by reason of the delivery or recording of the deed or mortgage, if any, shall be delivered by the party required by law or by this contract to pay such transfer and/or recording tax, together with any required tax returns duly executed and sworn to, and such party shall cause any such checks and returns to be delivered to the appropriate officer promptly after Closing. The obligation to pay any additional tax or deficiency and any interest or penalties thereon shall survive Closing.

15. **Apportionments and Other Adjustments; Water Meter and Installment Assessments**. (a) The following shall be apportioned as of midnight of the day before the day of Closing:  taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed.

(b) If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to the latest assessed valuation.

(c) If there is a water meter on the Premises, Seller shall furnish a reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

(d) If at the date of Closing the Premises are affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e) Any errors or omissions in computing apportionments or other adjustments at Closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

16. **Allowance for Unpaid Taxes, etc**. Seller has the option to credit Purchaser as an adjustment to the purchase price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less

than five business days after Closing, provided that official bills therefor computed to said date are produced at Closing.

17. **Use of Purchase Price to Remove Encumbrances**. If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the cash balance of the purchase price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments. As an alternative Seller may deposit sufficient monies with the title insurance company employed by Purchaser acceptable to and required by it to assure their discharge, but only if the title insurance company will insure Purchaser's title clear of the matters or insure against their enforcement out of the Premises and will insure Purchaser's Institutional Lender clear of such matters. Upon reasonable prior notice (by telephone or otherwise), Purchaser shall provide separate certified or official bank checks as requested to assist in clearing up these matters.

18. **Title Examination; Seller's Inability to Convey; Limitations of Liability**.

(a) Purchaser shall order an examination of title in respect of the Premises from the Title Company promptly after the execution of this contract. Purchaser shall cause a copy of the title report and of any additions thereto to be delivered to the attorney(s) for Seller promptly after receipt thereof.

(b) (i) If at the date of Closing Seller is unable to transfer title to Purchaser in accordance with this contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called **"Defects"**), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other than those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the purchase price, then, except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this contract; (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s), and if Purchaser shall still be unwilling to waive the same and to close title without abatement of the purchase price, then either party may cancel this contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, the existing mortgage (unless this sale is subject to the same)

and any matter created by Seller after the date hereof shall be released, discharged or otherwise cured by Seller at or prior to Closing.

(c) If this contract is cancelled pursuant to its terms, other than as a result of Purchaser's default, this contract shall terminate and come to an end, and neither party shall have any further rights; obligations or liabilities against or to the other hereunder or otherwise, except that: (i) Seller shall promptly refund or cause the Escrowee to refund the Downpayment to Purchaser and to reimburse Purchaser for the net cost of examination of title, including any appropriate additional charges related thereto, and the net cost, if actually paid or incurred by Purchaser, for updating the existing survey of the Premises or of a new survey, and (ii) the obligations under paragraph 20 shall survive the termination of this contract.

19. **Affidavit as to Judgments, Bankruptcies, etc**. If the Premises are sold other than pursuant to the contemplated Bankruptcy Court order, and a title examination discloses judgments, bankruptcies or other returns against persons having names the same as or similar to that of Seller, Seller shall deliver an affidavit at Closing showing that they are not against Seller.

20. **Defaults and Remedies**. (a) If Purchaser defaults hereunder, Seller's sole remedy shall be to receive and retain the Downpayment as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be impossible to ascertain and that the Downpayment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

(b) If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including, but not limited to, specific performance.

21. Intentionally omitted.

22. **Notices**. Any notice or other communication ("**Notice**") shall be in writing.

23. **No Assignment**. Purchaser may not assign this contract without the prior written consent of Seller, provided, however, that Purchaser may assign this contract, without the prior written consent of Seller, to an affiliate of Purchaser in which Purchaser and its direct and indirect owners owns and controls a greater than fifty percent (50%) economic and managerial interest and any such affiliated assignee assumes in writing all of the obligations of Purchaser to be performed under this contract. No assignment of this contract shall relieve Purchaser from any of its obligations set forth herein. Any assignment made or attempted in contravention of this Paragraph 23 shall be null and void. Notwithstanding anything to the contrary contained in this contract, any and all assignments of this contract shall be subject to the approval of the Bankruptcy Court; Seller shall consent to and support and cooperate with request for such approval of any assignment permitted under this Section 23.

