UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
In re:                                        :    Chapter 11
                                              :
WANSDOWN PROPERTIES CORPORATION               :    Case No.:  19-13223 (SMB)
N.V.,                                         :
                                              :
                   Debtor.                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MODIFIED DISCLOSURE STATEMENT FOR CHAPTER 11
PLAN OF WANSDOWN PROPERTIES CORPORATION N.V.**

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN
FOR WANSDOWN PROPERTIES CORPORATION N.V.  ACCEPTANCES OR
REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS
BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE
STATEMENT IS BEING SUBMITTED TO THE BANKRUPTCY COURT FOR
APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE
INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR
AMENDMENT.**

New York, New York
December 29, 2019

RUBIN LLC
Paul A. Rubin
Hanh V. Huynh
345 Seventh Avenue, 21st Floor
New York, New York 10001
Tel: 212.390.8054
Fax: 212.390.8064
prubin@rubinlawllc.com
hhuynh@rubinlawllc.com

1

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR THE PURPOSES OF SOLICITING ACCEPTANCES OF THE CHAPTER 11 PLAN OF WANSDOWN PROPERTIES CORPORATION N.V., DATED DECEMBER 2, 2019 (AS THE SAME MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE "PLAN"), AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.[1]  A COPY OF THE PLAN IS ANNEXED HERETO AS EXHIBIT A.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

**ALL HOLDERS OF CLAIMS ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  IN PARTICULAR, ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VI (CERTAIN OTHER FACTORS) OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THE PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.   IN THE EVENT OF ANY CONFLICTS BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN GOVERN.**

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING WITH RESPECT TO PROJECTED CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBE HEREIN.

AS TO CONTESTED MATTERS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT ALSO WILL NOT BE CONSTRUED TO BE

---

[1] Unless otherwise expressly set forth herein, capitalized terms used but not otherwise herein defined have the same meanings ascribed to such terms in the Plan.

CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR AND DEBTOR IN POSSESSION IN THE DEBTOR'S CHAPTER 11 CASE. THE DEBTOR URGES EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON SUCH HOLDER'S CLAIM OR INTEREST.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

# I.

## INTRODUCTION

On October 8, 2019 (the "Commencement Date"), Wansdown Properties Corporation N.V. (the "Debtor") commenced with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a voluntary case pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor's chapter 11 case (the "Chapter 11 Case") is being administered under the caption In re Wansdown Properties Corporation N.V., Case No. 19-13223 (SMB).

On [ ], 2019, the Bankruptcy Court preliminarily approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical holder of an Allowed Claim to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The purpose of this Disclosure Statement is to provide holders of Claims ~~entitled to vote to accept or reject the Plan~~ with adequate information about (i) the Debtor's business and certain historical events, (ii) the Chapter 11 Case, (iii) the Plan, and (iv) the rights of holders of Claims and Interests under the Plan~~, and (v) other information necessary to enable each Holder of a Claim entitled to vote on the Plan to make an informed judgment as to whether to vote to accept or reject the Plan. Holders of Interests are not entitled to vote on the Plan (see discussion at Section V of the Disclosure statement).~~.

Pursuant to section 1125 of the Bankruptcy Code, the Debtor submits this Disclosure Statement to all holders of Claims against ~~the Debtor entitled to vote on the Plan to provide information in connection with the solicitation of votes to accept or reject the Plan. The Disclosure Statement is also available to all holders of Claims against~~ and Interests in the Debtor for informational purposes, including detailing the impact the Plan will have on such holders' Claims and Interests. The Disclosure Statement is organized as follows:

- Section I includes certain general information.
- Section II provides an overview of the Debtor.
- Section III sets forth key events leading to the Chapter 11 Case.
- Section IV discusses the Chapter 11 Case.
- Section V contains a summary of the Plan.
- Section VI describes certain risk factors affecting the Debtor.
- Section VII discusses certain U.S. federal income tax consequences of the Plan.
- Section VIII addresses confirmation of the Plan.
- Section IX concludes this Disclosure Statement and recommends that eligible creditors vote to accept the Plan.

## A. ~~VOTING PROCEDURES~~

~~As set forth in more detail in Section V.C of this Disclosure Statement, certain holders of Claims are entitled to vote to accept or reject the Plan. For each holder of a Claim entitled to vote, the Debtor has enclosed, along with a copy of the Disclosure Statement, among other things, a ballot and voting instructions regarding how to properly complete the ballot and submit a vote with respect to the Plan. Holders of more than one Claim will receive an individual ballot for each Claim. The individual ballots must be used to vote each individual Claim. For detailed voting instructions, please refer to the specific voting instructions and the ballot enclosed with this Disclosure Statement.~~

~~All completed ballots must be actually received by the ballot collector at the following address no later than 5:00 p.m. (Eastern Time) on January 7, 2020 (the "Voting Deadline").~~

~~Via Regular Mail, Overnight Couriers, or Hand Delivery:~~

~~Hanh Huynh~~
~~Rubin LLC~~
~~345 Seventh Avenue, 21st Floor~~
~~New York, NY 10001~~

~~If you are holder of a Claim that is entitled to vote on the Plan and you did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting with respect to the Plan, please contact Hanh V. Huynh at (212) 390-8272 or email ().~~

~~THE BALLOT COLLECTOR WILL NOT COUNT ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE.~~

## ~~B.~~A. DISCLOSURE STATEMENT EXHIBITS

The following are exhibits to this Disclosure Statement. Exhibits A, B and C are included in the solicitation materials distributed with the Disclosure Statement.

• **EXHIBIT A – Liquidation Analysis**

• **EXHIBIT B – Chapter 11 Plan**

• **EXHIBIT C – Real Estate Purchase Agreement**

## ~~C.~~B. THE DEBTOR'S PROFESSIONALS

The Debtor has retained the following professionals pursuant to separate orders of the Bankruptcy Court: (i) Rubin LLC, as bankruptcy counsel to the Debtor, and (ii) Blank Rome LLP, as special litigation, real estate, and tax counsel to the Debtor.

