RUBIN LLC
Paul A. Rubin
Hanh V. Huynh
345 Seventh Avenue, 21st Floor
New York, New York 10001
Tel: 212.390.8054
Fax: 212.390.8064
prubin@rubinlawllc.com
hhuynh@rubinlawllc.com

*Counsel for the Debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                  :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| WANSDOWN PROPERTIES CORPORATION N.V., | : | Case No.: 19-13223 (SMB) |
| | : | |
| Debtor. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MOTION PURSUANT TO 11 U.S.C. §§ 363 AND 365**
**AND FED. R. BANKR. P. 2002 AND 6004 FOR AN ORDER**
**APPROVING THE SALE OF THE DEBTOR'S REAL PROPERTY**

Wansdown Properties Corporation N.V. (the "Debtor"), the debtor and debtor in possession herein, by its counsel, Rubin LLC, hereby submits this motion (the "Motion") for entry of an order substantially in the form annexed hereto as Exhibit "A" (the "Sale Order") authorizing and approving the sale of the Debtor's real property located at 29 Beekman Place, New York, New York 10022 (the "Property") to 29 Beekman Corp. (the "Purchaser") under that certain *Residential Contract of Sale* dated September 25, 2019 (together with exhibits and riders thereto, the "Purchase Agreement"), pursuant to sections 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Sale Guidelines for the Conduct of Asset Sales, General Order M-

1

383 (the "Sale Guidelines"). In support of this Motion, the Debtor respectfully represents as follows:

## BACKGROUND

1.     On October 8, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court, and an order for relief under section 301 of the Bankruptcy Code was entered in this case (the "Chapter 11 Case").

2.     The Debtor has been authorized to remain in possession of its property and to continue in the operation and management of its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.     No official committee of unsecured creditors has been appointed by the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") in the Chapter 11 Case.

**The Property**

4.     The Debtor was incorporated in 1979 under the laws of Curacao, in accordance with Article 38 of the Commercial Code of the Netherlands Antilles and continues to exist under the laws of the Netherland Antilles. The Debtor was formed to, among other things, invest and manage assets of Princess Achraf Pahlavi. In 1980, the Debtor acquired the Property, which the Princess used on those occasions she visited New York after she fled Iran due to the Iranian revolution.

5.     The Property is encumbered by a mortgage in favor of National Investment Bank (N.A.) (the "Mortgage Lender"). The Mortgage Lender has filed a proof of claim in the Chapter 11 Case asserting a fully secured claim in the amount of $5,627,088.52, inclusive of interest, default interest, and fees.

6. The Property is vacant and does not have any tenants. The Property does not generate any operating revenue.

**Pre-Petition Marketing of the Property**

7. During the final years of her life, the Princess's advanced age and deteriorating health resulted in the Princess spending limited time in New York. Consequently, the Debtor determined that it would not need to keep the Property, and that it would be prudent to reduce its expenses associated with the Property and staffing to maintain the Property. Thus, beginning in 2014, the Debtor marketed the Property for sale. However, the Debtor was unable to sell the Property, and the Debtor terminated the listing and removed the Property from the market.

8. The Princess died in January 2016. Thereafter, the Debtor resumed its marketing of the Property.

9. In December 2017, the Debtor entered into a contract for the sale of the Property to Secured Capital Partners, LLC ("SCP") for the purchase price of $17 million. SCP, however, failed to make any of the down payments or otherwise perform as required under its contract, and the Debtor was forced to terminate the contract. SCP sued for specific performance and filed a *lis pendens* against the Property, creating a cloud on title and preventing the Debtor from effectively marketing the Property for sale to a legitimate buyer. On April 3, 2019, the New York State Supreme Court dismissed the SCP action for specific performance and cancelled the *lis pendens*.

10. The Debtor then worked with Charlie Attias, a licensed real-estate broker at the Corcoran Group, to market and sell the Property. Mr. Attias was selected based upon his experience selling similar town houses and his international background. Mr. Attias listed the Property for $17,995,000. Given that the Property is situated near the United Nations, the Property was marketed primarily to wealthy internationals and foreign governments as potential embassy space. Several embassies viewed the Property, but none made an offer.

11.     In or around September 2019, Mr. Attias left Corcoran Group and began working at Compass.  After joining Compass, Mr. Attias used Compass's resources to market the Property.  As a result of this process, the Property garnered interest from a number of potential buyers, but Mr. Attias was unable to procure any binding offers.  Ultimately, the Debtor received one binding offer directly from the Purchaser in the amount of $10,300,000.  The offer from the Purchaser was not obtained through Mr. Attias, Corcoran, or Compass.

**The Purchase Agreement**

12.     Following the Debtor's receipt of the Purchaser's offer, the Debtor, in consultation with its advisors, negotiated the Purchase Agreement at arms' length.  A copy of the Purchase Agreement is annexed hereto as Exhibit B.

13.     The Purchase Agreement contains the following material economic terms:  (a) the purchase price for the Property is $10,300,000, (b) the closing on the sale of the Property will occur on or before January 31, 2020, and (c) the Purchaser has agreed to deliver a cash deposit of $1,030,000, which has been provided by the Purchaser.

14.     The Purchaser is an unrelated third party.  Neither the Debtor nor its president (Mr. Golsorkhi) owns any interest in the Purchaser directly or indirectly.

**The Scheduled Sheriff's Sale**

15.     At the time that the Debtor was attempting to market and sell the Property, as described above, the Debtor also was contending with litigation commenced by Azadeh Nasser Azari, a former employee of the Debtor.

16.     On April 21, 2016, the Clerk of the New York Supreme Court for the County of New York (the "State Court") entered a judgment in favor of Ms. Azari and against the Debtor in the principal amount of $2.7 million, based on a confession of judgment.  On February 13, 2017, the Debtor commenced a plenary action seeking to vacate the judgment by filing a complaint (the

"Complaint") in the State Court. On April 3, 2017, Ms. Azari moved to dismiss the Complaint. Following oral argument, on October 17, 2017, the State Court issued a ruling denying the motion. Ms. Azari appealed. On October 23, 2018, the Supreme Court, Appellate Division, reversed the State Court decision and entered a judgment against the Debtor. In its decision, the appellate court found that the Debtor's managing director had the authority to execute the confession of judgment on behalf of the Debtor and, as such, the judgment was proper. On July 8, 2019, Ms. Azari sought to enforce the judgment through a writ of execution. A sheriff's sale with respect to the Property was scheduled for October 9, 2019, at 11:00 a.m.

19.    Because a sheriff's sale of the Property would result in a depressed purchase price, and because the Debtor had a binding Purchase Agreement with the Purchaser for a sale of the Property on terms acceptable to the Debtor, the Debtor commenced the Chapter 11 Case on October 8, 2019, to prevent the sheriff sale from proceeding.

18.    Ms. Azari has filed a proof of claim in the Chapter 11 Case, asserting a fully secured claim in the amount of $3,605,152.23, inclusive of interest and expenses.

## PROCEDURAL POSTURE

19.    At the Debtor's initial case conference held on November 14, 2019, counsel for the Debtor advised the Court of the Purchase Agreement, the terms thereof (including the requirement that the closing on the sale of the Property occur on or before January 31, 2020), and the Debtor's contemplation that proceeds from the sale of the Property would be used to pay all creditors in full under a chapter 11 plan (other than the claim of an insider anticipated to be voluntarily subordinated to facilitate confirmation). The Court stated at the hearing that it would approve a disclosure statement on a preliminary basis and schedule a combined hearing to consider final approval of the disclosure statement and confirmation of a chapter 11 plan.

20.     On December 2, 2019, the Debtor filed its *Chapter 11 Plan* dated December 2, 2019, and a corresponding disclosure statement.  The Court scheduled a hearing on December 6, 2019, to address its concerns regarding the *Chapter 11 Plan.*  Following the December 6th hearing, and to address the concerns raised by the Court, the Debtor filed its *Modified Chapter 11 Plan* dated December 9, 2019 (the "Plan") [ECF No. 30] and related disclosure statement dated December 9, 2019 (the "Disclosure Statement") [ECF No. 31].

21.     Pursuant to the Plan, the Property was to be sold to the Purchaser in accordance with the terms of the Purchase Agreement.  The proceeds from the sale of the Property were anticipated to be sufficient to pay in full all allowed administrative and other unclassified claims, as well as the claims of creditors in Class 1 (Other Priority Claims), Class 2 (Real Property Tax Claims), Class 3 (Secured Claims), and Class 4 (General Unsecured Claims).  The sale proceeds were also anticipated to be sufficient to reserve the full amount of all disputed claims pending disposition of such disputed claims.  For the purposes of the Plan, Mr. Golsorkhi indicated his willingness to subordinate his general unsecured claim in the amount of $7,480,000 (the "Subordinated Claim")[1] in Class 5 (Subordinated Unsecured Claims), which would enable payment in full of general unsecured claims in Class 4.  Accordingly, no class of creditors was impaired under the Plan, and the Debtor would not be required to solicit votes for acceptance or rejection of the Plan.

22.     On December 12, 2019, the Court entered an order (the "Disclosure Statement Order") [ECF No. 32] preliminarily approving the Disclosure Statement and scheduling a combined hearing on final approval of the Disclosure Statement and confirmation of the Plan for January 14, 2020 (the "Scheduled Confirmation Hearing").

---

1 Mr. Golsorkhi also continues to accrue post-petition deferred compensation for his continued services as an employee of the Debtor.

23.     On December 12, 2019, the Debtor served the Disclosure Statement Order, notice of the Scheduled Confirmation Hearing, and the Disclosure Statement (including the Plan and the Purchase Agreement attached as exhibits) on all creditors and parties in interest in the Chapter 11 Case.  *See* Certificate of Service filed December 12, 2019 [ECF No. 33].  Since that time, the Debtor has been working diligently to prepare for plan confirmation.

24.     Without any prior notice or warning, however, the Debtor's sole shareholder, Pelmadulla Stiftung, Vaduz ("Pelmadulla") filed a proof of claim on December 31, 2019 (the bar date established by the Court was December 31, 2019) asserting a claim in the amount of $3,243,941.19 based on a purported loan that was never documented.  The Debtor does not believe the Pelmadulla claim is a valid claim against the Debtor and the Debtor intends to object to the claim.

