BEYS LISTON & MOBARGHA LLP
Nader Mobargha
Michael P. Beys
641 Lexington Avenue
New York, NY 10022
Tel: (646) 755-3603
Fax: (646) 755-3599
nmobargha@blmllp.com
mbeys@blmllp.com

*Counsel for Secured Creditor Azadeh Nasser Azari*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- X

In re:

WANSDOWN PROPERTIES CORPORATION, N.V.,

Debtor

----------------------------------------------------------------X

**Chapter 11**

**Case No. 19-13223 (SMB)**

**SECURED CREDITOR AZADEH NASSER AZARI'S OBJECTION TO THE
DEBTOR'S AMENDED PLAN AND MOTION TO SEEK DISCOVERY CONCERNING
THE SALE OF DEBTOR'S SOLE ASSET**

    Azadeh Nasser Azari ("Ms. Azari"), a secured creditor of the Debtor Wansdown

Properties Corporation, N.V. (the "Debtor"), through undersigned counsel, respectfully objects

under section 1128(b) of the Bankruptcy Code (the "Code") and Rule 3020(b) of the Federal

Rules of Bankruptcy Procedure to the confirmation of the Debtor's Modified Chapter 11 Plan,

filed December 9, 2019 (the "Modified Plan"), and moves for discovery concerning the sale of

Debtor's sole asset, a town house located at 29 Beekman Place, New York, New York 10022

(the "Town House") for $10.3 million to 29 Beekman Corp. (the "Sale").

## I- THE MODIFIED PLAN IS NOT FEASIBLE

### A. The Debtor Fails To Provide How It Will Pay The Legal Fees And Expenses It Has Incurred And Will Continue To Incur In This Bankruptcy

1. Ms. Azari objects to confirmation of the Modified Plan on the basis that it is not

feasible.[1] In its Modified Plan, the Debtor has not included any provision for the payment of Blank

Rome's hourly fees in prosecuting the adversary proceeding against Ms. Azari to avoid her April

21, 2016 judgment against the Debtor (the "Judgment"). (*See* Dock No. 34, Adversary

Proceeding). Blank Rome has a prepetition claim of $309,160.81 (*See* Claim No. 4), and its

retention order (*See* Dock No. 24) provides that, going forward, the Debtor shall pay the firm's

fees on an hourly basis. However, in both its Modified Plan and its disclosure statement, the

Debtor has failed to include any provision for how it is going to pay Blank Rome's administrative

expenses and legal fees, both those incurred since the Debtor filed its petition and those that it will

incur going forward. Furthermore, the Debtor has represented in multiple proceedings that, after

the sale of the Town House, it will be able to pay all prepetition creditors, meaning that Blank

Rome's post-petition administrative fees will not affect the payment of the prepetition creditors.

(*See* Dock No. 30, Modified Plan at § 4 (Classes 1 through 4 will be paid in full, and all classes

are unimpaired); *see also* Ex. 1 Transcript of November 14, 2019 Hearing at 3:12-15)(Sale "will

produce funds sufficient to be able to pay reserves for all non-insider claims, even that of [Ms.

---

[1]     Under section 1129(a)(11), the Court may only confirm a plan if the following requirement is met: "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

Azari]…") & Ex. 2, Transcript of 341 Creditor Meeting, at 14:12-15 ("Everyone will get paid" from the Sale).

2.       Unless Blank Rome is working for free, it impossible to understand how the Debtor's estate will fund Blank Rome's fees.   Without any plan to fund the administrative expenses and legal fees in the bankruptcy, "liquidation, or the need for further reorganization" under section 1129(a)(11) is inevitable.  As such, the Debtor's Modified Plan cannot be confirmed.

**B.       The Debtor Fails To Disclose How It Will Escrow The Interest Accruing on Ms. Azari's Judgment During The Adversary Proceeding**

3.       The Debtor also fails to disclose how it will escrow the interest that will continue to accrue on the $3.605 million Judgment, which it is challenging in the adversary proceeding. Under CPLR 5004, 11 U.S.C. § 502(b), and 11 U.S.C. § 506(b), interest on the Judgment continues to accrue at 9% interest, or $243,000 per year, on Ms. Azari's Judgment.  Furthermore, under section 7.2 of the Modified Plan, the Debtor represents that it "shall reserve an amount sufficient to pay holders of Disputed Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims."  (*See* Dock. No. 30, at § 7.2).  Under both the Code and the Debtor's Modified Plan, Ms. Azari is entitled to at least a few years of the interest that will accrue on the Judgment during the adversary proceeding.  The Debtor must place this future interest on a secured claim in escrow before paying any unsecured creditors or administrative expenses.  *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 5 (2000)("Administrative expenses…do not have priority over secured claims."); *In re Perez,* 339 B.R. 385, 408 (Bankr. S.D. Tex. 2006, *aff'd sub nom. Perez v. Peake*, 373 B.R. 468 (S.D. Tex. 2007)("secured claims may be said to have priority over all unsecured claims").  Despite this obligation, in its Modified Plan, the Debtor fails to provide the source of these funds or how it plans to escrow them.

**II-  MS. AZARI SEEKS DISCOVERY CONCERNING THE $10.3 MILLION SALE OF THE TOWN HOUSE, SINCE IT MAY NOT BE AN ARM'S LENGTH TRANSACTION OR IN THE BEST INTERESTS OF THE CREDITORS**

4.      The Sale that the Debtor claims will result in the payment of all of its creditors has numerous red flags that may show that, not only is the transaction not "arm's length" – as Debtor claimed under oath it is (*See* Dock No. 5, at ¶¶ 18-19) – it also is not in the best interests of creditors.

5.      To investigate these issues, Ms. Azari respectfully seeks discovery concerning the Sale, including but not limited to, the identities of 29 Beekman Corp.'s shareholders; the shareholders of those shareholders; the negotiations which led to the $10.3 million sale price; and whether Golsorkhi, the Debtor's sole President and Managing Director, received any undisclosed benefit from the transaction with 29 Beekman Corp.

6.      When Debtor filed its bankruptcy petition, Debtor already had signed a Residential Sale Agreement, dated September 25, 2019, with a buyer named 29 Beekman Corp. (the "Agreement").  (*See* Dock No. 21, Ex. A).

7.      The Agreement's liquidated damages clause imposes a particularly onerous burden on the Debtor.   It requires the Debtor to "petition the Bankruptcy Court to approve the sale of the [Town House] without seeking any other offers, bids and proposals..."  (*See* Dock. No. 21, Ex. A, at § 51b).   It further requires that, should "the Bankruptcy Court order an auction or any higher offer is made that the Bankruptcy Court accepts", then 29 Beekman Corp. is entitled to damages "equal to $500,000, plus 80% of all gross proceeds of such disposition that are in excess of $10.8 million."   (*Id.*)(emphasis added).   This leaves Debtor with very little

upside even if it finds a better offer.  Finally, the clause provides that this section "shall survive termination of [the Agreement]." (*Id.*).

8.     The following are some of additional facts surrounding the Agreement and Sale that invite scrutiny:

a.  29 Beekman Corp. did not exist when it signed the Agreement on September 25, 2019.  (*See* Ex. 3, NYS Dep't of State, Div. of Corp., 29 Beekman Corp status information)(29 Beekman Corp. formed a day later on <u>September 26, 2019</u>).

b.  At the Creditor Meeting, Golsorkhi, the President and Managing Director, refused to disclose the identity of the representative who gave the $10.3 million offer on behalf of 29 Beekman Corp.  (*See* Ex. 2, Creditor Meeting, at 12:13-24 & 22:8 – 18).  However, he admitted that he has known the representative for the past "10 [to] 15 years" and sees him at least "once a year.")(*Id.* at 22:22-23:10).

c.  The purchase price in the Agreement is $6.6 million lower than the price listed a week before the Sale – an almost 70 percent discount – and $4.2 million lower than broker's listing when Debtor signed the Agreement – an almost 40 percent discount.  (*See* Ex. 4, Streeteasy Price History for Town House)(showing that the Townhouse was listed as high as $16.9 million a week before Debtor signed the Agreement for $10.3 million).

d.  Golsorkhi denied access to buyers who may have had higher offers for the Town House, even though the Court had yet to approve the Sale.   (*See* Ex. 2, Creditor Meeting Tr., at 15:13-19).[2]

e.  29 Beekman Corp's listed address for process of service is 29 Beekman Place, the same address of the Town House.   (*See* Ex. 3).

---

[2] Although Golsorkhi initially resisted, recently opposing counsel informed undersigned counsel that Golsorkhi has granted other potential bidders access to the Town House after undersigned counsel requested that he do so.

f.   The address that Debtor listed for 29 Beekman Corp in this Bankruptcy may not be valid.  (See Ex. 5, Envelope addressed to 29 Beekman Corp)(envelope returned and listed address in this bankruptcy for 29 Beekman Corp. is "unknown" (i.e., "AUK" as acronym for "Address UnKnown")).

g.   When asked by U.S. Trustee Paul K. Schwartzenberg how the Debtor arrived at the $10.3 million purchase price, Golsorkhi responded that 29 Beekman Corp. offered that figure.  (*See* Ex. 2, Creditor Meeting, at 4:18-5:1).  This means that 29 Beekman Corp.'s $10.3 million offer coincidentally matched the $10.26 million of non-insider debt, both secured and unsecured, that Debtor represented in its filings that it owed in this bankruptcy.  (*See* Dock. No. 13, Forms 202 – 207 & Dock No. 4, List of Creditors Who Have The 20 Largest Unsecured Creditors).[3]   It also means that, despite anticipating a section 363 sale in bankruptcy where other buyers could offer higher bids, Debtor did not even attempt to negotiate with the buyer, even with the Town House listed at $16.9 million just a few weeks earlier.

9.     Despite these circumstances, at the Creditor Meeting, Golsorkhi reaffirmed under oath that the Sale was an "arm's length" transaction.  (Ex. 2, at 13:18-24).  Regardless, both the unsecured and secured creditors have a right to question the fairness of the Agreement and the Sale price, especially given that there is no trustee or creditor's committee appointed.

