**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------- x
:
In re: : Chapter 11
:
WANSDOWN PROPERTIES CORPORATION : Case No.: 19-13223 (SMB)
N.V., :
:
         Debtor. :
------------------------------------- x

**AFFIDAVIT OF GHOLAM REZA GOLSORKHI IN SUPPORT OF MOTION
PURSUANT TO 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002 AND 6004
FOR AN ORDER APPROVING THE SALE OF THE DEBTOR'S REAL PROPERTY**

STATE OF NEW YORK   )
                              ) ss:
COUNTY OF NEW YORK  )

      Gholam Reza Golsorkhi, being duly sworn, deposes and says:

      1.      I am the Managing Member and President of Wansdown Properties Corporation N.V. (the "Debtor"), and I am familiar with the business and affairs of the Debtor. Except as otherwise noted, I have personal knowledge of the matters set forth herein.

      2.      I submit this Affidavit in support of the Debtor's motion (the "Motion") for entry of an order approving the sale of the Debtor's real property (the "Sale"), and, if called to testify, I would and could testify to the facts stated herein.

      3.      The Debtor was incorporated in 1979 under the laws of Curacao, in accordance with Article 38 of the Commercial Code of the Netherlands Antilles and continues to exist under the laws of the Netherland Antilles. The Debtor was formed to, among other things, invest and manage assets of Princess Achraf Pahlavi. In 1980, the Debtor acquired a townhouse located at 29 Beekman Place, New York, New York (the "Property"), which the Princess used on those occasions she visited New York after she fled Iran due to the Iranian revolution.

      4.      During the final years of her life, the Princess's advanced age and deteriorating health resulted in the Princess spending limited time in New York. Consequently, the Debtor

determined that it would not need to keep the Property, and that it would be prudent to reduce its expenses associated with the Property and staffing to maintain the Property. Thus, beginning in 2014, the Debtor marketed the Property for sale and hired Brown Harris Stevens as its broker. However, the Debtor was unable to sell the Property, and the listing agreement with Brown Harris Stevens expired by its terms without the Debtor receiving any offers. In 2015, the Debtor again marketed the Property, this time through Sotheby's as its broker. The Debtor's listing agreement with Sotheby's also expired without any offers.

5. The Princess died in January 2016. Thereafter, the Debtor resumed its marketing of the Property.

6. In December 2017, the Debtor entered into a contract for the sale of the Property to Secured Capital Partners, LLC ("SCP") for the purchase price of $17 million. SCP was introduced to the Debtor by a grandson of the Princess. SCP, however, failed to make any of the down payments or otherwise perform as required under its contract, and the Debtor was forced to terminate the contract. SCP sued for specific performance and filed a *lis pendens* against the Property, creating a cloud on title and preventing the Debtor from effectively marketing the Property for sale to a legitimate buyer. On April 3, 2019, the New York State Supreme Court dismissed the SCP action for specific performance and cancelled the *lis pendens*.

7. The Debtor next interviewed several real estate brokers who specialized in selling high-end luxury townhouses. The Debtor selected Charlie Attias, a licensed real-estate broker at the Corcoran Group, to market and sell the Property. Mr. Attias was selected based upon his experience selling similar town houses and his international background. Mr. Attias listed the Property for $17,995,000. Given that the Property is situated near the United Nations, the

Property was marketed primarily to wealthy internationals and foreign governments as potential embassy space. Several embassies viewed the Property, but none made an offer.

8. In or around September 2019, Mr. Attias left Corcoran Group and began working at Compass. After joining Compass, Mr. Attias continued marketing the Property at a reduced asking price of $14,500,000. As a result of this process, the Property garnered interest from a number of potential buyers, but Mr. Attias was unable to procure any binding offers. Indeed, Mr. Attias did not convey to the Debtor any offers, binding or otherwise. Ultimately, the Debtor received one binding offer directly from 29 Beekman Corp. (the "Purchaser"), a New York Corporation not affiliated with the Debtor or me, in the amount of $10,300,000. The offer from the Purchaser was not obtained through Mr. Attias, Corcoran, or Compass. The sales price was negotiated for the Debtor by counsel at Blank Rome, who presented the offer to me for my approval. Blank Rome advised me that they had sought a higher price from the proposed buyer, but the Purchase Agreement reflects what the Purchaser agreed to pay. The Purchaser refused to serve as a stalking horse that would be entitled to a break up fee if the Property were sold for a higher amount, and insisted to structure the sale as a private sale.

9. I reviewed the offer and decided to accept the offer because, among other reasons, the proposed purchase price would be sufficient to pay in full all claims against the Debtor of which I had knowledge, other than my own claims.

10. Thereafter, the Debtor, through Blank Rome, negotiated, at arms' length, the *Residential Contract of Sale* dated September 25, 2019 (together with exhibits and riders thereto, the "Purchase Agreement") with the Purchaser.

