Nader Mobargha
Alison Moss
BEYS LISTON & MOBARGHA LLP
641 Lexington Avenue, 14th Floor
New York, New York 10022
(646) 755-3603
nmobargha@blmllp.com
amoss@blmllp.com
*Attorneys for Defendant Azadeh Nasser Azari*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>WANSDOWN PROPERTIES<br>CORPORATION, N.V.,<br><br>                    Debtor. | Chapter 11<br><br>Case No. 19-13223 (DSJ) |
| WANSDOWN PROPERTIES<br>CORPORATION, N.V.,<br>                    Plaintiff,<br>          v.<br><br>29 BEEKMAN CORP.,<br>                    Defendant | Adv. Pro. No. 20-010506 (DSJ) |
| WANSDOWN PROPERTIES<br>CORPORATION, N.V.,<br>                    Plaintiff,<br>          v.<br>AZADEH NASSER AZARI,<br><br>                    Defendant. | Adv. Pro. No. 19-1450 (DSJ) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS AZADEH NASSER**
**AZARI AND 29 BEEKMAN CORP.'S JOINT MOTION FOR SANCTIONS AGAINST**
**DEBTOR WANSDOWN PROPERTIES CORPORATION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT………………………………………………………………1

STATEMENT OF FACTS RELEVANT FOR THE JOINT SANCTIONS MOTION…… …….5

ARGUMENT……………………………………………………………………..….. 33

I.     DEBTOR AND ITS COUNSEL HAVE PERPETRATED A
FRAUD ON THE COURT. …. …………………………………………………………33

II.    SANCTIONS ARE WARRANTED UNDER FEDERAL
BANKRUPTCY RULE 9011…..…………………………………………………...39

III.   DEBTOR SHOULD PAY AZARI'S ATTORNEY'S FEES UNDER
28 U.S.C. § 1927 FOR FILING AN UNJUSTIFIED ACTION
ON BEHALF OF CREDITORS WHEN THEY
WERE SET TO BE PAID IN FULL …..……………………………………………….. 40

IV.   THE COURT SHOULD DENY BLANK ROME COMPENSATION
FOR ITS SERVICES UNDER 11 U.S.C. 328(c) …………………………………………42

V.    THE COURT SHOULD APPOINT AN EXAMINER TO INVESTIGATE DEBTOR
AND BLANK ROME'S UNDISPUTED PERJURY AND
VIOLATION OF 18 U.S.C. § 1621……………………………………………………...43

CONCLUSION……………………………………………………………………..44

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Chambers v. NASCO, Inc.,* 501 U.S. 32 (2d. Cir. 2000)……………………………..….33, 38, 43

*Dag Jewish Directories, Inc. v. Y & R Media, LLC*, No. 09 CV 7802 (RJH),
  2010 WL 3219292 (S.D.N.Y. Aug. 12, 2010) ……………………………………………34

*Gianna Enter. v. Miss World (Jersey) Ltd.,* 551 F. Supp. 1348 (S.D.N.Y. 1982)……………....41

*Hansen v. Jones & Leta v. Jeta* 220 B.R. 434 (D. Utah 1998)…………………………………43

*In re Angelika Films 57th , Inc.,* 227 B.R. 29 (Bankr. S.D.N.Y. 1998)………………………42,43

*In re C-TC 9th Ave. P'ship v. Norton Co.,* 113 F.3d 1304 (2d. Cir. 1997)……………………...36

*In re Dynex Capital, Inc. Sec. Litig.,* No. 5 Civ. 1897 (HB); 2011 WL 2471267
  (S.D.N.Y. June 21, 2011) ………………………………………………………………34

*In re Green*, 422 B.R. 469 (Bankr. S.D.N.Y. 2010) …………………………………………..33-34

*In re Mercury,* 280 B.R. 35 (Bankr. S.D.N.Y. 2002) …………………………………………..42

*In re Office Prods. of Am, Inc.,* 136 B.R. 983 (Bankr. W.D. Tex. 1992) ………………………42

*Kupferman v. Cons. Research & Mfg. Corp.,* 459 F.2d 1072 (2d. Cir. 1972) …………………34

*Mapother & Mapother, P.S.C. v. Cooper (In re Downs),* 103 F. 3d 472 (6th Cir. 1996)……….34

*McMunn v. Mem'l Sloan Kettering Cancer Ctr.*, 191 F.Supp. 2d 440
  (S.D.N.Y. 2002) ………………………………………………………………..…………35

*Oliveri v. Thompson,* 803 F.2d 1265 (2d Cir. 1986) ……………………………………………...41

*Passlogix, Inc. v. 2FA Tech., LLC,* 708 F.Supp.2d 378 (S.D.N.Y. 2010) …….…..………34, 43

*Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71 (2d Cir. 2000) ……………………..………33, 38

*Rezende v. Citigroup Global Mkts., Inc.,* No. 09 Civ. 9392 (HB),
  2011 WL 1584603  (S.D.N.Y. Apr. 27, 2011) …………………….…….…..…..37, 38

*Shangold v. The Walt Disney Co*., No. 03 Civ. 9522 (WHP),
  2006 WL 71672  (S.D.N.Y. Jan. 16, 2006) ……………………..……….……38-39

*U.S. v. Int'l Brotherhood of Teamsters,* 948 F.2d 1338 (2d. Cir. 1991)…………………………..41

*U.S. v. Norman*, 776 F.3d 67 (2d Cir. 2015) ……………………….…………………….……….43

*Wilder v. GL Bus Lines*, 258 F.3d 126, 130 (2d Cir. 2001) …………………………………..….35

*Zimmerman v. Poly Prep Cntry. Day Sch.,* No. 09 CV 4586 (FB),
    2012 WL 2049493 (E.D.N.Y. June 6, 2012) …………….…………………………..43

**Statutes and Rules**

CPLR 3218 …..……………….…………………………………………………….7, 9

CPLR 5015……………………………………………………………………….7, 9

11 U.S.C. § 105……………………………………………………………...1, 5, 33

11 U.S.C § 9011……………………………………….…………………….1, 5, 39, 40

11 U.S.C. § 330(a)(4) …………………………………………………...42, 43

11 U.S.C. 328(c) ………………………………………………………..1, 5, 41, 42

18 U.S.C. § 1621……………………………………………………………….43

28.U.S.C. 1927……………………………………………………….......1, 5, 40, 41

Defendant Azadeh Nasser Azari ("Azari") submits this memorandum of law as part of her joint motion with 29 Beekman Corp. for sanctions against Blank Rome LLP ("Blank Rome") and Debtor Wansdown Properties Corporation, N.V. ("Debtor") under 11 U.S.C § 105, 11 U.S.C. § 9011, 11 U.S.C. § 328(c) and 28.U.S.C. § 1927, and based upon a finding that Debtor and Blank Rome committed a fraud on the Court (the "Motion").

## PRELIMINARY STATEMENT

1. Debtor and its counsel, Blank Rome, have committed rampant perjury in affidavits and live testimony, filed false allegations and claims, and withheld material evidence from the bankruptcy court before the confirmation of Debtor's plan.

2. This pattern of fraud on the Court did not begin in this bankruptcy, but dates back to a 2017 New York state court action that Debtor and Blank Rome filed against Azari, in which they sought to vacate a February 10, 2016 Confession of Judgment ("Judgment"), which Golsorkhi signed on behalf of Debtor (*Wansdown v. Azari*, Index No. 151406/2017)(the "First Action").   To vacate the Judgment in the First Action, Blank Rome and Gholam Reza Golsorkhi ("Golsorkhi"), as Debtor's President and sole-decision maker, falsely alleged that (i) Golsorkhi could not understand the plain terms of his own affidavit because English was not his native language, and (ii) he did not have the authority to sign the Judgment even though he signed it himself.

3. These were both blatant lies.  Goslorkhi's ***only*** fluent language is English and, according to Golsorkhi's own filing in this bankruptcy, he "is authorized, empowered, and directed with full power of delegation, to negotiate, execute, deliver, file, and perform, in the name and on behalf of [Debtor]…."   This authority was consistent with the plain terms of Debtor's Articles of Incorporation.  Debtor lost the First Action, but was never held accountable

for the knowingly false allegations it filed.    This escape from accountability only emboldened Debtor and Golsorkhi going forward.

4.      After losing the First Action, Kamran Abbas-Vahid ("<u>Abbas-Vahid</u>"), a beneficiary of Debtor's sole shareholder, Pelmadulla Stiftung ("<u>Pelmadulla</u>"), filed a second against Azari (i.e., *Kamran Abbas-Vahid v. Azari,* 655724/2019 (the "<u>Second</u> <u>Action</u>")), this time falsely alleging "fraud and collusion" between, remarkably, Golsorkhi and Azari.    Golsorkhi had been in contact with Abbas-Vahid about vacating the Judgment before he filed the Second Action.   Just as Debtor did, Abbas-Vahid lost the Second Action.

5.      Debtor and Blank Rome next set their eyes on filing this bankruptcy to continue Golsorkhi's personal litigation campaign against Azari to pay himself.   Since they had run out of plaintiffs, this time they styled their action as a fraudulent conveyance action filed on behalf of creditors under Section 544(b) of the Code in this bankruptcy.    Blank Rome filed a retention application with this Court to be retained by Debtor as special counsel.   In that retention application, Blank Rome asserted multiple false statements under oath and failed to disclose its relationships with parties which posed huge conflicts of interest.   Specifically, Lawrence F. Flick II ("<u>Flick</u>"), the Blank Rome partner who signed a sworn declaration to support his firm's retention, lied that it had ***"no connection"*** to Debtor's "<u>current or former officers and directors,</u> <u>unsecured creditors,</u> or <u>equity holders</u>."

6.      In fact, Blank Rome had represented (i) Debtor's sole shareholder, Pelmadulla Stiftung ("<u>Pelmadulla</u>") and (ii) Debtor's President, sole managing director, and sole decision-maker, Golsorkhi, in the First Action, in addition to representing Debtor itself.   Indeed, Blank Rome was still representing Pelmadulla in the First Action when Flick signed his declaration, and was communicating with Pelmadulla about that very representation at the same time.   Flick also was corresponding with Golsorkhi about this bankruptcy.   Most significantly, however,

Flick and his wife also had been friends with Golsorkhi and his wife for decades and socialized together regularly.  Consequently, Flick's statements in his sworn declaration that he had "***no connection***" to these parties – when he was legally representing them, communicating with them, and socializing with one of them – were brazen lies.   To the contrary, Flick had nothing ***but connections*** to all relevant parties.  The obligation to disclose these connections, especially between Flick and Golsorkhi, was important because it shows that Flick and Blank Rome are far from "disinterested" parties.

7.      Only after 29 Beekman Corp. raised the possibility of a fraud on the Court by Blank Rome eight (8) months later, did Flick file a Supplemental Declaration to "correct" his lies.   However, rather than disclose all material facts to the Court, Flick double-downed on his lies and attempted to provide meritless justifications for his failure to disclose his representation of Pelmadulla.   Flick also failed to provide any justification for his lies and omissions about his connection to Golsorkhi and failed to disclose his longstanding social relationship with him.

8.      Golsorkhi also lied multiple times in that same retention application.   First, Golsorkhi, claimed that Blank Rome "had not represented any of Debtor's creditors or other parties in interest."   Golsorkhi knew full well this was a lie.  Not only did Golsorkhi know that he was a "creditor [and] party in interest" with unsubstantiated claims of $7,000,000 and $480,000, but he also knew that Blank Rome had represented him legally in the First Action and in settlement discussions with Azari for almost a year leading up to the bankruptcy.    Finally, Golsorkhi also lied to the Court that both the First and Second Actions were ***still*** pending when both actions had been dismissed in their entirety with Azari prevailing both times.