24. **Broker**. Seller and Purchaser each represents and warrants to the other that it has not dealt with any real estate broker in connection with this sale. The provisions of this paragraph shall survive Closing or, if Closing does not occur, the termination of this contract.

25. **Miscellaneous**. (a) All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.

(b) Neither this contract nor any provision thereof may be waived, changed or cancelled except in writing. This contract shall also apply to and bind the heirs, distributes, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize their respective attorneys to agree in writing to any changes in dates and time periods provided for in this contract.

(c) Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever the sense of this contract may require it.

(d) The captions in this contract are for convenience of reference only and in no way define, limit or describe the scope of this contract and shall not be considered in the interpretation of this contract or any provision hereof.

(e) This contract shall not be binding or effective until duly executed and delivered by Seller and Purchaser.

(f) Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(g) Each party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this contract. This subparagraph shall survive Closing.

(h) This contract is intended for the exclusive benefit of the parties hereto and, except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by, any other person or entity.

(i) If applicable, the complete and fully executed disclosure of information on lead-based paint and/or lead-based paint hazards is attached hereto and made a part hereof.

*[No further text appears on this page. Signatures appear on the following page.]*

**IN WITNESS WHEREOF,** this contract has been duly executed by the parties hereto.

**SELLER:**

WANSDOWN PROPERTIES CORPORATION N.V.,
a limited liability company established under the laws
of the Netherlands Antilles

By:_____
Name: Gholam Reza Golsorkhi
Title: President and Managing Director

**PURCHASER**

29 BEEKMAN CORP,
a New York corporation

By:_____
Name: Seth A. Akabas
Title: President

Receipt of the Downpayment is acknowledged and the undersigned agrees to act in accordance with the provisions of paragraph 4 above.

BLANK ROME LLP,
as Escrowee

PREMISES:

Section: _____
Block: 1361
Lot: 121
County or Town: Manhattan
Street No. Address: 29 Beekman Place

Schedule A

[legal description attached hereto]

# SCHEDULE A

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, County and State of New York, bounded and described as follows:

BEGINNING at a point on the easterly side of Beekman Place, distant eighty feet five inches northerly from the corner formed by the intersection of the easterly side of Beekman Place and the northerly side of East 50th Street;

RUNNING THENCE easterly and parallel with East 50th Street, and part of the way through a party wall, one hundred feet;

THENCE northerly and parallel with Beekman Place, twenty feet;

THENCE westerly again parallel with East 50th Street and part of the way through a party wall, one hundred feet to the easterly side of Beekman Place;

THENCE southerly along the easterly side of Beekman Place, twenty feet to the point or place of BEGINNING.

Premises known as and street number 29 Beekman Place, New York, NY

**RIDER TO RESIDENTIAL CONTRACT OF SALE BETWEEN**
**WANSDOWN PROPERTIES CORPORATION N.V., AS SELLER, AND**
**29 BEEKMAN CORP, AS PURCHASER**
**PREMISES: 29 BEEKMAN PLACE, NEW YORK, NEW YORK**

This Rider is a part of the captioned Residential Contract of Sale (the "Contract") to which it is annexed. In case of any contradiction, inconsistency or overlapping coverage between any of the following provisions and the provisions of the main portion of this Contract, the following provisions of this Rider shall govern.

26. Supplementing paragraph 4 of the Contract, Purchaser shall have no liability for the fees, costs or expenses of the Escrowee for operation of the Downpayment escrow in the ordinary course or if Escrowee represents Seller in any dispute.

27. If the Premises shall have been damaged or destroyed prior to the Closing (a) to the extent of $200,000 or less, then this Contract shall continue in full force and effect, and Seller shall forthwith assign to Purchaser all rights of Seller's to the insurance proceeds due by reason of said damage (or if none is due, the purchase price shall be reduced accordingly), or (b) to the extent of any amount greater than $200,000, then Purchaser may, at Purchaser's option, (i) elect to continue this Contract in full force and effect, in which case Seller shall forthwith assign to Purchaser (subject to Closing) all rights of Seller rights to the insurance proceeds due by reason of said damage (or if none is due, the purchase price shall be reduced accordingly), or (ii) elect to terminate this Contract, and thereafter neither party hereto shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract, except that the Downpayment shall be promptly refunded, with interest, to Purchaser.