## ~~D.~~C.    IMPORTANT DATES

Please take note of the following important dates and deadlines with respect to the Debtor's Plan and proposed sale of its property thereunder:

| | |
|---|---|
| Deadline to file and serve any objection or response to the Plan (the "Plan Objection Deadline") | January 7, 2020 at 5:00 p.m. (prevailing Eastern Time) |
| Scheduled date and time for the commencement of the combined hearing to consider final approval of the Disclosure Statement and confirmation of the Plan and to approve sale of the property (the "Confirmation Hearing") | January 14, 2020 at 10:00 a.m. (prevailing Eastern Time) |

## ~~E.~~D.    BRIEF OVERVIEW OF THE PLAN[2]

The Plan described in this Disclosure Statement provides the Allowed Claims of creditors to be satisfied from the sale of the Debtor's Property.  The Debtor has entered into a contract to sell the Property to 29 Beekman Corp. (the "Purchaser"), pursuant to a residential contract of sale, inclusive of the exhibits and riders thereto (the "Purchase Agreement") for the purchase price of $10,300,000.  Pursuant to the terms of the Purchase Agreement, the sale must close on or before January 31, 2020, and absent a timely closing, the Purchaser shall be entitled to the return of its deposit and have no further obligations under the Purchase Agreement.

As set forth herein, the Debtor has marketed the Property for over 12 months ~~in connection~~ with the assistance of a real estate broker. ~~Based~~The offer made by the Purchaser was made independently of the broker, and as set forth in Section III.B hereof, based on the ~~interest garnered from the~~ numerous and extensive marketing efforts and the results of the same, the Debtor determined that the offer made by the Purchaser ~~to be~~is the highest and best offer that it ~~could~~can currently obtain ~~as a result of its sale efforts~~ and represents fair and adequate consideration for the ~~purchase of the~~ Property.

Mr. Gholam Reza Golsorkhi, the Debtor's managing member and president, is the holder of general unsecured claims against the Debtor in the total amount of $7,480,000, which claims Mr. Golsorkhi has indicated he will agree to subordinate his claims to the claims of all other Allowed General Unsecured Claims for the purposes of the Plan.  Mr. Golsorkhi's claims are classified in Class 5 Subordinated Unsecured Claims, because the Debtor anticipates that Mr. Golsorkhi will enter into a stipulation with the Debtor memorializing his consent to the subordination of his claims under the Plan.

---

[2] This summary is qualified in its entirety by reference to the Plan. Statements as to the rationale underlying the treatment of Claims and Equity Interests under the Plan are not intended to, and will not, waive, compromise or limit any rights, claims, defenses, or causes of action in the event that the Plan is not confirmed. You should read the Plan in its entirety before voting to accept or reject the Plan.

The following summary table briefly outlines the classification and treatment of Claims against and Interests in the Debtor under the Plan, and the voting eligibility of the holders of such Claims and Interests.  As set forth in the Plan, the classification of Claims and Interests set forth herein will apply.  The following summary table is qualified in its entirety by reference to the full text of the Plan.

| Class | Designation | Treatment | Entitled to Vote | Estimated Amount |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | $0 |
| 2 | Real Property Tax Claims | Unimpaired | No (deemed to accept) | $386,937 |
| 3 | Secured Claims | Unimpaired | No (deemed to accept) | $8,811,543[3] |
| 4 | General Unsecured Claims | Unimpaired | No (deemed to accept) | $764,779 |
| 5 | Subordinated Unsecured Claims | Unimpaired | No (deemed to accept) | $7,480,000 |
| 6 | Existing Equity Interests | Unimpaired | No (deemed to accept) | $0 |

Section V.C of this Disclosure Statement provides a more detailed description of the treatment of Claims and Interests under the Plan.

Pursuant to the provisions of the Bankruptcy Code, only those holders of Claims or Interests in Classes that are impaired under a plan of reorganization and that are not deemed to have rejected the plan are entitled to vote to accept or reject such proposed plan.  Classes of Claims or Interests in which the holders of Claims are unimpaired under a proposed plan are deemed to have accepted such proposed plan and are not entitled to vote to accept or reject the Plan.  Classes of Claims or Interests in which the holders of Claims receive no distribution under a proposed plan are deemed to have rejected such proposed plan and are not entitled to vote to accept or reject the Plan.

~~G.     CONFIRMATION UNDER SECTION 1129(b)~~

~~If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtor reserves the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both.  In addition, with respect to the Classes that are deemed to have rejected~~

---

[3] The total estimated amount of Class 3 Secured Claims includes the claim of Azari in the amount of $3.4 million, which will be the subject of an avoidance action by the Debtor.

the Plan, the Debtor intends to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

Section 1129(b) permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or interests. Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and reasonable" with respect to each rejecting class.

## H.F.    CONFIRMATION HEARING

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on **January 14, 2020 at 10:00 a.m.** (Eastern Time) before the Honorable Stuart M. Bernstein at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Customs House, One Bowling Green, New York 10004. Objections and responses to confirmation of the Plan, if any, must be served and filed as to be received on or before the Plan Objection Deadline on **January 7, 2020 at 5:00 p.m. (prevailing Eastern Time)**, in the manner described in the order preliminarily approving this Disclosure Statement (the "Disclosure Statement Order") and Section VIII.B of this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## II.

## OVERVIEW OF THE DEBTOR

## A.    THE DEBTOR'S BUSINESS

The Debtor primary asset is a seven-story townhouse located at 29 Beekman Place, New York, New York (the "Property"). The Debtor was incorporated in 1979 under the laws of Curacao, in accordance with Article 38 of the Commercial Code of the Netherlands Antilles and continues to exist under the laws of the Netherland Antilles. The Debtor was formed as a holding company to own and manage the Property for an affluent individual who deceased in January 2016.

## III.

## KEY EVENTS LEADING TO THE
## COMMENCEMENT OF THE CHAPTER 11 CASE

## A.    LITIGATION WITH MS. AZARI & THE SCHEDULED SHERIFF'S SALE

In 2014, the Debtor decided to sell the Property and listed it for sale. Due to the then existing market conditions, the listing was terminated and the Property removed from the market. As late as 2016, the Debtor still had several employees, including Ms. Azari. At that time, Ms. Azari was earning $9,000 a month for her services. In an effort to maintain the high standard of living that her paycheck from the Debtor provided, Ms. Azari sought to secure a commitment from the Debtor to continue paying her even though her services were no longer needed.

On April 21, 2016, the Clerk of the New York Supreme Court for the County of New York (the "State Court") entered a judgment in favor of Ms. Azari and against the Debtor in the principal amount of $2.7 million, based on a confession of judgment. On February 13, 2017, the Debtor commenced a plenary action seeking to vacate the judgment by filing a complaint (the "Complaint") in the State Court. On April 3, 2017, Ms. Azari moved to dismiss the Complaint. Following oral argument, on October 17, 2017, the State Court issued a ruling denying the motion. Ms. Azari appealed. On October 23, 2018, the Supreme Court, Appellate Division, reversed the State Court decision and entered a judgment against the Debtor. In its decision, the appellate court found that the Debtor's managing director had the authority to execute the confession of judgment on behalf of the Debtor and, as such, the judgment was proper. On July 8, 2019, Ms. Azari sought to enforce the judgment through a writ of execution.