25.     The Debtor, however, has determined that Pelmadulla's assertion of a general unsecured claim against the Debtor for over $3.2 million (no matter how unsubstantiated) will not permit the Debtor to proceed with confirmation of the Plan, as proposed without modification, in time to close on the Sale of the Property by January 31, 2020.  The proceeds from the sale of the Property (after payment of the Mortgage Lender claim and reserving for the full amount of the disputed Azari claim) will no longer be sufficient to pay all allowed general unsecured claims in full and to reserve cash in the full amount of disputed general unsecured claims.  Nor does the Debtor believe that litigation to expunge or recharacterize the Pelmadulla claim can be completed prior to the Scheduled Confirmation Hearing.  Meanwhile, the deadline to close on the sale of the Property remains at January 31, 2020, pursuant to the Purchase Agreement.  Although counsel for the Debtor has communicated with counsel to the Purchaser to request an extension of time to

close, the Debtor has not received consent at this time.  Critically, the Debtor continues to accrue the carrying costs for the Property, including default interest to the Mortgage Lender.

26.     As a result of the unanticipated and significant increase in general unsecured claims asserted against the Debtor, the Debtor seeks now to proceed with a sale of the Property under section 363 of the Bankruptcy Code, as set forth in this Motion.  The Purchase Agreement itself contemplates that, should the Debtor be unable to proceed with a sale of the Property under a chapter 11 plan, the parties agreed that the Debtor would seek to sell the property in a section 363 sale.  *See* Purchase Agreement at ¶ 51(a).  Although the Debtor believes it must proceed with the Sale Motion at this time in the interest of preserving value, the Debtor will continue to communicate with parties in interest to attempt to move forward under the Plan on a parallel track.  Whether the Debtor proceeds with a section 363 sale or a sale under the Plan, the Debtor intends to seek authorization to pay the Mortgage Lender in full at closing.

27.     The Debtor further seeks to expedite the hearing on the sale of the Property, so that it can be held on the Scheduled Confirmation Hearing.  As set forth more fully in the motion to shorten time filed contemporaneously herewith, the circumstances here warrant scheduling the hearing on this Motion for the date of the Scheduled Confirmation Hearing, because all creditors and parties in interest have been made aware that the Debtor has intended from the commencement of the Chapter 11 Case to sell the Property to the Purchaser, and the hearing to consider approval of the sale as part of the Plan has already been scheduled for January 14, 2020.

### EXTRAORDINARY PROVISIONS UNDER SALE GUIDELINES

28.     The Purchase Agreement and this Motion contain the following "extraordinary provisions" as set forth in Section I.D of the Sale Guidelines:

      a.    <u>Private Sale/No Competitive Bidding</u>.  The Purchaser has stated that it is unwilling to proceed with the transaction if the sale of the Property is subject to competing bids.  Under the facts and circumstances of this case, the

Debtor believes that a private sale to the Purchaser pursuant to the terms of the Purchase Agreement is appropriate. The Property has been on the market since 2014, but no party, other than SCP (which sale could not be consummated and resulted in a cloud on title) and the Purchaser have submitted binding offers for the Property.

b.  Deadlines that Effectively Limit Notice. The Debtor will seek to expedite the hearing on this Motion to the January 14, 2020 hearing date originally scheduled for plan confirmation, so that a closing can occur by the January 31, 2020 deadline under the Purchase Agreement. Although notice of the hearing on the Motion itself will be less than the 21 days provided in the Bankruptcy Rules and Sale Guidelines, the sale of the Property was contemplated in the Debtor's Modified Chapter 11 Plan and described in the corresponding disclosure statement. Copies of the plan and disclosure statement (which included the Purchase Agreement as an exhibit) were served on all creditors on December 12, 2019, which is more than a month prior to the scheduled plan confirmation hearing on January 14, 2020. The motion to shorten time with respect to a hearing on this Motion provides additional details regarding the Debtor's request for an expedited hearing.

c.  Use of Proceeds. The Debtor seeks authorization to pay off the Mortgage Lender at closing without further order of the Court, to avoid diminution of its estate. Because the Mortgage Lender is over-secured, its secured claim continues to accrue default interest and fees until it is paid. The Mortgage Lender has a valid, perfected, first-priority lien on the Property, and its lien would otherwise attach to the proceeds of the sale of the Property. Accordingly, the passage of time and accrual of additional interests and fees would only serve to diminish the proceeds available to distribute to other creditors. Moreover, after payment of the Mortgage Lender's claim, there would still be enough sale proceeds to reserve for the full amount of the disputed secured claim asserted by Azari based on the judgment obtained in the State Court. Thus, no creditor is prejudiced by the payment of the Mortgage Lender's claim at closing, and indeed, the prompt payment of its claim will inure to the benefit of all general unsecured creditors.

d.  Record Retention. The Property is the Debtor's sole significant asset, and thus the sale will be for substantially all of the assets of the Debtor. The Debtor, however, will retain its books and records to enable it to administer the Chapter 11 Case.

e.  Requested Findings as to Successor Liability. The proposed Sale Order contains findings of fact and conclusions of law limiting the Purchaser's successor liability. These provisions were requested by the Purchaser as provided in the Purchase Agreement.

f.  Relief from Bankruptcy Rule 6004(b). The Debtor seeks relief from the 14-day stay imposed by Bankruptcy Rule 6004(b) in order to promptly

consummate the sale within the closing deadline set forth in the Purchase Agreement. The Motion discloses in greater detail the basis for such a request.

## RELIEF REQUESTED

29.     By this Motion, pursuant to sections 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002 and 6004, and the Sale Guidelines, the Debtor seeks entry of the Sale Order, authorizing and approving (i) assumption of the Purchase Agreement, and (ii) the sale of the Property to the Purchaser, free and clear of liens, claims, interests and other encumbrances, with any such liens, claims, interests and encumbrances attaching to the proceeds of the sale.

## BASIS FOR RELIEF REQUESTED

30.     Ample authority exists for approval of the sale of the Property. Pursuant to section 363(b)(1) of the Bankruptcy Code, the debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). "Although not specified by section 363, the Second Circuit requires that transactions under section 363 be based on the sound business judgment of the debtor or trustee." *In re MF Global, Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012) (citing *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)). "Generally, where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *MF Global*, 467 B.R. at 730 (citing *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)). "If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate; the burden of rebutting that presumption falls to parties opposing the transaction." *MF Global*, 467 B.R. at 730. "Once a court determines that a sound business justification exists, the court must determine whether (i) the debtor has provided all interested parties with adequate and reasonable notice,

(ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith." *Id.* at 730.

## A.    Business Justification for the Sale

31.    "The overriding consideration for approval of a section 363 sale is whether a good business reason has been articulated." *In re GSC Group, Inc.*, 453 B.R. 132, 173 (Bankr. S.D.N.Y. 2011). In determining whether the debtor has articulated a good business reason for the sale, the Second Circuit has set forth a nonexclusive list of factors to consider, including (i) the proportionate value of the asset to the estate as a whole, (ii) the amount of elapsed time since the filing, (iii) the likelihood that a plan of reorganization will be proposed and confirmed in the near future, (iv) the effect of the proposed disposition on future plans of reorganization, (v) the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, (vi) which of the alternatives of use, sale or lease the proposal envisions, and (vii) whether the asset is increasing or decreasing in value. *Lionel*, 722 F.2d at 1071. Additional factors include whether the estate has the liquidity to survive until confirmation of a plan; whether the sale opportunity will still exist as of the time of plan confirmation, and if not, how likely it is that there will be a satisfactory alternative sale opportunity, or a standalone plan alternative that is equally desirable (or better) for creditors; and whether there is a material risk that by deferring the sale, "the patient will die on the operating table." *Boston Generating*, 440 B.R. 302, 322 (Bankr. S.D.N.Y. 2010) (citing *In re Gen. Motors Corp.*, 407 B.R. 463, 490 (Bankr. S.D.N.Y. 2009)).

32.    In this regard, the debtor's decision-making is reviewed through the lens of the business judgment rule, which is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Id.* at 174; *see also In re Boston Generating, LLC*, 440 B.R. at 330 ("The business judgment rules entails (1) a business decision,

(2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets.").

33.     Here, the sale of the Property to the Purchase is a sound exercise of the Debtor's business judgment.  The Debtor has determined, in its business judgment, that the sale of the Property to the Purchaser under the terms of the Purchase Agreement is the highest and best offer based on the following considerations:

(a)     Pre-petition, the Debtor has extensively marketed the Property since 2014.

(b)     Since the Property was first marketed for sale in 2014, the Debtor has been unable to obtain binding offers from any interested party, other than from SCP (which sale could not be consummated and resulted in a cloud on title), and from the Purchaser.

(c)     Even after applying the considerable marketing resources of the Corcoran Group and Compass, there have been no binding offers for the Property from any party other than the Purchaser.  Following the commencement of the Chapter 11 Case, the Debtor received inquiries regarding the Property, but no offers were submitted.

(d)     The Property was subject to a sheriff's sale, which would have resulted in a sale of the Property at a much lower purchase price than under the Purchase Agreement.

(e)     The Debtor is continuing to incur the carrying costs of the Property, including debt service to the mortgage lender, real estate taxes, maintenance, repair, and utilities.  Absent a sale to the Purchaser, these costs would continue to accrue on the Property, which does not generate any revenue, and which does not appear to be increasing in value.  The Debtor does not want to lose this sale.

(f)     The Debtor cannot continue to operate post-petition without selling the Property and using the proceeds of the sale to fund a plan.

34.     Accordingly, the Debtor has shown a sound business purpose for the sale that should be upheld by the Court after applying the business judgment rule.

## B. Assumption of the Purchase Agreement

35. Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

36. The Debtor respectfully submits that it satisfies the business judgment test under section 365(a) for the same reasons the Debtor satisfies the test in the context of section 363(b), discussed above. Assumption of the Purchase Agreement is in the best interests of the Debtor, its estate and creditors, because the proceeds generated from the sale of the Property to the Purchaser under the Purchase Agreement represents the highest and best offer for the Property, and will allow the Debtor fund a chapter 11 plan. The Debtor believes that it would be a mistake to abandon the Purchase Agreement, and create a contract rejection damage claim with no alternative transaction in sight.