---

[3] This $10.26 figure contains the true value of Ms. Azari's judgment – $3,542,400 – when the Debtor filed this bankruptcy, rather than the $3.4 million figure that the Debtor inaccurately listed in its petition as the amount of Ms. Azari is owed.   The Debtor knew the true value of Ms. Azari's Judgment based on the Execution the Sheriff delivered to the Debtor.   (*See* Claim no. 6-3)(Interest on the Judgment began accruing as of April 21, 2016).  However, Debtor chose to ignore that figure, but rather listed $3.4 million as the amount of Ms. Azari's secured claim.   The basis of Debtor's inaccurately listed figure is unclear.

## **CONCLUSION**

10.     For all the foregoing reasons, including (i), Ms. Azari respectfully requests that

this Court deny the Plan's confirmation and (ii) grant Ms. Azari the right to seek discovery

concerning the Sale.


Dated: January 7, 2019
       New York, New York

                                             **BEYS LISTON & MOBARGHA LLP**

                                             By: _____/s/_____
                                                     Nader Mobargha, Esq.


                                             641 Lexington Avenue, 14th Floor
                                             New York, New York 10022
                                             Telephone: (646) 755-3603
                                             Facsimile: (646) 755-5229
                                             Email: nmobargha@blmllp.com
                                             *Attorneys for Secured Creditor*
                                             *Azadeh Azari*

# **EXHIBIT 1**

## **November 14, 2019 Initial Status Conference**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

*In re:*                                          Case No. 19-13223-smb
                                                  New York, New York
  WANSDOWN PROPERTIES CORPORATION N.V.,           November 14, 2019
                                      *Debtor.*   10:08 a.m. - 10:19 a.m.

19-13223-SMB, WANSDOWN PROPERTIES CORPORATION N.V., CHAPTER 11

INITIAL CASE CONFERENCE; APPLICATION TO EMPLOY BLANK ROME LLP
      AS SPECIAL LITIGATION, REAL ESTATE AND TAX COUNSEL
            FILED BY HANH VINH HUYNH ON BEHALF OF
              WANSDOWN PROPERTIES CORPORATION N.V.

           BEFORE THE HONORABLE STUART M. BERNSTEIN
                UNITED STATES BANKRUPTCY JUDGE

A P P E A R A N C E S :

 *For the Debtor:*                 PAUL A. RUBIN, ESQ.
                                   HANH V. HUYNH, ESQ
                                   Rubin LLC
                                   345 Seventh Avenue, 21st Floor
                                   New York, New York 10001
                                   (212) 390-8272; (212) 390-8273 fax

 *For Secured Creditor,*           ERICA FEYNMAN AISNER, ESQ.
 *National Investment Bank:*       Kirby Aisner & Curley LLP
                                   700 Post Road, Suite 237
                                   Scarsdale, New York 10583
                                   (914) 401-9502

 *For Secured Creditor,*           NADER MOBARGHA, ESQ.
 *Azadeh Nasser Azari:*            MICHAEL P. BEYS, ESQ.
                                   Beys Liston & Mobargha LLP
                                   641 Lexington Avenue, 14th Floor
                                   New York, New York 10022
                                   (646) 755-3603; (646) 755-3599 fax

 *Creditor:*                       THOMAS BRAZIEL
 *(via phone - listen only)*       B.E. Capital Management
                                   15 East 67th Street, 6th Floor
                                   New York, New York 10065
                                   (646) 650-5096

 *Transcriber:*                    AA EXPRESS TRANSCRIPTS
                                   195 Willoughby Avenue, Suite 1514
                                   Brooklyn, New York 11205
                                   (888) 456-9716

*(Proceedings recorded by electronic sound recording)*

1          THE COURT:  Wansdown!

2          MR. RUBIN:  Good morning, Your Honor, Paul Rubin,

3    Rubin LLC, on behalf of the Debtor.  Together with my colleague,

4    Hanh Huynh.

5          THE COURT:  How do you do?

6          MS. AISNER:  Good morning, Your Honor, Erica Aisner,

7    Kirby Aisner & Curley, on behalf of secured creditor, National

8    Investment Bank.

9          MR. MOBARGHA:  Nader Mobargha, from Beys Liston &

10   Mobargha, on behalf of secured creditor, Azadeh Azari.

11         THE COURT:  Okay.

12         MR. MOBARGHA:  And Mike Beys, my partner.

13         THE COURT:  How do you do?  You might begin by telling

14   me what the status of the sales efforts are for the townhouse?

15         MR. RUBIN:  Sure.  The townhouse is a vacant seven

16   story townhouse at 29 Beacon Place.  There was a pre-petition

17   contract that was signed with a $1 million deposit and a $10.3

18   million purchase price.  That contract calls for a closing on or

19   before January 31 of 2020.  We are therefore anticipating filing

20   a plan of reorganization early next week.  We may ask Your Honor

21   to shorten time just a slight bit so that we can make sure we

22   get to a closing by the end of January should that sale be

23   approved.  We have the initial case conference.  If I may

24   proceed with that, Your Honor?

25         THE COURT:  Yes.  That's why I asked about it.

1    MR. RUBIN:  Okay.  So, the petition date here was

2  October, the 8th.  The reason the petition had to be filed was

3  that one particular creditor was seeking to pursue a sheriff's

4  sale of the property the next day and there was the concern that

5  we wanted to preserve value for other creditors.  We didn't

6  think that there would be maximization of value through a

7  sheriff's sale.  Particularly, when we had a contract that was

8  signed with the million-dollar deposit in hand, Your Honor.

9    The Debtor has already filed its schedules of assets

10  and liabilities.  Your Honor has entered a bar date for

11  December, the 31st for claims in the case.  I should say that

12  with regard to that existing contract of sale, we believe that

13  it will produce funds sufficient to be able to pay reserves for

14  all non-insider claims, even that of the objecting party, who's

15  here today.

16    THE COURT:  Is there a mortgage on the property?

17    MR. RUBIN:  Yes, there is.  And counsel for the

18  mortgagee is here as well.

19    THE COURT:  How much is the mortgage?

20    MR. RUBIN:  The mortgage is approximately $5.4

21  million.  It may be higher with the accrual of interest, but at

22  the time that we filed, that was the most recent information

23  that we had.

24    MS. AISNER:  I believe it's about $5.5, but I'm

25  working on getting those figures, Your Honor.

1          THE COURT:  Okay.  Thanks.

2          MR. RUBIN:  There are some real estate taxes of about

3   $387,000 pre-petition also that are owed, Your Honor.  The

4   property is insured.  Proof of insurance has been provided to

5   the U.S. Trustee's Office.  The Debtor has opened it's DIP

6   account.  And that's pretty much the overall statement for the

7   status of the case.

8          THE COURT:  All right.  And does the Debtor have any

9   employees?

10         MR. RUBIN:  There's one individual really.  And

11  there's a part-time person, who is just keeping upkeep of the

12  place to make sure there are no leaks, things like that to keep

13  it in salable condition.

14         THE COURT:  All right.  Does anyone want to be heard

15  in connection with the case conference?

16         (No response.)

17         THE COURT:  Let me just adjourn that.  What was the

18  date that you told me you were aiming for in January?

19         MR. RUBIN:  We're looking for a January 31 closing

20  date.  So, we're going to --

21         THE COURT:  Okay.  So, that means you'd have to

22  confirm your plan when?  By January 14 or January 15?

23         MR. RUBIN:  We would hope around then.  Yes, Your

24  Honor.

25         THE COURT:  Let me give you a case conference for that

1    date.  How about January 14?

2            MR. RUBIN:  Thank you, Your Honor.

3            THE COURT:  Okay.

4            MR. RUBIN:  Would that be 10:00 a.m., sir?

5            THE COURT:  Yes.

6            MR. RUBIN:  And you can use that date for confirmation

7    hearing.  Since there is not going to be any voting, you can

8    submit a disclosure statement, and a request conditional

9    approval, and seek final approval, along with confirmation on

10   January 14.  So, you really have to get me the disclosure

11   statement by mid-December.  Okay?

12           MR. RUBIN:  Yes, Your Honor.

13           THE COURT:  All right.  You can move onto the next

14   application.

15           MR. RUBIN:  So, now, this is the application of the

16   Debtor to retain the firm Blank Rome as special counsel for a

17   few different purposes.  One is, we need real estate and tax

18   counsel to deal with the sale.  And then we need special

19   litigation counsel as well to deal with there's one large claim

20   which we believe is jumping ahead of the line.  It was a claim

21   of a former employee.

22           THE COURT:  Well, one of the arguments that's made in

23   opposition is there's nothing left to litigate about her claim.

24           MR. RUBIN:  Well, I understand that, Your Honor, and

25   we did address that in the reply papers.  I'm not sure that this

1  is an issue really that is appropriate for addressing at

2  retention stage, because I don't know that the issue is whether

3  the Debtor has a claim.  But I will address it directly.  And

4  that is simply, the claim to avoid fraudulent transfers under

5  the New York Debtor Creditor Law belongs to creditors; it

6  doesn't belong to the Debtor.  At this point in time, we are a

7  debtor in position, and now the Debtor does have its fiduciary

8  obligations to vet the claims.

9         There is a history here.  The Blank Rome firm is

10  intimately familiar with it.  They are familiar with the

11  litigation.  They worked with the client very closely.  They

12  were retained as far back as December of 2016 with regard to

13  this matter.  And we believe that for the estate's interest, it

14  would be most efficient and most effective to have them on board

15  to handle that particular issue, Your Honor.

16         THE COURT:  Thank you.

17         MR. MOBARGHA:  Good morning, Your Honor.  I just

18  wanted to start off by saying that there are so many red flags

19  in this bankruptcy, it's difficult for me to know where to

20  begin.

21         THE COURT:  Why don't you just address the

22  application?