11. I have reviewed the Purchase Agreement, and I understand that the Purchase Agreement contains the following material economic terms: (a) the purchase price for the

Property is $10,300,000, (b) the closing on the sale of the Property will occur on or before January 31, 2020, and (c) the Purchaser agreed to deliver a cash deposit of $1,030,000, which has been provided by the Purchaser.

12. At the time that the Debtor was attempting to market and sell the Property, as described above, the Debtor also was contending with litigation commenced by Azadeh Nasser Azari, a former employee of the Debtor. On April 21, 2016, the Clerk of the New York Supreme Court for the County of New York (the "State Court") entered a judgment in favor of Ms. Azari and against the Debtor in the principal amount of $2.7 million, based on a confession of judgment. On February 13, 2017, the Debtor commenced a plenary action seeking to vacate the judgment by filing a complaint (the "Complaint") in the State Court. On April 3, 2017, Ms. Azari moved to dismiss the Complaint. Following oral argument, on October 17, 2017, the State Court issued a ruling denying the motion. Ms. Azari appealed. On October 23, 2018, the Supreme Court, Appellate Division, reversed the State Court decision and entered a judgment against the Debtor. In its decision, the appellate court found that the Debtor's managing director had the authority to execute the confession of judgment on behalf of the Debtor and, as such, the judgment was proper. On July 8, 2019, Ms. Azari sought to enforce the judgment through a writ of execution. A sheriff's sale with respect to the Property was scheduled for October 9, 2019, at 11:00 a.m.

13. Because a sheriff's sale of the Property would almost certainly result in a depressed purchase price, and because the Debtor had a binding Purchase Agreement with the Purchaser for a sale of the Property on terms acceptable to the Debtor, the Debtor commenced its chapter 11 case on October 8, 2019, to prevent the sheriff sale from proceeding.

14. It is my business judgment that the sale to the Purchaser under the terms of the Purchase Agreement is the highest and best offer for the sale of the Property based on my consideration of the following factors:

   (a) Pre-petition, the Debtor has extensively marketed the Property since 2014.

   (b) Since the Property was first marketed for sale in 2014, the Debtor has been unable to obtain offers from any interested party, other than from SCP (which sale could not be consummated and resulted in a cloud on title), and from the Purchaser.

   (c) Even after applying the considerable marketing resources of several well-respected brokerage firms, there have been no real offers for the Property from any party other than the Purchaser. I have been advised by bankruptcy counsel that, following the commencement of the Debtor's chapter 11 case, counsel has received inquiries regarding the Property, but no offers were submitted.

   (d) The Property was subject to a sheriff's sale, which would have almost certainly resulted in a sale of the Property at a much lower purchase price than under the Purchase Agreement.

   (e) The Debtor is continuing to incur the carrying costs of the Property, including debt service to the mortgage lender, real estate taxes, maintenance, repair, and utilities. Absent a sale to the Purchaser, these costs would continue to accrue on the Property, which does not generate any revenue, and which does not appear to be increasing in value. The Debtor does not have available cash to pay these carrying costs. The Debtor believes it is important to proceed with the sale because the Debtor does not want to take the risk that it will not find a buyer at a higher price.

   (f) The Debtor cannot continue to operate post-petition without selling the Property and using the proceeds of the sale to fund a plan.

   (g) I have been advised by counsel that, if the Debtor were to close with a different buyer, the Debtor would have to reject the Purchase Agreement, resulting in the Purchaser asserting contract rejection damage claim against the Debtor.

   (h) The Purchaser and its principal(s) are third parties that have no relation to or affiliation with the Debtor or me. The Purchaser negotiated the Purchase Agreement at arms' length and has provided a deposit of $1,030,000 as required under the Purchase Agreement. I will not receive any personal financial benefit from the sale of the Property to the Purchaser, other than any distribution I (along with all other similarly-

situated creditors) may receive from the Debtor's estate as a creditor in this case.

15. I would add that Ms. Azari is now objecting to the sale of the Property for $10.3 million. Just three months ago, Ms. Azari was pressing to have the Property sold in a sheriff's sale, which almost certainly would have produced a lower price than the purchase price under the Purchase Agreement. In fact, the proposed purchase price under the Purchase Agreement will generate sufficient net proceeds to pay Ms. Azari's claim in full, with interest, to the extent her disputed claim is allowed.

16. Based on all of the foregoing, the Court should approve the proposed sale to the Purchaser as the highest and best offer for the Property.

17. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: New York, New York
January 10th, 2020

_____
Gholam Reza Golsorkhi
Managing Member and President

Sworn to before me this
10th day of January, 2020
_____
Notary Public

KEVIN LOPEZ
Notary Public, State of New York
Registration No. 01LO6391399
Qualified in New York County
Commission Expires May 6, 2023