9.      The motive for all these lies was for Flick, and his firm Blank Rome, to continue their fraudulent litigation campaign against Azari for the benefit of Flick's friend, Golsorkhi.   In fact, Debtor and Blank Rome filed this entire bankruptcy solely to file a third action against

Azari.   That is because Debtor was already in contract with a company called 29 Beekman Corp. to sell its primary asset, a townhouse located at 29 Beekman Place, New York, NY 10022 (the "Townhouse") for $10.3 million.   In the contract, Debtor represented that all the proceeds from the sale would be sufficient to satisfy all claims of creditors.   As such, Debtor just needed to close on the contract and pay the creditors.  It opted to file bankruptcy instead.

10.     However, even after it filed bankruptcy, for months, Debtor continued to represent to the Court that the proceedings from the sale of its Townhouse would satisfy the claims of all creditors, even filing two bankruptcy plans and disclosure statements indicating that none of the claims of the unsecured creditors would be impaired, except two subordinated claims of Golsorkhi for $7,000,000 and $480,000.   There simply was no reason to file this action on behalf of the unsecured creditors when those creditors were set to be paid in full.  Rather than just pay the creditors, Blank Rome and Golsorkhi filed this adversary proceeding, captioned *Wansdown v. Azari*, Adv. Pro. No. 19-1450 (the "Adversary Action"), to obtain money to pay Golsorkhi's unsubstantiated claims.   This was an insurmountable conflict of interest for Blank Rome, which it intentionally failed to disclose to the Court.

11.     After filing the Adversary Action, over the next several months, Debtor and Blank Rome continued their fraud on the Court.  At a January 16, 2020 hearing to approve the sale of the Townhouse to 29 Beekman Corp., Golsorkhi perjured himself no less than eleven (11) times, and even submitted a perjurious affidavit to accompany his perjurious live testimony.     Debtor and Blank Rome also withheld communications with Pelmadulla, Debtor's sole shareholder, that would have exposed both the perjury Blank Rome committed in its retention application and its false allegations against 29 Beekman Corp. in yet another adversary proceeding Debtor filed in this bankruptcy (*Wansdown v. 29 Beekman Corp.*, 20-1056).   Debtor deliberately waited until

*after* the Court confirmed its bankruptcy plan on July 16, 2020 before producing these communications so that its perjury would not impact the Court's confirmation.

12.     This undisputed record confirms that Debtor's perjury and fraud on the Court is part of a pattern of conduct that began over five (5) years ago, has spanned both state and federal courts, and affected multiple parties in this bankruptcy, including 29 Beekman Corp.    As such, sanctions are warranted under 11 U.S.C § 105, 11 U.S.C. § 9011, and 28.U.S.C. § 1927.    The most appropriate remedy for Debtor and Blank Rome's fraud on the Court and violations of these statutes is for the Court to deny the payment of Blank Rome's attorney's fees in this bankruptcy under 11 U.S.C. § 328(c), and order Debtor and Blank Rome to pay Azari's legal fees for their unjustified litigation.

13.     Finally, given that Debtor's misconduct satisfies all the elements of a fraud on this Court, the Adversary Action should be dismissed in its entirety.    These remedies are justified to deter future fraudulent conduct and to send a message that the bankruptcy court is not a haven for abuse or for parties to vindicate unjustified personal and financial goals to the detriment of others whom they are purporting to represent.

## STATEMENT OF FACTS RELEVANT FOR THE JOINT SANCTIONS MOTION

14.     The following are the relevant facts for Azari's Motion.

## I-     THE PARTIES

15.     **Debtor** is a Netherland Antilles corporation with its former "principal place of business at 29 Beekman Place, New York, New York 10022" (the "Townhouse").  (*See Adversary Action, ECF No. 53, Azari Memorandum Of Law In Support Of Her Motion For Summary Judgment On Debtor's Claims Under Federal Rule Of Bankruptcy Procedure 7056*

(the "Motion"), ¶ 16).[1]    Debtor's principal asset was the Townhouse, a seven-story luxury property located at 29 Beekman Place, New York, NY 10022 (the "Townhouse").    (*See Motion*, ¶ 19)

16.    **Pelmadulla** is Debtor's sole shareholder.   It is a "trust…formed under the laws of the country of Lichtenstein and is domiciled in Vaduz, Lichtenstein." (*Motion,* ¶ 17).

17.    **Princess Achraf Pahlavi** was the twin sister of the former Shah of Iran.   She was the "beneficial owner" of Debtor.    (*Motion,* ¶ 20).

18.    **Golsorkhi** served as the Debtor's President and sole Managing Director for the past forty-two (42) years since the Debtor's formation in 1979.   (*Motion, at* ¶ 21).   He was Debtor's sole executive and decision-maker.   He also served as a board member of Pelmadulla from 1979 until 2012.   (*Motion,* ¶ 22).

19.    **Azari** was an employee of Debtor from 1979 to 2016.    (*Motion,* ¶ 24).   At the time that she left her employment, she was one of two office employees of Debtor.   Golsorkhi was the other employee.

## II-    *DEBTOR'S PREPETITION MISCONDUCT*:   FILING AN ACTION AGAINST AZARI ON KNOWINGLY FALSE BASES

20.    On February 10, 2016, Debtor signed a Confession of Judgment for $2.7 million in Azari's favor based on her life expectancy and her annual salary (i.e., the "Judgment").    The Judgment contains the facts and circumstances giving rise to Azari's pension.    (*Motion*, ¶¶ 27-27)   It was signed and notarized by Golsorkhi.

---

[1] To reduce the replication of exhibits, Azari will cite her April 26, 2022 Motion for some of the facts referenced there.   All facts cited in the Motion are supported by exhibits.

21.     Debtor "doe[s] not dispute that [it]…owes Azari" her "Pension." (*Motion,* at ¶ 30). Debtor further admits that the "Confession of Judgment is based upon a debt justly due and owing by [the Debtor] and the Private Secretariat." (*Id.*).

22.     The Confession of Judgment granted Azari authority to file it in New York County, which she did on February 12, 2016. (*Motion*, ¶ 29; *see also Azadeh N. Azari v. Wansdown*, Index No. 652137/2016, ECF No. 1).

23.     Ultimately, the clerk docketed the Judgment on April 21, 2016. (*Motion,* ¶ 31).

24.     Despite Debtor's sworn admission that it owed Azari the amount of the Judgment, and its sworn statement authorizing her to file the Judgment, on February 13, 2017 – without giving Azari any notice by phone or correspondence – Debtor filed an action against her in New York Supreme Court under CPLR 3218 and CPLR 5015 to renege on its own affidavit memorializing the pension it promised Ms. Azari. (*See Wansdown v. Azari*, Index No. 151406/2017)(the "First Action"). CPLR 3218 requires affidavits of confession of judgment to comply with certain statutory requirements, including "stating concisely the facts out of which the debt arose and showing that the sum confessed is justly due or become due." CPLR 5015 allows a court to vacate a judgment on the grounds of "fraud, misrepresentation, or other misconduct by the adverse party."

25.     One of Debtor's primary bases to vacate the Judgment in the First Action was Golsorkhi's allegation that he was not a "native English speaker," and that, as a result, he did not understand the plain terms of his own affidavit. (*Ex. 40, Azari Affirmative Defenses*, ¶ 3; *see also First Action, Dock. No. 1*, at ¶ 6). However, this was a lie since Golsorkhi received an undergraduate degree and MBA from American universities, and also attended secondary school in the United Kingdom and the United States. (*Ex. 1*, *Golsorkhi Day 1 Deposition ("Dep.") Transcript ("Tr.")*, 12:25-14:6). Not only does Golsorkhi have a "mastery of the English

language," but English is his ***only*** fluent language.[2]  (*Ex. 1*, 12:10-13; 136:16-18).

Consequently, Debtor's first basis to dismiss the First Action was fraudulent.

26.     Discovery further confirmed that Golsorkhi's claim that he did not understand the

English terms of the Judgment was without merit since he (i) admitted that he "helped" and

"collaborated" with Azari in drafting a December 15, 2015 letter sent by Azari to Pelmadulla,

which memorializes the same English terms that were in the Judgment, and (ii) sent his own

email, in English, repeating that the Princess made "promises to Azari in [his] presence on which

she relied."  (*Ex. 34*, 163:14-164:9; *see also Ex. 2, Dec. 15, 2015 Azari Letter to A. Kerman*

(memorializing the terms of her pension); *Ex. 3, April 18, 2016 Email From GRG to Pelmadulla,*

at AA101 (repeating fact that promises were made to Azari).

27.     Debtor's other basis to vacate the Judgment in the First Action was Golsorkhi's

claim that he did not have the authority to sign the Judgment.    (*Ex. 40*, ¶ 4).  Remarkably, in

making this argument, Golsorkhi was accusing himself – as the sole executive of Debtor – of

committing fraud when he signed the Judgment since, according to himself, he allegedly did not

have authority to do so, but signed the Judgment anyway.    However, as the Appellate Division

found, Debtor's Articles of Incorporation unambiguously confirm that Golsorkhi did, in fact,

have authority to sign the Judgment. (*See Ex. 10, Oct. 23, 2018 First Dep't Decision in First*

*Action,* at 21-22).  Furthermore, when Golsorkhi filed this bankruptcy, he filed a Resolution

indicating that he "is authorized, empowered, and directed with full power of delegation, to

negotiate, execute, deliver, file, and perform, in the name and on behalf of [Debtor]…."  (*Ex.*

---

[2] A cursory review of the numerous affidavits that Golsorkhi has filed in this bankruptcy only further
confirms the absurdity of his claim that he does not understand the plain English terms of a simple
affidavit.

*11, Oct. 7, 2019 Resolution of Debtor, Bankr. ECF No. 2, pg. 1*).  As such, Golsorkhi's second, and only other basis, for vacating the Judgment in the First Action was also fraudulent.

28.     Ultimately, the First Department found in favor of Azari in a 5-0 decision and dismissed the First Action.  (*See Ex. 10*)

29.     On October 1, 2019 – a week before a duly-noticed Sheriff's sale of the Townhouse would have satisfied the Judgment after three-and-one-half (3 ½) years – Kamran Abbas-Vahid, a beneficiary of Pelmadulla, Debtor's shareholder, filed a second action in New York Supreme Court to vacate the Judgment again under CPLR 3218 and CPLR 5015, and alleged "fraud and collusion" against Azari.  *See Kamran Abbas-Vahid v. Azari,* 655724/2019 (the "Second Action").  (*Ex. 40*, ¶ 34, fn. 2).  Abbas-Vahid also sought a temporary restraining order ("TRO") to enjoin the Sheriff's sale.  (*See Second Action,* ECF No. 8).   Abbas-Vahid had been in contact with Golsorkhi before filing the Second Action.

30.     On October 4, 2019, Judge Bannon denied the TRO and dismissed the entire Second Action.  (*See id.* at ECF No. 33).

## III-  *DEBTOR'S POSTPETITION MISCONDUCT*:     PERJURY  AND  FALSE STATEMENTS  BY  BOTH  DEBTOR  AND  BLANK  ROME  IN  THE APPLICATION TO RETAIN BLANK ROME AS COUNSEL

31.     Four (4) days later, on October 8, 2019 – the day before a Sheriff's sale was scheduled –  the Debtor filed this bankruptcy petition to (i) prevent Ms. Azari from enforcing her Judgment at the sale, and (ii) seek a third attempt to void Ms. Azari's pension, this time claiming, as a DIP, that it was a "fraudulent transfer" on behalf of creditors.  (*Motion,* at ¶ 39; *see also Ex. 37, S. Akabas Dep. Tr.*, 25:20-26:9 (There was "no other reason[ ]" given to potential purchaser 29 Beekman Corp for filing bankruptcy except to "contest the Judgment…in bankruptcy court rather than in state court."))