28. Seller represents and warrants that Seller has not received, and is not aware of, any written notice for emergency repairs or to repair sidewalks adjacent to the Premises that have not heretofore been removed of record. If any mechanic's lien based upon services rendered, or goods supplied, to the Premises prior to the Closing is discovered or levied and is or becomes of record, then the Seller shall remove same prior to Closing.

29. Intentionally omitted.

30. If any lien, claim, violation, failure of condition, breach or encumbrance of any kind, other than such as Seller is permitted hereunder to convey title subject to, (collectively, "Defects") exists with regard to the Premises, then Seller shall use Seller's commercially reasonable efforts to remove same on or prior to Closing, but shall not be obligated to spend more than $250,000 therefor, and at any time prior to Closing may notify Purchaser that Purchaser will be required to accept either: (a) a termination of the Contract under Seller's inability to convey title as set forth in the Contract; or (b) the Closing with the Premises subject to such Defect in consideration of a reduction in the purchase price equal to the difference, if any, between $250,000 and all funds already expended by Seller to remove such Defect; provided, however, that any such Defect created

affirmatively by or on behalf of Seller or by Seller's failure to pay amounts due and owing by Seller shall be removed by Seller out of the proceeds of the sale of the Premises.

31. No Defect will be acceptable, nor shall Purchaser be obligated to close subject to it, unless the Title Company will omit such Defect from Purchaser's title insurance policy. For clarity, the Title Company willingness to insure against collection of same from the Premises will not be a sufficient satisfaction of such Defect; provided, however, that if a Defect to title shall arise, Seller shall have a reasonable time to remove such Defect. Any requested adjournment by the Seller and/or any attempt by Seller to remove such Defect, shall not be or be deemed to be an admission that a Defect to title does exist. If Seller fails after a reasonable time to remove any such Defect to title that Seller is required hereunder to remove, then Purchaser shall be entitled to terminate this Contract by notice to Seller, in which case Purchaser shall receive back the entire Downpayment, and neither party hereto shall have any further obligation to the other.

32. Seller shall execute such title affidavit as the Title Company shall reasonably request in order for the Title Company to insure title as contemplated herein.

33. If condition in paragraph 13 of the Contract or a representation in paragraph 9 of the Contract shall not be satisfied or true, as applicable, at Closing, then, at Seller or Purchaser's option: the Closing shall be adjourned for such reasonable period for Seller to remedy any such defect; or the Closing shall be effected and the purchase price under the Contract reduced by the reasonable cost of remedying any such defect.

34. Seller shall maintain the Premises in its current condition, subject to ordinary wear and tear and natural deterioration, between the execution hereof and Closing.

35. No limitation of representations and/or warranties shall in any way limit any warranty or representation expressly stated in the Contract.

36. All notices required under this Contract shall be made in writing and shall be sent by Certified Mail, Return Receipt Requested, or by facsimile or email, however all notices delivered by facsimile or email shall be deemed given on the day indicated on the confirmation of receipt if prior to 3:00 p.m. on a business day at the place of receipt, and otherwise on the next business day, to the address of party set forth below, and a confirmation copy should be sent out by Certified Mail, Return Receipt Requested on the day the e-mail shall be deemed given. The attorneys of parties hereto may give notices hereunder. Notice shall be deemed given on the date signed for or not accepted by the addressee on first attempted delivery. Any party hereto may change the address set forth below to which notice addressed to said party is to be thereafter sent, by sending written notice of said new address to the other party to the Agreement. The addresses to which notices are to be sent (until said addresses are changed as herein authorized) are:

| Seller: | WANSDOWN PROPERTIES CORPORATION N.V. |
| | 29 Beekman Place |
| | New York, NY 10022 |

| With a copy to: | BLANKROME |
| | 1271 Avenue of the Americas |
| | New York, NY 10020 |
| | Attn: Lawrence F. Flick II, Esq. |
| | flick@blankrome.com |

| Purchaser: | 29 BEEKMAN CORP |
| | c/o Akabas & Sproule |
| | 11th Floor |
| | 488 Madison Avenue |
| | New York, NY 10022 |
| | Attention: Seth A. Akabas |
| | Email: SAkabas@akabas-sproule.com |

| With a copy to: | Akabas & Sproule |
| | 11th Floor |
| | 488 Madison Avenue |
| | New York, NY 10022 |
| | Jesse Greene, Esq. |
| | Fax: 212-308-8505 |
| | Email: JGreene@akabas-sproule.com. |

37. Intentionally omitted.

38. If Seller defaults under the Contract, and Purchaser is entitled to file a lis pendens against the Premises, then Purchaser shall be permitted to record a copy of this Contract in connection with enforcing its rights hereunder.