A sheriff's sale with respect to the Property was scheduled for October 9, 2019, at 11:00 a.m. The Debtor believes that the Judgment is far in excess of the amount due Ms. Azari and entry of the judgment constitutes a fraudulent transfer.

**B.      PREPETITION MARKETING EFFORTS AND OBJECTIVES OF THE SALE PROCESS**

This case has been commenced by the Debtor to protect its sole asset – the Property – and to sell it in an organized sale process, and not a fire sale, so that the Debtor will maximize its value.

In early 2019, the Debtor retained Charlie Attias, a licensed real-estate broker, at the Corcoran Group, to market and sell the property. Mr. Attias was hired based upon his experience selling similar town houses and his international background.[4] Given that the Property is situated near the United Nations, the Property was marketed to wealthy internationals and foreign governments as potential embassy space. Several embassies viewed the Property, but none made an offer. ~~Ultimately~~Before the retention of Mr. Attias, one buyer made an offer for $17 million, but the sale never closed and the purchaser created a cloud on title.

In April 2019, Mr. Attias re-listed the Property for $17,995,000. In or around September 2019, Mr. Attias left Corcoran and began working at Compass. After joining Compass, Mr. Attias used Compass's resources to market the Property. As a result of this process, the Property garnered interest from a number of potential buyers, but Mr. Attias was unable to procure any binding offers. Ultimately, however, the Debtor received one binding offer, which was not obtained through Mr. Attias, Corcoran, or Compass. The offer came from the Purchaser, a New York Corporation, in the amount of $10,300,000. After reviewing the offer and an arms' length negotiation, and after considering the length of the marketing process, the Debtor determined that Purchaser's offer was not only the highest, but also the best offer for the Property, because of Purchaser's willingness to structure the Purchase Agreement to reduce the Debtor's execution risk.

Thereafter, the Debtor, in consultation with its advisors, negotiated, at arms' length, the Purchase Agreement with the Purchaser.

Under the Purchase Agreement, the Purchase, among other things, has agreed to:

---

[4] https://streeteasy.com/cattias

(a)       pay the purchase price of $10,300,000;

(b)       close on the sale of the Property on or before January 31, 2020; and

~~(c)~~       deliver a cash deposit of $1,030,000, which has been provided by Purchaser~~; and~~

~~(d)~~(c)     ~~purchase the Property "as is" being fully aware of its physical condition and state of repair~~.

Collectively, these agreements of Purchaser limit the risk of Purchaser's failure to perform as required by the Purchase Agreement. It was of the utmost importance to the Debtor to reduce the execution risk regarding the Purchase Agreement, and Purchaser was the only party willing to provide a cash deposit to support its offer at a time when the Debtor was contemplating the filing of a chapter 11 case.

Under the Purchase Agreement, the parties have agreed that the consummation of the transactions contemplated thereunder is subject to the Debtor's receipt of requisite authority under the Bankruptcy Code pursuant to, among other things, the entry of an order confirming a chapter 11 plan, or if not possible, then an order approving a sale of the property under section 363 of the Bankruptcy Code.

At Purchaser's insistence, the Purchase Agreement contains the following liquidated damages provision:

> If, despite Seller's petition described herein, the Bankruptcy Court orders an auction or if any higher offer is made that the Bankruptcy Court accepts, or if the Bankruptcy Court proceeding is dismissed without approval of the sale under this Contract, then, Seller and Purchaser acknowledge, Purchaser will suffer damages that will be extremely difficult to calculate, and so Purchaser shall be entitled to receive, as liquidated damages and not as a penalty, which, Seller and Purchaser acknowledge, is a reasonable estimate of such damages from any disposition in any manner of the Premises other than to Purchaser or Purchaser's assignee (except on a default by Purchaser not cured following notice), equal to: US$500,000, plus 80% of all gross proceeds of such disposition(s) that are in excess of US$10,800,000 (for clarity). This Section 5(b) shall survive termination of this Contract.

As set forth above, the Debtor determined that value will be maximized by commencing this case and seeking ~~court~~Court approval of the Purchase Agreement.

In order to implement the terms of the Purchase Agreement, the Debtor filed for bankruptcy to stay the sheriff's sale. The Debtor believes that the Purchase Agreement represents the best means to obtain the highest amount of proceeds for a sale of the Property and concomitantly the largest amount of proceeds for distribution to unsecured ~~creditor~~creditors.

# IV.

# THE CHAPTER 11 CASE

## A.   PLEADINGS

Shortly after the Chapter 11 Case was filed, the Debtor filed the following initial documents:

(a)   Schedules of Assets and Liabilities

(b)   Statement of Financial Affairs

(c)   Application to Employ Rubin LLC as Bankruptcy Counsel

(d)   Application to Employ Blank Rome LLP as special litigation, real estate and tax counsel

(e)   Application for an order establishing the deadline for creditors to file proofs of claim against the Debtor

By filing these pleadings, the Debtor has retained the appropriate professionals to administer the Chapter 11 Case in order to proceed with its proposed sale process and seek to confirm a plan providing for such sale.

## B.   AZARI AVOIDANCE ACTION

The Debtor intends to file a complaint against Ms. Azari to avoid, as a fraudulent transfer, the transaction memorialized by the confession of judgment discussed above in that the Debtor received no value, let alone reasonably equivalent value, for the obligations assumed by the Debtor in the confession of judgment.

# V.

# THE PLAN

## A.   INTRODUCTION

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed as Exhibit B hereto.  This summary is qualified in its entirety by reference to the provisions of the Plan, which provisions shall control in the event of any discrepancy with the descriptions contained in the Disclosure Statement.

In general, a chapter 11 plan divides claims and equity interests into separate classes, specifies the property that each class is to receive under the Plan, and contains other provisions necessary to implement the Plan.

Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "equity holders," are classified because creditors and equity holders may hold claims and equity interests in more than one class.

Statements as to the rationale underlying the treatment of claims and equity interests under the Plan are not intended to, and will not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

THE DEBTOR URGES YOU TO READ THE PLAN IN ITS ENTIRETY
BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

One of the key concepts under the Bankruptcy Code is that only claims that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below.