## C. Fair Purchase Price

37. The purchase price of $10,300,000 is a fair price for the Property, based on the extensive marketing of the Property and the absence of any other binding offers being submitted at any time in the last 5 years (other than the failed transaction with SCP).

## D. Notice of Sale Transaction

38. In accordance with the Sale Guidelines, notice of the Motion will be served on all creditors and interested parties, including any parties known by the Debtor to have expressed an interest in acquiring the Property.

39.     Furthermore, as described above and in the motion for an expedited hearing on this Motion, all creditors and interested parties have been aware of the Debtor's intention to sell the Property under the Plan, and all parties were served with the Purchase Agreement as an attachment to the Disclosure Statement, and all parties were served with notice of the Scheduling Confirmation Hearing for January 14, 2020.

**E.     Sale Free and Clear of Liens, Claims, Encumbrances, and Interests**

40.     Pursuant to section 363(f) of the Bankruptcy Code, the debtor may sell estate property free and clear of any interests in that property if one of the following conditions is met: "(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."  11 U.S.C. § 363(f).

41.     Here, Debtor may sell the Property free and clear of all liens, because the Property will be sold at a purchase price of $10,300,000, which is greater than the aggregate value of all liens on the Property.

**F.     Good Faith Purchaser Protections**

42.     The Purchaser is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code.  "A good faith purchaser is one who purchases the assets for value, in good faith and without notice of adverse claims."  *GSC*, 453 B.R. at 180 (citing *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 385 (2d Cir. 1997)).  "A purchaser's good faith is shown by the integrity of his conduct during the course of the sale proceedings.  *Id.* at 180 (internal quotations omitted).  "The absence of good faith is shown by fraud, collusion between the purchaser and other

bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id.* at 180 (internal quotations omitted).

43.     In this case, the Purchaser and its principal(s) are third parties that have no relation or affiliation with the Debtor or its principals.  The Purchaser negotiated the Purchase Agreement at arms' length and has provided a deposit of $1,030,000 as required under the Purchase Agreement.

## G.     Payment of Mortgage Debt at Closing

44.     As set forth above, the Debtor also seeks authorization to pay off the Mortgage Lender at closing without further order of the Court.  The Mortgage Lender's over-secured claim will continues to accrue default interest and fees until it is paid.  The passage of time and accrual of additional interests and fees would only serve to diminish the proceeds available to distribute to other creditors.  As noted above, after payment of the Mortgage Lender's claim, there are sufficient sale proceeds to reserve for the full amount of the Azari secured claim, which is currently the subject of an adversary proceeding seeking to avoid the obligation underlying the Azari judgment as a fraudulent transfer.  No creditor is prejudiced by the payment of the Mortgage Lender's claim at closing; rather, the payment of its claim at closing will inure to the benefit of all general unsecured creditors.  It is respectfully submitted that, payoff of the Mortgage Lender's claim at closing of the sale is in the best interest of the Debtor, its estate and its creditors.

## H.     Waiver of Stay Under Rule 6004(h)

45.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." FED. R. BANK. P. 6004(h).  In light of the January 31, 2020 deadline to close the sale of the Property to the Purchaser, the Debtor requests that the Sale Order be

effective immediately upon entry and that the fourteen day stay under Bankruptcy Rule 6004(h) be waived.

WHEREFORE, the Debtor respectfully requests that this Court enter an order, in the form annexed hereto as Exhibit A, granting the relief requested herein, and grant such other relief as may be just and proper.

Dated: New York, New York
 January 7, 2020

RUBIN LLC

By:    */s/ Paul A. Rubin*
 Paul A. Rubin
 Hanh V. Huynh

345 Seventh Avenue, 21st Floor
New York, New York 10001
Tel: 212.390.8054
prubin@rubinlawllc.com
hhuynh@rubinlawllc.com

# EXHIBIT A
# (PROPOSED ORDER)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :

In re:                                  :      Chapter 11
                                          :

WANSDOWN PROPERTIES CORPORATION    :      Case No.:  19-13223 (SMB)
N.V.,                                    :
                                          :

                   Debtor.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ORDER APPROVING THE SALE OF THE DEBTOR'S REAL PROPERTY LOCATED AT 29 BEEKMAN PLACE, NEW YORK, NEW YORK TO 29 BEEKMAN CORP.

Upon the *Motion Pursuant to 11 U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 2002 and 6004 for an Order Approving the Sale of the Debtor's Real Property* [ECF No.    ] (the "Motion")[1] of Wansdown Properties Corporation N.V. (the "Debtor"), and the Affidavit Gholam Reza Golsorkhi in support of the Motion (the "Golsorkhi Affidavit") [ECF No.  ]; and a hearing on the Motion having been held before the Court on January 14, 2020 (the "Hearing"); and upon the Court's consideration of the Motion and the Golsorkhi Affidavit, the record of the Hearing, the objections thereto, if any, and the testimony and evidence admitted at the Hearing; and upon the record of this case; and after due deliberation thereon, and good and sufficient cause appearing therefor, it is hereby:

**FOUND, CONCLUDED AND DETERMINED THAT**:[2]

A.     **Jurisdiction and Venue**.  This Court has jurisdiction to consider the Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.  The

---

[1]  Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Motion.

[2]  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

statutory and legal predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 363, and 365, Bankruptcy Rules 2002 and 6004, and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "<u>Local Rules</u>").

B.    **<u>Notice</u>**.  As evidenced by affidavits of service previously filed with the Court, and based on representations of counsel at the Hearing, (i) due, proper, timely, adequate and sufficient notice of the Motion has been provided to all parties entitled thereto; (ii) such notice was and is good, sufficient and appropriate under the circumstances of the Chapter 11 Case; and (iii) no other or further notice of the Motion is or shall be required.

C.    **<u>Arm's-Length Sale</u>**.  The sale of the Property pursuant to the Purchase Agreement and this Order was negotiated by the Debtor and the Purchaser at arm's-length, without collusion or fraud, and in good faith within the meaning section 363(m) of the Bankruptcy Code.  None of the Debtor, the Purchaser, their respective affiliates, or their representatives has engaged in any conduct that would cause or permit sale of the Property or the Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code, or has acted in any improper or collusive manner with any person.  The terms and conditions of the sale transaction and the Purchase Agreement, including without limitation, the consideration provided therein, are fair and reasonable and shall not be avoided under section 363(n) of the Bankruptcy Code.

D.    **<u>Sale in Best Interests</u>**.  The relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors and all other parties in interest.  Immediate approval by this Court of the sale of the Property is necessary and appropriate to maximize the value of the Debtor's estate.  There is risk of deterioration of the value of the Property if the sale transaction is not promptly consummated.

E.   **Business Justification**.  The Debtor has demonstrated both good, sufficient and sound business reasons and compelling circumstances for the Court to approve the Purchase Agreement and authorize the Debtor to sell the Property under section 363(b) of the Bankruptcy Code outside the ordinary course of business.  Entry of this Order approving the sale of the Property is a necessary condition precedent to the Purchaser's consummation of the sale transaction.

F.   **Consideration**.  The purchase price to be provided by the Purchaser pursuant to the Purchase Agreement (i) represents the highest or otherwise best offer received by the Debtor for the Property, and (ii) constitutes reasonably equivalent value and fair consideration for the Property.

G.   **Free and Clear**.  The sale of the Property to the Purchaser in accordance with the Purchase Agreement will be a legal, valid, and effective transfer of the Property, and, except as otherwise provided in the Purchase Agreement, vests or shall vest the Purchaser with all right, title, and interest of the Debtor in and to the Property pursuant to section 363(f) of the Bankruptcy Code free and clear of all liens, claims, encumbrances, obligations, liabilities, demands, guarantees, options, rights, restrictions, contractual commitments, rights of first refusal, rights of setoff, or interests of any kind or nature that have been, are or could be asserted against the Debtor or the Property, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of the Chapter 11 Case, whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "Interests").

H.   **Findings Required by Purchaser**.  The Purchaser represents that it would not have entered into the Purchase Agreement and would not consummate the sale transaction, thus

adversely affecting the Debtor, its estate and creditors, if (i) the Property is not conveyed to the Purchaser free and clear of all Interests of any kind or nature as set forth in this Order, or if the Purchaser would, or in the future could, be liable for any of the Interests, and (ii) unless the Purchase Documents provide, and the Court so orders, none of the Purchaser or the Property shall have any liability whatsoever with respect to any Interest or be required to satisfy any Interest in any manner (whether at law or in equity, by payment, setoff or otherwise, directly or indirectly). An injunction against creditors and third parties pursuing claims against, and liens, interests and encumbrances on, the Property is necessary to induce the Purchaser to close the sale transaction, and the issuance of such injunctive relief is therefore necessary to avoid irreparable injury to the Debtor's estate and will benefit the Debtor and its creditors and all other parties in interest.

I.     **<u>Good Faith Purchaser</u>**. The Purchaser has proceeded in good faith and without collusion in all respects in connection with the sale transaction, the Purchase Agreement, and this sale proceeding. The Purchaser is, therefore, entitled to all of the benefits and protections of section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale of the Property shall not affect the validity of the sale unless, prior to the Closing (as defined in the Purchase Agreement), such authorization is duly stayed pending such appeal.

J.     **<u>Satisfaction of Section 363(f) Standards</u>**. Pursuant to the terms set forth in the Purchase Agreement, the Debtor may sell the Property free and clear of any Interests of any kind or nature as set forth in this Order because in each instance, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Each person or entity with any Interest in the Property: (i) has, subject to the terms and conditions of this Order and the

Purchase Agreement, consented to the sale of the Property, is deemed to have consented to the sale, or has had its objections to the sale considered and overruled by this Court; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Interest; (iii) has a lien and the purchase price for the Property is greater than the aggregate value of all liens on the Property; or (iv) otherwise is subject to the provisions of Bankruptcy Code section 363(f).