23         MR. MOBARGHA:  Sure.  There were many numerous

24  misrepresentations made about the status of the Azari litigation

25  in the application that called to --

1          THE COURT:  Okay.  Let's stop.  I've read your papers.

2          MR. MOBARGHA:  Okay.

3          THE COURT:  They're a little inflammatory.  This isn't

4   state court.  I take it you have no objection to the services

5   for tax or real estate, because the Debtor is going to need tax

6   and real estate counsel if it's going to sell the property.

7          MR. MOBARGHA:  Your Honor, I do not.

8          THE COURT:  All right.  So, let's go to litigation.

9   The Debtor is saying that it may be that they're going to sue to

10  avoid the obligation, not the transfer, but really the

11  underlying obligation that was created in favor of your client

12  in 2016.  So, what's the objection to the retention of Blank

13  Rome to do that?  That's never been litigated.

14         MR. MOBARGHA:  Yes, Your Honor, but I believe that

15  they walked in with a predisposed notion to litigate this on

16  behalf of the Debtor.  And when I examined --

17         THE COURT:  But people do that all the time.  I used

18  to do that when I was practicing.

19         MR. MOBARGHA:  But on behalf of the Debtor or on

20  behalf of the creditor?  I mean this is a 544(b) claim, which is

21  supposed to be on behalf of the creditors, where actually you

22  need a triggering creditor to bring the claim.

23         THE COURT:  Are you saying there's no triggering

24  creditor?

25         MR. MOBARGHA:  I am, Your Honor.  They actually had

1   made a representation that all of the unsecured claims'

2   creditors will be paid.

3         THE COURT:  But that's under the plan.  That's not the

4   way it works.  The question is whether there are unsecured

5   creditors, I'm not sure of the timing, but certainly at the time

6   the petition was filed.  And maybe it has to be the same

7   creditor that existed when the transfer was made.  Although the

8   transfer could be void as to future creditors also.

9         MR. MOBARGHA:  But if all the creditors are paid, and

10  none of them are actually suffering any financial injury, there

11  is no real fraudulent conveyance action under state law.

12        THE COURT:  Well, I see what you're saying.  If you're

13  owed the money, you're owed the money.  They're saying you're

14  not owed the money because they're going to avoid the transfer.

15        MR. MOBARGHA:  Well, but --

16        THE COURT:  But that's a legal argument.  I hear what

17  you're saying.  I understand what you're saying.  You're saying

18  that they can't bring a fraudulent transfer action.  The only

19  benefit is to equity.  That's basically what you're saying.

20        MR. MOBARGHA:  Yes, Your Honor.  It's to equity.  And

21  the largest unsecured creditor here is Blank Rome with almost

22  double its fees.

23        THE COURT:  All right.

24        MR. MOBARGHA:  Double the obligations that are owed to

25  it.  And what they want to do basically is hire Blank Rome to

1  continue litigating a fraudulent transfer claim, I guess, on

2  behalf of themselves?

3        THE COURT:  Are there any other creditors beside Blank

4  Rome?  And I know you make an argument that the creditors of the

5  trust are not creditors of the Debtor, but there any creditors

6  of the Debtor?

7        MR. MOBARGHA:  The top five creditors of the Debtor,

8  based on their own representations are Blank Rome at $294,000,

9  another law firm at $124,000, and Kelley Drye Warren at $73,500.

10        THE COURT:  So, you don't think law firms should get

11  paid?

12        MR. MOBARGHA:  No, no.  I do, but I'm just saying,

13  they are getting paid actually in this instance.  And --

14        THE COURT:  Well, let me stop you.  You're arguing the

15  merits.  At the end of the day, you may be right, but it seems

16  to me that the Debtor may have a claim.  Because whether or not

17  you have a valid obligation under a peppercorn theory of

18  contractual consideration, doesn't mean that they can't bring a

19  fraudulent transfer action or fraudulent obligation action, I

20  guess, to avoid the obligation.  And we can discuss at that

21  point whether they have a claim because the unsecured creditors

22  are going to be paid in full if they sell the house.  They're

23  saying you're not a creditor basically.

24        MR. MOBARGHA:  Yes, they are saying that, but I also

25  think that --

1          THE COURT:  And you're saying that a solvent debtor

2    can't bring that action because it doesn't need to avoid your

3    obligation to pay all the claims.  That's basically --

4          MR. MOBARGHA:  You're right.  And it's on behalf of

5    the estate.

6          THE COURT:  Okay.  But I'm not going to rule on that

7    in the context of the retention action.

8          MR. MOBARGHA:  I understand, Your Honor, but I just

9    wanted to make sure this Court knows the misrepresentations

10   about the past litigation that they made to this Court under

11   oath.

12         THE COURT:  It doesn't matter!  I'm dealing with a

13   retention application, and I doubt it matters in connection with

14   their fraudulent transfer action.  So, let's stick to what's

15   going on.  I'm going to grant the motion.  Make sure you

16   separately -- well, you have to do it anyway, but categorize

17   your various litigation efforts, because challenging the debt or

18   the claim on the theories you've already challenged and lost on

19   is not going to be compensable.  Okay?  And it's really a

20   compensation issue.

21         MR. MOBARGHA:  Yes.  And the only other issue I would

22   say regarding the retention is depletion of the estate is a

23   factor in considering whether to retain a second law firm.  And

24   in this instance, I know Your Honor doesn't want to get into the

25   merits, but to litigate that claim is going to actually shrink

1  the pool the money that's going --

2          THE COURT:  That's true every time you retain.  Look,

3  cases have administrative expenses.  This case is going to have

4  an administrative expense because there's only two assets, or

5  two things that are going to happen.  They're going to sell the

6  townhouse, and maybe probably they'll sue your client as the

7  recipient of a fraudulent obligation, or a fraudulent transfer.

8  Those are the only two things that happen where a chapter 11 has

9  transaction costs.  Your administrative claims are usually

10  professional fees.  This case is no different.  And I'm not

11  going to hear the potential defendant to that lawsuit saying

12  that the Debtor shouldn't hire counsel to sue me because it's

13  going to cost the estate money.

14          MR. MOBARGHA:  Understood, Your Honor.  I did want to

15  just bring some attention to the history.

16          THE COURT:  You don't have to bring it to my

17  attention, and next time around, just stick to the issues.

18  Okay?

19          MR. MOBARGHA:  Thank you, Your Honor.

20          THE COURT:  The motion is granted.  You can submit an

21  order.

22          MR. RUBIN:  Thank you, Your Honor.

23                          - o0o -

24

25

CERTIFICATION

    I, Rochelle V. Grant, certify that the foregoing is a
correct transcript from the official electronic sound recording
of the proceedings in the above-entitled matter.

Dated:  November 22, 2019

_____
Signature of Approved Transcriber

**EXHIBIT 2**

**341 Creditor Meeting**

1   UNITED STATES BANKRUPTCY COURT

2   EASTERN DISTRICT OF NEW YORK

3   Case No. 19-13223 (SMB)

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   WANSDOWN PROPERTIES CORPORATION, N.V.,

8

9           Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  271-C Cadman Plaza East

14                  Brooklyn, NY 11201

15

16                  November 12, 2019

17

18  341 Meeting of Creditors

19

20

21

22

23  B E F O R E :

24  PAUL SCHWARTZBERG

25  Trustee

1    A P P E A R A N C E S :

2

3    RUBIN LLC

4         Attorneys for the Debtor

5

6    BY:  PAUL RUBIN

7         HANH HUYNH

8

9    NADER MOBARGHA

10         Attorney for Creditor, Azadeh Nasser Azari

11

12    GHOLAM REZA GOLSORKHI, For the Debtor

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              MR. SCHWARTZBERG:  Wansdown Properties

3    Corporation, NV.  My name is Paul Schwartzberg.  I'm an

4    attorney with the US Trustee's Office.  It is November 12 at

5    approximately three PM.  At this time, I'm going to swear

6    the Debtor's representative in.  Please raise your right

7    hand, sir.  Do you swear or affirm that the testimony you

8    are about to give is the truth and nothing but the truth?

9              MR. GOLSORKHI:  I do.

10             MR. SCHWARTZBERG:  And what is your position with

11   the Debtor?

12             MR. GOLSORKHI:  Managing Director.

13             MR. SCHWARTZBERG:  Can you please state your name

14   for the record?

15             MR. GOLSORKHI:  Gholam Reza Golsorkhi.

16             MR. SCHWARTZBERG:  Can you please spell that?

17             MR. GOLSORKHI:  First name, G-H-O-L-A-M; second,

18   R-E-Z-A; last name, G-O-L-S-O-R-K-H-I.

19             MR. SCHWARTZBERG:  Thank you.  I don't need that.

20   Is the Debtor represented by counsel today?

21             MR. GOLSORKHI:  Yes.

22             MR. RUBIN:  Paul Rubin, together with my

23   colleague, Hahn Huynh from Rubin LLC, counsel for the

24   Debtor.

25             MR. SCHWARTZBERG:  Are you familiar with the

1    petition, the bankruptcy schedules and the statement of

2    financial affairs that were filed in this case?

3              MR. GOLSORKHI:  Yes.

4              MR. SCHWARTZBERG:  I don't have originals, but I

5    have ones that were filed on the docket.  Is the -- did you

6    sign the originals?

7              MR. GOLSORKHI:  Yes, I did.

8              MR. SCHWARTZBERG:  And is the information

9    contained in the schedule of statement of financial affairs

10   and voluntary petition true and correct?

11             MR. GOLSORKHI:  Correct.

12             MR. SCHWARTZBERG:  Are you aware of any changes

13   that need to be made to any of the documents?

14             MR. GOLSORKHI:  No.

15             MR. SCHWARTZBERG:  In Schedule A, you list a

16   property at 29 Beekman Place, New York.

17             MR. GOLSORKHI:  That's correct.

18             MR. SCHWARTZBERG:  You list an estimated value of

19   10.3 million.