32.     To challenge the Judgment a third time, Debtor and Blank Rome filed an application to retain its same prepetition counsel, Blank Rome, as special counsel, to continue its years-long litigation campaign against Azari ("Retention Application").   (*See Ex. 4, Retention Application, Bankr. ECF No. 11*)

33.     Egregiously, however, in the Retention Application, both Blank Rome and Golsorkhi, on behalf of Debtor, committed perjury and made numerous false statements to the Court about Blank Rome's concurrent legal representation of all three parties in interest – including (i) Debtor, (ii) its sole executive and (iii) its sole shareholder – in the related First Action and the status of the First Action.

**A.     In Its Retention Application, Debtor Makes False Representations To The Court**

34.     In the Retention Application, Debtor, or more accurately Golsorkhi, made three (3) knowingly false statements to push the Court to retain Blank Rome's services.

35.     First, Golsorkhi claimed that he "seeks to retain Blank Rome to perform services" for the "continued counsel and representations" of Debtor in the First Action, which is "currently pending." (*Ex. 4, Debtor's Application,* ¶ 10, PDF pg. 5-6).  This was knowingly false as Azari already had prevailed against Debtor in the First Action.[3]  In one of its filed schedules, Debtor took the lie further and even represented that the ***Second Action*** also was still "pending." (*Bankr. ECF. No. 13, Official Form 207 Part 3*).   This was also knowingly false; the Second Action had been entirely dismissed.   (*See supra,* ¶ 31).

---

[3] The only claim that was still pending in the First Action was Azari's counterclaim against Pelmadulla for payment of a "bequest" in the late Princess' will.  (*See Infra,* ¶ 42; *see also Ex. 12, Sept. 5, 2016 GRG Email To Armao & Azari*)("All severance payments will be made once the property has been sold and will be offset by anything that was <u>willed</u> by [the Princess]")(emphasis added); *Ex. 3,* AA 00101 (discussing "BEQUEST" in Princess' will).

36. <u>Second</u>, Golsorkhi falsely represented that Blank Rome "had not represented any of Debtor's creditors or other parties in interest." (*Ex. 4, Debtor's Application,* ¶ 14). Golsorkhi knew full well this also was a lie. Golsorkhi knew that he was an unsecured "creditor" and "party in interest" in this bankruptcy with unsubstantiated claims of $7 million and $480,000. He also knew that Blank Rome had represented him legally in the First Action and in settlement discussions with Azari for almost a full year leading up to the bankruptcy.

37. <u>Third</u>, Golsorkhi falsely stated that "Blank Rome has not represented, nor does it now represent, any interest adverse to Debtor with respect to matters on which it is to be employed." (*Id.*). However, Golsorkhi knew that his interest was "adverse" to that of the other unsecured creditors since filing this Action on their behalf to vindicate his unsubstantiated and subordinated claims of $7,000,000 and $480,000 would be detrimental for them. That is because the other unsecured creditors, aside from Golsorkhi, had no reason to file this Action since they were set to be paid in full. (*See Motion*, ¶ 4, 43-49, 102). As such, they had nothing to gain and everything to lose if Debtor did not prevail in the Action. Even if Debtor prevailed, the unsecured creditors' claims could still become impaired since Blank Rome, as bankruptcy counsel, would have priority in payment over them.

**B.    Blank Rome Perjures Itself In Its Retention Application**

38. Lawrence F. Flick III ("<u>Flick</u>"), a partner at Blank Rome, also made false statements under oath in the Retention Application to ensure that his firm could keep incurring legal fees in its continuous litigation campaign against Azari on behalf of his friend, Golsorkhi. Specifically, Flick swore the following:

> a. "Blank Rome has examined its database of existing and former clients to determine whether it had or has any connections with the parties in interest. Specifically, based on the ***information made available to Blank Rome***, Rome's analysis included an ***"examination of the following parties: Debtor; professional engaged by Debtor in this chapter 11 case; current or former***

11

*officers or directors of Debtor (to the extent identified to Blank Rome); certain known unsecured creditors and equity interest holders of Debtor…"*. It further stated that "Blank Rome's examination process is necessarily ongoing." (*Ex. 4, Flick Declaration*, ¶¶ 4 & 5, PDF pg. 18)(emphasis added).

b. "While Blank Rome has taken all reasonable steps to ascertain whether *current or recent clients are creditors of Debtor, are affiliated with creditors of Debtor, or are otherwise parties in interest,* it is possible there may be relationships or connections of which Blank Rome is not aware through *reasonable diligence*… (*Ex. 4, Flick Declaration*, ¶ 7, PDF pg. 19)(emphasis added).

c. "Based on the database examination of potential interest parties…[Blank Rome] ha[s] concluded that, except as set forth in this Declaration, neither [Flick], Blank Rome, nor any partner, of counsel or associate thereof *has any connection with the Debtor, its creditors or parties in interest."* (*Ex. 4, Flick Declaration*, ¶ 8, PDF pg. 19)(emphasis added).

d. *"Neither Blank Rome*, any member of Blank Rome, any attorney who is of counsel to Blank Rome, nor any associate of Blank Rome, *insofar as I have been able to ascertain presently represents a creditor or equity interest holder of Debtor….."* (*Ex. 4, Flick Declaration*, ¶ 9(a))(emphasis added).

39. All four (4) of these statements were indisputably false.

40. <u>First</u>, Blank Rome did not conduct any "examination" of "the current or former officers or directors of Debtor" or "certain known unsecured creditors and equity interest holders of Debtor…" (*Supra*, ¶ 38(a)). As an obvious point, it was not necessary for Blank Rome to conduct a true "examination" or consult a "database" to determine Debtor's current officer and director or equity interest holder. That is because Debtor only had *one* "current officer [and] director" and only *one* "equity interest holder." The sole "officer and director" was Golsorkhi. The sole "equity holder" was Pelmadulla. Golsorkhi also was an "unsecured creditor" of Debtor with unsubstantiated, but large, claims of $7,000,000 and $480,000. Similarly, Pelmadulla also became an "unsecured creditor" of Debtor, though a meritless one, when it ultimately filed a claim in the bankruptcy. (*See Bankr. ECF, Claim 9*). This

"information" was indisputably "available to Blank Rome." (*Ex. 5, ¶ 4*). Had Blank Rome simply asked itself the basic questions of who the one shareholder and one executive of Debtor were, which would have required no effort, it would have easily identified Pelmadulla and Golsorkhi. Consequently, Blank Rome's sworn statement that it conducted any "examination" at all was intentionally false.

41. Second, Blank Rome's claim that "it has taken all reasonable steps to ascertain whether **current or recent clients** are creditors of Debtor, are **affiliated with creditors** of Debtor, **or are otherwise parties in interest**" was also intentionally false. …" (*Supra*, ¶ 38(b)). **Both** Pelmadulla and Golsorkhi were "recent clients" of Blank Rome in the First Action and were alleged "creditors of the Debtor." (*First Action, ECF No. 37* (Blank Rome had been Pelmadulla's counsel in the First Action since at least August 2018), *ECF No. 34* (Blank Rome had been Golsorkhi's counsel since March 2018)). Blank Rome knew about Golsorkhi's status as a creditor since it assisted in preparing Debtor's schedule of creditors, which listed Golsorkhi's alleged creditor claims. (*Ex. 30, Debtor's Amended Responses and Objections To Azari's First Set Of Interrogatories*, Response to No. 2)(Blank Rome partner Ira Herman and counsel Evan J. Zucker listed as assisting in preparation of Official Form 202). During the months following Debtor's bankruptcy filing, Blank Rome also knew about Pelmadulla's potential creditor claim since Pelmadulla informed Blank Rome of its claim twice by email, and even requested assistance in filing the claim. (*Ex. 15, Nov. 4, 2019 Pelmadulla Email To Blank Rome and GRG,* WANDIP 2410)(Pelmadulla indicating that it "has to be mentioned as creditor" based on an "outstanding shareholder loan"); (*Ex. 16, Dec. 6, 2019 Pelmadulla Email to Blank Rome and GRG,* WANDIP 2831)("[I]t would be correct for Pelmadulla to be listed as creditor" based on a "shareholder loan"). When Pelmadulla ultimately filed its claim, Blank Rome never

informed the Court that its client, Pelmadulla, was also now claiming to be a creditor against Debtor, who also was Blank Rome's client at the time. (*Supra*, at ¶ 38(a)).

42.     <u>Third</u>, Flick's statement that Blank Rome does not "***presently*** represent[ ] a creditor or equity interest holder of Debtor" also was intentionally false. Pelmadulla was not just a recent client of Blank Rome's. Pelmadulla was a ***current*** client of Blank Rome's when Debtor filed this bankruptcy.[4] …" (*Supra*, ¶ 38(d)). Although Azari prevailed in the First Action against Debtor, Blank Rome was still actively defending Pelmadulla against Azari for Pelmadulla's failure to pay Azari a $150,000 bequest from the Princess' will. Blank Rome knew this fact, and even was contemporaneously communicating with Pelmadulla about this very legal representation at the time it filed its Retention Application. (*See, e.g., Ex. 15, Oct. 9, 2015 Email,* WANDIP 2413 (referencing the "litigation" in the First Action and its representation of Pelmadulla); *Ex. 15, Oct. 16, 2019 Email,* WANDIP 2411 (Blank Rome references First Action, indicating that "[a]ll litigation is stayed unless the bankruptcy court grants a party relief from the automatic stay."); *Ex. 15, Nov. 4, 2019 Email*, WANDIP 2410 (an entire heading of an email is called "Pending litigation"); *Ex. 16, Dec. 6, 2019 Email,* WANDIP 2832 (again devoting an entire heading devoted to "pending litigation")(collectively, the "<u>Pelmadulla Emails</u>"). Flick also was corresponding frequently with Golsorkhi as both Debtor's sole executive and largest creditor. At the time, Golsorkhi was not represented by counsel, individually. Blank Rome intentionally failed to disclose these communications and facts to the Court.

43.     <u>Fourth</u>, and most significantly, Blank Rome's sworn statement that it has no "connection with Debtor, its creditors or parties in interest" was intentionally false. (*Supra*, ¶

---

[4] Blank Rome's motion to withdraw as counsel to Pelmadulla in the First Action was only granted in February 2020, four (4) months after Debtor filed bankruptcy. (First Action, ECF No. 62).

38(c)).  As confirmed by its recent and ongoing legal representation of both Golsorkhi and

Pelmadulla, Blank Rome had undisputed and extensive "connections" to both parties, who were

both "creditors" <u>and</u> "parties in interest."

44.     Furthermore, for over a year leading up to this bankruptcy, Flick engaged in

settlement negotiations with Azari's counsel in which he jointly and legally represented three

parties to the First Action:    (i) Debtor; (ii) Golsorkhi; and (iii) Pelmadulla.    Although these

were not genuine settlement discussions, but rather efforts to delay Azari from enforcing her

Judgment after her victory in the First Action, Blank Rome's representation of all three parties

was undisputed.  (*See Ex. 40*, ¶ 34).