39. Any error made in the adjustments under Paragraph 15, shall be corrected and the appropriate adjustment payment made. This Section 39 shall survive Closing.

40. At Closing, Seller and Purchaser shall deliver a prepared and fully executed (i) NYC Real Property Transfer Tax Return, (ii) Combined Real Estate Transfer Tax Return, Credit Line Mortgage Certificate, and Certification of Exemption from Payment of Estimated Personal Income Tax (i.e., TP-584 Form), and (iii) NYS Real Property Transfer Report (i.e., RP-5217). Any provision in the foregoing sentence notwithstanding, if the Premises are sold hereunder other pursuant to the contemplated Bankruptcy Court order, then: At Closing, Seller and Purchaser shall deliver a prepared and fully executed (i) NYC Real Property Transfer Tax Return and Seller shall deliver a bank check, in payment of the tax or filing fee owed thereon, (ii) Combined Real Estate Transfer Tax Return, Credit Line

Mortgage Certificate, and Certification of Exemption from Payment of Estimated Personal Income Tax (i.e., TP-584 Form) and Seller shall deliver a bank check, in payment of the tax or filing fee owed thereon except that Purchaser shall be responsible for the NYS and NYC "Mansion Tax.", and (iii) NYS Real Property Transfer Report (i.e., RP-5217). Seller and Purchaser shall pay promptly any tax due and interest and penalties, if any, thereon, as required under this Section 40, and each shall indemnify the other therefrom and from any cost, claim and expense (including reasonable attorneys' fees relating thereto or to the enforcement of this indemnity) incurred in connection therewith. The obligations under this paragraph 40 shall survive Closing.

41. Intentionally omitted.

42. In addition to any other "subject to" clauses contained herein, the Premises shall be sold subject to: (a) any state of facts that an accurate survey of the Premises might reveal; (b) any state of facts that a personal inspection of the Premises might reveal provided the same does not render title unmarketable; (c) any minor variance in connection with any fence, hedge, wall or the like surrounding the Premises, provided such variance does not unreasonably interfere with the continued use of the Premises; (d) recorded rights of way, restrictions and easements that do not prohibit the existing structures or the use of the Premises as a residential dwelling or render title to the Premises unmarketable, or make development of the property impractical; (e) any matters of record or in fact created by (i) Seller after the date of this Agreement with the prior written consent of Purchaser, or (ii) Purchaser; (f) revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Premises; and (g) such other matters as the title insurer shall be willing, without special premium, to omit as exceptions to coverage.

43. Intentionally omitted.

44. This Contract may be executed in multiple counterparts and executed and delivered by digital means, all of which shall be one and the same instrument and as valid as a paper contract manually signed and delivered by or on behalf of all parties to this Contract.

**IN WITNESS WHEREOF,** this Rider has been duly executed by the parties hereto as of September 25, 2019.

**SELLER:**

WANSDOWN PROPERTIES CORPORATION N.V.,
a limited liability company established under the laws
of the Netherlands Antilles

By: _____
Name: Gholam Reza Golsorkhi
Title: President and Managing Director

**PURCHASER**

29 BEEKMAN CORP,
a New York corporation

By: _____
Name: Seth A. Akabas
Title: President

**SECOND RIDER TO RESIDENTIAL CONTRACT OF SALE BETWEEN
WANSDOWN PROPERTIES CORPORATION N.V., AS SELLER, AND
29 BEEKMAN CORP, AS PURCHASER
PREMISES: 29 BEEKMAN PLACE, NEW YORK, NEW YORK**

This Second Rider is annexed to and forms a part of the above described transaction and Contract of Sale (the "Contract of Sale" or the "Contract"). If the provisions of this Second Rider conflict with the provisions of the Rider or printed form Contract of Sale to which this Second Rider is attached, the provisions of this Second Rider shall control.