In general, an "allowed" claim or an "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed. These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or under applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damages in excess of specified amounts, late-filed claims, and contingent claims for contribution and reimbursement. In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires, for purposes of treatment and voting, that a chapter 11 plan divides the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are not necessarily classified together, nor are equity interests of a substantially similar legal nature necessarily classified together. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the Plan) or "unimpaired" (unaffected by the Plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the Plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the Plan (i) does not alter the legal, equitable and contractual rights of the holders, or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights.

Pursuant to section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the Plan. Accordingly, their votes are not solicited. Under the Plan, all of the following classes are unimpaired, and therefore, the holders of such Claims are "conclusively presumed" to have voted to accept the Plan: Class 1 (Other Priority Claims), Class 2 (Real Property Tax Claims), Class 3 (Secured Claims), and Class 4 (General Unsecured Claims)..

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan. For example, a class is deemed to reject a plan under section 1126(g) of the Bankruptcy Code if the holders of claims or equity interests in such class do not receive or retain property under the Plan on account of their claims or equity interests. In this plan, no class is conclusively presumed to have rejected the Plan.

## B.    UNCLASSIFIED CLAIMS

*1.    Administrative Claims.*

Administrative Claims are the actual and necessary costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code.

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Debtor or Reorganized Debtor, as applicable, agree to different treatment, the Debtor (or the Reorganized Debtor as the case may be) shall pay to each holder of an Allowed Administrative Expense Claim, Cash in an amount equal to such Claim (plus statutory interest on such claim, if applicable), on or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor shall be paid from Available Cash by the Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the Bar Date Order), requests for payment of Administrative Expense Claims, other than requests for payment of Fee Claims must be filed and served on the Debtor no later than the Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.

Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtor or its property, and Administrative Expense Claims shall be deemed compromised, settled, and released as of the Effective Date. The Debtor or Reorganized Debtor, as applicable, must file and serve objections to Administrative Expense Claims on or before the Administrative Expense Claims Objection Bar Date.

  2. *Fee Claims.*

All entities seeking an award by the Bankruptcy Court of Fee Claims shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date. No later than ten (10) days prior to the Effective Date, all entities holding claims for Fee Claims shall serve upon the Debtor a notice of the estimated amount of their unpaid Fee Claim and Debtor shall segregate, at Closing of the Sale Transaction, into a Estimated Professional Fee Escrow, the amounts which are necessary to pay the amount of such Fee Claim, in full subject to Allowance by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the date upon which the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtor or Reorganized Debtor, as applicable. The Reorganized Debtor is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

  3. *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course.

## C. **CLASSIFICATION OF CLAIMS AND INTERESTS**

All of the potential classes of claims against the Debtor and equity interests in the Debtor are set forth in the Plan.

  1. *Class 1 – Other Priority Claims.*

Class 1 is unimpaired, and the holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Priority Claim against the Debtor that has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash from the Plan Fund in an amount equal to such Claim,

payable on the later of the Effective Date, the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or when such claim becomes payable in the ordinary course or as soon as reasonably practical thereafter.

2.       *Class 2 – Real Property Tax Claims.*

Class 2 is unimpaired, and holders of Allowed Class 2 Real Property Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Real Property Tax Claims are not entitled to vote to accept or reject the Plan.

Each Holder of an Allowed Class 2 Claim shall receive Cash in an amount sufficient to satisfy the sum of the Allowed Class 2 Claim, together with all applicable interest, costs and fees payable on the Effective Date.

3.       *Class 3 – Secured Claims.*

Class 3 is unimpaired, and holders of Allowed Claims in Class 3 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Secured Claims are not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Secured Claim against the Debtor has agreed to less favorable treatment of such Claim, each holder of an Allowed Secured Claim shall receive, at the option of the Reorganized Debtor, (i) payment in full and final satisfaction of such Allowed Class 3 Claim, Cash from the Plan Fund in the amount of such Allowed Claim payable on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Claim, or as soon as reasonably practical thereafter, (ii) delivery of the collateral securing such Allowed Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code..

4.       *Class  – General Unsecured Claims.*

Class 4 is unimpaired, and holders of Allowed Claims in Class 4 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of a General Unsecured Claim against the Debtor has agreed to less favorable treatment of such Claim, each holder of an Allowed General Unsecured Claim shall receive payment in full and final satisfaction of such Allowed Class 4 Claim, Cash from the Plan Fund in the amount of such Allowed Claim payable plus accrued post-petition interest at the Federal Judgment Rate on the Effective Date, on the later of the Effective Date and the date on which such General Unsecured Claim becomes an Allowed Claim, or as soon as reasonably practical.

5. *Class 5 – Subordinated Unsecured Claims.*

Class 5 is ~~Impaired~~unimpaired by the Plan, and the ~~holders~~holder of ~~Allowed~~the Class 5 Subordinated Unsecured Claims ~~are~~is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holder of Subordinated Unsecured Claims is not entitled to vote to accept or reject the Plan.

~~Except to the extent that a~~The holder of ~~a~~Allowed Subordinated Unsecured ~~Claim against~~ Claims shall receive (up to ~~the Debtor has agreed to less favorable treatment~~amount of ~~such Claim, each holder of an~~his Allowed Subordinated Unsecured ~~Claim shall receive a pro rata share of~~Claims) the Cash remaining after (a) payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Fee Claims, and (b) payment in full of the Allowed Claims in Classes 1, 2, 3 and 4.

6. *Class 6 – Existing Equity Interests.*

Class 6 is ~~Impaired~~unimpaired by the Plan, and the holders of Allowed Existing Equity Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holders Existing Equity Interest are not entitled to vote to accept or reject the Plan.

The holders of Allowed Existing Equity Interests shall retain their equity interests in the Debtor, and shall receive the Sale proceeds, if any, remaining after ~~(i)~~ payment of the Allowed Claims in Classes 1, 2, 3, 4 and 5 and payment in full of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Fee Claims in full in Cash on the Effective Date.

D. **MEANS FOR IMPLEMENTATION**

1. *The Sale.*

The Confirmation Order shall authorize the Sale of the Property under sections 363, 365, 1123(b)(4), 1129(b)(2)(A)(iii) and 1146(a) of the Bankruptcy Code. ~~Upon~~ and approve the ~~occurrence~~terms of the ~~Effective Date, the~~Purchase Agreement. The Confirmation Order shall authorize the Debtor and Reorganized Debtor, as applicable, to sell the Property to the Purchaser, free and clear of all liens, claims and encumbrance and to take any and all actions necessary to consummate the Sale of the Property, consistent with the terms of the Purchase Agreement, without further order of the Bankruptcy Court.