K.  **No Successor Liability**.  Upon the Closing (as defined in the Purchase Agreement), the Purchaser shall not and shall not be deemed to: (i) be a successor or successor employer to the Debtor or its estate under any theory of law or equity; (ii) have, *de facto* or otherwise, merged or consolidated with or into the Debtor or the Debtor's estate; (iii) be a mere continuation or substantial continuation of any the Debtor or any enterprise of the Debtor; or (iv) be liable for any acts or omissions of the Debtor in the conduct of the Debtor's business or arising under or related to the Property other than as set forth in the Purchase Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in the Purchase Agreement and this Order, the parties intend that the Purchaser shall not be liable for any Interest, claim or liability against the Debtor, and the Purchaser shall have no successor or vicarious liability of any kind or character whatsoever, whether known or unknown as of the Closing Date, whether now existing or hereafter arising, whether asserted or unasserted, or whether fixed or contingent, with respect to the business of the Debtor, the Property or any claims against or liabilities of the Debtor arising prior to the Closing Date.  The Purchaser would not have acquired the Property but for the foregoing protections against potential claims based upon "successor liability" theories.

L.    **Assumption of Purchase Agreement**.    The assumption of the Purchase Agreement by the Debtor is in the best interests of the Debtor, its estate, creditors and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtor.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1.    **Motion is Granted**.    The Motion and the relief requested therein are GRANTED and APPROVED, as set forth herein.

2.    **Objections Overruled**.    Any objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, settled, or otherwise resolved as set forth on the record at the Hearing and/or memorialized pursuant to the terms hereof (if any) hereby are denied and overruled on the merits with prejudice.

3.    **Approval**.    The Purchase Agreement and all of the terms and conditions therein are approved.    The Debtor is hereby authorized and directed to (i) assume the Purchase Agreement; (ii) perform its obligations under and comply with the terms of the Purchase Agreement and execute and perform any additional agreements, instruments or documents that may be reasonably necessary or appropriate to implement the Purchase Agreement; (iii) consummate the sale of the Property in accordance with the terms and conditions of the Purchase Agreement; and (iv) take all other and further actions as may be reasonably necessary or appropriate to implement the sale of the Property and perform its obligations under the Purchase Agreement.    The provisions of this Order authorizing the sale of the Property free and clear of Interests, except as otherwise set forth in the Purchase Agreement or this Order, shall be self-executing, and neither the Debtor or the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to

effectuate, consummate and implement the provisions of this Order. However, the Debtor, the Purchaser, and each of their respective officers, directors, employees, agents, and representatives are hereby authorized and empowered to take all actions and execute and deliver any and all agreements, instruments and documents that the Debtor or the Purchaser deem necessary or appropriate to implement and effectuate the terms of the Purchase Agreement and this Order.

4. **Valid Transfer**. Upon the Closing, (i) the sale transaction effects a legal, valid, enforceable and effective sale and transfer of all of the Debtor's rights, title, and interests in the Property to the Purchaser, and shall vest the Purchaser with all of the Debtor's rights, title, and interests in the Property free and clear of all Interests of any kind whatsoever, except as expressly provided in this Order and the Purchase Agreement, and (ii) the Purchase Agreement, the sale of the Property, and any agreements, instruments and documents contemplated thereby shall be enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtor or any successor trustee appointed with respect thereto.

5. **Injunction**. Except as expressly provided in the Purchase Agreement or by this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants, and other persons, holding Interests of any kind or nature whatsoever in the Debtor or against the Debtor, or the Debtor's rights, title, and interests in the Property (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of the Chapter 11 Case, whether imposed by agreement, understanding, law, equity or otherwise), including, without limitation, those arising under, out of, in connection with, or in any way relating to the Debtor, the Property, the

operation of the Debtor's business, or the transfer of the Debtor's rights, title, and interests in the Property to the Purchaser, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Interests against the Property, or the rights, title, and interests of the Debtor in such Property. Following the Closing, no holder of an Interest against the Debtor or the Property shall interfere with the Purchaser's title to or use and enjoyment of the Property based on or related to such Interests. For the avoidance of doubt, the foregoing shall not prevent the Debtor from enforcing the terms of the Purchase Agreement against the Purchaser and/or its successors and assigns.

6. **No Successor Liability**. Upon the Closing, the Purchaser shall not and shall not be deemed to: (i) be a successor or successor employer to the Debtor or its estate under any theory of law or equity; (ii) have, *de facto* or otherwise, merged or consolidated with or into the Debtor or the Debtor's estate; (iii) be a mere continuation or substantial continuation of the Debtor or any enterprise of the Debtor; or (iv) be liable for any acts or omissions of the Debtor in the conduct of the Debtor's business or arising under or related to the Property other than as set forth in the Purchase Agreement. None of the Purchaser or the Property shall have (i) any liability or responsibility for or be required to satisfy in any manner (whether at law or in equity, by payment, setoff or otherwise, directly or indirectly) any claim or any Interest against the Debtor, or (ii) any successor or vicarious liabilities of any kind or character, including, but not limited to, federal, state or other tax liabilities, U.S. or foreign pension liabilities, or liabilities based on any theory of antitrust law, environmental law, labor law, alter ego, veil piercing, continuity of enterprise, mere continuation, product line, *de facto* merger or substantial continuity, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or

subsequent to the commencement of the Chapter 11 Case, whether imposed by agreement, understanding, law, equity or otherwise with respect to the Debtor or any obligations of the Debtor, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Debtor's business prior to the Closing or any taxes in connection with, or in any way relating to, the cancellation of debt of the Debtor.

7.     **Assumption of the Purchase Agreement**.   Pursuant to section 365 of the Bankruptcy Code, the Debtor's assumption of the Purchase Agreement is hereby approved.

8.     **Binding Effect of Order**.   The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon the Debtor, the Debtor's estate, the Purchaser, all creditors of the Debtor, all holders of equity interests in the Debtor, and all other parties in interest.

9.     **Sale Free and Clear of Interests**.   This Order (i) shall vest the Purchaser with all right, title and interest in the Property free and clear of any and all Interests of any kind or nature whatsoever, except as otherwise provided in the Purchase Agreement or this Order, and (ii) shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Property.  Upon the occurrence of the Closing, the Debtor, and all persons holding an Interest in the Property immediately prior to the Closing are hereby

authorized to execute such documents and take all other actions as may be reasonably necessary to release their Interests in the Property (if any) as such Interests may have been recorded or may otherwise exist. All recorded Interests against the Property shall be deemed stricken from their records, official and otherwise.

10. **Release of Liens**. If any person or entity which has filed statements or other documents or agreements evidencing Interests in the Property shall not have delivered to the Debtor before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents required to document the release of such Interests, the Debtor and the Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Property. Each and every federal, state and governmental agency or department and any other person or entity is hereby authorized and directed to accept any and all documents and instruments in connection with or necessary to consummate the sale of the Property contemplated by the Purchase Agreement or evidence the release of Interests in the Property.

11. **Use of Proceeds**. All net proceeds of the sale of the Property, including the deposit made by the Purchaser, shall be held by Debtor's special counsel pending further order of this Court. Notwithstanding the foregoing, however, the Debtor is authorized and directed to payoff the claim of the Mortgage Lender at Closing from the proceeds of the sale of the Property without further order of the Court.

12. **Retention of Jurisdiction**. This Court retains exclusive jurisdiction to interpret, implement, and enforce the terms and provisions of, and to resolve any and all disputes that may arise under or in connection with, this Order and the Purchase Agreement, all amendments

thereto and any waivers and consents thereunder, including, but not limited to, the authority to (i) compel delivery of the Property to the Purchaser; (ii) interpret, implement and enforce the provisions of this Order and any related order; and (iii) protect the Purchaser and the Property against any Interests of any kind or nature whatsoever from which the Property has been sold free and clear.

13. **Subsequent Orders and Plan Provisions**.  Nothing contained in any subsequent order of this Court (including without limitation, an order authorizing any sale of assets pursuant to sections 363, 365 or any other provision of the Bankruptcy Code, or a conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or a dismissal of the Chapter 11 Case) shall nullify, alter, conflict with or derogate from the provisions of this Order, and the provisions of this Order shall survive and remain in full force and effect.

14. **Failure to Specify Provisions**.  The failure to reference or specifically include any particular provisions of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement and the sale of the Property be authorized and approved in its entirety.

15. **No Stay of Order**.  Notwithstanding the provisions of Bankruptcy Rule 6004 or any applicable provisions of the Local Rules, this Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon entry.  Time is of the essence in approving the sale of the Property, and the Debtor and the Purchaser may close the sale of the Property as soon as practicable.  Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

16.     **Inconsistencies with Prior Orders, Pleadings or Agreement**.  To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in the Chapter 11 Case, the terms of this Order shall govern.  To the extent this Order is inconsistent with the terms of the Purchase Agreement, the terms of the Order shall govern.

Dated:   January ___, 2020

                                           _____
                                           Honorable Stuart M. Bernstein
                                           United States Bankruptcy Judge

# EXHIBIT B
# (PURCHASE AGREEMENT

## Residential Contract of Sale

Contract of Sale made as of September 25, 2019 between WANSDOWN PROPERTIES CORPORATION N.V., a limited liability company established under the laws of the Netherlands Antilles, Address: 29 Beekman Place, New York, NY 10022 (hereinafter called **"Seller"**), and29 BEEKMAN CORP, a New York corporation, Address: 488 Madison Ave., 11th Fl, New York, NY 10022, (hereinafter called **"Purchaser"**).

RECITALS

WHEREAS, Seller intends to file a petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York on or before October 7, 2019 and its assets will be subject to the jurisdiction of such Court (the "**Bankruptcy Court**").

WHEREAS, Seller desires to liquidate all, or substantially all, of its assets to fund a plan of reorganization under chapter 11 or a plan of liquidation under chapter 7 of the Bankruptcy Code (the "**Plan**").

WHEREAS, Purchaser desires to purchaser the Premises (as herein defined) from the Seller, free and clear of liens, claims and interests of third parties and to have that sale effected pursuant to the Plan, or, if not possible then under section 363 of the Bankruptcy Code ("**363 Sale**"), the applicable Federal Rules of Bankruptcy Procedure and other rules of bankruptcy practice applicable in the Bankruptcy Court, or as otherwise provided in this contract.