20             MR. GOLSORKHI:  That's correct.

21             MR. SCHWARTZBERG:  How did you come up with that

22   value?

23             MR. GOLSORKHI:  It was an offer we had.

24             MR. SCHWARTZBERG:  When was that offer made?

25             MR. GOLSORKHI:  This offer was made about two

1    months ago.  Less, in October.

2            MR. SCHWARTZBERG:  Okay.  Was it made by a

3    relative of yours?

4            MR. GOLSORKHI:  No, no.

5            MR. SCHWARTZBERG:  A friend of yours?

6            MR. GOLSORKHI:  A friend of mine who originally

7    represented the buyer that I don't know.

8            MR. SCHWARTZBERG:  So, your friend wasn't the one

9    who's offering the money?

10            MR. GOLSORKHI:  No, no, no.

11            MR. SCHWARTZBERG:  So, it was a third-party who

12    you do or do not know?

13            MR. GOLSORKHI:  I do not know.

14            MR. SCHWARTZBERG:  Okay.  And is that offer still

15    good?

16            MR. GOLSORKHI:  Yes, the offer is still good.

17            MR. RUBIN:  There is a signed contract that was

18    filed with the most recent pleading we filed in the case,

19    just so you know.

20            MR. SCHWARTZBERG:  Okay.  When was that filed?

21            MR. RUBIN:  Last week.

22            MR. SCHWARTZBERG:  Was that the response in

23    support of the application?

24            MR. RUBIN:  Application to retain special counsel.

25            MR. SCHWARTZBERG:  I saw the motion, I saw the

1      objection, didn't bother with the response.

2              MR. RUBIN:  The concept is an exhibit there.

3              MR. SCHWARTZBERG:  At some point, you know …  Now,

4      it's a townhouse?

5              MR. GOLSORKHI:  Yes.

6              MR. SCHWARTZBERG:  Is there commercial space in

7      it?

8              MR. GOLSORKHI:  No.

9              MR. SCHWARTZBERG:  It's all residential?

10             MR. GOLSORKHI:  All residential.

11             MR. SCHWARTZBERG:  And how many units are in it?

12             MR. GOLSORKHI:  There's seven floors, six

13     bedrooms, eight bedrooms all told, living room, dining room,

14     two living rooms.

15             MR. SCHWARTZBERG:  So, it's for one family with --

16             MR. GOLSORKHI:  For one family, yes.

17             MR. RUBIN:  It's not a multi-unit --

18             MR. SCHWARTZBERG:  That was -- yeah.  And who is

19     currently residing, or living there?

20             MR. GOLSORKHI:  No one.

21             MR. SCHWARTZBERG:  Nobody.  And how long has it

22     been vacant?

23             MR. GOLSORKHI:  Two thousand --

24             MR. SCHWARTZBERG:  A while?

25             MR. GOLSORKHI:  A while.

1                MR. SCHWARTZBERG:  I can see your thinking.  It's

2     not like a month, it's --

3                MR. GOLSORKHI:  No, no, no, a while, yes.

4                MR. SCHWARTZBERG:  And the last -- how long has

5     the Debtor been in possession of the property?  How long

6     have you owned --?

7                MR. GOLSORKHI:  Since 1979.

8                MR. SCHWARTZBERG:  So, you just bought it?  And I

9     saw email correspondence going back and forth with Mr.

10    (indiscernible).

11               MR. RUBIN:  That's correct.

12               MR. SCHWARTZBERG:  He did not have an IDI, is that

13    correct?

14               MR. RUBIN:  That's correct.  And he informed me

15    that he was not going to do one in this --

16               MR. SCHWARTZBERG:  And have you advised the Debtor

17    of the quarterly fee and the operating report requirements.

18               MR. RUBIN:  I have.

19               MR. SCHWARTZBERG:  All right, because the first

20    operating report, obviously -- you can combine -- I don't

21    know, unless you had other discussions with Mr.

22    (indiscernible), you can combine October, November --

23               MR. RUBIN:  Correct.

24               MR. SCHWARTZBERG:  -- sometime in December.

25               MR. RUBIN:  Correct.  Joe had mentioned, though,

1   that he had wanted to see me October 1, in November, and so

2   we were asked to prepare that.  We're just going to finalize

3   and file.

4           MR. SCHWARTZBERG:  Yeah, unless you worked out

5   with him something different.

6           MR. RUBIN:  And it's no problem to do it that way.

7           MR. SCHWARTZBERG:  So, from our colloquy regarding

8   a contract, I assume, and if I recall, the Debtor seeks --

9   and I'm asking counsel this -- seeks to sell the property or

10  --

11          MR. RUBIN:  Correct.

12          MR. SCHWARTZBERG:  And use the proceeds to --

13          MR. RUBIN:  Creditors --

14          MR. SCHWARTZBERG:  Okay.  And would the sale, the

15  proposed contract be subject to high and better, or is it a

16  private sale?  Or --?

17          MR. RUBIN:  We're going to ask to sell pursuant to

18  the plan.  You'll see, if you look at the contract, there is

19  --

20          MR. SCHWARTZBERG:  I hadn't --

21          MR. RUBIN:  Okay, but when you see the contract --

22          MR. SCHWARTZBERG:  Sure, sure.

23          MR. RUBIN:  -- there is a provision in there where

24  this purchaser can assert a claim for liquidated damages so

25  if somebody does come forward, we'll have to entertain it

1    and we'll get whether it's economically worthwhile.

2    However, we are satisfied with the price because we believe

3    with that purchase price we'll be able to pay the creditors

4    --

5             MR. SCHWARTZBERG:  Okay, that was my next

6    question, would that allow for --

7             MR. RUBIN:  We were hoping that we're going to

8    have a consensual plan that would provide for full payment

9    other than any creditors that voluntarily subordinate --

10            MR. SCHWARTZBERG:  Okay.  The only question I have

11   then is, what's your timing on filing a plan?

12            MR. RUBIN:  We hope to file the plan within the

13   next week and we hope to have a closing before the end of

14   January.

15            MR. SCHWARTZBERG:  And I just, because I don't

16   know the ins and outs, the litigation associated reference

17   in the objection to the Brown Rudnick --

18            MR. RUBIN:  Blank Rome.

19            MR. SCHWARTZBERG:  -- Blank Rome retention

20   application -- they're all the same.

21            MR. RUBIN:  Got the first letters

22            MR. SCHWARTZBERG:  Is confirming a plan contingent

23   on the -- cover that?  Okay.  They're at least your

24   position?

25            MR. RUBIN:  Correct.

1                    MR. SCHWARTZBERG:  I don't have any other

2      questions.  I know there are some people here.  If you have

3      a question would just ask that you state your name before

4      you issue your question.  And if you -- would you like to

5      come up here?  Would that make it easier?  I do recall this,

6      just to remind you, this is a 341 meeting, it's not a

7      deposition.

8                    MR. BEYS:  Correct.  I'll try and be quick

9      although I do have questions.  Mr. Golsorkhi --

10                    MR. SCHWARTZBERG:  Could you identify yourself for

11     the record.

12                    MR. BEYS:  My name is Michael Beys with the law

13     firm of Beys Liston & Mobargha and I represent the secured

14     creditor, Azadeh Azari.  And in fact, you and I have met

15     before, correct?

16                    MR. GOLSORKHI:  Yes, correct.

17                    MR. BEYS:  We've met on one occasion, correct?

18                    MR. GOLSORKHI:  One occasion.

19                    MR. BEYS:  Was that about three or four months ago

20     at 29 Beekman?

21                    MR. GOLSORKHI:  That's correct.

22                    MR. BEYS:  And I was there on a tour of the

23     property with a broker, right?

24                    MR. GOLSORKHI:  That's correct.

25                    MR. BEYS:  The broker was Charlie Attias.

1          MR. GOLSORKHI:  That's correct.

2          MR. BEYS:  He used to be with Corcoran.  Now he's

3     with Compass, correct?

4          MR. GOLSORKHI:  Correct.

5          MR. BEYS:  First Corcoran and now Compass had an

6     exclusive contract to sell 29 Beekman, correct?

7          MR. RUBIN:  We object to (indiscernible),

8     conclusion, I'm sorry?

9          MR. BEYS:  Well you signed a contract --

10          MR. GOLSORKHI:  With Corcoran, yes.

11          MR. BEYS:  And the new contract you signed was

12     during the exclusivity period of Compass's arrangement,

13     correct?

14          MR. GOLSORKHI:  I don't know whether the

15     exclusivity, I can't recall that now, but the -- when they

16     moved from Corcoran to Compass, I don't recall whether they

17     had the exclusive with Mr. Attias or not.  I don't recall

18     that right now.

19          MR. BEYS:  And Mr. Golsorkhi, you're the only

20     person who has access to 29 Beekman, the townhouse, correct?

21          MR. GOLSORKHI:  That's correct.

22          MR. BEYS:  So, if somebody wants to see the

23     apartment, only you can physically provide access, correct?

24          MR. GOLSORKHI:  That's correct.

25          MR. BEYS:  How many times did this buyer, who's

1    willing to pay $10.3 million see the apartment, see the

2    townhouse.

3              MR. GOLSORKHI:  His representative came on one

4    occasion, and then he came again and again.  On three

5    occasions representative came, saw what he likes, spoke to

6    his client and came up with the offer.

7              MR. BEYS:  And those three occasions were how soon

8    before the contract was signed on September 25th?

9              MR. GOLSORKHI:  How soon?  It was shortly

10   thereafter, once he had confirmed that they liked the place

11   and they were willing to put the deposit.  The contract came

12   and they sent the deposit down.

13             MR. BEYS:  And what as the name of the

14   representative.

15             MR. GOLSORKHI:  I'm not allowed to give -- should

16   I have to -- (indiscernible) on the -- we have a --

17             MR. RUBIN:  It's a contract that's publicly filed.

18             MR. GOLSORKHI:  So, the contract is there.  So,

19   the contract has been signed, the deposit has been --

20             MR. RUBIN:  Totally fine.

21             MR. BEYS:  What's the secret?  Why can't you say

22   the name of the person?