45.     Finally – and most significantly – for at least "twenty (20) years," Flick and

Golsorkhi had been social friends, and Golsorkhi and his wife also had been longtime friends

with Flick's wife, Maryam Flick.   (*Ex. 31, Apr. 30, 2021, Affidavit Mwafak Peress*, ¶ 3; *see also

Ex. 1*, at 129:10-13 (GRG "met Larry Flick socially some many years ago")).   All four of them

"dine and socialize regularly" together.  (*Ex. 31*, ¶ 3).  The "connections" between Flick and

Golsorkhi could not be any stronger.   Throughout the years, Flick also "provided legal advice to

Golsorkhi as a courtesy for no compensation." (*Ex. 31*, ¶ 4).  Flick, of all people, did not need to

consult a "database" or conduct an "examination" to "ascertain" what "connection," if any, he

had to these key parties in the bankruptcy before he signed his sworn declaration.

46.     Never during the entire time when it was corresponding with Pelmadulla and

Golsorkhi did Flick ever correct, or "supplement," his sworn declaration to the Court to disclose

these "connections," as it swore it would do in his Retention Application.   (*Ex. 4, Flick

Declaration*, ¶ 4, PDF pg. 18; *Ex. 4, Debtor Application*, ¶ 14, fn. 1, PDF pg. 7).    Rather, Flick

and his firm continued to profit and incur legal fees with undisclosed conflicts of interest

between Debtor, Pelmadulla, Golsorkhi, and the unsecured creditors, and uncorrected perjured statements in their Retention Application.

### C. Blank Rome Files A Supplemental Declaration, But Fails To Provide Any Justification For Its Lies And Continues To Deceive The Court

47. It was a full seven (7) months later, after 29 Beekman Corp. raised the falsity of Flick's declaration, that Flick finally decided he had no choice but to supplement his false Declaration to finally disclose his and Blank Rome's connections to Pelmadulla and Golsorkhi. (*Ex. 6, June 19, 2020 Supplemental Declaration of Flick* (the "Supplemental Declaration")).

48. Flick blamed his lack of disclosure of his connections to Pelmadulla on Pelmadulla "not [being] included in Blank Rome's conflict database" – even though Pelmadulla had played a central role in Blank Rome's litigation campaign against Azari dating back years and Flick was contemporaneously communicating with them in the Pelmadulla Emails when he executed his original Declaration. (*Ex. 6*, ¶ 10). Flick also disingenuously claimed that he thought the First Action "would be stayed against [Debtor], and informed Pelmadulla accordingly," as if a stay of an action terminates an attorney-client relationship or justifies a failure to disclose Blank Rome's current representation of Pelmadulla to the Court. (*Ex. 6*, ¶ 15). Flick, however, never explains why, if he had the presence of mind to inform Pelmadulla about a possible "stay" of the State Action, that he did not have the same presence of mind to inform the Court about his firm's representation of Pelmadulla in that very same State Action. After all, the October 16, 2019 email in which he informed Pelmadulla about the possible "stay" was only two days apart from Blank Rome's October 14, 2019 disclosures in his Retention Application to the Court.

49. Remarkably, in his Supplemental Declaration, Flick still omitted to properly explain his failure to disclose Blank Rome's previous legal representation of Golsorkhi in the

First Action, even while admitting that Blank Rome did, in fact, legally represent Golsorkhi. (*Ex. 6,* ¶ 11).  Worse yet, Flick also still failed to disclose his decades-long social relationship between and among himself, his wife, Golsorkhi, and Golsorkhi's wife.

50.    Consequently, none of Flick's attempts at damage control in his Supplemental Declaration excused his perjured statement that he had no "connection" to Pelmadulla or Golsorkhi.   Finally, Flick intentionally ignored the possible conflict of interest between Golsorkhi and the other unsecured creditors on whose behalf Debtor filed this unnecessary Action.

51.    In response to Flick's Supplemental Declaration, Azari's counsel filed his own declaration, informing the Court, among other things, about (i) Blank Rome's continued representation of Pelmadulla in the First Action and the current status of that litigation; and (ii) all of the conflicts of interest that Blank Rome disregarded throughout the years.  (*Ex. 7, Declaration of Nader Mobargha, Esq. In Response To June 19, 2020 Declaration of Flick*). These unambiguous past and present conflicts of interest include, but are not limited to, the following:

   a.    **Conflict Of Interest In Execution Of RSA.**  The impossibility of Blank Rome adequately representing (i) Pelmadulla, (ii) Golsorkhi, and (iii) Debtor in the negotiation and execution of a $10.3 million Residential Sale Contract with 29 Beekman Corp., dated September 25, 2019 ("RSA"), which was $6.6 million below the listed price and at a price which cuts off precisely when Pelmadulla, Debtor's equity holder, would receive its first dollar. (*Ex. 7,* ¶¶ 9 & 10; *see also Ex. 27*, 29:12-15 (One week before the RSA, the price was $16.9 million)).  The RSA was executed only two (2) weeks before Debtor filed bankruptcy.

   b.    **Conflict Of Interest In First Action**.  The impossibility of Blank Rome adequately representing (i) Pelmadulla, (ii) Golsorkhi, and (iii) Debtor in the First Action where Debtor claimed that Golsorkhi did not have the authority to sign the Judgment.   This position contradicts Golsorkhi's statement in the Judgment that he "has the responsibility over the compensation of all

employees" and his signature on the Judgment, which confirmed his authority. *(Ex. 7, ¶ 13).*[5]

c. **Conflict Of Interest In This Action**.   The impossibility in this Action of Blank Rome adequately representing (i) Debtor, whose sole executive and decision-maker, Golsorkhi, was intent on continuing his pre-bankruptcy litigation campaign against Azari, and (ii) the unsecured creditors who had no reason to file this Action when they were set to be paid in full without litigation.   *(Ex. 7, ¶ 14(b)).*

52.     What is perhaps most remarkable is the conflict of interest detailed in paragraph 51(a) concerning Blank Rome's joint representation of Debtor and Pelmadulla in the negotiation and execution of the RSA.  It is undisputed that, at the low $10.3 million sale price, Pelmadulla – who had a direct interest in the Townhouse as the sole shareholder of Debtor – would not benefit from the RSA's sale price since the proceeds were enough to only satisfy the claims of creditors and Blank Rome's fees in bankruptcy.   Blank Rome resolved this conflict by ***intentionally hiding the $10.3 million sale of the Townhouse from its own current client, Pelmadulla***. Pelmadulla only learned about the RSA after reading about it in Golsorkhi's publicly-filed affidavit in this bankruptcy, filed over two weeks after the RSA was a done deal.   *(See, e.g., Ex. 15,* WANDIP 2410 ("According to the [bankruptcy] affidavit of GRG," Debtor "negotiated" the RSA.  "We assume [Flick] advised Debtor."); *Ex. 16,* WANDIP 2831 ("According to GRG's [bankruptcy] affidavit, [Debtor] received one binding offer regarding the sale of [the Townhouse].")(emphasis added)).

53.     In an indignant December 13, 2019 email (the "December 13th Email"), Pelmadulla raised this blatant breach of fiduciary duty by Blank Rome with both Flick and Golsorkhi:

> We are quite astonished about your email(s).

---

[5] Of course, this distinction between Debtor and Golsorkhi ignores the reality that Debtor *is* Golsokrhi since Golsorkhi was the sole executive and decision-maker.

According to our information, the [RSA] was made **September 25, 2019.** Your law firm, Blank Rome, was informed about the sale since the receipt of the down payment was acknowledged by your firm by signature of the contract.

Before and after September 25, 2019, your firm still represented the legal interests of Pelmadulla. Consequently, ***you were obliged to inform your client***, Pelmadulla, [about the RSA] accordingly.

In the email correspondence at that time, you did not mention at all that an [RSA] was made on September 25, 2019.

(*Ex. 17, Pelmadulla Dec. 13, 2019 Email to Flick and GRG,* WANDIP 3659)(part of the

"Pelmadulla Emails")(emphasis added in second bold only).

54.     In that same email, Pelmadulla also chided Golsorkhi not only for hiding the sale

of the Townhouse and the RSA from Pelmadulla, Debtor's sole shareholder, but misleading them

into believing that it had ***not sold yet*** when Debtor ***already*** had signed the RSA and inviting

potential buyers to see the Townhouse:

By email dated October 1, 2019, Dr. Taskapan [i.e., Pelmadulla's adviser] asked Golsorkhi about the broker and he responded on the same day that the exclusivity with the last broker was still valid. He omitted to inform us that at that time that a sale contract had already been concluded!

*Id.; see also Ex. 13, GRG Oct. 1, 2019 Email to Pelmadulla* (in response to Pelmadulla having

"two potential buyers" for the Townhouse, Golsorkhi falsely stated that the broker agreement

was "still valid" and failed to disclose that the RSA had been executed six (6) days earlier).

Golsorkhi invited Pelmadulla to bring its "potential buyers" to the Townhouse, even though he

did not believe that he was "allowed to show the Townhouse because [Debtor] already [had] a

contract [i.e, the RSA]." He further testified, "how can I bring someone else when I have a

contract there so I have another lawsuit with them?" (*Ex. 28, 341 Creditor Meeting Tr.,* at

15:16-19). Based on Golsorkhi's own testimony, Golsorkhi flat out deceived Pelmadulla,

Debtor's sole shareholder, by leading them to believe that the Townhouse was still available for purchase.

55.     Neither Blank Rome nor Golsorkhi bothered to deny, let alone even address, these points or the very serious breaches of the attorney-client or Debtor-sole shareholder relationships.

**IV-**  ***DEBTOR'S POST-PETITION MISCONDUCT:*** **DEBTOR WITHOLDS MATERIAL FACTS THAT WOULD EXPOSE ITS PERJURY AND AFFECT CONFIRMATION OF ITS PLAN**

56.     Debtor and Blank Rome intentionally hid the Pelmadulla Emails – including the December 13th Email above – from the Court.   In these emails, which span from October through December 2019, Pelmadulla, Flick, and Golsorkhi discuss (i) Blank Rome's legal representation of Pelmadulla, (ii) the status of the bankruptcy; (iii) Pelmadulla's dismay at Blank Rome's unwillingness to assist Pelmadulla in filing its alleged claim; and (iv) Flick's failure to inform Pelmadulla, his own client, about the negotiation and execution of the RSA (the "Pelmadulla Emails").  (*See, e.g., Exs. 13, 14, 15, 16, 17, 19*).