45. The acceptance of a deed by Purchaser or its title agent shall be deemed to be full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Contract, except those, if any, which are specifically stated in this contract to survive delivery of the deed.

46. This Contract shall not be recorded and any attempt to do so shall constitute a material default hereunder.

47. Supplementing Paragraph 6 of the Contract, the Premises are to be transferred subject to the following:

a. Covenants, easements, consents, agreements and restrictions of record which do not adversely affect the use and enjoyment of the Premises for residential purposes, don't affect marketability of the Premises, do not impose any costs on the owner of the Premises, and do not adversely affect ability to develop or re-develop the Premises; and

b. Real estate taxes and sewer rents, subject to adjustment as provided in this Agreement.

48. Seller and Purchaser agree that the Property Condition Disclosure Act, enacted pursuant to Chapter 456 of the Laws of 2001 and as Article 14 of the Real Property Law (the "Disclosure Act") requires a seller of residential real property improved by a one to four family dwelling to deliver to a purchaser a property condition disclosure statement in the form prescribed by the Disclosure Act (the "Disclosure Statement") prior to a purchaser's execution of a binding contract of sale. In lieu of delivering the Disclosure Statement, the Disclosure Act permits a seller to give a purchaser a $500 credit against the purchase price upon the transfer of title (the "Disclosure Credit"). In accordance with the foregoing, Seller hereby elects to give Purchaser the Disclosure Credit against the Purchase Price in lieu of delivering the Disclosure Statement and Purchaser hereby agrees to accept and acknowledges receipt of the Disclosure Credit in lieu of the Disclosure Statement and acknowledges that Purchaser shall have no rights against Seller and Seller shall have no responsibility or liability to Purchaser for not giving the Disclosure Statement.

49. This Contract contains all the terms of the agreement entered into between the parties. Purchaser acknowledges that neither Seller nor anyone on behalf of Seller has made any representations or held out any inducements to Purchaser as to the physical condition or state of

repair of the Premises, except as expressly set forth herein. In furtherance of Section 9 hereof, Purchaser represents and warrants that Purchaser has inspected or caused to be inspected or waived inspection of the Premises, and is fully aware of the physical condition and state of repair thereof. Seller shall not be responsible or liable for any statements, representations, warranties, promises, conditions, agreements or other information (including, without limitation, verbal or written statements, representations of real estate brokers, or "set-up" furnished by any broker, agent, employee, or other person), relating to the Premises, as to the physical condition, state of repair, expenses, operations, legal occupancy, use or any other matter or thing affecting or relating to the Premises, except as expressly set forth herein.

50. See "Disclosure of Information on Lead-Based Paint and Lead-Based Paint Hazards" attached as Schedule A hereof, to be signed by Seller, Purchaser and the broker, if any.

51. **Bankruptcy Matters and Closing.**

a. Purchaser acknowledges that the Premises is owned by Seller, and Seller will file a voluntary chapter 11 case pursuant to the Bankruptcy Code and that consummation of the transactions contemplated herein is subject to Seller's receipt of requisite authority under the Bankruptcy Code pursuant to, among other things, the entry of an order confirming the Plan, or if not possible, then approving a 363 Sale, which order shall contain provisions (i) approving the sale of the Property by Seller to Purchaser, free and clear of any and all mortgages, liens, claims, encumbrances and interests, with any such existing and valid mortgages, liens, claims, encumbrances and interests to attach to only the proceeds of the sale (ii) providing for appropriate injunctions against any actions against Purchaser or the Premises to collect on account of any such mortgages, liens, claims, encumbrances or interests to the fullest extent permitted by the applicable law and rules; (iii) reserving to the Bankruptcy Court jurisdiction to enforce all orders approving and/or matters relating to the sale; (iv) providing that that the Seller and Purchaser are entitled to the relief set forth in Section 1146(a) of the Bankruptcy Code with respect to the Sale if pursuant to a Plan (v) findings that (1) Purchaser has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code (the "**Confirmation Order**"); (2) adequate notice was provided for the sale pursuant to the applicable laws and rules; (3) the Contract price constitutes the highest and best offer for the purchase of said assets under the circumstances of the Case and represents fair and adequate consideration for the assets, (4) the sale to Purchaser is in the best interests of Seller, its bankruptcy estate, creditors, and equity interest holders; (5) the sale has been conducted on an arms-length basis; (6) Purchaser has made proper disclosures of any and all connections between Purchaser and Seller; (7) Purchaser is not a successor in interest to Seller and is not assuming or otherwise liable for any debts of Seller; (8) the sale is being effected pursuant to and in conjunction with the Plan, if one is being confirmed, and, therefore, Purchaser is entitled to the protections and exemptions provided in and pursuant to Section 1146(a) of the Bankruptcy Code; and (vi) shall otherwise be acceptable to Purchaser in its reasonable business discretion. provided, however, if Seller does not file such proceeding or it is dismissed for any reason, then this Contract shall remain a binding obligation of Seller to sell and Purchaser to buy the Premises as set forth herein apart from the contemplated Bankruptcy Court proceeding.