2. *Exemption From Certain Taxes.*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer under this Plan as confirmed by the Court, (including an instrument of transfer executed in furtherance of the sale contemplated by the Plan), shall not be subject to tax under any law imposing a stamp tax, real estate transfer tax, mortgage recording tax or similar tax due on the sale of the Property in connection with or in furtherance of the Plan as confirmed by the Court and the funding requirements contained herein and shall not be subject to any state, local or federal law imposing such tax and the appropriate state or local government officials or agents shall forego collection of

any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

3.     *Preservation of Rights and Causes of Action.*

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court order, the Reorganized Debtor, on behalf of the Estate, reserves any and all Causes of Action. On and after the Effective Date, the Reorganized Debtor may pursue such Causes of Action in its sole discretion. No Entity mayshould rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtor will not pursue any and all available Causes of Action against it.  The Reorganized Debtor shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Confirmation of the Plan itself.  For avoidance of doubt, claims, causes of action and rights against Azari are specifically preserved.

## E.     **DISTRIBUTIONS**

1.     *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the transfer register for each of the Classes of Claims or Interests as maintained by the Debtor shall be deemed closed, and there shall be no further changes in the record of holders of any of the Claims or Interests. The Debtor or the Reorganized Debtor, as applicable, shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

2.     *Date of Distributions.*

Except as otherwise provided herein, the Reorganized Debtor shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date and thereafter, the Reorganized Debtor shall from time to time determine the subsequent Distribution Dates, if any. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

The Reorganized Debtor shall reserve an amount sufficient to pay holders of Disputed Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims. In the event the holders of Allowed Claims have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Reorganized Debtor shall make a final distribution to all holders of Allowed Claims.

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

### 3. *Delivery of Distributions.*

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Reorganized Debtor has determined the then current address of such holder, at which time such distribution shall be made to such holder without Interest; provided, however, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date the Initial Distribution is made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Reorganized Debtor automatically and without need for a further order by the Bankruptcy Court for distribution in accordance with the Plan, and the Claim of any such holder to such property or interest in property shall be released, settled, compromised, and forever barred. The Reorganized Debtor shall have no obligation to locate the current address for a returned distribution.

### 4. *Payment of Disputed Claims.*

As Disputed Claims are resolved pursuant to Section 8 hereof, the Reorganized Debtor shall make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date. Such distributions shall be made on the first Distribution Date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Reorganized Debtor in the Reorganized Debtor's sole discretion.

## F. PROCEDURES FOR DISPUTED CLAIMS

### 1. *Allowance of Claims.*

After the Effective Date, the Reorganized Debtor shall have and shall retain all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under this Plan. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim.

### 2. *Objections to Claims.*

As of the Effective Date, objections to and requests for estimation of Claims against the Debtor may be interposed and prosecuted only by the Reorganized Debtor. Such objections and requests for estimation shall be served and filed (a) on or before the 60th day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is

otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Reorganized Debtor.

3.      *Estimation of Claims.*

The Debtor or Reorganized Debtor, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim(s) pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor or Reorganized Debtor, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or Reorganized Debtor, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. The aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4.      *No Distributions Pending Allowance.*

No payment or distribution provided under the Plan shall be made on account of a Claim unless and until such Claim is an Allowed Claim.

5.      *Resolution of Claims.*

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its estate may hold against any Person, without the approval of the Bankruptcy Court, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith. The Reorganized Debtor may pursue such retained Claims, rights, Causes of Action, suits or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtor.

6.      *Disallowed Claims.*

All Claims held by persons or entities against whom or which of the Debtor or Reorganized Debtor, as applicable, has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code shall be deemed "disallowed" Claims pursuant to section 502(d) of the Bankruptcy Code and holders of such Claims shall not be entitled to vote to accept or reject the Plan. Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the Avoidance Action against such

party has been settled or resolved by Final Order and any sums due to the Debtor or Reorganized Debtor, as applicable, from such party have been paid.

## G.     **EFFECT OF CONFIRMATION**

### 1.     *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtor's Estate shall vest in the Reorganized Debtor free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided pursuant to this Plan and the Confirmation Order.

### 2.     *Release of Liens.*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Reorganized Debtor, unless sold to the Purchaser pursuant to the Sale Transaction. Upon the closing of the sale of the Property and Purchaser's payment of the purchase price as required under the Purchase Agreement, the Property shall be sold free and clear of all liens, claims and encumbrances, and such liens, claims and encumbrances shall attach to the proceeds of the sale.

### 3.     *Subordination of Claims or Interests.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, under section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtor or Reorganized Debtor, as applicable, reserves the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 4.     *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtor, and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

### 5.     *Term of Injunctions or Stays.*

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence

on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

6.      *Plan Injunction.*

Except (i) as otherwise provided under a Final Order entered by the Bankruptcy Court or (ii) with respect to the Debtor's obligations under the Plan and the Purchase Agreement, the entry of the Confirmation Order shall forever stay, restrain and permanently enjoin, with respect to any Claim held against the Debtor as of the date of entry of the Confirmation Order, (i) the commencement or continuation of any action, the employment of process, or any act to collect, enforce, attach, recover or offset from the Debtor, from the Property, or from property of the Estate that has been or is to be distributed under the Plan, and (ii) the creation, perfection or enforcement of any lien or encumbrance against the Property and any property of the Estate that has been or is to be, distributed under the Plan. Except as otherwise provided in the Confirmation Order, the entry of the Confirmation Order shall constitute an injunction against the commencement or continuation of any action, the employment of process, or any act to collect, recover or offset from the Debtor, from the Property, or from property of the Estate, any claim, any obligation or debt that was held against the Debtor by any person or entity as of the Confirmation Date except pursuant to the terms of this Plan. The entry of the Confirmation Order shall permanently enjoin all Creditors, their successors and assigns, from enforcing or seeking to enforce any such Claims.