WHEREAS, Seller has made good faith efforts to market the Premises for more than 12 months prior to the date of this contract and considers the offer it has received from Purchaser to be the highest and best offer that it could currently obtain as a result of such efforts;

WHEREAS, Seller has conducted a review of its books and records and projects that the net proceeds of the purchase price will be sufficient to pay all of the valid, liquidated debts of Seller, after adjudication of any disputed claims, in full;

WHEREAS, Purchaser acknowledges that the Seller will incorporate this contract into its Plan, or, if necessary, a 363 Sale, to be approved by the Bankruptcy Court as a sale that would generate sufficient net proceeds to satisfy all claims in form mutually and reasonably acceptable to Purchaser and Seller.

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual covenants set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller hereby agree as set forth below.

1. **Premises**. Seller shall sell and convey and Purchaser shall purchase the property, together with all buildings and improvements thereon (collectively the "**Premises**"), more fully described on a separate page marked "Schedule A", annexed hereto and made a part hereof and also known as: 29 Beekman Place Street Address: 29 Beekman Place, New York, New York 10022. Tax Map Designation: Block 1361, Lot 121 in the Borough of Manhattan. Together with Seller's ownership and rights, if any, to land lying in the bed of any street or highway, opened or proposed, adjoining the Premises to the center line thereof, including any right of Seller to any unpaid award by reason of any taking by condemnation and/or for any damage to the Premises by reason of change of grade of any street or highway. Seller shall deliver at no additional cost to Purchaser, at Closing (as hereinafter defined), or thereafter, on demand, any documents that Purchaser may reasonably require for the conveyance of such title and the assignment and collection of such award or damages, together with all rights, including choses in action appurtenant or relating to the Premises.

2. **Personal Property**. This sale also includes all fixtures and articles of personal property now attached or appurtenant to the Premises, unless specifically excluded below. Seller represents and warrants that at Closing they will be paid for and owned by Seller, free and clear of all liens and encumbrances, except any existing mortgage to which this sale may be subject. They include, but are not limited to, plumbing, heating, lighting and cooking fixtures, chandeliers, bathroom and kitchen cabinets and counters, mantels, mirrors, switch plates and door hardware, venetian blinds, window treatments, shades, screens, awnings, storm windows, storm doors, window boxes, mail box, TV aerials, weather vane, flagpole, pumps, shrubbery, fencing, outdoor statuary, tool shed, dishwasher, washing machine, clothes dryer, garbage disposal unit, range, oven, built-in microwave oven, refrigerator, freezer, air conditioning equipment and installations, wall to wall carpeting and built-ins, furniture and household furnishings, provided, however, that this sale shall <u>exclude</u> any and all rugs, art work, statues, dining tables, humidors, and personal items such as files, documents, photos and other similar items.

3. **Purchase Price**. The purchase price is ten million three hundred thousand dollars ($10,300,000.00), payable as follows:

(a) on the signing of this contract, by Purchaser's good check payable to or wire transfer to the Escrowee (as hereinafter defined), subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 4 of this contract (together with the payment in Section 3(b), the "**Downpayment**"): $200,000.00.

(b) on or before 12:00 noon on October 7, 2019, time being of the essence, by Purchaser's wire transfer to the Escrowee, subject to collection, to be held in escrow pursuant to paragraph 4 of this contract: $830,000.00.

(c) balance at Closing in accordance with paragraph 5: $9,270,000.00.

**4. Downpayment in Escrow.** (a) Seller's attorney (**"Escrowee"**) shall hold the Downpayment in escrow in a segregated bank account at Signature Bank, address: 565 Fifth Avenue, New York, NY 10017, until Closing or sooner termination of this contract and shall pay over or apply the Downpayment in accordance with the terms of this paragraph. Escrowee shall hold the Downpayment in an interest-bearing account for the benefit of the parties. If interest is held for the benefit of the parties, it shall be paid to the party entitled to the Downpayment and the party receiving the interest shall pay any income taxes thereon. If interest is not held for the benefit of the parties, the Downpayment shall be placed in an IOLA account or as otherwise permitted or required by law. The Social Security or Federal Identification numbers of the parties shall be furnished to Escrowee upon request. At Closing, the Downpayment shall be paid by Escrowee to Seller. If for any reason Closing does not occur, Escrowee shall continue to hold such amount until otherwise directed by joint Notice from the parties to this contract or a final, nonappealable judgment, order or decree of a court. However, Escrowee shall have the right at any time to deposit the Downpayment and the interest thereon with the clerk of a court in the county in which the Premises are located and shall give Notice of such deposit to Seller and Purchaser. Upon such deposit or other disbursement in accordance with the terms of this paragraph, Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience and that Escrowee shall not be liable to either party for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally (with right of contribution) agree to defend (by attorneys selected by Escrowee), indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

(d) Escrowee acknowledges receipt of the Downpayment, if by check subject to collection, and Escrowee's agreement to the provisions of this paragraph by signing in the place indicated on the signature page of this contract.

(e) Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

(f) The party whose attorney is Escrowee shall be liable for loss of the Downpayment.

5. **Acceptable Funds**. All money payable under this contract, unless otherwise specified, shall be paid by:

      a.     Cash, but not over $1,000.00;

      b.     Good certified check of Purchaser drawn on or official check issued by any bank, savings bank, trust company or savings and loan association having a banking office in the State of New York, unendorsed and payable to the order of Seller, or as Seller may otherwise direct upon reasonable prior notice (by telephone or otherwise) to Purchaser;

      c.     As to money other than the purchase price payable to Seller at Closing, uncertified check of Purchaser up to the amount of $5,000.00;

      d.     Direct wire transfer of funds; and

      e.     As otherwise agreed to in writing by Seller or Seller's attorney.

6. **Permitted Exceptions**. The Premises are sold and shall be conveyed subject to:

      a.     Zoning and subdivision laws and regulations, and landmark, historic or wetlands designation, provided that they are not violated by the existing buildings and improvements erected on the property or their use;

      b.     Consents for the erection of any structures on, under or above any streets on which the Premises abut;

      c.     Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway;

      d.     Real estate taxes that are a lien, but are not yet due and payable; and

      e.     The other matters, if any, including a survey exception, set forth in a Rider attached.

7. **Governmental Violations and Orders**. (a) Seller shall have no obligation whatsoever to comply with any noted, or any notices of, violations of law or municipal ordinances, orders or requirements noted or issued by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises and Purchaser agrees to accept the Premises subject to any and all of the foregoing; provided, however, Seller shall remove and discharge the two currently open violations on the Premises (elevator and façade/structure), Seller shall use reasonable efforts to do so prior to Closing and shall use funds from the Downpayment escrow, if necessary,

to pay the costs thereof, upon Purchaser's prior written approval of such disbursement amount, which approval shall not be unreasonably withheld, conditioned or delayed, provided that Purchaser acknowledges that such release may require Bankruptcy Court approval, and, if Seller shall not remove same prior to Closing, then an escrow shall be maintained by Seller's counsel from and after Closing to pay the remaining amount necessary to discharge such violations, as estimated by Seller's contractor then working on such discharge.

(b) All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing.

8. **Seller's Representations**. (a) Seller represents and warrants to Purchaser that:

(i)     The Premises abut or have a right of access to a public road;

(ii)     Seller is the sole owner of the Premises and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this contract;

(iii)     The "Whereas" recitals are correct in all material respects, except Seller makes not statement as to Purchaser's desires or knowledge;

(iv)     The Premises are not affected by any exemptions or abatements of taxes; and

(v)     Seller has been known by no other name for the past ten years.

(b) Seller covenants and warrants that all of the representations and warranties set forth in this contract shall be true and correct at Closing.

(c) Except as otherwise expressly set forth in this contract, none of Seller's covenants, representations, warranties or other obligations contained in this contract shall survive Closing.

9. **Condition of Property**. Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, based on Purchaser's own inspection and investigation thereof, and that Purchaser is entering into this contract based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the Premises or the other property included in the sale, given or made by Seller or its representatives, and shall accept the same "as is" in their present condition and state of repair, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of Closing, without any reduction in the purchase price or claim of any kind

for any change in such condition by reason thereof subsequent to the date of this contract. Purchaser and its authorized representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.

10. **Insurable Title**. Seller shall give and Purchaser shall accept such title as Madison Title Agency LP, acting as agent for a title insurance underwriter, which Purchaser shall request to be First American Title Insurance Company (the "**Title Company**") shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this contract.

11. **Closing, Deed and Title**. (a) "**Closing**" means the settlement of the obligations of Seller and Purchaser to each other under this contract, including the payment of the purchase price to Seller, and the delivery to Purchaser of a bargain and sale deed in proper statutory short form for record, duly executed and acknowledged, so as to convey to Purchaser fee simple title to the Premises, free of all encumbrances, except as otherwise herein stated. The deed shall contain a covenant by Seller as required by subd. 5 of Section 13 of the Lien Law.

12. **Closing Date and Place**. See Second Rider to Contract of Sale, Paragraph 51(e).

13. **Conditions to Closing**.

(a) This contract and Purchaser's obligation to purchase the Premises are also subject to, and conditioned upon, the fulfillment of the following conditions precedent:

(i)     The accuracy, as of the date of Closing, of the representations and warranties of Seller made in this contract.

(ii)    Intentionally omitted.

(iii)   Intentionally omitted.

(iv)    The delivery of the Premises and all building(s) and improvements comprising a part thereof in broom clean condition (subject to all included personal property), vacant and free of leases or tenancies, together with keys to the Premises.

(v)     Intentionally omitted.

(b) This contract, Purchaser's obligation to purchase the Premises and Seller's obligation to convey the Premises in accordance with this contract are also subject to, and conditioned upon, the fulfillment of the following conditions precedent:

(i)    Delivery by the parties at Closing of affidavits in compliance with state and local law requirements to the effect that there is installed in the Premises a smoke detecting alarm device or devices.

(ii)    The delivery by the parties of any other affidavits required as a condition of recording the deed.

(c) The Premises shall be in the condition such Premises are in on the date hereof, subject to reasonable wear and tear and Section 27 of the Rider annexed hereto.