23             MR. GOLSORKHI:  There's no secret about that.  The

24   point is, I don't have the authority to give his name.

25             MR. BEYS:  No, no, no, the name of the

1   representative who was just physically there, not the

2   principal.

3           MR. GOLSORKHI:  I could ask his authority and then

4   I can gladly give it to you.

5           MR. BEYS:  I would ask the United States Trustee

6   to ask you for the name of the representative for something

7   so important.

8           MR. SCHWARTZBERG:  It's not a question I have.

9           MR. GOLSORKHI:  I don't see the bearing on this.

10  The fact is, there is an offer, there's a deposit that is

11  there to ensure that everybody gets paid, including your

12  client, whatever the deal may be.  But the point is, now

13  who's put the money?  What kind of an action are you trying

14  to make to that?  It's legitimate, there's a contract there.

15  If you have a problem that -- Mr. Attias didn't make it.

16  That is, some day you got to take up with him.  I have no

17  idea why you're asking this question.

18          MR. BEYS:  And was the contract signed on the same

19  day -- well, I'll tell you why I'm asking the question.

20  Because in your affidavit, you represented that the Debtor

21  negotiated an arm's-length residential sale agreement.  So,

22  I'm just trying to find out whether in fact it's arm's

23  length --

24          MR. GOLSORKHI:  It is arm's length.

25          MR. BEYS:  -- and not an affiliate of yours.

1            MR. GOLSORKHI:  It is an arm's length, so don't

2     insinuate anything, please.  It is an arm's length -- you've

3     asked a question, I've answered it.

4            MR. BEYS:  And you have been in that building for

5     over 40 years, correct?

6            MR. GOLSORKHI:  I have, yes.

7            MR. BEYS:  And you go there every working day of

8     your life, correct?

9            MR. GOLSORKHI:  Yes.

10            MR. BEYS:  But you're not willing to disclose

11     anything about the buyer or his representative?

12            MR. GOLSORKHI:  You can ask -- if I'm obliged to

13     do so, I can do so, but I don't understand what your concern

14     is.  Your concern is your client.  Did your client get paid?

15     I think from this deal, everyone will get paid.

16            MR. BEYS:  Now, you've also said in your affidavit

17     that the creditors, you believe the creditors are going to

18     bring a claim against the secured creditor, my client.  Is

19     that still your position or --?

20            MR. RUBIN:  That misstates --

21            MR. SCHWARTZBERG:  That's not what he wrote in his

22     affidavit.

23            MR. BEYS:  Could you point me?

24            MR. RUBIN:  Why would he be speculating as to what

25     creditors --

1            MR. BEYS:  Is it your belief -- actually, let me

2    ask you a more basic question.  Are you aware that there are

3    people seeking to offer more than 10.3 seeking access to the

4    building?

5            MR. GOLSORKHI:  I'm aware after the contract was

6    signed.  Prior to that, we've never had an offer except one

7    offer, which the gentleman did not come through.  As a

8    result, we were in a lawsuit for over a year with that

9    person.  Since then I've had no offer whatsoever.  You can

10   check with Charlie Attias, you check with any -- we have had

11   no person.  We've had people come and see it but there's

12   been no offers made.

13           MR. BEYS:  Are you aware that as of today, there

14   are people seeking access who are prepared to pay 11 to 12

15   million?

16           MR. GOLSORKHI:  I am not allowed to show it

17   because I already have a contract.  How can I bring someone

18   else when I have a contract there so I have another lawsuit

19   with them?

20           MR. BEYS:  Back to the last thing I was trying to

21   ask you, paragraph 14 of your affidavit, you wrote, "The

22   Debtor believes that the judgment is far in excess of the

23   amount due to Ms. Azari.  An entry of the judgment

24   constitutes a fraudulent transfer."  Do you remember writing

25   that?

1          MR. GOLSORKHI:  If you've said I've written it --

2    say yes.

3          MR. BEYS:  And do you believe that as you sit here

4    today under oath?

5          MR. GOLSORKHI:  I think the amount is excess, yes.

6          MR. BEYS:  Okay.  And who believes that?  You

7    believe that on your own behalf or on behalf of the Debtor?

8          MR. GOLSORKHI:  I believe that the amount that is

9    in excess of what it should be.  That is my belief, yes.

10          MR. BEYS:  But that is the amount that you

11    confessed to in an affidavit of confession of judgment,

12    correct?

13          MR. HUYNH:  Objection, calls for legal conclusion.

14          MR. BEYS:  He can still answer it.

15          MR. HUYNH:  If you understand the question.

16          MR. GOLSORKHI:  The document that you claimed that

17    was given by me was given -- yes, but the amount is in

18    excess of what -- I have no idea that the amount would be

19    that much or the interest would be that high, or whatever.

20          MR. BEYS:  But that is the amount you confessed to

21    under penalty of perjury, correct.

22          MR. HUYNH:  Objection.  He did not confess to

23    judgment, the Debtor did, he did not.

24          MR. BEYS:  But you, as managing director,

25    confessed a judgment, confessed the amount --

1                    [OVERLAPPING SPEAKERS]

2              MR. HUYNH:  For the record, your original question

3       was, are you aware that the creditors will be bringing --

4       were bringing a claim?

5              MR. BEYS:  Excuse me, if he wants to correct me,

6       he can.  I don't take my instructions from you.

7              MR. HUYNH:  The creditors are now bringing

8       disputes.  The Debtor does intend to object to the Azari

9       claim if that's the question.  That's correct.  But you had

10      asked whether a creditor was going to object to that claim.

11      That's not what he wrote.

12             MR. BEYS:  Is he in his capacity here as the

13      Debtor or as a creditor?

14                   [OVERLAPPING SPEAKERS]

15             MR. SCHWARTZBERG:   -- administration of the case,

16      not parochial issues relating to your particular claim.

17      This is not a deposition.  You'll have your chance.

18             MR. BEYS:  We're just asking questions about --

19             MR. HUYNH:  About general assets and liabilities

20      and this is not it.

21             MR. BEYS:  And how much in liquidated damages have

22      you agreed to in this contract of sale?

23             MR. RUBIN:  Objection, calls for a legal

24      conclusion.

25             MR. SCHWARTZBERG:  What's the liquidated damages,

1      if you understand the question?

2               MR. GOLSORKHI:  I don't understand the question

3      please.

4               MR. BEYS:  In the contract with 29 Beekman Corp,

5      how much have you agreed to in liquidated damages?

6               MR. GOLSORKHI:  What do you mean by liquidated

7      damages?  I don't understand the term.  What does liquidated

8      damages refer to?

9               MR. BEYS:  Your lawyers already said that if this

10     contract gets broken because a higher number comes in, then

11     you have to pay money to the contract vendee, to 29 --

12               MR. RUBIN:  That's not what I said.  I said the

13     contract contains a liquidated damages provision, and if a

14     different offer comes in we would have to assess it and the

15     enforceability of that provision.  That's what I said.

16               MR. BEYS:  So, would you just make an attorney

17     representation, how much it's for.

18               MR. RUBIN:  I don't recall.  I don't have the

19     contract right in front of me.  It's publicly-filed

20     information, sir.  We don't need a 341 to get that from

21     reading the contract.

22               MR. BEYS:  Your lawyer mentioned that there's the

23     possibility that some creditors might voluntarily

24     subordinate their claims to this potential sale.  Are you

25     among those creditors?

1          MR. GOLSORKHI:  When the time comes, we'll decide

2    who it is.  I can't tell you who it is.  Are you willing to

3    take a subordinate position?  Don't ask me that question.

4    When the time comes if anybody is willing to take a

5    subordinate position, they'll take it at that time.

6          MR. BEYS:  I can tell you right now, the secured

7    creditor, Ms. Azari is not willing --

8          MR. GOLSORKHI:  Okay, fine, in that case you're

9    not.  So, that is a different issue.  Right now, whoever is

10   a creditor, if they decide at that time they will decide to

11   take it, if not they will not.  So, don't ask me a question

12   which is -- I have no response to.

13         MR. BEYS:  I think I'm allowed to.

14         MR. GOLSORKHI:  I know you're allowed to.

15         MR. BEYS:  And you can refuse and the record will

16   speak for itself.  So, you're refusing to answer whether

17   you, Reza Golsorkhi, are willing to subordinate your claim.

18         MR. RUBIN:  He hasn't decided as of today.

19         MR. GOLSORKHI:  I haven't decided yet.

20         MR. BEYS:  You've not decided, is your answer?

21         MR. GOLSORKHI:  I have not decided, no.

22         MR. BEYS:  Okay.  And your attorney said that this

23   particular contract is scheduled to close in January?

24         MR. GOLSORKHI:  If everything goes --

25         MR. BEYS:  is that what you had said?  Did I hear

1    you correctly?

2              MR. RUBIN:  (indiscernible) the contract.  There's

3    a provision that calls for a closing by a certain date

4    subject to the purchaser's extension.

5              MR. BEYS:  And what was that date?  You said it

6    originally on the record?

7              MR. RUBIN:  I believe it's January 31.

8              MR. BEYS:  Thank you, Mr. Golsorkhi.  I appreciate

9    your courtesy.

10             MR. SCHWARTZBERG:  Can you just state your name

11   before --

12             MR. MOBARGHA:  My name is Nader Mobargha and I am

13   here with the firm Beys Liston Mobargha.  Mike Beys is my

14   partner.  I just wanted to ask you about the fraudulent

15   transfer claim that you represented was your belief in your

16   affidavit.  Have you spoken to any creditors about bringing

17   that claim?

18             MR. GOLSORKHI:  Have I spoken to any creditors --

19   what?  On what basis would I speak to any creditors?

20             MR. MOBARGHA:  I'm just asking you, forget about

21   what -- did you speak to any creditors about asserting a

22   fraudulent transfer claim against Ms. Azari?