57.     The reason for Blank Rome and Debtor withholding this information is simple. They did not want the Court to know about the Pelmadulla Emails until after the Court confirmed Debtor's bankruptcy plan.   The following timeline confirms this:

a.  In both a **May 12, 2020** email to Debtor and a subsequent **May 26, 2020** letter to the Court, 29 Beekman Corp. raised the possibility that Flick lied under oath in its Declaration.   (*Ex. 8, May 12, 2020 Email From 29 Beekman Corp. to Blank Rome,* No. 5 (requesting information regarding Debtor and Blank Rome's communications with Pelmadulla between "September 20, 2019 and December 31, 2019," the precise time frame of the Pelmadulla Emails); (*Ex. 9, May 26, 2020 29 Beekman Corp. Letter To Court*, at 3) ("Blank Rome has also misrepresented its relationship with Pelmadulla and Debtor in its [Retention Application].").

b.  On **June 5, 2020**, 29 Beekman Corp. sent a formal document request seeking the Pelmadulla Emails, which prove that Flick lied under oath in the Retention

Application. (the "<u>29 Beekman Document Request</u>").  (*Ex. 36, June 5, 2020 29 Beekman First Set of Document Requests*).

c.  On **June 9, 2020**, Debtor filed a motion to shorten the time for the Court to preliminarily approve its disclosure statement and to schedule a hearing date for final approval of the disclosure statement and bankruptcy plan.  The Court granted the motion and scheduled a hearing for one week later on June 16, 2020.  (*Ex. 21, June 12, 2020 Court Order*)

d.  On **June 19, 2020**, Flick filed his Supplemental Declaration. (*Ex. 6*).  At the time, Blank Rome and Flick possessed the Pelmadulla Emails, which indisputably show that he was contemporaneously communicating with Pelmadulla about Blank Rome's legal representation of it, while he falsely was declaring to the Court under oath that he had ***"no connection"*** to Pelmadulla.

e.  On **July 16, 2020**, the Court confirmed Debtor's bankruptcy plan and approved the disclosure statement. (*Ex. 35, Restated Order Granting Final Approval of Disclosure Statement & Confirming Debtor's Second Amended Chapter 11 Plan*).

f.  On **July 24, 2020** – eight (8) days <u>after</u> the Court confirmed Debtor's plan – Debtor produced the Pelmadulla Emails in response to the 29 Beekman Document Request. (*Ex. 41, Blank Rome July 24, 2020 Cover Email For Document Production*)

58.     Had Blank Rome produced these Pelmadulla Emails before the Court's confirmation of Debtor's plan, the Court may have delayed confirmation to disqualify Blank Rome from continuing its representation of Debtor based on its perjury and connections to the key parties in this bankruptcy.    But it never had the opportunity to do so.

**V-    *DEBTOR'S POST-PETITION MISCONDUCT:*  BLANK ROME REPRESENTS THE INTERESTS OF GOLSORKHI, INCLUDING HIS CONTINUOUS LITIGATION CAMPAIGN AGAINST AZARI, ABOVE THE INTERESTS OF THE CREDITORS**

59.     The result of Flick and Golsorkhi's collaborative false statements in the Retention Application, and the Court's approval of Blank Rome's retention without knowing about their perjury and deception, was that Blank Rome partner Flick could now freely represent the interests of his friend, Golsorkhi, over the interests of the unsecured creditors.    Nothing

illustrates this more than Debtor's – or more accurately, Golsorkhi's – decision to file this Action purportedly on behalf of creditors, while representing – no less than <u>five</u> (5) times over an almost (3) three-month period – that all creditors would be paid from the proceeds RSA with 29 Beekman Corp  (*See Motion,* at ¶¶ 4, 48, 94-98).

60.     <u>First</u>, in the RSA executed before this bankruptcy, Debtor "represent[ed] that the net proceeds of a sale under this [RSA] would be sufficient to satisfy all claims against [Debtor], and as reasonably projected, [Debtor's] contemplated estate in bankruptcy…" (Ex. 42, at § 51(b); *see also* § 8(b)("[Debtor] covenants and warrants that all of the representations and warranties set forth in this [RSA] shall be true and correct at Closing.")

61.     <u>Second</u>, at the November 12, 2019 creditor meeting, both Debtor and its counsel separately reiterated that the proceeds would satisfy the claims of all creditors.   Debtor's counsel informed the U.S. Trustee, Paul Schwartzberg, that Debtor "[is] satisfied with the purchase price [of the RSA] because [it] believes, with that purchase price, [it] will be able to pay the creditors."  (*See* Motion, ¶ 45).  Golsorkhi testified under oath that the RSA "<u>ensure[s]</u> that everybody gets paid, including [Azari], whatever the deal may be."  (*See* Motion, ¶ 45)(emphasis added).  To avoid any doubt about his assurance, Golsorkhi reiterated that he "thinks from [the RSA], everyone will get paid."  (*See* Motion, ¶ 45).

62.     <u>Third</u>, at the November 14, 2019 Initial Case Conference, Debtor's counsel indicated that, "with regard to the [RSA], we believe that it will produce funds sufficient to be able to pay reserves for all non-insider claims, even that of [Azari]."  (*See* Motion, ¶ 46)

63.     <u>Fourth</u>, at a December 6, 2019 hearing, Debtor's counsel indicated that the only "two impaired classes" are a "subordinated creditor" and "equity."   (*See* Motion, ¶ 47).  The Court confirmed that it did not believe "[Debtor] ha[s] any impaired classes in this case."   (*See* Motion, ¶ 47).  These representations were consistent with the bankruptcy plans and disclosure

statements that Debtor filed on December 2, 2019 and on December 9, 2016 after the hearing. [Bankr. ECF Nos. 26, 27, 30, 31).

64.     <u>Fifth</u>, at a January 16, 2020 evidentiary hearing, under oath, Golsorkhi confirmed that Debtor "felt that the [purchase price of the RSA] was sufficient to pay all the loan creditors except [himself]."   (*See* Motion, ¶ 48).  Golsorkhi elaborated further:   "[Debtor] knew how much debt [it] was carrying, and as a result, [it] knew how much [it] needed in order to satisfy those debts…[T]he offer was accepted solely for the fact that, this offer would be sufficient enough to pay all the claims that I was aware of."   (*See* Motion, ¶ 48).

65.     Over two years later, at his deposition, Golsorkhi confirmed Debtor's representation that "[w]hen Debtor filed bankruptcy…all creditors would be paid."   (*See* Motion, ¶ 49).  Specifically, the "creditors would be paid based on the price that [Debtor was] being offered for the Townhouse."   (*See* Motion, ¶ 49).

66.     Despite representing that the creditors would be paid in full, on four (4) occasions over the next two (2) months – including simultaneous with its bankruptcy filing – Debtor confirmed that it planned to file a fraudulent conveyance action on their behalf against Azari. (*See* Motion, ¶ 50) .    Ultimately, on December 18, 2019, Debtor did file the Adversary Action. [*Adversary Action*, ECF No. 1]

67.     Golsorkhi made no secret of his disregard of the creditors in filing the Adversary Action.    When asked whether he spoke to unsecured creditors about the action he was planning to file on their behalf – despite their projected payment in full <u>without</u> any litigation – he responded, "on what basis would I speak to creditors…[The creditors] have no bearing on it." (*See* Motion, ¶ 51).

68.     The only beneficiaries of this Adversary Action were (i) Golsorkhi and his two unsubstantiated claims of $7 million and $480,000, which were subordinate to the claims of

other creditors, and (ii) Blank Rome, who would incur legal fees that would take priority over the claims of the unsecured creditors.

## VII- DEBTOR LIES TO THE COURT AND MAKES FALSE STATEMENTS IN ITS COMPLAINT AGAINST 29 BEEKMAN CORP.

69.    In addition, Debtor lied to this Court that Debtor did not have any knowledge or notice that Pelmadulla was going to file its $3,243,941.19 claim.

70.    First, at a January 14, 2020 conference, Debtor lied to the Court that the Pelmadulla claim was "unexpected." (*See Motion*, ¶ 57).

71.    Second, a little over a month later, on February 26, 2020, in its complaint against 29 Beekman Corp., Debtor doubled-down on that lie when it alleged that it had no "prior notice or warning" that Pelmadulla was going to file its claim "[o]n December 31, 2019." (*Ex. 18, Complaint, Bankr. ECF No. 77*, ¶ 31).

72.    Third, almost two years later, at a deposition under oath, Debtor further confirmed the lie that that it "had no idea that [Pelmadulla] would file a claim." (*See Motion,* at ¶ 57)(citing GRG deposition).

73.    The Pelmadulla Emails, including those on November 4, 2019 and December 6, 2019, confirm that Debtor and Blank Rome **did** have notice of Pelmadulla's claim. (*See Exs. 15 & 16*).  Rather than inform the Court about these communications – at either the November 16, 2019 initial conference or the December 6, 2019 hearing, or even by letter – Debtor simply proceeded with the approval of its bankruptcy plan and disclosure statement.  Then Debtor and its counsel actively lied to the Court in multiple filings that it did not even have any  "prior notice or warning" of the Pelmadulla claim.

## VIII- GOLSORKHI PERJURES HIMSELF NO LESS THAN EIGHT (8) TIMES AT A JANUARY 16, 2020 SALE HEARING

74.    As if all of this deception was not enough, Golsorkhi and Debtor continued to deceive the Court and commit perjury in another venue, this time at a January 16, 2020 sale hearing concerning the approval of the RSA and the sale of the Townhouse (the "Sale Hearing"). At this Sale Hearing, Golsorkhi perjured himself no less than eleven (11) times, including submitting a perjured affidavit along with his testimony.    This perjury claim is not based on the testimony of a third party, or the subject of a "he said, she said" debate.    Rather, it is based on Golsorkhi's own sworn testimony and documents produced in discovery, which contradict his sworn testimony at the Sale Hearing.

### A.    Golsorkhi Lied About The Amount Of Offers Debtor Received For The Townhouse Throughout The Years

75.    First, Golsorkhi lied to the court – and its counsel lied to the Court in a separate hearing – that during the previous six (6) years, the only offer Debtor received was the one from Secured Capital Partners ("Secured").    The Court even required confirmation of Golsorkhi's testimony that "there were no offers."    Golsorkhi responded, "Yeah, I said that."    (*Ex. 27, Excerpt from Sale Hearing,* at 14:6-8).    To eliminate any doubt about his testimony, Golsorkhi further testified, "Your Honor…we have [had]  no offers whatsoever since 2014" except "one [that] ended up in court…".  (*Ex. 27*, 13:9; 18:13-16)(emphasis added); *see also Ex. 43,* at 16:24-17:3) (two days earlier, at a January 14, 2020 hearing, Debtor's counsel falsely tells the Court that Debtor received only one offer for the Townhouse before the RSA).    Later in the hearing, Golsorkhi again confirmed that "we have had not one offer."  (*Ex. 27,* 33:11).

76.    Months earlier, at the Creditor Meeting, Golsorkhi had lied about the same issue. Specifically, he testified that "[p]rior to [the contract with 29 Beekman Corp.], we never had an offer except one, which the gentleman did not come through….We've had people come and see

it, but there's been <u>no</u> offers made."  (*Ex. 28, Nov. 12, 2019 Creditor Meeting*, at 15:6-12)(emphasis added).

77.  In its decision to approve the RSA at $10.3 million, the Court relied on Golsorkhi's testimony that Debtor only "got that one offer that fell through" and "[t]he fact [that] they just weren't getting offers."  (*See Ex. 27*, at 50:3-6).

78.  However, as discovery has confirmed, before filing bankruptcy, Debtor received no less than <u>four</u> offers, and one "interest" at a specific price, for the Townhouse.  (*See* Motion, at ¶¶ 69-74).

**B.      Golsorkhi Lied That A Previous Purchaser, Who Had Signed A Contract, <u>Wanted To Purchase The Townhouse With No Down Payment</u>**

79.  <u>Second</u>, Golsorkhi lied to the Court that Secured, who had entered into a $17 million real estate contract with Debtor in December 2017 to purchase the Townhouse, had "insisted that they wanted to buy [the Townhouse] with no down payment, nothing."  (*Ex. 27*, at 15:1-3).  This testimony is belied by the two contract deposit payments that Secured tried to make to Debtor, including the wire received – and rejected – by Debtor's counsel at Kelly Drye & Warren.  (*See Motion,* at ¶ 76).  Although these wires were late under the contract, they confirm that Secured did not expect to buy the Townhouse without any down payment or "nothing."  In its decision approving the sale, the Court again relied on Golsorkhi's perjured testimony that Secured wanted to purchase the Townhouse "with no down payment." (*Ex. 27*, 50:22-51:2).