b. Seller shall petition the Bankruptcy Court to approve the sale of the Premises under this Contract, i.e., for clarity, without seeking any other offers, bids or proposals, and shall not propose or request any auction. Seller represents that the net proceeds of a sale under this

Contract would be sufficient to satisfy all claims against Seller and, as reasonably projected, Seller's contemplated estate in bankruptcy, and Seller shall present the Contract for approval by the Bankruptcy Court in such context. Purchaser's expenses in negotiating this Contract, investigating the Premises and participating in the Bankruptcy Proceeding shall, to the fullest extent permitted by applicable law, be treated as administrative expenses of the bankruptcy estate. If, despite Seller's petition described herein, the Bankruptcy Court orders an auction or if any higher offer is made that the Bankruptcy Court accepts, or if the Bankruptcy Court proceeding is dismissed without approval of the sale under this Contract, then, Seller and Purchaser acknowledge, Purchaser will suffer damages that will be extremely difficult to calculate, and so Purchaser shall be entitled to receive, as liquidated damages and not as a penalty, which, Seller and Purchaser acknowledge, is a reasonable estimate of such damages from any disposition in any manner of the Premises other than to Purchaser or Purchaser's assignee (except on a default by Purchaser not cured following notice), equal to: US$500,000, plus 80% of all gross proceeds of such disposition(s) that are in excess of US$10,800,000 (for clarity.. This Section 51(b) shall survive termination of this Contract.

      c.  Notwithstanding anything to the contrary contained in this contract, except subject to Section 51(a) above, the obligations of the parties under this contract are subject in all events to the entry by the Bankruptcy Court of the Confirmation Order approving the sale contemplated by this contract and providing, among other things, that the conveyance to the Purchaser at Closing shall be free and clear of all liens, claims, and encumbrances otherwise payable by Seller or Purchaser at the Closing, other than real estate taxes, permitted exceptions and free of all transfer taxes.

      d.  Seller shall from the date hereof cease all marketing of the Premises, whether direct or indirectly through any other person or entity, and Seller shall respond to any unsolicited communication from a prospective purchaser of the Premises only to the extent to meet Seller's fiduciary duties, and Seller shall cause all of its agents, personnel and affiliates to comply with this Section 51(d); provided, however, in all cases, Seller may depart from compliance with this Section 51(d) to the limited extent as expressly directed by the Bankruptcy Court, if such Bankruptcy Court so directs despite Seller's opposition.

      e.  The closing of the transactions contemplated herein (**"Closing Date"**) shall take place no later than the forty-five (45) days after the Confirmation Order which becomes final and non-appealable, at the office of Blank Rome LLP, 1271 Avenue of the Americas, New York, NY 10020, provided, however, that in no event shall the Closing take place later than January 31, 2020, subject to extension of the Final Date (defined below).

      f.  In the event Purchaser qualifies as a good faith purchaser for value within the meaning of the Bankruptcy Code section 363(m), Purchaser may request that the Closing Date take place prior to the Confirmation Order becoming final and non-appealable. Purchaser shall give at least two (2) business day's written notice of its election to fix a Closing Date pursuant to this paragraph. Seller shall take all commercially reasonable steps to accommodate Purchaser's request.