7.      *Limitation of Liability.*

To the maximum extent permitted under section 1125(e) of the Bankruptcy Code, neither the Exculpated Parties nor any of their respective officers, directors, or employees (acting in such capacity) nor any professional person employed by any of them, shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, the Disclosure Statement, the Plan Supplement or the any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan, provided that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement, except in the case of fraud, gross negligence, willful misconduct, malpractice, breach of fiduciary duty, criminal conduct, unauthorized use of confidential information that causes damages, or ultra vires acts. Nothing in this Section 11.7 shall limit the liability of the Debtor's professionals pursuant to Rule 1.8 (h)(1) of the New York State Rules of Professional Conduct. Nothing in the Plan or the confirmation order shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Debtor or any of its respective members, shareholders, officers, directors, employees, attorneys, advisors, agents, representatives and assigns, nor shall anything in the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Debtor or any of its respective members, officers, directors, employees, attorneys, advisors, agents, representatives and assigns for any liability whatever, including without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority, nor

~~shall anything in this Plan exculpate Debtor or any of its respective members, officers, directors, employees, attorneys, advisors, agents, representatives and assigns from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority.~~

~~8.     *Debtor Release.*~~

~~Except as otherwise provided in the Plan, upon the Effective Date, in consideration of the Cash and other property to be distributed to or on behalf of the holders of Claims and Interests under the Plan, the Plan shall be deemed to resolve all disputes and constitute a settlement and release, between and among the Debtor, on the one hand, and each Creditor and Interest Holder, on the other, from any claim or liability, whether legal, equitable, contractual, secured, unsecured, liquidated, unliquidated, disputed, undisputed, matured, unmatured, fixed or contingent, known or unknown, that the Debtor, its Creditors or Interest Holder ever had or now have through the Effective Date in connection with their Claim or Interest (including, without limitation, any claims the Debtor may assert on its own behalf or on behalf of Creditors or Interest Holders pursuant to sections 510 and 542 through 553 of the Bankruptcy Code, any claims Creditors or Interest Holders may have asserted derivatively on behalf of the Debtor absent bankruptcy, any claims based on the conduct of the Debtor's business affairs prior or subsequent to the commencement of the Case or any claims based on the negotiation, submission and confirmation of the Plan).~~

~~9.~~8.     *Plan Supplement.*

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court by no later than the Plan Supplement Filing Deadline. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

## H.     **MISCELLANEOUS PROVISIONS**

*1.     Amendments.*

(a)     *Plan Modifications*. Plan may be amended, modified or supplemented by the Debtor in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code; provided that such amendments, modifications, or supplements shall be satisfactory in all respects to the Debtor. In addition, after the Confirmation Date, the Debtor may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

(b)     *Other Amendments*. Before the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

2.     *Revocation or Withdrawal of Plan.*

The Debtor reserves the right to revoke or withdraw the Plan, prior to the Confirmation Date. If the Debtor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtor, the Debtor's Estates, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor, the Debtor's Estates, or any other Entity.

## VI.

## CERTAIN RISK FACTORS AFFECTING THE DEBTOR

## A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

1.     *Risk of Non-Confirmation of the Plan.*

Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate ~~re~~-solicitation of votes.

~~2.     *Non-Consensual Confirmation.*~~

~~In the event any impaired class of claims or interests entitled to vote on a plan of reorganization does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.~~

## B.    ADDITIONAL FACTORS TO BE CONSIDERED

1.     *The Debtor Has No Duty to Update.*

The statements contained in this Disclosure Statement are made by the Debtor as of the ~~Commencement Date~~date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

2.     *No Representation Outside This Disclosure Statement Are Authorized.*

No representations concerning or related to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

3.     *No Legal or Tax Advice Is Provided to You by This Disclosure Statement.*

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of a Claim or Interests should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

4.     *No Admission Made.*

Nothing contained in the Plan will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or on holders of Claims or Interests.

5.     *Failure to Identify Litigation Claims or Projected Objections.*

No reliance should be placed on the fact that particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtor may seek to investigate, file, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

6.     *No Waiver of Right to Object or Right to Recover Transfers and Assets.*

The vote by a holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtor (or any entity, as the case may be) to object to that holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtor or its Estate are specifically or generally identified in this Disclosure Statement.

7.     *Information Was Provided by the Debtor and Was Relied Upon by the Debtor's Advisors.*

The Debtor's advisors have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement.  Although the Debtor's advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

# VII.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and to certain holders of Allowed Claims. This summary does not address the U.S. federal income tax consequences to holders of Claims whose Claims are entitled to payment in full in Cash, holders of Secured Claims or holders of Claims or Interests who are deemed to have rejected the Plan.

This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "Tax Code"), existing and proposed U.S. Treasury regulations (the "Treasury Regulations"), judicial decisions, and published rules and of the Internal Revenue Service (the "IRS") as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Debtor has not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan. This summary does not address state, local or foreign income or other tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as non-U.S. persons, broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, any other Debtor entity, persons holding securities as part of a hedging, straddle, conversion or constructive sale transaction or other integrated investment, traders in securities that elect to use a mark-to-market method of accounting for their security holding, dealers in securities or foreign currencies, persons whose functional currency is not the U.S. dollar, certain expatriates or former long term residents of the United States, persons who received their Claim as compensation or who acquired their Claim in the secondary market, and persons subject to the alternative minimum tax or the "Medicare" tax on net investment income). Additionally, this discussion does not address the Foreign Account Tax Compliance Act.

The following discussion generally assumes that, the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form, that the Plan will be treated as a plan of liquidation of the Debtor for U.S. federal income tax purposes, and that all distributions to holders of Claims and Interests will be taxed accordingly.

**ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR *INFORMATIONAL* PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.**

## A.    <u>CONSEQUENCES TO THE DEBTOR</u>

As indicated above, the Debtor intends to treat the Plan as a plan of liquidation for U.S. federal income tax purposes in that the Debtor will remain in existence following the Effective Date solely for the purpose of winding up their affairs including, but not limited to, resolving outstanding Claims, selling their assets and distributing the proceeds and any remaining property to or for the benefit of holders of Allowed Claims and Interests. The U.S. federal income tax impact of the Plan on the NOLs and other tax attributes of the Debtor is further discussed below.