14. **Deed Transfer and Recording Taxes**. At Closing, certified or official bank checks payable to the order of the appropriate State, City or County officer, or the Title Company, in the amount of any applicable transfer and/or recording tax payable by reason of the delivery or recording of the deed or mortgage, if any, shall be delivered by the party required by law or by this contract to pay such transfer and/or recording tax, together with any required tax returns duly executed and sworn to, and such party shall cause any such checks and returns to be delivered to the appropriate officer promptly after Closing. The obligation to pay any additional tax or deficiency and any interest or penalties thereon shall survive Closing.

15. **Apportionments and Other Adjustments; Water Meter and Installment Assessments**. (a) The following shall be apportioned as of midnight of the day before the day of Closing:  taxes, water charges and sewer rents, on the basis of the fiscal period for which assessed.

(b) If Closing shall occur before a new tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the immediately preceding fiscal period applied to the latest assessed valuation.

(c) If there is a water meter on the Premises, Seller shall furnish a reading to a date not more than 30 days before Closing and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

(d) If at the date of Closing the Premises are affected by an assessment which is or may become payable in annual installments, and the first installment is then a lien, or has been paid, then for the purposes of this contract all the unpaid installments shall be considered due and shall be paid by Seller at or prior to Closing.

(e) Any errors or omissions in computing apportionments or other adjustments at Closing shall be corrected within a reasonable time following Closing. This subparagraph shall survive Closing.

16. **Allowance for Unpaid Taxes, etc**. Seller has the option to credit Purchaser as an adjustment to the purchase price with the amount of any unpaid taxes, assessments, water charges and sewer rents, together with any interest and penalties thereon to a date not less

than five business days after Closing, provided that official bills therefor computed to said date are produced at Closing.

17. **Use of Purchase Price to Remove Encumbrances**. If at Closing there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the cash balance of the purchase price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments. As an alternative Seller may deposit sufficient monies with the title insurance company employed by Purchaser acceptable to and required by it to assure their discharge, but only if the title insurance company will insure Purchaser's title clear of the matters or insure against their enforcement out of the Premises and will insure Purchaser's Institutional Lender clear of such matters. Upon reasonable prior notice (by telephone or otherwise), Purchaser shall provide separate certified or official bank checks as requested to assist in clearing up these matters.

18. **Title Examination; Seller's Inability to Convey; Limitations of Liability**.

(a) Purchaser shall order an examination of title in respect of the Premises from the Title Company promptly after the execution of this contract. Purchaser shall cause a copy of the title report and of any additions thereto to be delivered to the attorney(s) for Seller promptly after receipt thereof.

(b) (i) If at the date of Closing Seller is unable to transfer title to Purchaser in accordance with this contract, or Purchaser has other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objections to title or otherwise (herein collectively called **"Defects"**), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other than those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the purchase price, then, except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this contract; (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate (but not extending beyond the date upon which Purchaser's mortgage commitment, if any, shall expire), and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s), and if Purchaser shall still be unwilling to waive the same and to close title without abatement of the purchase price, then either party may cancel this contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, the existing mortgage (unless this sale is subject to the same)

and any matter created by Seller after the date hereof shall be released, discharged or otherwise cured by Seller at or prior to Closing.

(c) If this contract is cancelled pursuant to its terms, other than as a result of Purchaser's default, this contract shall terminate and come to an end, and neither party shall have any further rights; obligations or liabilities against or to the other hereunder or otherwise, except that: (i) Seller shall promptly refund or cause the Escrowee to refund the Downpayment to Purchaser and to reimburse Purchaser for the net cost of examination of title, including any appropriate additional charges related thereto, and the net cost, if actually paid or incurred by Purchaser, for updating the existing survey of the Premises or of a new survey, and (ii) the obligations under paragraph 20 shall survive the termination of this contract.

19. **Affidavit as to Judgments, Bankruptcies, etc**. If the Premises are sold other than pursuant to the contemplated Bankruptcy Court order, and a title examination discloses judgments, bankruptcies or other returns against persons having names the same as or similar to that of Seller, Seller shall deliver an affidavit at Closing showing that they are not against Seller.

20. **Defaults and Remedies**. (a) If Purchaser defaults hereunder, Seller's sole remedy shall be to receive and retain the Downpayment as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be impossible to ascertain and that the Downpayment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

(b) If Seller defaults hereunder, Purchaser shall have such remedies as Purchaser shall be entitled to at law or in equity, including, but not limited to, specific performance.

21. Intentionally omitted.

22. **Notices**. Any notice or other communication (**"Notice"**) shall be in writing.

23. **No Assignment**. Purchaser may not assign this contract without the prior written consent of Seller, provided, however, that Purchaser may assign this contract, without the prior written consent of Seller, to an affiliate of Purchaser in which Purchaser and its direct and indirect owners owns and controls a greater than fifty percent (50%) economic and managerial interest and any such affiliated assignee assumes in writing all of the obligations of Purchaser to be performed under this contract. No assignment of this contract shall relieve Purchaser from any of its obligations set forth herein. Any assignment made or attempted in contravention of this Paragraph 23 shall be null and void. Notwithstanding anything to the contrary contained in this contract, any and all assignments of this contract shall be subject to the approval of the Bankruptcy Court; Seller shall consent to and support and cooperate with request for such approval of any assignment permitted under this Section 23.

24. **Broker**. Seller and Purchaser each represents and warrants to the other that it has not dealt with any real estate broker in connection with this sale. The provisions of this paragraph shall survive Closing or, if Closing does not occur, the termination of this contract.

25. **Miscellaneous**. (a) All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.

(b) Neither this contract nor any provision thereof may be waived, changed or cancelled except in writing. This contract shall also apply to and bind the heirs, distributes, legal representatives, successors and permitted assigns of the respective parties. The parties hereby authorize their respective attorneys to agree in writing to any changes in dates and time periods provided for in this contract.

(c) Any singular word or term herein shall also be read as in the plural and the neuter shall include the masculine and feminine gender, whenever the sense of this contract may require it.

(d) The captions in this contract are for convenience of reference only and in no way define, limit or describe the scope of this contract and shall not be considered in the interpretation of this contract or any provision hereof.

(e) This contract shall not be binding or effective until duly executed and delivered by Seller and Purchaser.

(f) Seller and Purchaser shall comply with IRC reporting requirements, if applicable. This subparagraph shall survive Closing.

(g) Each party shall, at any time and from time to time, execute, acknowledge where appropriate and deliver such further instruments and documents and take such other action as may be reasonably requested by the other in order to carry out the intent and purpose of this contract. This subparagraph shall survive Closing.

(h) This contract is intended for the exclusive benefit of the parties hereto and, except as otherwise expressly provided herein, shall not be for the benefit of, and shall not create any rights in, or be enforceable by, any other person or entity.

(i) If applicable, the complete and fully executed disclosure of information on lead-based paint and/or lead-based paint hazards is attached hereto and made a part hereof.

*[No further text appears on this page. Signatures appear on the following page.]*

**IN WITNESS WHEREOF,** this contract has been duly executed by the parties hereto.

| | |
|---|---|
| **SELLER:** | **PURCHASER** |
| WANSDOWN PROPERTIES CORPORATION N.V., a limited liability company established under the laws of the Netherlands Antilles | 29 BEEKMAN CORP, a New York corporation |

By:_____
Name: Gholam Reza Golsorkhi
Title: President and Managing Director

By:_____
Name: Seth A. Akabas
Title: President

Receipt of the Downpayment is acknowledged and the undersigned agrees to act in accordance with the provisions of paragraph 4 above.

BLANK ROME LLP,
as Escrowee

**PREMISES:**

Section: _____
Block: 1361
Lot: 121
County or Town: Manhattan
Street No. Address: 29 Beekman Place

Schedule A

[legal description attached hereto]

# SCHEDULE A

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, County and State of New York, bounded and described as follows:

BEGINNING at a point on the easterly side of Beekman Place, distant eighty feet five inches northerly from the corner formed by the intersection of the easterly side of Beekman Place and the northerly side of East 50th Street;

RUNNING THENCE easterly and parallel with East 50th Street, and part of the way through a party wall, one hundred feet;

THENCE northerly and parallel with Beekman Place, twenty feet;

THENCE westerly again parallel with East 50th Street and part of the way through a party wall, one hundred feet to the easterly side of Beekman Place;

THENCE southerly along the easterly side of Beekman Place, twenty feet to the point or place of BEGINNING.

Premises known as and street number 29 Beekman Place, New York, NY

**RIDER TO RESIDENTIAL CONTRACT OF SALE BETWEEN
WANSDOWN PROPERTIES CORPORATION N.V., AS SELLER, AND
29 BEEKMAN CORP, AS PURCHASER
PREMISES: 29 BEEKMAN PLACE, NEW YORK, NEW YORK**

This Rider is a part of the captioned Residential Contract of Sale (the "Contract") to which it is annexed. In case of any contradiction, inconsistency or overlapping coverage between any of the following provisions and the provisions of the main portion of this Contract, the following provisions of this Rider shall govern.

26. Supplementing paragraph 4 of the Contract, Purchaser shall have no liability for the fees, costs or expenses of the Escrowee for operation of the Downpayment escrow in the ordinary course or if Escrowee represents Seller in any dispute.

27. If the Premises shall have been damaged or destroyed prior to the Closing (a) to the extent of $200,000 or less, then this Contract shall continue in full force and effect, and Seller shall forthwith assign to Purchaser all rights of Seller's to the insurance proceeds due by reason of said damage (or if none is due, the purchase price shall be reduced accordingly), or (b) to the extent of any amount greater than $200,000, then Purchaser may, at Purchaser's option, (i) elect to continue this Contract in full force and effect, in which case Seller shall forthwith assign to Purchaser (subject to Closing) all rights of Seller rights to the insurance proceeds due by reason of said damage (or if none is due, the purchase price shall be reduced accordingly), or (ii) elect to terminate this Contract, and thereafter neither party hereto shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract, except that the Downpayment shall be promptly refunded, with interest, to Purchaser.

28. Seller represents and warrants that Seller has not received, and is not aware of, any written notice for emergency repairs or to repair sidewalks adjacent to the Premises that have not heretofore been removed of record. If any mechanic's lien based upon services rendered, or goods supplied, to the Premises prior to the Closing is discovered or levied and is or becomes of record, then the Seller shall remove same prior to Closing.