23             MR. GOLSORKHI:  No, I have not spoken to any -- on

24   what basis would I want to speak to any of --

25   (indiscernible) has no bearing to it.

1          MR. MOBARGHA:  The creditors have no bearing to

2     the fraudulent --

3          MR. RUBIN:  That's not what he said.

4          MR. MOBARGHA:  Let him answer.

5          MR. RUBIN:  He said no.  You asked a question, his

6     answer as no.

7          MR. MOBARGHA:  Okay, so you never -- do you know

8     who you would be bringing a fraudulent transfer claim on

9     behalf of?  Don't look at your attorney, just answer the

10    question.

11         MR. GOLSORKHI:  I don't understand.  You better

12    speak more lay language so I can understand you --

13         MR. MOBARGHA:  Who would you bring the fraudulent

14    transfer claim for?

15         MR. RUBIN:  Objection to the form, but go ahead.

16         MR. GOLSORKHI:  For Wansdown Properties.

17         MR. MOBARGHA:  Wansdown Properties?

18         MR. GOLSORKHI:  Yes.

19         MR. MOBARGHA:  That's it?

20         MR. GOLSORKHI:  Your claim is against Wansdown

21    Properties.  Who else would I bring it against?

22         MR. MOBARGHA:  So, you said the -- and I only have

23    two more questions so I'm not going to belabor this point,

24    but do you know who the shareholders of 29 Beekman Place

25    are?

1            MR. GOLSORKHI:  Shareholders of 29 Beekman Place?

2            MR. MOBARGHA:  Yeah, 29 Beekman Corporation.

3            MR. GOLSORKHI:  I don't know.

4            MR. MOBARGHA:  You don't know?

5            MR. GOLSORKHI:  No, I don't.

6            MR. MOBARGHA:  And my partner asked you who was

7    the representative that gave you a binding offer?

8            MR. GOLSORKHI:  As I mentioned, I think you heard

9    me clearly, I'm not in a position to name until I get his

10   approval.

11           MR. MOBARGHA:  So, he told you not to tell

12   anybody?

13           MR. GOLSORKHI:  No, he did not say -- I cannot

14   give his name without having -- he did not tell me anything.

15   He brought the buyer, they made an offer, the offer was

16   accepted, they put a down payment there.  Now, you're asking

17   me who is a representative?  I said I'm not willing to give

18   you his name --

19           MR. MOBARGHA:  Fine, fair enough.

20           MR. GOLSORKHI:  -- until such time as he gives me

21   the okay, at that time I'll --

22           MR. MOBARGHA:  Do you know the representative

23   personally?

24           MR. GOLSORKHI:  I know the gentleman, yeah.

25           MR. MOBARGHA:  And how long have you known him

1    for?

2              MR. GOLSORKHI:  I've known him for -- I don't

3    know, ten, 15 years.

4              MR. MOBARGHA:  Ten, 15 years.  And how many times

5    have you spoken or seen this gentleman in the last ten, 15

6    years?

7              MR. GOLSORKHI:  Maybe once a year.

8              MR. MOBARGHA:  Once a year.  So, you know him

9    personally.  Is he a family member?

10             MR. GOLSORKHI:  No, he's not a family, no.

11             MR. MOBARGHA:  Okay.  Do you personally know the -

12   - you said you don't know the shareholders of 29 Beekman

13   Corp.?

14             MR. GOLSORKHI:  Yeah.

15             MR. MOBARGHA:  Okay, that's all I have.  Thanks

16   very much.

17             MR. SCHWARTZBERG:  All right.  Thank you very

18   much.

19             MR. GOLSORKHI:  Thank you.

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3         I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 22, 2019

**&**

**&** 10:13

**1**

**1** 8:1
**10.3** 4:19 12:1
  15:3
**11** 15:14
**11201** 1:14
**11501** 24:23
**12** 1:16 3:4 15:14
**14** 15:21
**15** 23:3,4,5
**19-13223** 1:3
**1979** 7:7

**2**

**2019** 1:16 24:25
**22** 24:25
**25th** 12:8
**271** 1:13
**29** 4:16 10:20 11:6
  11:20 18:4,11
  21:24 22:1,2
  23:12

**3**

**300** 24:22
**31** 20:7
**330** 24:21
**341** 1:18 10:6
  18:20

**4**

**40** 14:5

**a**

**able** 9:3
**accepted** 22:16
**access** 11:20,23
  15:3,14
**accurate** 24:4
**action** 13:13
**administration**
  17:15

**advised** 7:16
**affairs** 4:2,9
**affidavit** 13:20
  14:16,22 15:21
  16:11 20:16
**affiliate** 13:25
**affirm** 3:7
**ago** 5:1 10:19
**agreed** 17:22 18:5
**agreement** 13:21
**ahead** 21:15
**allow** 9:6
**allowed** 12:15
  15:16 19:13,14
**amount** 15:23
  16:5,8,10,17,18
  16:20,25
**answer** 16:14
  19:16,20 21:4,6,9
**answered** 14:3
**anybody** 19:4
  22:12
**apartment** 11:23
  12:1
**application** 5:23
  5:24 9:20
**appreciate** 20:8
**approval** 22:10
**approximately**
  3:5
**arm's** 13:21,22,24
  14:1,2
**arrangement**
  11:12
**asked** 8:2 14:3
  17:10 21:5 22:6
**asking** 8:9 13:17
  13:19 17:18 20:20
  22:16
**assert** 8:24
**asserting** 20:21
**assess** 18:14

**assets** 17:19
**associated** 9:16
**assume** 8:8
**attias** 10:25 11:17
  13:15 15:10
**attorney** 2:10 3:4
  18:16 19:22 21:9
**attorneys** 2:4
**authority** 12:24
  13:3
**aware** 4:12 15:2,5
  15:13 17:3
**azadeh** 2:10 10:14
**azari** 2:10 10:14
  15:23 17:8 19:7
  20:22

**b**

**b** 1:23
**back** 7:9 15:20
**bankruptcy** 1:1
  1:12 4:1
**basic** 15:2
**basis** 20:19,24
**bearing** 13:9
  20:25 21:1
**bedrooms** 6:13,13
**beekman** 4:16
  10:20 11:6,20
  18:4 21:24 22:1,2
  23:12
**behalf** 16:7,7 21:9
**belabor** 21:23
**belief** 15:1 16:9
  20:15
**believe** 9:2 14:17
  16:3,7,8 20:7
**believes** 15:22
  16:6
**better** 8:15 21:11
**beys** 10:8,12,12
  10:13,17,19,22,25
  11:2,5,9,11,19,22
  11:25 12:7,13,21

**12**:25 13:5,18,25
  14:4,7,10,16,23
  15:1,13,20 16:3,6
  16:10,14,20,24
  17:5,12,18,21
  18:4,9,16,22 19:6
  19:13,15,20,22,25
  20:5,8,13,13
**binding** 22:7
**blank** 9:18,19
**bother** 6:1
**bought** 7:8
**bring** 14:18 15:17
  21:13,21
**bringing** 17:3,4,7
  20:16 21:8
**broken** 18:10
**broker** 10:23,25
**brooklyn** 1:14
**brought** 22:15
**brown** 9:17
**building** 14:4 15:4
**buyer** 5:7 11:25
  14:11 22:15

**c**

**c** 1:13 2:1 3:1 24:1
  24:1
**cadman** 1:13
**calls** 16:13 17:23
  20:3
**capacity** 17:12
**case** 1:3 4:2 5:18
  17:15 19:8
**certain** 20:3
**certified** 24:3
**chance** 17:17
**changes** 4:12
**charlie** 10:25
  15:10
**check** 15:10,10
**claim** 8:24 14:18
  17:4,9,10,16
  19:17 20:15,17,22

21:8,14,20
**claimed** 16:16
**claims** 18:24
**clearly** 22:9
**client** 12:6 13:12
14:14,14,18
**close** 19:23
**closing** 9:13 20:3
**colleague** 3:23
**colloquy** 8:7
**combine** 7:20,22
**come** 4:21 8:25
10:5 15:7,11
**comes** 18:10,14
19:1,4
**commercial** 6:6
**compass** 11:3,5,16
**compass's** 11:12
**concept** 6:2
**concern** 14:13,14
**conclusion** 11:8
16:13 17:24
**confess** 16:22
**confessed** 16:11
16:20,25,25
**confession** 16:11
**confirmed** 12:10
**confirming** 9:22
**consensual** 9:8
**constitutes** 15:24
**contained** 4:9
**contains** 18:13
**contingent** 9:22
**contract** 5:17 8:8
8:15,18,21 11:6,9
11:11 12:8,11,17
12:18,19 13:14,18
15:5,17,18 17:22
18:4,10,11,13,19
18:21 19:23 20:2
**corcoran** 11:2,5
11:10,16

**corp** 18:4 23:13
**corporation** 1:7
3:3 22:2
**correct** 4:10,11,17
4:20 7:11,13,14
7:23,25 8:11 9:25
10:8,15,16,17,21
10:24 11:1,3,4,6
11:13,20,21,23,24
14:5,8 16:12,21
17:5,9
**correctly** 20:1
**correspondence**
7:9
**counsel** 3:20,23
5:24 8:9
**country** 24:21
**court** 1:1,12
**courtesy** 20:9
**cover** 9:23
**creditor** 2:10
10:14 14:18 17:10
17:13 19:7,10
**creditors** 1:18
8:13 9:3,9 14:17
14:17,25 17:3,7
18:23,25 20:16,18
20:19,21 21:1
**currently** 6:19

**d**

**d** 3:1
**damages** 8:24
17:21,25 18:5,7,8
18:13
**date** 20:3,5 24:25
**day** 13:16,19 14:7
**deal** 13:12 14:15
**debtor** 1:9 2:4,12
3:11,20,24 7:5,16
8:8 13:20 15:22
16:7,23 17:8,13
**debtor's** 3:6