**C.      Golsorkhi Lied That He Informed Pelmadulla, Debtor's Sole Shareholder, <u>About The RSA</u>**

80.  <u>Third</u>, Golsorkhi lied to the Court when he testified that he informed Pelmadulla about the RSA with 29 Beekman Corp.   Golsorkhi testified that, "[a]fter the negotiation with the buyer's counsel, the price that was offered was relayed to [Pelmadulla] for approval.

[Pelmadulla] found under the circumstances, they agreed to the price." (*Ex. 27*, at 21:1-4). Both Golsorkhi's own deposition testimony and the December 13th Email from Pelmadulla confirm that this was false.

81.     In the December 13th Email, Pelmadulla wrote to Golsorkhi and Blank Rome, complaining that, remarkably, neither Blank Rome – despite being Pelmadulla's counsel – nor Debtor, informed Pelmadulla about the execution of the RSA. (*Ex. 17*). Blank Rome and Golsorkhi did not deny their concealment of the RSA.

82.     In his deposition, Golsorkhi also testified that he did ***not*** contact Pelmadulla, even orally, about the RSA, its purchase price, or the bankruptcy filing. (*Ex. 1*, at 187:22-25; 189:3-12). He just assumed that Blank Rome "must have" told Pelmadulla about the RSA. (*Ex. 1, 190:12-16*) However, even this claim is contradicted by Pelmadulla's indignant emails to Blank Rome, which Golsorkhi also received, about Blank Rome's failure to inform them of the RSA.[6] (*Ex. 17*).

83.     Even more egregiously, Blank Rome was the recipient of these indignant emails and knew that neither the firm nor Debtor informed Pelmadulla about the RSA. Nevertheless, Blank Rome, who was present at the Sale Hearing, permitted Golsorkhi to freely lie to the Court on the stand and to testify that he did in fact inform Pelmadulla about the RSA.

### D.     Golsorkhi Lied That, When Debtor Was Negotiating The RSA, Debtor Never Told 29 Beekman Corp. The Total Amount Of Debt

84.     <u>Fourth</u>, Golsorkhi lied that Debtor "never told [29 Beekman Corp.] the total amount of claims that the creditors could have against [Debtor]." (*Ex. 27*, at 34:20-22).

---

[6] On the second day of his deposition, realizing that he admitted to lying under oath at the Sale Hearing, Golsorkhi tried to change his testimony – again – by claiming that he ***did*** tell Pelmadulla about 29 Beekman Corp. and discussed the offer with them. (*See Ex. 34*, 83:20-25; 84:25-85:14). However, this is belied by the December 13th Email. (*Ex. 17*). Regardless of which version of his testimony Golsorkhi chooses, it is undisputed that one of them is perjurious.

According to Golsorkhi, 29 Beekman Corp. did not offer $10.3 million "because [he] told them we owe so much money." (*Ex. 27*, 34:23-35:3).

85.     However, since 29 Beekman Corp. and its counsel testified that they were only willing to pay the minimum amount necessary to satisfy all claims of Debtor, Golsorkhi must have informed them the total amount of debt that Debtor was carrying. (*See, e.g., Ex. 32*, *May 7, 2020 Declaration of Seth Akabas,* ¶ 9). Indeed, that is the only way 29 Beekman Corp. could have arrived at the specific $10.3 million figure – which almost magically matches the $10.03 million of alleged debt that Debtor was carrying, plus an additional $270,000 for routine administrative costs and attorney's fees in bankruptcy. [*ECF No. 13, Official Form 206 E/F/: Creditors Who Have Unsecured Claims*][the total secured and unsecured claims of Debtor are $10.03 million at the time of the petition]. "Independent of the information that [29 Beekman Corp.] received from Debtor, 29 Beekman Corp. had no independent knowledge of the amount of debt that Debtor was carrying." (*Ex. 37*, 51:22-25). More accurately, 29 Beekman Corp., was told the total liabilities "were slightly under $10.3 million so that, when the costs of the transaction taken from the proceeds, the proceeds would satisfy all claims." (*Ex. 37*, 37:13-38:1).

### E.     Golsorkhi Lied About The Estimated Value That Lenders Placed On The Townhouse

86.     <u>Fifth</u>, Golsorkhi lied about the "estimated" value that "bridge finance lenders" placed on the Townhouse, claiming that they did not value it "more than $8 to 10 million." (*Ex. 27*, at 35:13-14). The term sheets produced in discovery, however, show that, in 2019, the same year that Debtor signed the $10.3 million RSA, bridge finance lenders were estimating the value well above that range. In 2019, Bloomfield Capital was willing to lend $10,000,000 at a loan-to-value of no greater than 65%, while Titan was providing a $8 million loan with a loan-to-value

of no greater than 60%.  (*Motion*, at ¶¶ 89, 120).  These "bridge finance lenders" were estimating the value of the Townhouse to be at least $14 million and $13.3 million, respectively.

### F.    Golsorkhi Lied About Who Negotiated The RSA

87.    Sixth, Golsorkhi lied that the "price [of the RSA] was negotiated by the attorneys from Blank Rome [Debtor's counsel] and Seth Akabas ("Akabas"), the real estate lawyer for 29 Beekman Corp."  (*Ex. 27*, at 20:7-8)(emphasis added).  The Court sought clarification on the issue, asking "[Mike] Perez [29 Beekman Corp's principal] made the offer?"  Golsorkhi responded "[t]he offer was made by the lawyer representing 29 Beekman….Perez did not give the offer to me.  I made it very clear.  The offer was given by the counsel representing [29 Beekman Corp.], and it was negotiated with counsel for the [Debtor], Blank Rome."  (*Ex. 27*, at 32:3-18).

88.    However, in his deposition, Golsorkhi contradicted this testimony by stating that he "made a suggestion of what they would offer." (*Ex. 1*, 199:6-7).  Peress "came up with the price" and "made the offer on behalf of [29 Beekman Corp.]."  (*Ex. 1*, 224:25 – 225:2; *Ex. 34*, 80:20-81:6, *see also Ex. 34*, 83:11-14 (confirming that Peress made the offer); 93:15-21(same). That price was "$10.3 million." (*See Ex. 34*, 80:20-81:6).  Golsorkhi told him it was "low." Peress responded that "this is all they are willing to offer."  Golsorkhi said it was "fine."  (*Ex. 1*, 204:3-20).  Golsorkhi further confirmed that it was "only after the price was determined that the lawyers got involved…to draw up the contract."  (*Ex. 1*, 205:12-20).  The lawyers "did ***not*** negotiate the price themselves."  (*Ex. 1*, 205:18-20)(emphasis added).  Golsorkhi's admissions about the negotiation of the RSA, alone, confirm Golsorkhi's perjury at the Sale Hearing.

89.    Emails from Debtor's own counsel, Blank Rome, also confirm that the principals, Mike Peress ("Peress") and Golsorkhi – not the lawyers, Akabas and Blank Rome – negotiated the Townhouse's sale price.  (*Ex. 33, Sept. 13, 2009 Email Chain b/w L. Flick and S. Akabas*,

BK 0038-39)(Debtor's and 29 Beekman Corp.'s counsel acknowledging that the principals negotiated the price).

90.     Finally, in their depositions, both 29 Beekman Corp.'s lawyer, Akabas, and 29 Beekman Corp's principal, Peress, Akabas confirmed that "[p]rior to [his] communication with Flick…the basic economic terms were already negotiated."   (*Ex. 37, Akabas Depos. Tr.*, 12:20-13:5; *see also* 36:6-9 (The "[p]rice was already negotiated between the principals" of Debtor and 29 Beekman Corp.); 46:25-47:3 (The lawyers "had no involvement whatsoever in negotiating the price.").   They further confirmed that the "[a]ttorneys did <u>not</u> negotiate the price."   (*Ex. 38, Perez Depos. Tr.*, at 58:25-59:1).

91.     In sum, all the key parties involved in the RSA – Blank Rome, Peress, Akabas, and most importantly, Golsorkhi himself – confirmed that Golsorkhi perjured himself on this issue.

### G.     Golsorkhi Lied About The Identity Of The Broker Handling The Sale Of The Townhouse During The Relevant February 2016 Period

92.     <u>Seventh</u>, Golsorkhi intentionally omitted disclosing the identity of Dan Danielli, the Halstead broker who was responsible for selling the Townhouse during the relevant early 2016 period when Debtor signed the Judgment.  Danielli also prepared a detailed $34 million valuation of the Townhouse, a fact that certainly played a role in Golsorkhi omitting to disclose Danielli's identity to the Court.  (*See Motion*, at ¶ 64).   Furthermore, in response to a targeted question by the Court, Golsorkhi compounded his lie to the Court by further lying that it was <u>Sotheby's</u> who was retained during the relevant period in 2016.  (*Ex. 27*, 11:22-12:5).  It is undisputed that Debtor retained Halstead as its broker in 2016.  (*Ex. 30*, Response To Interrogatory No. 5).

93.     At the Sale Hearing, Golsorkhi disclosed the identities of almost all of Debtor's *other* brokers, including Sotheby's, Corcoran, Brown Harris, and Compass.  (*See Ex. 27*, 11:22-12:5).  However, he intentionally left out Danielli and Halstead's names.

**H.     Golsorkhi Lied About Informing The Broker About 29 Beekman Corp. or the RSA Debtor Was Executing**

94.     <u>Eighth</u>, Golsorkhi lied at the Sale Hearing when he testified that he told Charlie Attias ("<u>Attias</u>"), Debtor's broker at Compass in September 2019, about 29 Beekman Corp., "a potential buyer," for the Townhouse.  (*Ex. 27*, 38:6 – 23).  There is not a single email produced in discovery informing Attias about the RSA with 29 Beekman Corp. and it is undisputed that Attias was not part of any of the negotiations for the purchase of the Townhouse.  Under a September 7, 2019 Exclusive Townhouse Sales Agreement that it signed with Compass (the "<u>Broker Agreement</u>") just weeks before signing the RSA, Debtor was obligated to "refer all inquiries and offers regarding the sale of [the Townhouse] to Compass and negotiate exclusively through Compass."  (*Ex. 5*, ¶ 4).  Debtor never even informed Compass about 29 Beekman Corp.'s "offer" before executing the RSA, let alone "negotiate" through Compass.  Attias only discovered Debtor's execution of the RSA and breach of the Broker Agreement after Debtor filed bankruptcy.

**I.     Golsorkhi Lied About Informing Debtor's Broker About The RSA**

95.     <u>Ninth</u>, Debtor intentionally omitted to disclose to the Court that it had conducted an appraisal of the Townhouse.    That appraisal was for $18 million, and followed a $34 million broker-prepared valuation, which Debtor also did not disclose.    (*See* Motion, ¶¶ ).  Given that this was a Sale Hearing on the value of the Townhouse, these were material omissions.  Not only did Debtor and its counsel mislead the Court into believing that Debtor had not appraised the

Townhouse, they also did not bother to correct the Court when it stated on the record, as part of its decision, that "it's true there are no appraisals…" (*See* Ex. 27, 50:23).

**J. Golsorkhi Submitted A Perjured Affidavit To Accompany His Live Perjured Testimony**

96. <u>Tenth</u>, to accompany his perjured testimony at the Sale Hearing, Golsorkhi submitted a perjured affidavit into evidence as well. (*Ex. 29, Jan. 10, 2020 GRG Affidavit In Support Of Motion For Order Approving Sale Of Debtor's Real Property*). In the affidavit, Golsorkhi double-downed on <u>two</u> indisputably false statements that he gave on the stand.