      52. In addition to the conditions set forth in Paragraph 13 of this Contract, this Contract, Purchaser's obligation to purchase the Premises, and Seller's obligation to convey the

Premises in accordance with this Contract are also subject to, and conditioned upon, the fulfillment of the following conditions precedent:

a.  The Seller shall be a debtor-in-possession, under chapter 11 of the Bankruptcy Code, with the rights, powers, and duties under section 1107 of the Bankruptcy Code and no trustee shall have been appointed.

b.  No order of any court shall have been entered in any action or proceeding instituted by any person that enjoins, restrains, or prohibits the consummation of the transactions contemplated hereby.

c.  The Bankruptcy Court, having jurisdiction over a chapter 11 case of the Seller, shall have entered Confirmation Order, in a form that is not materially different from the proposed order agreed to by the Purchaser and Seller, and the order is final and not the subject of any stay.

d.  The Closing shall occur within forty-five (45) days after the entry of the Confirmation Order but no later than January 31, 2020 (such January 31, 2020 date, as extended hereunder, the "Final Date"); provided, however, that Purchaser may extend such Final Date, on one or more occasions, until the earlier of 30 days after the entry of the Confirmation Order or January 31, 2021 by notice to Seller prior to the passing of the then effective Final Date.

**IN WITNESS WHEREOF,** this Second Rider has been duly executed by the parties hereto as of September 25, 2019.

**SELLER:**                                      **PURCHASER**

WANSDOWN PROPERTIES CORPORATION N.V.,            29 BEEKMAN CORP,
a limited liability company established under the laws   a New York corporation
of the Netherlands Antilles

By:_____                      By:_____
Name: Gholam Reza Golsorkhi                       Name: Seth A. Akabas
Title: President and Managing Director            Title: President

## SCHEDULE A TO SECOND RIDER

### SAMPLE DISCLOSURE FORMAT FOR TARGET HOUSING SALES
### DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT
### AND LEAD-BASED PAINT HAZARDS

**Lead Warning Statement**

Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

**Seller's Disclosure** (initial)

_____ (a) Presence of lead-based paint and/or lead-based paint hazards (check one below):

[ ] Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

[ x ] Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

_____ (b) Records and reports available to the seller (check one below):

[ ] Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

[ x ] Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment** (initial)

_____ (c) Purchaser has received copies of all information listed above.

_____ (d) Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*

_____ (e) Purchaser has (check one below):

[ ] Received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

[ x ] Waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment** (initial)

_____ (f) Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify as of September 25, 2019, to the best of their knowledge, that the information provided by the signatory is true and accurate.

**SELLER:**

WANSDOWN PROPERTIES CORPORATION N.V., a limited liability company established under the laws of the Netherlands Antilles

By:_____
Name: Gholam Reza Golsorkhi
Title: President and Managing Director

**PURCHASER**

29 BEEKMAN CORP,
a New York corporation

By:_____
Name: Seth A. Akabas
Title: President

**AGENT (IF ANY):**

By: _____

**GHOLAM REZA GOLSORKHI**
**29 Beekman Place**
**New York, NY 10022**

September 25, 2019

29 BEEKMAN CORP
c/o Akabas & Sproule
11th Floor
488 Madison Avenue
New York, NY 10022

Re:  Residential Contract of Sale made as of September 25, 2019 between WANSDOWN PROPERTIES CORPORATION N.V., a limited liability company established under the laws of the Netherlands Antilles, and 29 BEEKMAN CORP, a New York corporation

Dear Ladies and Gentlemen:

You and I hereby agree as follows.

In connection with the subject contract (the "Contract") you shall purchase, and I shall sell, the mirrors and chandeliers in the Premises (defined in the Contract), which mirrors and chandeliers are owned by me, for a purchase price of $15,000, which amount shall be placed in escrow with your counsel, who shall acknowledge receipt of same to you and to me upon receipt. Such purchase shall be memorialized by a customary bill of sale at closing under the Contract, and the escrowed purchase price shall be paid at such closing. You will be responsible for any sales tax on such purchase.

The provisions of the Contract are incorporated herein by reference.

Very truly yours,

GHOLAM REZA GOLSORKHI

Agreed:
29 BEEKMAN CORP

By:
Name: Seth A. Akabas
Title:  President