    *1.    Sale and Other Dispositions of Assets.*

The Plan authorizes the Debtor to take any and all actions necessary to consummate the sale of the Property. The Tax Code as cancellation of debt income ("<u>CODI</u>"), upon the elimination or reduction of debt for insufficient consideration. The Tax Code provides an exception to such income recognition treatment for any CODI arising in bankruptcy, but generally requires the debtor to reduce certain of its tax attributes – such as current year NOLs, NOL carryforwards, tax credits, capital losses and tax basis in assets – by the amount of any such CODI that arises by reason of the discharge of the debtor's indebtedness in the bankruptcy case. CODI is generally the amount by which the adjusted issue price of indebtedness discharged exceeds the sum of the amount of cash and the fair market value of any other property given in exchange therefore. Any reduction in tax attributes under the CODI rules does not occur until the end of the tax year after such attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the tax year in which the CODI occurs. Accordingly, consistent with the intended treatment of the Plan as a plan of liquidation for U.S. federal income tax purposes, the Debtor expects that no CODI should be incurred by a Debtor as a result of the implementation of the Plan prior to the disposition by such Debtor of all or substantially all of its assets. In such case, the reduction of tax attributes resulting from such CODI (which, as indicated above, only occurs as of the end of the tax year in which the CODI occurs) generally should not have a material impact on the Debtor.

The Debtor's ability to utilize its NOL carryforwards and certain other tax attributes could be subject to limitation if the Debtor underwent or were to undergo an ownership change within the meaning of section 382 of the Tax Code by reason of the implementation of the Plan or otherwise. Nevertheless, there can be no assurance that all or a substantial amount of the CODI will not be incurred prior to the disposition of the Property, or that an ownership change will not occur upon consummation of the Plan due to, among other things, a lack of authoritative IRS guidance as to when CODI occurs in the context of a liquidating Chapter 11 plan. In such event, the Debtor could incur a material amount of U.S. federal income tax in respect of the sale of the Property depending, in part, on the amount realized upon the disposition of such assets and the then tax basis of the assets.

    *2.    Alternative Minimum Tax.*

In general, a U.S. federal alternative minimum tax ("<u>AMT</u>") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing AMT taxable income, certain tax deductions and other beneficial allowances are modified or eliminated. In particular,

even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

## B.    CONSEQUENCES TO HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS

### 1.    Recognition of Gain or Loss.

The U.S. federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, upon the origin of the holder's Claim, when the holder receives payment in respect of such Claim, whether the holder reports income using the accrual or cash method of tax accounting, whether the holder acquired its Claim at a discount, whether the holder has taken a bad debt deduction or worthless security deduction with respect to such Claim, and/or whether (as intended and herein assumed) the Plan is treated as a plan of liquidation for U.S. federal income tax purposes. A holder of a Claim should consult its tax advisor regarding the timing and amount of any potential bad debt deduction.

Generally, a holder of an Allowed Claim will recognize gain or loss with respect to its Allowed Claim) in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any other property received by the holder and (ii) the adjusted tax basis of the Allowed Claim exchanged therefore (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). As discussed below, the amount of Cash or other property received in respect of Claims for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a holder under its method of accounting. See Section B.2.— "Allocation of Consideration to Interest."

Consistent with the treatment of the Plan as a plan of liquidation, any loss realized by a holder of a Claim may not be recognizable until all of the distributions to such holder are received.

When gain or loss is recognized, such gain or loss may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the holder and has been held for more than one year. Each holder of an Allowed Claim should consult its tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such holder.

### 2.    Allocation of Consideration to Interest.

All distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for U.S. federal income tax purposes), with any excess allocated to accrued but unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. In general, to the extent any amount received (whether stock, cash, or other property) by a holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as ordinary interest income (if not previously included in the holder's gross income under the holder's normal method of accounting). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.

Each holder of an Allowed Claim is urged to consult its own tax advisors regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

## C.     WITHHOLDING ON DISTRIBUTIONS AND INFORMATION REPORTING

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, a holder of an Allowed Claim that is a not a U.S. person may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. As to certain Claims, it is possible that withholding may be required with respect to Distributions by the Debtor even if no withholding would have been required if payment was made prior to the Chapter 11 Case. A non-U.S. holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders. Non-U.S. holders are urged to consult their tax advisors regarding potential withholding on Distributions by the Debtor.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

**VIII.**

**CONFIRMATION OF THE PLAN**

## A.     CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan. The Bankruptcy Court has scheduled the Confirmation Hearing to commence on January 14, 2020 at 10:00 a.m. (Eastern

Time). The Confirmation Hearing may be adjourned from time-to-time by the Debtor or the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

## B.     OBJECTIONS

Section 1128 of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## C.     REQUIREMENTS FOR CONFIRMATION OF THE PLAN

*1.      Requirements of Section 1129(a) of the Bankruptcy Code.*

### a.      General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(i)     The Plan complies with the applicable provisions of the Bankruptcy Code.

(ii)    The Debtor has complied with the applicable provisions of the Bankruptcy Code.

(iii)   The Plan has been proposed in good faith and not by any means proscribed by law.

(iv)    Any payment made or promised by the Debtor or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been approved or is subject to the approval of the Bankruptcy Court as reasonable.

(v)     The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a plan with the Debtor, or a successor to the Debtor under the Plan, and the appointment to, or continuance in, such office of such individual is with the interests of creditors and equity holders and with public policy.

(vi)    With respect to each Class of Claims or Interests, each holder of an Impaired Claim or Impaired Interest either has accepted the Plan or

will receive or retain under the Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtor was liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

(vii) Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of Claims or Interests has either accepted the Plan or is not impaired under the Plan.

(viii) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative and priority claims will be paid in full on the Effective Date.

(ix) At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

(x) Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan. See "Feasibility Analysis" below.

(xi) All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

b.     **Best Interests Test**

As noted above, the Bankruptcy Code requires that each holder of an Claim or Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. This requirement is referred to as the "best interests test."

The best interests test requires the Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtor believes that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation

under chapter 7 of the Bankruptcy Code. The Debtor's belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the Liquidation Analysis set forth at Exhibit A.

The Liquidation Analysis is a comparison of (i) the estimated recoveries for creditors and equity holders of the Debtor that may result from the Plan and (ii) an estimate of the recoveries that may result from a hypothetical chapter 7 liquidation. The Liquidation Analysis is based upon a number of significant assumptions which are described therein. The Liquidation Analysis is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtor, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that the Bankruptcy Court will accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### c. Liquidation Analysis

The Debtor has concluded that the Plan provides to each Creditor and Interest Holder recovery with a present value at least equal to the present value of the distribution which such person would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. The Plan provides for a sale of the Property through an organized arm's length transaction. If a sale of the Property were to occur in a chapter 7 liquidation, the Property would likely be sold through a depressed auction sale at a lower price, while the administrative burden (including state and federal taxes) would increase the amount of liabilities that get deducted from the proceeds of the sale, and ultimately decreasing the amount available to creditors.