29. Intentionally omitted.

30. If any lien, claim, violation, failure of condition, breach or encumbrance of any kind, other than such as Seller is permitted hereunder to convey title subject to, (collectively, "Defects") exists with regard to the Premises, then Seller shall use Seller's commercially reasonable efforts to remove same on or prior to Closing, but shall not be obligated to spend more than $250,000 therefor, and at any time prior to Closing may notify Purchaser that Purchaser will be required to accept either: (a) a termination of the Contract under Seller's inability to convey title as set forth in the Contract; or (b) the Closing with the Premises subject to such Defect in consideration of a reduction in the purchase price equal to the difference, if any, between $250,000 and all funds already expended by Seller to remove such Defect; provided, however, that any such Defect created

13

affirmatively by or on behalf of Seller or by Seller's failure to pay amounts due and owing by Seller shall be removed by Seller out of the proceeds of the sale of the Premises.

31. No Defect will be acceptable, nor shall Purchaser be obligated to close subject to it, unless the Title Company will omit such Defect from Purchaser's title insurance policy. For clarity, the Title Company willingness to insure against collection of same from the Premises will not be a sufficient satisfaction of such Defect; provided, however, that if a Defect to title shall arise, Seller shall have a reasonable time to remove such Defect. Any requested adjournment by the Seller and/or any attempt by Seller to remove such Defect, shall not be or be deemed to be an admission that a Defect to title does exist. If Seller fails after a reasonable time to remove any such Defect to title that Seller is required hereunder to remove, then Purchaser shall be entitled to terminate this Contract by notice to Seller, in which case Purchaser shall receive back the entire Downpayment, and neither party hereto shall have any further obligation to the other.

32. Seller shall execute such title affidavit as the Title Company shall reasonably request in order for the Title Company to insure title as contemplated herein.

33. If condition in paragraph 13 of the Contract or a representation in paragraph 9 of the Contract shall not be satisfied or true, as applicable, at Closing, then, at Seller or Purchaser's option: the Closing shall be adjourned for such reasonable period for Seller to remedy any such defect; or the Closing shall be effected and the purchase price under the Contract reduced by the reasonable cost of remedying any such defect.

34. Seller shall maintain the Premises in its current condition, subject to ordinary wear and tear and natural deterioration, between the execution hereof and Closing.

35. No limitation of representations and/or warranties shall in any way limit any warranty or representation expressly stated in the Contract.

36. All notices required under this Contract shall be made in writing and shall be sent by Certified Mail, Return Receipt Requested, or by facsimile or email, however all notices delivered by facsimile or email shall be deemed given on the day indicated on the confirmation of receipt if prior to 3:00 p.m. on a business day at the place of receipt, and otherwise on the next business day, to the address of party set forth below, and a confirmation copy should be sent out by Certified Mail, Return Receipt Requested on the day the e-mail shall be deemed given. The attorneys of parties hereto may give notices hereunder. Notice shall be deemed given on the date signed for or not accepted by the addressee on first attempted delivery. Any party hereto may change the address set forth below to which notice addressed to said party is to be thereafter sent, by sending written notice of said new address to the other party to the Agreement. The addresses to which notices are to be sent (until said addresses are changed as herein authorized) are:

| Seller: | WANSDOWN PROPERTIES CORPORATION N.V. |
| | 29 Beekman Place |
| | New York, NY 10022 |

| With a copy to: | BLANKROME |
| | 1271 Avenue of the Americas |
| | New York, NY 10020 |
| | Attn: Lawrence F. Flick II, Esq. |
| | flick@blankrome.com |

| Purchaser: | 29 BEEKMAN CORP |
| | c/o Akabas & Sproule |
| | 11th Floor |
| | 488 Madison Avenue |
| | New York, NY 10022 |
| | Attention: Seth A. Akabas |
| | Email: SAkabas@akabas-sproule.com |

| With a copy to: | Akabas & Sproule |
| | 11th Floor |
| | 488 Madison Avenue |
| | New York, NY 10022 |
| | Jesse Greene, Esq. |
| | Fax: 212-308-8505 |
| | Email: JGreene@akabas-sproule.com. |

37. Intentionally omitted.

38. If Seller defaults under the Contract, and Purchaser is entitled to file a lis pendens against the Premises, then Purchaser shall be permitted to record a copy of this Contract in connection with enforcing its rights hereunder.

39. Any error made in the adjustments under Paragraph 15, shall be corrected and the appropriate adjustment payment made. This Section 39 shall survive Closing.

40. At Closing, Seller and Purchaser shall deliver a prepared and fully executed (i) NYC Real Property Transfer Tax Return, (ii) Combined Real Estate Transfer Tax Return, Credit Line Mortgage Certificate, and Certification of Exemption from Payment of Estimated Personal Income Tax (i.e., TP-584 Form), and (iii) NYS Real Property Transfer Report (i.e., RP-5217). Any provision in the foregoing sentence notwithstanding, if the Premises are sold hereunder other pursuant to the contemplated Bankruptcy Court order, then: At Closing, Seller and Purchaser shall deliver a prepared and fully executed (i) NYC Real Property Transfer Tax Return and Seller shall deliver a bank check, in payment of the tax or filing fee owed thereon, (ii) Combined Real Estate Transfer Tax Return, Credit Line

Mortgage Certificate, and Certification of Exemption from Payment of Estimated Personal Income Tax (i.e., TP-584 Form) and Seller shall deliver a bank check, in payment of the tax or filing fee owed thereon except that Purchaser shall be responsible for the NYS and NYC "Mansion Tax.", and (iii) NYS Real Property Transfer Report (i.e., RP-5217). Seller and Purchaser shall pay promptly any tax due and interest and penalties, if any, thereon, as required under this Section 40, and each shall indemnify the other therefrom and from any cost, claim and expense (including reasonable attorneys' fees relating thereto or to the enforcement of this indemnity) incurred in connection therewith. The obligations under this paragraph 40 shall survive Closing.

41. Intentionally omitted.

42. In addition to any other "subject to" clauses contained herein, the Premises shall be sold subject to: (a) any state of facts that an accurate survey of the Premises might reveal; (b) any state of facts that a personal inspection of the Premises might reveal provided the same does not render title unmarketable; (c) any minor variance in connection with any fence, hedge, wall or the like surrounding the Premises, provided such variance does not unreasonably interfere with the continued use of the Premises; (d) recorded rights of way, restrictions and easements that do not prohibit the existing structures or the use of the Premises as a residential dwelling or render title to the Premises unmarketable, or make development of the property impractical; (e) any matters of record or in fact created by (i) Seller after the date of this Agreement with the prior written consent of Purchaser, or (ii) Purchaser; (f) revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Premises; and (g) such other matters as the title insurer shall be willing, without special premium, to omit as exceptions to coverage.

43. Intentionally omitted.

44. This Contract may be executed in multiple counterparts and executed and delivered by digital means, all of which shall be one and the same instrument and as valid as a paper contract manually signed and delivered by or on behalf of all parties to this Contract.

**IN WITNESS WHEREOF,** this Rider has been duly executed by the parties hereto as of September 25, 2019.

**SELLER:**

WANSDOWN PROPERTIES CORPORATION N.V., a limited liability company established under the laws of the Netherlands Antilles

By: _____
Name: Gholam Reza Golsorkhi
Title: President and Managing Director

**PURCHASER**

29 BEEKMAN CORP, a New York corporation

By: _____
Name: Seth A. Akabas
Title: President

**SECOND RIDER TO RESIDENTIAL CONTRACT OF SALE BETWEEN
WANSDOWN PROPERTIES CORPORATION N.V., AS SELLER, AND
29 BEEKMAN CORP, AS PURCHASER
PREMISES: 29 BEEKMAN PLACE, NEW YORK, NEW YORK**

This Second Rider is annexed to and forms a part of the above described transaction and Contract of Sale (the "Contract of Sale" or the "Contract"). If the provisions of this Second Rider conflict with the provisions of the Rider or printed form Contract of Sale to which this Second Rider is attached, the provisions of this Second Rider shall control.

45. The acceptance of a deed by Purchaser or its title agent shall be deemed to be full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Contract, except those, if any, which are specifically stated in this contract to survive delivery of the deed.

46. This Contract shall not be recorded and any attempt to do so shall constitute a material default hereunder.

47. Supplementing Paragraph 6 of the Contract, the Premises are to be transferred subject to the following:

a. Covenants, easements, consents, agreements and restrictions of record which do not adversely affect the use and enjoyment of the Premises for residential purposes, don't affect marketability of the Premises, do not impose any costs on the owner of the Premises, and do not adversely affect ability to develop or re-develop the Premises; and

b. Real estate taxes and sewer rents, subject to adjustment as provided in this Agreement.

48. Seller and Purchaser agree that the Property Condition Disclosure Act, enacted pursuant to Chapter 456 of the Laws of 2001 and as Article 14 of the Real Property Law (the "Disclosure Act") requires a seller of residential real property improved by a one to four family dwelling to deliver to a purchaser a property condition disclosure statement in the form prescribed by the Disclosure Act (the "Disclosure Statement") prior to a purchaser's execution of a binding contract of sale. In lieu of delivering the Disclosure Statement, the Disclosure Act permits a seller to give a purchaser a $500 credit against the purchase price upon the transfer of title (the "Disclosure Credit"). In accordance with the foregoing, Seller hereby elects to give Purchaser the Disclosure Credit against the Purchase Price in lieu of delivering the Disclosure Statement and Purchaser hereby agrees to accept and acknowledges receipt of the Disclosure Credit in lieu of the Disclosure Statement and acknowledges that Purchaser shall have no rights against Seller and Seller shall have no responsibility or liability to Purchaser for not giving the Disclosure Statement.

49. This Contract contains all the terms of the agreement entered into between the parties. Purchaser acknowledges that neither Seller nor anyone on behalf of Seller has made any representations or held out any inducements to Purchaser as to the physical condition or state of

repair of the Premises, except as expressly set forth herein. In furtherance of Section 9 hereof, Purchaser represents and warrants that Purchaser has inspected or caused to be inspected or waived inspection of the Premises, and is fully aware of the physical condition and state of repair thereof. Seller shall not be responsible or liable for any statements, representations, warranties, promises, conditions, agreements or other information (including, without limitation, verbal or written statements, representations of real estate brokers, or "set-up" furnished by any broker, agent, employee, or other person), relating to the Premises, as to the physical condition, state of repair, expenses, operations, legal occupancy, use or any other matter or thing affecting or relating to the Premises, except as expressly set forth herein.