**december** 7:24
**decide** 19:1,10,10
**decided** 19:18,19
19:20,21
**deposit** 12:11,12
12:19 13:10
**deposition** 10:7
17:17
**different** 8:5
18:14 19:9
**dining** 6:13
**director** 3:12
16:24
**disclose** 14:10
**discussions** 7:21
**disputes** 17:8
**district** 1:2
**docket** 4:5
**document** 16:16
**documents** 4:13
**due** 15:23

**e**

**e** 1:23,23 2:1,1 3:1
3:1,18 24:1
**easier** 10:5
**east** 1:13
**eastern** 1:2
**economically** 9:1
**eight** 6:13
**email** 7:9
**enforceability**
18:15
**ensure** 13:11
**entertain** 8:25
**entry** 15:23
**estimated** 4:18
**everybody** 13:11
**excess** 15:22 16:5
16:9,18
**exclusive** 11:6,17
**exclusivity** 11:12
11:15

**excuse** 17:5
**exhibit** 6:2
**extension** 20:4

**f**

**f** 1:23 24:1
**fact** 10:14 13:10
13:22
**fair** 22:19
**familiar** 3:25
**family** 6:15,16
23:9,10
**far** 15:22
**fee** 7:17
**file** 8:3 9:12
**filed** 4:2,5 5:18,18
5:20 12:17 18:19
**filing** 9:11
**finalize** 8:2
**financial** 4:2,9
**find** 13:22
**fine** 12:20 19:8
22:19
**firm** 10:13 20:13
**first** 3:17 7:19
9:21 11:5
**floors** 6:12
**foregoing** 24:3
**forget** 20:20
**form** 21:15
**forth** 7:9
**forward** 8:25
**four** 10:19
**fraudulent** 15:24
20:14,22 21:2,8
21:13
**friend** 5:5,6,8
**front** 18:19
**full** 9:8

**g**

**g** 3:1,17,18
**general** 17:19
**gentleman** 15:7
22:24 23:5

**gholam** 2:12 3:15
**give** 3:8 12:15,24
13:4 22:14,17
**given** 16:17,17
**gives** 22:20
**gladly** 13:4
**go** 14:7 21:15
**goes** 19:24
**going** 3:5 7:9,15
8:2,17 9:7 14:17
17:10 21:23
**golsorkhi** 2:12 3:9
3:12,15,15,17,21
4:3,7,11,14,17,20
4:23,25 5:4,6,10
5:13,16 6:5,8,10
6:12,16,20,23,25
7:3,7 10:9,16,18
10:21,24 11:1,4
11:10,14,19,21,24
12:3,9,15,18,23
13:3,9,24 14:1,6,9
14:12 15:5,16
16:1,5,8,16 18:2,6
19:1,8,14,17,19
19:21,24 20:8,18
20:23 21:11,16,18
21:20 22:1,3,5,8
22:13,20,24 23:2
23:7,10,14,19
**good** 5:15,16

**h**

**h** 3:17,18
**hahn** 3:23
**hand** 3:7
**hanh** 2:7
**hear** 19:25
**heard** 22:8
**high** 8:15 16:19
**higher** 18:10
**hope** 9:12,13
**hoping** 9:7

**huynh** 2:7 3:23
16:13,15,22 17:2
17:7,19
**hyde** 24:3,8

**i**

**idea** 13:17 16:18
**identify** 10:10
**idi** 7:12
**important** 13:7
**including** 13:11
**indiscernible** 7:10
7:22 11:7 12:16
20:2,25
**information** 4:8
18:20
**informed** 7:14
**ins** 9:16
**insinuate** 14:2
**instructions** 17:6
**intend** 17:8
**interest** 16:19
**issue** 10:4 19:9
**issues** 17:16

**j**

**january** 9:14
19:23 20:7
**joe** 7:25
**judgment** 15:22
15:23 16:11,23,25

**k**

**k** 3:18
**kind** 13:13
**know** 5:7,12,13,19
6:3 7:21 9:16 10:2
11:14 19:14 21:7
21:24 22:3,4,22
22:24 23:3,8,11
23:12
**known** 22:25 23:2

**l**

**l** 3:17,18
**language** 21:12
**law** 10:12
**lawsuit** 15:8,18
**lawyer** 18:22
**lawyers** 18:9
**lay** 21:12
**ledanski** 24:3,8
**legal** 16:13 17:23
24:20
**legitimate** 13:14
**length** 13:21,23
13:24 14:1,2
**letters** 9:21
**liabilities** 17:19
**life** 14:8
**liked** 12:10
**likes** 12:5
**liquidated** 8:24
17:21,25 18:5,6,7
18:13
**list** 4:15,18
**liston** 10:13 20:13
**litigation** 9:16
**living** 6:13,14,19
**llc** 2:3 3:23
**long** 6:21 7:4,5
22:25
**look** 8:18 21:9

**m**

**m** 3:17
**managing** 3:12
16:24
**matter** 1:5
**mean** 18:6
**meeting** 1:18 10:6
**member** 23:9
**mentioned** 7:25
18:22 22:8
**met** 10:14,17
**michael** 10:12

**mike** 20:13
**million** 4:19 12:1
15:15
**mine** 5:6
**mineola** 24:23
**misstates** 14:20
**mobargha** 2:9
10:13 20:12,12,13
20:20 21:1,4,7,13
21:17,19,22 22:2
22:4,6,11,19,22
22:25 23:4,8,11
23:15
**money** 5:9 13:13
18:11
**month** 7:2
**months** 5:1 10:19
**motion** 5:25
**moved** 11:16
**multi** 6:17

**n**

**n** 2:1 3:1 24:1
**n.v.** 1:7
**nader** 2:9 20:12
**name** 3:3,13,17,18
10:3,12 12:13,22
12:24,25 13:6
20:10,12 22:9,14
22:18
**nasser** 2:10
**need** 3:19 4:13
18:20
**negotiated** 13:21
**never** 15:6 21:7
**new** 1:2 4:16
11:11
**november** 1:16
3:4 7:22 8:1 24:25
**number** 18:10
**nv** 3:3
**ny** 1:14 24:23

**o**

**o** 1:23 3:1,17,18 3:18 24:1
**oath** 16:4
**object** 11:7 17:8 17:10
**objection** 6:1 9:17 16:13,22 17:23 21:15
**obliged** 14:12
**obviously** 7:20
**occasion** 10:17,18 12:4
**occasions** 12:5,7
**october** 5:1 7:22 8:1
**offer** 4:23,24,25 5:14,16 12:6 13:10 15:3,6,7,9 18:14 22:7,15,15
**offering** 5:9
**offers** 15:12
**office** 3:4
**okay** 5:2,14,20 8:14,21 9:5,10,23 16:6 19:8,22 21:7 22:21 23:11,15
**old** 24:21
**once** 12:10 23:7,8
**ones** 4:5
**operating** 7:17,20
**original** 17:2
**originally** 5:6 20:6
**originals** 4:4,6
**outs** 9:16
**overlapping** 17:1 17:14
**owned** 7:6

**p**

**p** 2:1,1 3:1
**paid** 13:11 14:14 14:15

**paragraph** 15:21
**parochial** 17:16
**particular** 17:16 19:23
**partner** 20:14 22:6
**party** 5:11
**paul** 1:24 2:6 3:3 3:22
**pay** 9:3 12:1 15:14 18:11
**payment** 9:8 22:16
**penalty** 16:21
**people** 10:2 15:3 15:11,14
**period** 11:12
**perjury** 16:21
**person** 11:20 12:22 15:9,11
**personally** 22:23 23:9,11
**petition** 4:1,10
**physically** 11:23 13:1
**place** 4:16 12:10 21:24 22:1
**plan** 8:18 9:8,11 9:12,22
**plaza** 1:13
**pleading** 5:18
**please** 3:6,13,16 14:2 18:3
**pm** 3:5
**point** 6:3 12:24 13:12 14:23 21:23
**position** 3:10 9:24 14:19 19:3,5 22:9
**possession** 7:5
**possibility** 18:23
**potential** 18:24
**prepare** 8:2

**prepared** 15:14
**price** 9:2,3
**principal** 13:2
**prior** 15:6
**private** 8:16
**problem** 8:6 13:15
**proceedings** 24:4
**proceeds** 8:12
**properties** 1:7 3:2 21:16,17,21
**property** 4:16 7:5 8:9 10:23
**proposed** 8:15
**provide** 9:8 11:23
**provision** 8:23 18:13,15 20:3
**publicly** 12:17 18:19
**purchase** 9:3
**purchaser** 8:24
**purchaser's** 20:4
**pursuant** 8:17
**put** 12:11 13:13 22:16

**q**

**quarterly** 7:17
**question** 9:6,10 10:3,4 13:8,17,19 14:3 15:2 16:15 17:2,9 18:1,2 19:3 19:11 21:5,10
**questions** 10:2,9 17:18 21:23
**quick** 10:8

**r**

**r** 1:23 2:1 3:1,18 3:18 24:1
**raise** 3:6
**reading** 18:21
**recall** 8:8 10:5 11:15,16,17 18:18

**record** 3:14 10:11 17:2 19:15 20:6 24:4
**refer** 18:8
**reference** 9:16
**refuse** 19:15
**refusing** 19:16
**regarding** 8:7
**relating** 17:16
**relative** 5:3
**remember** 15:24
**remind** 10:6
**report** 7:17,20
**represent** 10:13
**representation** 18:17
**representative** 3:6 12:3,5,14 13:1 13:6 14:11 22:7 22:17,22
**represented** 3:20 5:7 13:20 20:15
**requirements** 7:17
**residential** 6:9,10 13:21
**residing** 6:19
**response** 5:22 6:1 19:12
**result** 15:8
**retain** 5:24
**retention** 9:19
**reza** 2:12 3:15 19:17
**right** 3:6 7:19 10:23 11:18 18:19 19:6,9 23:17
**road** 24:21
**rome** 9:18,19
**room** 6:13,13
**rooms** 6:14
**rubin** 2:3,6 3:22 3:22,23 5:17,21