97. He again lied that Debtor's broker in 2015 was Sotheby's. (*Ex. 29, ¶ 4, but see Ex. 30*, Response to Interrogatory No. 5)(listing Douglas Elliman as broker in 2015).[7]

98. Golsorkhi also lied again about the number of offers that Debtor received for the Townhouse by claiming that it only received one (1) from a third-party called Secured Capital Partners. (*Ex. 29*, ¶ 14(b)). This was untrue, as discovery confirmed. (*See Motion,* at ¶¶ 69-74).

99. In sum, during a short, few-hour hearing on the sale of the Townhouse, Golsorkhi managed to indisputably make no less than eleven (11) perjurious statements and omissions. These are just the ***known*** lies. The only motive for all of these lies was that Debtor was attempting to justify its rushed sale of the Townhouse at an almost 70 percent discount from its listed price. The hasty and suspect way in which Debtor executed the RSA was never more evident than its inclusion of the unconscionable "liquidated damages" provision, which requires that, should the Court conduct an auction rather than approve the RSA with 29 Beekman Corp., 29 Beekman Corp. would still receive "$500,000, <u>plus</u> 80% of all gross proceeds of [an

---

[7] Mr. Danielli's damaging deposition testimony against Debtor, and especially against Golsorkhi, showed why Golsorkhi had every incentive to lie twice – both on the stand and in his affidavit – about the identity of the broker for Debtor in early 2016.

alternative sale] in excess of $10,800,000." (*Ex. 42, ¶* 51(b), PDF pg. 20 (emphasis added).

This meant that, even if Debtor received a higher offer, practically all of that financial benefit

still would go to 29 Beekman Corp. To date, the identity of the owner of 29 Beekman Corp. has

not been revealed.

100. Blank Rome did not just hide this RSA, and its onerous "liquidated damages"

provision, from Pelmadulla, its own client. When Pelmadulla finally discovered the RSA, Flick

further lied to them, stating in writing that "if [29 Beekman Corp.] had not agreed to buy the

[Townhouse] when they did, the [Townhouse] would already have sold at a sheriff's sale…"

(*Ex. 19, Dec. 12, 2019 Flick Email*). This was patently false. Blank Rome knew that all Debtor

had to do was declare bankruptcy on October 8, 2019, when they did, and the Sheriff's sale

would have been stayed regardless of whether Debtor had a signed contract with a third party.

## **ARGUMENT**

### I. **DEBTOR AND ITS COUNSEL HAVE PERPETRATED A FRAUD ON THE COURT**

101. This Court should exercise its inherent power to impose sanctions on Debtor and

its counsel for perpetrating a fraud on the Court. Section 105(a) of the Code permits a

bankruptcy court to "sua sponte, [take] any action or [make] any determination necessary or

appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11

U.S.C. § 105; *see also Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 78 (2d Cir. 2000)(a "court

has inherent power to sanction parties and their attorneys, a power born of the practical necessity

that courts be able 'to manage their own affairs so as to achieve the orderly and expeditious

disposition of cases.'")(quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43(2d. Cir. 2000)).

"'Bankruptcy courts, like Article III courts, enjoy inherent power to sanction parties for improper

conduct.'" *In re Green*, 422 B.R. 469, 473 (Bankr. S.D.N.Y. 2010) (quoting *Mapother &*

*Mapother, P.S.C. v. Cooper (In re Downs),* 103 F. 3d 472, 477 (6th Cir. 1996). The Court "has inherent authority to do whatever is reasonably necessary to deter the abuse of the judicial process and assure a level playing field for all litigants." *Passlogix, Inc. v. 2FA Tech., LLC,* 708 F.Supp.2d 378, 394 (S.D.N.Y. 2010)(citations omitted). "Upon finding that a party has engaged in misconduct that rises to the level of fraud on the court, the Court may impose sanctions." *In re Dynex Capital, Inc. Sec. Litig.,* No. 5 Civ. 1897 (HB); 2011 WL 2471267, *3 (S.D.N.Y. June 21, 2011).

102.     The Second Circuit Court of Appeals has held that "a fraud on the court is perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Kupferman v. Cons. Research & Mfg. Corp.,* 459 F.2d 1072 (2d. Cir. 1972); *see also Dynex* 2011 WL 2471267, at *2 (noting that "[a]s opposed to a fraud against an adverse party, a fraud upon the court will only be found where the misconduct at issues seriously affects the integrity of the normal process of adjudication.")(internal citations omitted).

103.     In determining the appropriate sanction for a fraud on the court, courts typically weigh the following five factors: "(i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the other party; (iii) whether there is a pattern of misbehavior; rather than one isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to continue in the future." *Dag Jewish Directories, Inc. v. Y & R Media, LLC*, No. 09 CV 7802 (RJH), 2010 WL 3219292, *4 (S.D.N.Y. Aug. 12, 2010)(citations omitted); *see also Passlogix*, 708 F. Supp.2d at 393 (fraud on the court occurs "when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process.")(quoting *McMunn v. Mem'l Sloan Kettering Cancer Ctr.*, 191 F.Supp. 2d 440, 445 (S.D.N.Y. 2002).

104.    All five factors are present here.

105.    <u>First</u>, Debtor and its counsel's conduct was intentional, as the number of instances of their perjury confirm.  In the Retention Application, Flick lied no less than four (4) times and Golsorkhi lied no less than (3) three times.   At the January 14, 2020 status conference and the Sale Hearing two days later, Debtor lied eleven (11) times and its counsel lied once and suborned perjury.   A few months before the Sale Hearing, at three (3) different hearings on  November 12, November 14, and December 6, 2019, Debtor's counsel omitted to disclose to the Court that there was a possibility that Pelmadulla would file a claim, and continued to push the confirmation and approval of a plan and disclosure statement that the Court had no chance of confirming or approving.   It then lied about the same issue in its pleadings when it claimed that it had no "notice and warning" of the Pelmadulla claim, when in fact, it had written notice of it in multiple emails.    This is a remarkable twenty-three (23) instances of perjury, material omissions, false court filings, and false statements to the court.   This all occurred during the first four (4) months of this bankruptcy alone, and does not even include the two false bases for the First Action filed by Debtor and its same counsel, Blank Rome.

106.    This repeated pattern can only be characterized as intentional.    The intent was twofold.  *First*, the Golsorkhi-Flick duo were willing to do and say whatever was necessary so that Flick and his firm could continue to represent Flick's good friend, Golsorkhi, in his endless litigation campaign against Azari to pay himself, even if it was to the detriment of the creditors. *Wilder v. GL Bus Lines*, 258 F.3d 126, 130 (2d Cir. 2001)(sanctions are appropriate under a court's inherent power "where the attorney has acted in bad faith in the actions that led to the lawsuit or in the conduct of the litigation.").  *Second*, Flick and Golsorkhi were willing to do or say anything to push for the approval of the sale of the Townhouse to 29 Beekman Corp. and the onerous RSA for what are still unknown and suspect reasons.  Otherwise, there was no reason for

35

Golsorkhi to lie eleven (11) times at the Sale Hearing or to lie to Pelmadulla, Debtor's sole shareholder, about the sale. The execution and approval of the RSA was so important to Flick and Golsorkhi that Flick was willing to risk a malpractice claim against his firm by intentionally hiding a $10.3 million sale from Pelmadulla, *its own client*, who had a very direct financial interest in a higher sale price for the Townhouse. Flick not only hid the RSA from Pelmadulla, but blatantly lied to them by claiming that the RSA was a prerequisite to hold off the Sheriff sale.[8]

107. <u>Second</u>, this misconduct prejudiced Azari. Had Flick disclosed his extensive conflicts of interest, including his close social relationship with Golsorkhi and his wife, the Court would have rejected the retention of a lawyer who would cast aside the interests of the unsecured creditors to file an action on behalf of his good friend, Golsorkhi, just so that he could attempt to satisfy his meritless and subordinated claims of $7,000,000 and $480,000. This meritless action, which provided no benefit to the creditors, has cost Azari hundreds of thousands of dollars in legal fees and prevented her from enforcing her Judgment. *See, e.g., In re C-TC 9th Ave. P'ship v. Norton Co.,* 113 F.3d 1304 (2d. Cir. 1997)(dismissal of bankruptcy justified where DIP's filing is just a two-party dispute with the goal of frustrating the legitimate enforcement efforts by a secured creditor in a state foreclosure action). This Judgment, which was signed by Golsorkhi himself, was supposed to be compensation for a lifetime of devotion to Debtor, and its beneficial owner, the Princess.

---

[8] Debtor repeatedly references this Court's statements that the Townhouse was a "melting ice cube," implying that it had to be sold immediately. However, it was a "melting ice" cube because Debtor preferred to keep the seven-floor Townhouse empty, rather than follow its corporate purpose and rent it to earn income and pay basic maintenance expenses. Debtor did not speak to a single broker regarding the feasibility of renting the Townhouse. Furthermore, even if a sale of the Townhouse was immediately necessary, there still was no need for Debtor and its counsel to lie about it to the Court or to Debtor's sole shareholder, Pelmadulla. There was even less of a reason for Blank Rome to defraud its own client by hiding a $10.3 million transaction from it.

108.    The sale hearing and approval of the Townhouse also prejudiced Azari since the Court made findings on the record that could potentially affect the Court's view on the market value of the Townhouse.  The value of the Townhouse is relevant to Debtor's debt to equity ratio, a factor in the Court's assessment of insolvency in this Adversary Action.

109.    Third, twenty-three (23) instances of perjury and deception are part of a "pattern," and far from an isolated incident.    This pattern did not begin with the Retention Application, but began years earlier in the First Action.  It also did not end at the Sale Hearing, but continued for months afterwards.

110.    Fourth, Golsorkhi and Flick did not just fail to correct their perjury or deception. Even worse, they continued to hide the truth from the Court about their "connections" with each other.

111.    In his Supplemental Declaration to "correct" his earlier Retention Application, Flick failed to inform the Court that he was communicating with Pelmadulla about his firm's legal representation when it swore under oath that it had no "connection" to Pelmadulla.    In his Supplemental Declaration, Flick still failed to disclose his and his wife's extensive and longstanding social relationship with Golsorkhi and his wife.   Rather, Flick and Blank Rome upped the ante on their deception by hiding the Pelmadulla Emails from the Court – which would have exposed their perjury – so that the Court could confirm the bankruptcy plan without any knowledge of these communications.

112.    Golsorkhi has never even attempted to correct his perjury at the Sale Hearing.   If anything, the perjurious affidavit that he submitted to accompany his perjurious testimony at the Sale Hearing only confirms that the lies on the stand were intentional.   *See, e.g., Rezende v. Citigroup Global Mkts., Inc.,* No. 09 Civ. 9392 (HB), 2011 WL 1584603, *4-5 (S.D.N.Y. Apr.

27, 2011)(imposing sanctions for fraud on the court for plaintiff's fabrication of evidence, production of a misleading affidavit, and false statements under oath).

113. <u>Fifth</u>, Golsorkhi and Flick's perjury is likely to continue in the future. That is because this pattern of lies to the Court already has a five (5) year history, dating back to Blank Rome's representation of Golsorkhi in the First Action. Although Debtor lost the First Action, neither he nor his counsel was held accountable for their lies that formed the basis of a three-year litigation, costing Azari exorbitant legal fees. Emboldened by their ability to escape all accountability for their fraud on the court in the First Action, Debtor and Blank Rome continued their campaign of lying and withholding evidence in their Retention Application and at the Sale Hearing. This misconduct continued a few months later when they withheld material evidence, which would have exposed their perjury, from the Court.