The Debtor further believes that the net effect of a conversion of this case to chapter 7 would be to (i) increase the administrative expenses of the estate and (ii) decrease the funds available for non-administrative creditors. In such event, the amount of funds available to unsecured creditors for distribution would be substantially less.

While the Debtor believes the assumptions underlying the Liquidation Analysis are reasonable, the validity of such assumptions may be affected by the occurrence of events, and the existence of conditions not now contemplated or by other factors, many of which will be beyond the control of the Bankruptcy Court, the Debtor and any trustee appointed for the Debtor. The actual liquidation value of the Debtor may vary from that considered herein and the variations may be material

### d. Feasibility Analysis

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless contemplated by the Plan. The Plan provides for the sale of substantially all of the Debtor's assets and the distribution of the proceeds of such sale. Thus, the Plan provides for the total liquidation of the Debtor's assets and therefore meets the feasibility tests of section 1129.

2. *Requirements of Section 1129(b) of the Bankruptcy Code.*

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of Claims or Interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

### a. No Unfair Discrimination

The "no unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan. A chapter 11 plan of reorganization does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its claims or equity interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtor believes that, under the Plan, all impaired classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of other classes of Claims and Interests having the same priority. Accordingly, the Debtor believes the Plan does not discriminate unfairly as to any impaired class of Claims or Interests.

### b. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. The test sets forth different standards for what is fair and equitable, depending on the type of claims or interests in such class. In order to demonstrate that a plan is "fair and equitable," the plan proponent must demonstrate the following:

(ii) *Secured Creditors.* With respect to a class of impaired secured claims, a proposed plan must provide the following: (a) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estates' interest in such property, or (b) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) or (c) of this paragraph, or (c) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim. There are two impaired classes of Secured Claims. Class 2 Real Property Tax Claims will either be paid in full or retain their liens in the same priority as before the Commencement Date.

(iii) *Unsecured Creditors.* With respect to a class of impaired unsecured claims, a proposed plan must provide the following: either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its

allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

With respect to Unsecured Creditors, the absolute priority rule allows the confirmation of a Plan over the rejection of a class of Unsecured Claims if the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the Plan on account of such junior claim or interest any property. As subordinated claims and equity interests in the Debtor are only receiving a distribution if all claims senior are paid in full, there is no class of claims or interests junior to the unsecured creditor class that is to receive payment under the Plan or retain any interest in any property under the Plan.

(iv) *Holders of Equity Interests.* A plan is fair and equitable as to a class of equity interests if that class of equity interests receives its liquidation preference, its fixed redemption price or its value. The Plan is fair and equitable as to the Holders of Interests because they are receiving a distribution only after all other distributions are made pursuant to the Plan. Thus, the Holders Interests are receiving the value of their equity interest in the Debtor.

**c. Application to the Plan**

As to any Class that may reject the Plan, the Debtor believes the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirements, because, as to any such dissenting Class, there is no Class of equal priority receiving more favorable treatment, and such Class will either be paid in full, or no Class that is junior to such a dissenting Class will receive or retain any property on account of the Claims or Interests in such Class.

~~3.~~2. *Alternative to Confirmation and Consummation of the Plan.*

The Debtor has evaluated several alternatives to the Plan. After studying these alternatives, the Debtor has concluded that the Plan is the best option for the Debtor and its estate and will maximize recoveries to parties-in-interest—assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan include a ~~sale of the Property under section 363 of the Bankruptcy Code or a~~ liquidation of the Debtor under chapter 7 of the Bankruptcy Code, with no assurance that the Purchaser, or any other purchaser, will be willing to pay the same consideration for the Property that is currently offered, and with the additional expenses and delays attendant to a chapter 7 case.

**a. Section 363 Sale**

If the Plan is not confirmed, the Debtor could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell the Property and other assets under section 363 of the Bankruptcy Code. ~~Indeed~~**However, the** ~~form of Asset~~ **Purchaser's obligations under the Purchase Agreement** ~~will require any Purchaser to consummate~~**are conditioned on a sale** ~~under section 363 in the event that the Plan is not confirmed.~~ **closing on or before January 31, 2020.**

### b. Liquidation Under Chapter 7

In a chapter 7 case, a trustee is appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

Substantially all of the Debtor's assets are being sold through the proposed Sale Transaction under the Plan. The Debtor believes that the Plan provides a greater recovery to Holders of Allowed General Unsecured Claims than would a chapter 7 liquidation for several reasons. First, liquidation under chapter 7 of the Bankruptcy Code would both decrease the aggregate proceeds available to holders of Claims and Interests and increase the magnitude of claims to those proceeds. Specifically, the Plan contemplates that the Debtor sell the Property through a sale that is the result of substantial marketing and not a liquidation fire sale. A liquidation of the Property under chapter 7 would be less orderly and would yield only the liquidation value of the Property, not its fair market value.

The Debtor believes that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a chapter 7 trustee and its retained professionals would cause a substantial diminution in the value of the Debtor's assets. The assets available for distribution to creditors would be reduced by such additional expenses and by the Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts.

Based on the Debtor's analysis, it is probable that a liquidation of the Debtor's assets under a chapter 7 liquidation would result in smaller distributions being made to creditors than those provided for under the Plan because of (i) the likelihood that the assets of the Debtor would have to be sold or otherwise disposed of in a less orderly fashion over a short period of time, and (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the chapter 7 liquidation process. Accordingly, the Debtor believes that the Plan is in the best interests of creditors.

### c. Alternative Plans

The Debtor does not believe that there are any alternative plans for the reorganization or liquidation of the Debtor's Estate that would, or indeed could, yield a better result for its creditors that the current proposed plan. The Debtor believes that the Plan, as described herein, enables Holders of Claims and Interests to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

*4.*3.     *Nonconsensual Confirmation.*

In the unlikely circumstance that any impaired Class of Claims entitled to vote will not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtor reserves the right to amend the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.  With respect to impaired Classes of Claims that are deemed to reject the Plan, the Debtor would request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

## IX.

## CONCLUSION

The Debtor believes that confirmation and implementation of the Plan is in the best interests of all creditors, and urges holders of impaired Claims to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than the Voting Deadline, January 7, 2020 at 5:00 p.m. (prevailing Eastern Time)..

Dated: December 29, 2019
        New York, New York

                                        Wansdown Properties Corporation N.V.


                                        By:      */s/ Gholam Reza Golsorkhi*
                                                 Gholam Reza Golsorkhi
                                                 Managing Member and President