50. See "Disclosure of Information on Lead-Based Paint and Lead-Based Paint Hazards" attached as Schedule A hereof, to be signed by Seller, Purchaser and the broker, if any.

51. **Bankruptcy Matters and Closing.**

a . Purchaser acknowledges that the Premises is owned by Seller, and Seller will file a voluntary chapter 11 case pursuant to the Bankruptcy Code and that consummation of the transactions contemplated herein is subject to Seller's receipt of requisite authority under the Bankruptcy Code pursuant to, among other things, the entry of an order confirming the Plan, or if not possible, then approving a 363 Sale, which order shall contain provisions (i) approving the sale of the Property by Seller to Purchaser, free and clear of any and all mortgages, liens, claims, encumbrances and interests, with any such existing and valid mortgages, liens, claims, encumbrances and interests to attach to only the proceeds of the sale  (ii) providing for appropriate injunctions against any actions against Purchaser or the Premises to collect on account of any such mortgages, liens, claims, encumbrances or interests to the fullest extent permitted by the applicable law and rules; (iii) reserving to the Bankruptcy Court jurisdiction to enforce all orders approving and/or matters relating to the sale; (iv) providing that that the Seller and Purchaser are entitled to the relief set forth in Section 1146(a) of the Bankruptcy Code with respect to the Sale if pursuant to a Plan (v) findings that (1) Purchaser has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code (the "**Confirmation Order**"); (2) adequate notice was provided for the sale pursuant to the applicable laws and rules; (3) the Contract price constitutes the highest and best offer for the purchase of said assets under the circumstances of the Case and represents fair and adequate consideration for the assets, (4) the sale to Purchaser is in the best interests of Seller, its bankruptcy estate, creditors, and equity interest holders; (5) the sale has been conducted on an arms-length basis; (6) Purchaser has made proper disclosures of any and all connections between Purchaser and Seller; (7) Purchaser is not a successor in interest to Seller and is not assuming or otherwise liable for any debts of Seller; (8) the sale is being effected pursuant to and in conjunction with the Plan, if one is being confirmed, and, therefore, Purchaser is entitled to the protections and exemptions provided in and pursuant to Section 1146(a) of the Bankruptcy Code; and (vi) shall otherwise be acceptable to Purchaser in its reasonable business discretion.  provided, however, if Seller does not file such proceeding or it is dismissed for any reason, then this Contract shall remain a binding obligation of Seller to sell and Purchaser to buy the Premises as set forth herein apart from the contemplated Bankruptcy Court proceeding.

b.  Seller shall petition the Bankruptcy Court to approve the sale of the Premises under this Contract, i.e., for clarity, without seeking any other offers, bids or proposals, and shall not propose or request any auction. Seller represents that the net proceeds of a sale under this

Contract would be sufficient to satisfy all claims against Seller and, as reasonably projected, Seller's contemplated estate in bankruptcy, and Seller shall present the Contract for approval by the Bankruptcy Court in such context. Purchaser's expenses in negotiating this Contract, investigating the Premises and participating in the Bankruptcy Proceeding shall, to the fullest extent permitted by applicable law, be treated as administrative expenses of the bankruptcy estate. If, despite Seller's petition described herein, the Bankruptcy Court orders an auction or if any higher offer is made that the Bankruptcy Court accepts, or if the Bankruptcy Court proceeding is dismissed without approval of the sale under this Contract, then, Seller and Purchaser acknowledge, Purchaser will suffer damages that will be extremely difficult to calculate, and so Purchaser shall be entitled to receive, as liquidated damages and not as a penalty, which, Seller and Purchaser acknowledge, is a reasonable estimate of such damages from any disposition in any manner of the Premises other than to Purchaser or Purchaser's assignee (except on a default by Purchaser not cured following notice), equal to: US$500,000, plus 80% of all gross proceeds of such disposition(s) that are in excess of US$10,800,000 (for clarity.. This Section 51(b) shall survive termination of this Contract.

      c. Notwithstanding anything to the contrary contained in this contract, except subject to Section 51(a) above, the obligations of the parties under this contract are subject in all events to the entry by the Bankruptcy Court of the Confirmation Order approving the sale contemplated by this contract and providing, among other things, that the conveyance to the Purchaser at Closing shall be free and clear of all liens, claims, and encumbrances otherwise payable by Seller or Purchaser at the Closing, other than real estate taxes, permitted exceptions and free of all transfer taxes.

      d. Seller shall from the date hereof cease all marketing of the Premises, whether direct or indirectly through any other person or entity, and Seller shall respond to any unsolicited communication from a prospective purchaser of the Premises only to the extent to meet Seller's fiduciary duties, and Seller shall cause all of its agents, personnel and affiliates to comply with this Section 51(d); provided, however, in all cases, Seller may depart from compliance with this Section 51(d) to the limited extent as expressly directed by the Bankruptcy Court, if such Bankruptcy Court so directs despite Seller's opposition.

      e. The closing of the transactions contemplated herein ("**Closing Date**") shall take place no later than the forty-five (45) days after the Confirmation Order which becomes final and non-appealable, at the office of Blank Rome LLP, 1271 Avenue of the Americas, New York, NY 10020, provided, however, that in no event shall the Closing take place later than January 31, 2020, subject to extension of the Final Date (defined below).

      f. In the event Purchaser qualifies as a good faith purchaser for value within the meaning of the Bankruptcy Code section 363(m), Purchaser may request that the Closing Date take place prior to the Confirmation Order becoming final and non-appealable. Purchaser shall give at least two (2) business day's written notice of its election to fix a Closing Date pursuant to this paragraph. Seller shall take.all commercially reasonable steps to accommodate Purchaser's request.

      52. In addition to the conditions set forth in Paragraph 13 of this Contract, this Contract, Purchaser's obligation to purchase the Premises, and Seller's obligation to convey the

Premises in accordance with this Contract are also subject to, and conditioned upon, the fulfillment of the following conditions precedent:

a. The Seller shall be a debtor-in-possession, under chapter 11 of the Bankruptcy Code, with the rights, powers, and duties under section 1107 of the Bankruptcy Code and no trustee shall have been appointed.

b. No order of any court shall have been entered in any action or proceeding instituted by any person that enjoins, restrains, or prohibits the consummation of the transactions contemplated hereby.

c. The Bankruptcy Court, having jurisdiction over a chapter 11 case of the Seller, shall have entered Confirmation Order, in a form that is not materially different from the proposed order agreed to by the Purchaser and Seller, and the order is final and not the subject of any stay.

d. The Closing shall occur within forty-five (45) days after the entry of the Confirmation Order but no later than January 31, 2020 (such January 31, 2020 date, as extended hereunder, the "Final Date"); provided, however, that Purchaser may extend such Final Date, on one or more occasions, until the earlier of 30 days after the entry of the Confirmation Order or January 31, 2021 by notice to Seller prior to the passing of the then effective Final Date.

**IN WITNESS WHEREOF,** this Second Rider has been duly executed by the parties hereto as of September 25, 2019.

**SELLER:**

WANSDOWN PROPERTIES CORPORATION N.V., a limited liability company established under the laws of the Netherlands Antilles

By: _____
Name: Gholam Reza Golsorkhi
Title: President and Managing Director

**PURCHASER**

29 BEEKMAN CORP, a New York corporation

By: _____
Name: Seth A. Akabas
Title: President

**SCHEDULE A TO SECOND RIDER**

**SAMPLE DISCLOSURE FORMAT FOR TARGET HOUSING SALES
DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT
AND LEAD-BASED PAINT HAZARDS**

**Lead Warning Statement**

Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

**Seller's Disclosure** (initial)

_____ (a)  Presence of lead-based paint and/or lead-based paint hazards (check one below):

[ ]  Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

[ x ]  Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

_____ (b)  Records and reports available to the seller (check one below):

[ ]  Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

[ x ]  Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment** (initial)

_____ (c)  Purchaser has received copies of all information listed above.

_____ (d)  Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*

_____ (e)  Purchaser has (check one below):

[ ]  Received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

[ x ]  Waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment** (initial)

_____ (f)  Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify as of September 25, 2019, to the best of their knowledge, that the information provided by the signatory is true and accurate.

**SELLER:**

WANSDOWN PROPERTIES CORPORATION N.V.,
a limited liability company established under the laws
of the Netherlands Antilles

By:_____
Name: Gholam Reza Golsorkhi
Title: President and Managing Director

**PURCHASER**

29 BEEKMAN CORP,
a New York corporation

By:_____
Name: Seth A. Akabas
Title: President

**AGENT (IF ANY):**

By: _____

**GHOLAM REZA GOLSORKHI**
**29 Beekman Place**
**New York, NY 10022**


September 25, 2019


29 BEEKMAN CORP
c/o Akabas & Sproule
11th Floor
488 Madison Avenue
New York, NY 10022

> Re: Residential Contract of Sale made as of September 25, 2019 between WANSDOWN
> PROPERTIES CORPORATION N.V., a limited liability company established under the laws
> of the Netherlands Antilles, and 29 BEEKMAN CORP, a New York corporation

Dear Ladies and Gentlemen:

You and I hereby agree as follows.

In connection with the subject contract (the "Contract") you shall purchase, and I shall sell, the mirrors and chandeliers in the Premises (defined in the Contract), which mirrors and chandeliers are owned by me, for a purchase price of $15,000, which amount shall be placed in escrow with your counsel, who shall acknowledge receipt of same to you and to me upon receipt. Such purchase shall be memorialized by a customary bill of sale at closing under the Contract, and the escrowed purchase price shall be paid at such closing. You will be responsible for any sales tax on such purchase.

The provisions of the Contract are incorporated herein by reference.

Very truly yours,

GHOLAM REZA GOLSORKHI


Agreed:
29 BEEKMAN CORP

By: _____
Name: Seth A. Akabas
Title: President