5:24 6:2,17 7:11
7:14,18,23,25 8:6
8:11,13,17,21,23
9:7,12,18,21,25
11:7 12:17,20
14:20,24 17:23
18:12,18 19:18
20:2,7 21:3,5,15
**rudnick** 9:17

**s**

**s** 2:1 3:1,18
**sale** 8:14,16 13:21
17:22 18:24
**satisfied** 9:2
**saw** 5:25,25 7:9
12:5
**schedule** 4:9,15
**scheduled** 19:23
**schedules** 4:1
**schwartzberg**
1:24 3:2,3,10,13
3:16,19,25 4:4,8
4:12,15,18,21,24
5:2,5,8,11,14,20
5:22,25 6:3,6,9,11
6:15,18,21,24 7:1
7:4,8,12,16,19,24
8:4,7,12,14,20,22
9:5,10,15,19,22
10:1,10 13:8
14:21 17:15,25
20:10 23:17
**second** 3:17
**secret** 12:21,23
**secured** 10:13
14:18 19:6
**see** 7:1 8:1,18,21
11:22 12:1,1 13:9
15:11
**seeking** 15:3,3,14
**seeks** 8:8,9
**seen** 23:5

**sell** 8:9,17 11:6
**sent** 12:12
**september** 12:8
**seven** 6:12
**shareholders**
21:24 22:1 23:12
**shortly** 12:9
**show** 15:16
**sign** 4:6
**signed** 5:17 11:9
11:11 12:8,19
13:18 15:6
**sir** 3:7 18:20
**sit** 16:3
**six** 6:12
**smb** 1:3
**solutions** 24:20
**somebody** 8:25
11:22
**sonya** 24:3,8
**soon** 12:7,9
**sorry** 11:8
**space** 6:6
**speak** 19:16 20:19
20:21,24 21:12
**speakers** 17:1,14
**special** 5:24
**speculating** 14:24
**spell** 3:16
**spoke** 12:5
**spoken** 20:16,18
20:23 23:5
**state** 3:13 10:3
20:10
**statement** 4:1,9
**states** 1:1,12 13:5
**subject** 8:15 20:4
**subordinate** 9:9
18:24 19:3,5,17
**suite** 24:22
**support** 5:23
**sure** 8:22,22

**swear** 3:5,7

**t**

**t** 24:1,1
**take** 13:16 17:6
19:3,4,5,11
**tell** 13:19 19:2,6
22:11,14
**ten** 23:3,4,5
**term** 18:7
**testimony** 3:7
**thank** 3:19 20:8
23:17,19
**thanks** 23:15
**thing** 15:20
**think** 14:15 16:5
19:13 22:8
**thinking** 7:1
**third** 5:11
**thousand** 6:23
**three** 3:5 10:19
12:4,7
**time** 3:5 19:1,4,5
19:10 22:20,21
**times** 11:25 23:4
**timing** 9:11
**today** 3:20 15:13
16:4 19:18
**told** 6:13 22:11
**totally** 12:20
**tour** 10:22
**townhouse** 6:4
11:20 12:2
**transcript** 24:4
**transfer** 15:24
20:15,22 21:8,14
**true** 4:10 24:4
**trustee** 1:25 13:5
**trustee's** 3:4
**truth** 3:8,8
**try** 10:8
**trying** 13:13,22
15:20

**two** 4:25 6:14,23
21:23

**u**

**understand** 14:13
16:15 18:1,2,7
21:11,12
**unit** 6:17
**united** 1:1,12 13:5
**units** 6:11
**use** 8:12

**v**

**vacant** 6:22
**value** 4:18,22
**vendee** 18:11
**veritext** 24:20
**voluntarily** 9:9
18:23
**voluntary** 4:10

**w**

**wansdown** 1:7 3:2
21:16,17,20
**want** 20:24
**wanted** 8:1 20:14
**wants** 11:22 17:5
**way** 8:6
**we've** 10:17 15:6
15:11
**week** 5:21 9:13
**whatsoever** 15:9
**willing** 12:1,11
14:10 19:2,4,7,17
22:17
**worked** 8:4
**working** 14:7
**worthwhile** 9:1
**writing** 15:24
**written** 16:1
**wrote** 14:21 15:21
17:11

|      x      |
| :---------: |
| **x**  1:4,10 |
|      **y**  |
| **yeah**  6:18 8:4 22:2  22:24 23:14 |
| **year**  15:8 23:7,8 |
| **years**  14:5 23:3,4  23:6 |
| **york**  1:2 4:16 |
|      **z**  |
| **z**  3:18 |

<u>**EXHIBIT 3**</u>

<u>**NYS Dep't of State Division of Corporation:  29 Beekman Corp.**</u>

# NYS Department of State

## Division of Corporations

## Entity Information

The information contained in this database is current through November 4, 2019.

---

Selected Entity Name: 29 BEEKMAN CORP
Selected Entity Status Information

|  |  |
|---|---|
| **Current Entity Name:** | 29 BEEKMAN CORP |
| **DOS ID #:** | 5628061 |
| **Initial DOS Filing Date:** | SEPTEMBER 26, 2019 |
| **County:** | NEW YORK |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

29 BEEKMAN CORP
29 BEEKMAN PLACE
NEW YORK, NEW YORK, 10022

**Registered Agent**

NONE

This office does not record information regarding the
names and addresses of officers, shareholders or
directors of nonprofessional corporations except the
chief executive officer, if provided, which would be

listed above. Professional corporations must include
the name(s) and address(es) of the initial officers,
directors, and shareholders in the initial certificate of
incorporation, however this information is not
recorded and only available by <u>viewing the certificate.</u>

### *Stock Information

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| 200 | Par Value | .01 |

*Stock information is applicable to domestic business corporations.

### Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| SEP 26, 2019 | Actual | 29 BEEKMAN CORP |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York
State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

<u>Search Results</u>    <u>New Search</u>

<u>Services/Programs</u>  |  <u>Privacy Policy</u>  |  <u>Accessibility Policy</u>  |  <u>Disclaimer</u>  |  <u>Return to DOS
Homepage</u>  |  <u>Contact Us</u>

## EXHIBIT 4

### Streeteasy price listings for 29 Beekman Place

**1 ACTIVE SALE IN THIS BUILDING**

SINGLE-FAMILY HOME IN B

**29 Beekman Place**

**$14,500,000**

10        9



## House: 29 Beekman Plac

29 Beekman Place, New York, NY, 10022

1 unit     6 stories     Built in 1910

Single-Family Home in Beekman

☆ SAVE                              ✉ S




# Description

29 Beekman Place is a remarkable residence was built in 1934 by William S. Paley, head of CBS for his wife, Dorothy Paley and they lived there until 1940. The house was subsequently acquired by Albert and Mary Lasker, the noted philanthropists who lived there for 35 years. Since 1975, it has housed equally notable and accomplished

**READ MORE**

# Amenities

StreetEasy Verified

**LOCATION**

NYC Storm Zone 6

# Building Facts

| | |
|---|---|
| Facts | 1 unit    6 stories    Built in 1910 |
| Building Class | A4 |
| District | Community District 106    City Council District 4    Police Precinct 17 |
| Floorplans | 10 floorplans available |
| Documents and Permits | 3 documents and permits |
| Sales Listings | 1 active sale ($1,183 per ft² avg, $14,500,000 avg price) |
| | 5 previous sales ($2,747 per ft² avg, $32,560,000 avg price) |

# Units

Filter th

| Date ▼ | Unit | Price | Listing status | Beds | Baths | ft² | Fl |
|---|---|---|---|---|---|---|---|
| 09/18/2019 | Unknown | $16,900,000 | No Longer Available on StreetEasy | 10 beds | 9 baths | 12,260 ft² | |
| 10/24/2017 | Unknown | $28,000,000 | No Longer Available on StreetEasy | 8 beds | 7+ baths | 12,240 ft² | |
| 09/14/2016 | Unknown | $34,000,000 | No Longer Available on StreetEasy | 10 beds | 11 baths | 12,268 ft² | |
| 01/18/2016 | Unknown | $34,000,000 | No Longer Available on StreetEasy | 10 beds | 9 baths | 11,000 ft² | |
| 01/01/2015 | Unknown | $49,900,000 | No Longer Available on StreetEasy | 8 beds | 11 baths | 11,500 ft² | |

# Nearby

**TRANSPORTATION**



at Lexington Av-53 St **0.46 miles**

at 51st St **0.47 miles**

at 42 Street - Grand Central **0.59 miles**

 w at Lexington Av-59 St **0.62 miles**

at Grand Central **0.62 miles**

View subway lines on Google Maps ▶

SCHOOLS

**District 02** - Schools zoned for this address:

P.S. 059 Beekman Hill International (PK,0K,01,02,03,04,05,SE)

J.H.S. 104 Simon Baruch (06,07,08,SE)

Disclaimer: School attendance zone boundaries are not guaranteed to be accurate – they are provided by a third party and subject to change. Check with the applicable school district prior to making a decision based on these boundaries.

## Similar Buildings

### 414 East 50th Street

Single-Family Home in Beekman

### 411 East 50th Street

Single-Family Home in Beekman

### 21 Beekman Place

Single-Family Home in Beekman

### 111 Murray Stree

1- to 5-BRs from $2.:
Immediate Occupar
Models Now Open

## Latest discussions

BE THE FIRST TO CREATE A DISCUSSION ABOUT THIS LISTING

## More Listings

MORE SALES LISTINGS IN BEEKMAN

MORE RENTALS LISTINGS IN BEEKMAN

## EXHIBIT 5

## Return Envelope Addressed to 29 Beekman Corp.



$2.50 ⁰
US POSTAGE
FIRST-CLASS
9062080794
PITNEY BOWES
10022

...TON & MOBARGHA LLP

...xington Avenue, 14th Floor

New York, NY 100...

29 Beekman Corp
488 Madison Ave
Fl.11
New York, NY 10022-5702

NIXIE        061   CE  1        0211/07/19

RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

BC: 10022        0060N11165-01671