114. In this bankruptcy alone, Debtor and Blank Rome have lied to the Court; lied to Pelmadulla; lied to 29 Beekman Corp.; lied to Compass, its broker; and filed a bad faith action against Azari on behalf of creditors whose interests they also cast aside. The only way to stop their misconduct it to hold them accountable. *Revson,* 221 F.3d at 78 (The "court has inherent power to sanction parties and their attorneys, a power born of the practical necessity that courts be able 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'")(quoting *Chambers*, 501 U.S. at 43). Thus far, they have banked on the apathy of the Court.

115. Based on Debtor and Golsorkhi's undisputed fraud on the Court, the Court has the authority to dismiss the Adversary Action in its entirety. *Shangold v. The Wal Disney Co.*, No. 03 Civ. 9522 (WHP), 2006 WL 71672, *5-6 (S.D.N.Y. Jan. 16, 2006)(dismissing plaintiffs' case where court found fraud on the court based on plaintiffs' fabrication of evidence, lies during depositions, and manipulation of judicial process). Even if the Court does not dismiss the

Adversary Action, if there is a trial, Debtor should be estopped from making any arguments about the value of the Townhouse based on its perjury and deception at the Sale Hearing.

**II-  SANCTIONS ARE WARRANTED UNDER FEDERAL BANKRUPTCY RULE 9011**

116.  Sanctions are also appropriate under Federal Rule of Bankruptcy Procedure 9011(b) based on the numerous false statements and omissions of Debtor and Blank Rome. Rule 9011(b)(3) provides that the "factual contentions" in a "written motion," "pleading", or "other paper" to the Court must have "evidentiary support."  Furthermore, Rule 9011(b)(3) imposes an obligation on Debtor and its counsel to conduct an "reasonable inquiry reasonable under the circumstances."

117.  Debtor and Blank Rome's Retention Application not only contained knowingly false statements, but it also reveals that they conducted no "inquiry" whatsoever before its submission to the Court.

118.  Furthermore, Golsorkhi's eleven (11) false statements under oath indisputably lacked any "evidentiary support", and in fact, were intentionally false.

119.  Finally, Debtor's complaint against 29 Beekman Corp., or "pleading", also contained knowingly false statements, such as that Debtor had no "notice or warning" of the Pelmadulla claim when, in fact, it had written notice on multiple occasions.  Blank Rome conducted no "inquiry" of whether their statement in their complaint was false.  In fact, the Pelmadulla Emails, which Blank Rome possessed when it made this statement, confirm that the statement was false.

120.  Consequently, sanctions under Rule 9011 are justified, including awarding all of Azari's legal fees incurred in (i) raising the issues concerning Blank Rome's lies in the Retention Application, (ii) preparing for and attending the Sale Hearing, including preparing and drafting

all objections Debtor's motion to approve the sale to 29 Beekman Corp.; and (iii) filing this

Motion.

### III- DEBTOR SHOULD PAY AZARI'S ATTORNEY'S FEES UNDER 28 U.S.C. § 1927 FOR FILING AN UNJUSTIFIED ACTION ON BEHALF OF CREDITORS WHEN THEY WERE SET TO BE PAID IN FULL

121.    Debtor is liable for Azari's attorney's fees under 28 U.S.C. § 1927 for filing an

unnecessary action on behalf of creditors against Azari.    Under 28 U.S.C. § 1927, a law firm or

attorney "who so multiplies the proceedings in any case unreasonably and vexatiously maybe

required by the court to satisfy personally the excess costs, expenses and attorneys' fees

reasonably incurred because of such conduct."    This is precisely the case here.

122.    First, the Adversary Action is "vexatious" and "excess[ive]" in that Debtor had no

right or purpose to file it given that it represented that all creditors would be paid.    In fact, just

nine (9) days before filing the Azari Action, Debtor had filed an amended plan and disclosure

statement, in which it still represented that there were no impaired classes of unsecured

creditors except the unsubstantiated and subordinated claims of Golsorkhi.    On the day Debtor

filed the Adversary Action, and afterwards, none of the creditors suffered any injury, which is a

requirement for standing under Article III.    Golsorkhi and Blank Rome filed this case on behalf

of themselves and in bad faith.

123.    Second, this was not the first vexatious litigation filed by Golsorkhi and Blank

Rome.    They also collaborated on filing the First Action, which was based on two fraudulent

arguments, namely that (i) Golsorkhi did not speak English and that (ii) he did not have

authority to sign the Judgment despite his position as Debtor's sole decision-maker.

Subsequently, although the Second Action was filed by a different plaintiff, Abbas-Vahid,

Abbas-Vahid had been in touch with Golsorkhi about challenging the Judgment.    Judge

Bannon tossed the case on the first hearing day for Abbas-Vahid's TRO.    The collection of the

First Action, Second Action, and this Adversary Action is the textbook definition of "multipl[ying] proceedings," with each action having less merit than the previous one. This is an outright abuse of the judicial system.

124. <u>Third</u>, the volume of litigation and the numerous meritless actions confirm that both Debtor and Blank Rome acted in "bad faith." *U.S. v. Int'l Brotherhood of Teamsters,* 948 F.2d 1338, 1355 (2d. Cir. 1991)("Bad faith is the touchstone of an award under this statute."); *Wilder v. GL Bus Lines,* 258 F.3d 126, 130 (2d Cir. 2001)(holding that sanctions are appropriate "where the attorney has acted in bad faith in the actions that led to the lawsuit or in the conduct of the litigation."); *Oliveri v. Thompson,* 803 F.2d 1265, 1273 (2d Cir. 1986), *cert. denied,* 480 U.S. 918 (1987)(actions are sanctionable under 28 U.S.C. § 1927 "when an attorney's actions are so completely without merit as to require the conclusion that they must have been taken for some improper purpose."); *Gianna Enter. v. Miss World (Jersey) Ltd.,* 551 F. Supp. 1348, 1359 (S.D.N.Y. 1982)("[C]lear evidence that the claims are 'entirely without color and made for reasons of harassment or delay or for other improper purposes,' must exist in order to find bad faith). Despite signing the Judgment itself, Debtor has continued to file one action after another just to "harass" Azari, and "delay" the enforcement of her Judgment.

## IV- THE COURT SHOULD DENY BLANK ROME COMPENSATION FOR ITS SERVICES UNDER 11 U.S.C. 328(c)

125. Since Flick and Blank Rome litigated for their own benefit and the benefit of Golsorkhi, running up unnecessary and exorbitant legal fees to the detriment of the creditors, and by extension the estate, their fees should be disallowed under Section 328(c) of the Bankruptcy Code.

126. Section 328(c) states, in pertinent part, that "the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed

under section 327 . . . if, at any time during such professional person's employment under section 327 . . . such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed." 11 U.S.C. § 328(c)*; see also In re Mercury,* 280 B.R. 35, 57-58 (Bankr. S.D.N.Y. 2002) (citing case law confirming what the statute provides – "that a professional retained to represent the estate under Section 327 may be denied compensation and reimbursement of expenses if he was not disinterested or was burdened with by a conflict of interest."). The court may even disallow those fees and expenses incurred in performing services that are reasonably calculated to benefit the estate, in order to serve the deterrence purpose of 328(c). *See, e.g., In re Office Prods. of Am, Inc.,* 136 B.R. 983, 986 (Bankr. W.D. Tex. 1992)(compensation denied if counsel ceases to be disinterested or came to represent an interest adverse to the estate).

127. As demonstrated above, Flick and his firm were far from disinterested, as they represented the interests of Flick's friend, Golsorkhi, over the interests of the unsecured creditors who had no financial incentive to litigate this fraudulent conveyance action.

128. Section 330(a)(4) of the Code also gives the court authority to disallow fees and expenses when the services performed were not reasonably calculated to benefit the estate. *See* 11 U.S.C. § 330(a)(4). More specifically, a "scheme that promoted the interests of the principal over the interests of the [creditors], denial of counsel's fees in their entirety is an appropriate response to preserve the integrity of the bankruptcy process and deter such behavior in the future." *In re Angelika Films 57th , Inc.,* 227 B.R. 29, 45 (Bankr. S.D.N.Y. 1998). Where an attorney, such as Flick and his firm, represent Debtor's "principal", such as Golsorkhi, to the exclusion of other constituents, the Court may conclude that he not only failed to remain disinterested, but also failed to perform services which were 'reasonably likely to benefit the

Debtor's estate' under Section 330 of the Code.   *See In re Angelika*, 227 B.R. at 40 (citing

*Hansen v. Jones & Leta v. Jeta*  220 B.R. 434, 466)(D. Utah 1998).

129.    Under both of these provisions, the Court is justified in denying Blank Rome's

legal fees in litigating the Adversary Action in their entirety.

**V-    THE COURT SHOULD APPOINT AN EXAMINER TO INVESTIGATE DEBTOR AND BLANK ROME'S UNDISPUTED PERJURY AND VIOLATION OF 18 U.S.C. § 1621**

130.    It is undisputed that Blank Rome and Golsorkhi have perjured themselves

multiple times as part of a pattern in this bankruptcy and in both adversary proceedings in

violation of 18 U.S.C. § 1621, the federal perjury statute.   "A witness testifying under oath or

affirmation violates" 18 U.S.C. § 1621 "if she gives false testimony concerning a material matter

with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or

faulty memory." *U.S. v. Norman*, 776 F.3d 67, 84 (2d Cir. 2015)(citation omitted).   The sheer

number of times that Debtor and Golsorkhi lied about the same issue, including in affidavits, on

the stand, and in court filings, confirms that none of their statements were the result of

"confusion, mistake, or faulty memory."   Even more significantly, Blank Rome's intentional

withholding of the Pelmadulla Emails until after the confirmation of its plan confirms that, not

only was their perjury intentional, but they were attempting to cover it up.

131.    Appointing an examiner to investigate this undisputed perjury, and any other

potential perjury by Debtor and Blank Rome, is justified here.   *See Passlogix,* 708 F. Supp. 2d at

394 ("The Court has inherent authority 'to conduct an independent investigation in order to

determine whether it has been the victim of fraud.'")(quoting *Chambers,* 501 U.S. at 44); *see

also Zimmerman v. Poly Prep Cntry. Day Sch.,* No. 09 CV 4586 (FB), 2012 WL 2049493, *34

(E.D.N.Y. June 6, 2012).

## CONCLUSION

132. For all the foregoing reasons, Azari respectfully requests the Court to order that:

   a. Blank Rome be denied all legal fees it has incurred to litigate the Azari Action;

   b. Blank Rome and Debtor must, jointly and severally, pay the attorney's fees of Azari for filing an unlawful action against her and forcing her to incur unnecessary costs to defend herself;

   c. Blank Rome and Debtor must, jointly and severally, pay the attorney's fees of Azari for any and all legal fees and costs incurred in connection with the (i) the Sale Hearing; (ii) the Retention Application; and (iii) this motion;

   d. The Azari Action be dismissed due to the fraud on the Court perpetrated by Debtor and Blank Rome;

   e. The appointment of an examiner to investigate any further perjury committed by Debtor and Blank Rome; and

   f. Any other the relief that the Court deems just and proper

Dated: June 17, 2022
    New York, New York

**BEYS LISTON & MOBARGHA LLP**

By: *Nader Mobargha*
    _____
    Nader Mobargha, Esq.
    Alison Moss, Esq.
    641 Lexington Avenue, 14th Floor
    New York, New York 10022
    Telephone: (646) 755-3603
    Facsimile: (646) 755-5229
    Email: nmobargha@blmllp.com
    *Attorneys for Defendant Azadeh Azari*